**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

PAUL JONES,

Plaintiff

v.

MONTACHUSETT REGIONAL TRANSIT AUTHORITY, et al.,

Defendants.

**CIVIL ACTION**
**No. 4:19-cv-11093-TSH**

**REPORT AND RECOMMENDATION**

**February 7, 2020**

Hennessy, M.J.,

On May 10, 2019, pro se plaintiff Paul Jones brought claims against Montachusett Regional Transit Authority ("MART") and unidentified individual defendants. [Dkt. No. 1]. On June 14, 2019, Plaintiff amended his complaint asserting claims against MART, HB Software Solutions, Inc. ("HBSS"), thirteen individual defendants, and Jane and John Does (collectively "Defendants").[1] [Dkt. No. 7 ("Am. Compl.")]. Plaintiff avers that Defendants violated the Telephone Consumer Protection Act ("TCPA") (*Count I* and *Count II*), violated Title VII of the Civil Rights Act of 1964 (*Count III* and *Count VI*), violated Title VI of the Civil Rights Act of

[1] Under Rule 8(a) "a complaint must contain three essential elements: (1) a short and plain statement of the legal basis for federal court jurisdiction; (2) a short and plain statement of plaintiff's claim(s); and (3) a demand for judgment, *i.e.*, the damages or other relief sought by plaintiff." Fed. R. Civ. P. 8(a). Though undersigned does not recommend dismissal on these grounds, Plaintiff's sixty-page amended complaint and approximately eight-hundred pages of attached exhibits ignores this rule. See Green v. Massachusetts, 108 F.R.D. 217, 218 (D. Mass. 1985) ("The First Circuit holds a pro se litigant to a standard of pleading less stringent than that for lawyers . . . this cannot be taken to mean that pro se complaints are held to no standard at all . . . '[C]omplaints which ramble, which needlessly speculate, accuse and condemn, and which contain circuitous diatribes far removed from the heart of the claim do not comport with these goals and this system; such complaints must be dismissed . . ..'")

1964 (*Count VII*), violated Massachusetts anti-discrimination law Chapter 151B (*Count VIII*), and committed the state law tort of intentional infliction of emotional distress.[2] [Dkt. No. 7].

On August 5, 2019, MART and the individual defendants moved to dismiss all claims against them pursuant to Federal Rule of Civil Procedure 12(b)(6). [Dkt. No. 32]. On August 13, 2019, HBSS moved to dismiss all claims against it. [Dkt. No. 35]. Plaintiff opposed both motions. [Dkt. Nos. 39-40]. The undersigned recommends that MART and the individual defendants' motions be GRANTED IN PART and DENIED IN PART. The undersigned recommends that HBSS's motion be GRANTED.

## I. FACTUAL ALLEGATIONS

This court must accept as true all well-pleaded facts and draws all reasonable inferences in favor of the plaintiff. See Cooperman v. Individual, Inc., 171 F.3d 43, 46 (1st Cir. 1999).

Plaintiff is the proprietor and director of Commonwealth Community Recovery Division, Inc. ("CCRD"), a minority-owned livery service business. [Am. Compl. at ¶ 44]. MART is a public, nonprofit organization established under Chapter 161B of the Massachusetts General Laws to provide public transportation in Northern Massachusetts. [Am. Compl. at ¶ 14]; see also M.G.L. c. 161B, § 2. MART receives federal funding to provide public transportation and therefore is subject to Title VI. [Am. Compl. at ¶¶ 176-179]. The individual defendants are, or were at one point, employees of MART. [Am. Compl. at ¶¶ 16-29].

CCRD contracted with MART to provide non-emergency livery services on behalf of MART through MART's online portal system. [Am. Compl. at ¶¶ 44, 67]. HBSS, a software company, is the manufacturer of MART's portal system. [Am. Compl. at ¶¶ 15, 82, 158]. Despite

[2] Plaintiff's amended complaint does not include a *Count IV* or a *Count V* and Plaintiff does not number his intentional infliction of emotional distress claim. Plaintiff's TCPA claims are only against MART and HBSS. The remainder of Plaintiff's claims are against each defendant.

being directly employed by CCRD, Plaintiff asserts that he was in an employee/employer relationship with MART. [Am. Compl. at ¶¶ 135-142]. As an employee of CCRD, Plaintiff drives participants in MART's programs and serves as a dispatcher for other CCRD drivers. [Am. Compl. at ¶¶ 44, 53, 60, 68]. MART required Plaintiff to use the portal system to receive driving assignments. [Am. Compl. at ¶ 68]. From as early as 2016, continuing to the present, Plaintiff asserts that Defendants violated state and federal law through, among other conduct, the improper manipulation of the portal system. [Am. Compl. at ¶ 42].

Though MART policy states that the portal system assigns work based on a "low bid system," Plaintiff contends that MART employees did not follow this policy. [Am. Compl. at ¶ 67]. Plaintiff contends that MART showed racial preference in assigning work. [Am. Compl. at ¶¶ 67, 146]. Plaintiff asserts that he was required to take jobs from MART through the portal system while other non-minority employees received direct job offers from MART. [Am. Compl. at ¶¶ 68, 146]. Plaintiff asserts that MART offered him less profitable work because of his race. [Am. Compl. at ¶ 91-92, 96-97]. Plaintiff's employees also underwent heightened scrutiny compared to non-minority livery service providers. [Am. Compl. at ¶ 93].

MART denied Plaintiff access to participate in a "low-bid" system, which would have granted CCRD access to daily and weekly jobs. [Am. Compl. at ¶ 51]. After Plaintiff complained on behalf of CCRD, MART employees intentionally restricted his portal system access, fined CCRD, altered CCRD's operating hours, provided deficient training, and generally interfered with CCRD's business. [Am. Compl. at ¶¶ 58, 60, 62, 72, 75, 119]. MART also failed to pay CCRD for services performed. [Am. Compl. at ¶¶ 59, 64; Ex. 7]. Plaintiff asserts that MART's treatment of him and CCRD has caused him mental and emotional injury. [Am. Compl. at ¶ 133].

Plaintiff avers that the first instance of racial discrimination occurred on or about March 15, 2016 when he appeared at a MART facility. [Am. Compl. at ¶ 69]. After his visit, Plaintiff did not receive job offers for six months. [Am. Compl. at ¶ 69]. Plaintiff received less work despite bidding lower than ninety-seven percent of other livery service providers. [Am. Compl. at ¶ 108]. Despite his low bids, Plaintiff received approximately ninety-eight percent less work than similarly situated non-minority livery service providers. [Am. Compl. at ¶ 71]. On or about August 24, 2016, Plaintiff emailed MART manager Rebecca Badgley claiming racial discrimination. [Am. Compl. at ¶ 78; Ex. 12]. Plaintiff avers that MART did not investigate his claim and instead, Ms. Badgley requested Plaintiff work elsewhere. [Am. Compl. at ¶¶ 79-80].

On or about October 15, 2016, Plaintiff began to receive automated phone calls to his personal cellular phone from MART in his capacity as director of CCRD. [Am. Compl. at ¶ 83]. These calls would offer Plaintiff work which Plaintiff did not accept because the opportunities were not cost-effective. [Am. Compl. at ¶ 83]. This development relates to Plaintiff's claims against HBSS because, in addition to managing the portal system, HBSS controls the automatic dialing system that called Plaintiff's cellular phone. [Am. Compl. at ¶ 160]. Plaintiff immediately asked MART to no longer call his cellular phone. [Am. Compl. at ¶ 84]. Plaintiff later sent written requests to stop the calls. [Am. Compl. at ¶ 87; Exs. 1, 23]. However, Plaintiff continued to receive automated calls, sometimes as often as seventy times per day. [Am. Compl. at ¶ 84]. Plaintiff asserts that he received a heightened volume of calls because of Defendants' racial animus. [Am. Compl. at ¶¶ 76, 160-61].

On or about March 22, 2017, Plaintiff sent MART a letter alleging a Title VI racial discrimination complaint. [Am. Compl. at ¶ 52; Exs. 2-3]. On or about September 1, 2018, Plaintiff filed a complaint with the United States Equal Employment Opportunity Commission

("EEOC") against MART. [Am. Compl. at ¶ 120; Ex. 18]. On or about December 27, 2018, after alleged improper conduct, Plaintiff informed MART that its employees were violating Chapter 151B, Title VI, and Title VII. [Am. Compl. at ¶ 127; Ex. 20]. After each complaint, MART limited Plaintiff's access to the portal system. [Am. Compl. at ¶¶ 128-29]. Plaintiff believes that by restricting his access, MART and its employees retaliated against him. [Am. Compl. at ¶¶ 109-100, 121, 174].

On or about February 11, 2019, Plaintiff received a right to sue letter from the EEOC and timely filed his complaint. [Am. Compl. at ¶¶ 120, 151].

## II. STANDARD

Motions to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure test the sufficiency of the pleadings. See Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009). To survive a motion to dismiss, a complaint must "'state a claim [for] relief that is plausible on its face,' accepting the plaintiff's factual allegations and drawing all reasonable inferences in the plaintiff's favor." Maloy v. Ballori-Lage, 744 F.3d 250, 252 (1st Cir. 2014) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A complaint need not contain detailed factual allegations, but it must recite facts to at least "raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atl. Corp., 550 U.S. at 555. When deciding a motion to dismiss, the First Circuit has "emphasize[d] that the complaint must be read as a whole," and that circumstantial evidence may be sufficient to surpass the plausibility threshold. Garcia-Catalan v. United States, 734 F.3d 100, 103 (1st Cir. 2013). At a minimum, however, a complaint must include sufficient factual matter that, when accepted as true, would allow the court to draw "the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citations omitted).

## III.  DISCUSSION

Though many of his claims relate to the relationship between CCRD and MART, Plaintiff asserts only personal claims against Defendants. The undersigned's discussion does not address whether the allegations within Plaintiff's amended complaint state claims which could entitle the entity CCRD to relief.

Plaintiff brings five claims against Defendants: (1) violations of the TCPA, (2) violations of Title VII, (3) violations of Title VI, (4) violations of Chapter 151B, and (5) intentional infliction of emotional distress. Defendants move to dismiss the TCPA claims on the grounds that Plaintiff is not a "consumer" with standing to bring suit under the statute. [Dkt. No. 33, at pp. 6-8; Dkt. No. 36, at pp. 7-10]. Defendants move to dismiss Plaintiff's Title VII and Chapter 151B claims on the grounds that Plaintiff is not an employee of MART or HBSS. [Dkt. No. 33, at pp. 8-10; Dkt. No. 36, at pp. 5-7]. As to the Title VI claims, Defendants argue that Plaintiff did not aver facts that Defendants discriminated against him in connection with the specific program or activity for which federal financial assistance has been provided. [Dkt. No. 33, at p. 10; Dkt. No. 36, at pp. 10-11]. Lastly, Defendants move to dismiss Plaintiff's state law tort claim on the ground that Plaintiff failed to plead all necessary elements. [Dkt. No. 33, at pp. 11-12; Dkt. No. 36, at pp. 10-11]. This court reviews each of Defendants' arguments for dismissal. See Borden v. Sec'y of Health and Human Srvcs., 836 F.2d 4, 6 (1st Cir. 1987) ("[A]rgument[s] which could have been, but inexplicably [were] not, presented to the magistrate in the first instance [are considered waived].") (per curiam).

### A.  TCPA Claims

Section 227(b)(1)(A) of the TCPA prohibits "any person" from making "any call (other than a call made . . . with prior express consent of the called party) using any automatic telephone

dialing system [("ATDS")] or an artificial or prerecorded voice . . . to any telephone number assigned to a . . . cellular telephone service . . . or any service for which the called party is charged for the call."[3] 47 U.S.C. § 227(b)(1)(A)(iii). Plaintiff averred that he was an employee of MART and that each of the alleged offending calls was related to his work as CCRD's director, dispatcher, and driver. Because Plaintiff premised his TCPA claims on this established business relationship with Defendants, Defendants argue that he is not a "consumer" under the TCPA and lacks statutory standing.

In contrast to Article III standing, which addresses the constitutional power of a federal court to resolve a dispute, statutory standing "relates to whether the plaintiff has a cause of action under a particular statute." United States v. Catala, 870 F.3d 6, 10 (1st Cir. 2017) (citing Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 128 n.4 (2014)). "[A] dismissal for lack of prudential or statutory standing is properly granted under Rule 12(b)(6)." Katz v. Pershing, LLC, 806 F. Supp. 2d 452, 456 (D. Mass. 2011) (quoting Harold H. Huggins Realty, Inc. v. FNC, Inc., 634 F.3d 787, 795 n.2 (5th Cir. 2011)), aff'd, 672 F.3d 64 (1st Cir. 2012).

As the title of the act suggests, Congress enacted the TCPA "to protect consumers from the nuisance, invasion of privacy, cost, and inconvenience that autodialed and prerecorded calls generate." In re Rules Implementing the Tel. Consumer Prot. Act of 1991, 30 F.C.C.R. 7961, 7979-80 (Jul. 15, 2015); see also Mims v. Arrow Fin. Servs., LLC, 565 U.S. 368, 373 (2012). Specifically, "Congress found that consumers consider these kinds of calls, regardless of the

[3] The First Circuit has yet to define the scope of individual liability for ATDS cases under the TCPA. Courts that have addressed the issue have concluded that individuals acting on behalf of a corporation may be held personally liable for violations of Section 227 if they "had direct, personal participation in or personally authorized the conduct found to have violated the statute." City Select Auto Sales Inc. v. David Randall Assocs., Inc., 885 F.3d 154, 161 (3rd Cir. 2018) (quoting Texas v. Am. Blastfax, Inc., 164 F. Supp. 2d 892, 898 (W.D. Tex. 2001); see also Maryland v. Universal Elections, 787 F. Supp. 2d 408, 415 (D. Md. 2011) (applying standard to an ATDS case). Undersigned does not need to decide whether Plaintiff alleged facts which establish personal liability for the individual defendants because undersigned recommends dismissal on other grounds.

content or the initiator of the message, to be a nuisance and an invasion of privacy." In re Rules Implementing, 30 F.C.C.R. 7961 at 7980 (internal quotations omitted). In accordance with this purpose, the TCPA defined "telephone solicitations" as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person, but such term does not include a call or message . . . to any person with whom the caller has an established business relationship." 47 U.S.C. § 227(a)(4)(C). Here, the amended complaint established that the sole purpose of Defendants' calls to Plaintiff's cellular phone was to facilitate providing non-emergency livery services on behalf of MART. Thus, the calls are squarely within the scope of the TCPA's "established business relationship" exception. In re Rules Implementing, 30 F.C.C.R. 7961 at 7979-80. Even viewing these allegations in the light most favorable to Plaintiff, the facts do not support an inference that the calls were made for any other reason other than the parties' established business relationship. [Am. Compl. at ¶ 83]. These assertions do not suffice as the type of harm required to maintain a TCPA action. See, e.g., Leyse v. Bank of Am. Nat'l Ass'n, 804 F.3d 316, 323 (3d Cir. 2015) ("[O]nly certain plaintiffs will have suffered the particularized injury required to maintain an action in federal court for a [TCPA] violation."). Even assuming all of Plaintiff's allegations as true, Plaintiff failed to allege that the calls constituted telephone solicitations or that he was a consumer within the meaning of the TCPA. Accordingly, the undersigned recommends that Defendants' motions to dismiss *Count I* and *Count II* of Plaintiff's amended complaint be granted.

Additionally, because Plaintiff's allegations as to defendant HBSS are limited to its role in facilitating MART's automated calls, all remaining claims as to HBSS are dismissed as well.[4]

---

[4] Plaintiff also does not allege that he exhausted administrative remedies as to defendant HBSS. See 42 U.S.C. § 2000e-5(f); M.G.L. c. 151B, § 5.

**B. Title VII Claims**

It is settled that there is no individual employee liability under Title VII. Fantini v. Salem State College, 557 F.3d 22, 30 (1st Cir. 2009). Accordingly, Plaintiff's Title VII claims are dismissed as to the individually named defendants. As to MART, Title VII provides in relevant part that,

> [i]t shall be an unlawful employment practice for an *employer* . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]

42 U.S.C. § 2000e-2(a)(1) (emphasis added).

MART argues that it is not Plaintiff's "employer," and hence cannot be held liable for Plaintiff's claims of employment discrimination under Title VII. See Lopez v. Massachusetts, 588 F.3d 69, 72 (1st Cir. 2009) ("The Title VII claim depends on the [defendant] being the 'employer' of the [plaintiffs]"). Plaintiff does not allege the common indicia of a customary employee-employer relationship – *e.g.* that MART hired him or that MART directly paid him. In fact, Plaintiff admits that he was a director, dispatcher, and driver for CCRD, an independent business entity, during all relevant times. [Am. Compl. at ¶¶ 44, 53, 60, 68]. However, the First Circuit has recognized that the term "employer" under Title VII of the Civil Rights Act is not so narrow as to preclude suit in the absence of a conventional employee-employer relationship. See Alberty-Velez v. Corporacion de Puerto Rico Para La Difusion Publica, 361 F.3d 1, 6 (1st Cir. 2004) (noting that the statutory definitions of employee and employer under Title VII are "completely circular and explain[] nothing"). Rather, "[g]iven the opacity of the statutory text, courts have been forced to develop their own approaches to determining whether an entity is acting as an

employer within the purview of [federal anti-discrimination statutes.]" Camacho v. Puerto Rico Ports Authority, 369 F.3d 570, 573-74 (1st Cir. 2004)).

In Carparts Distribution Ctr., Inc. v. Auto. Wholesaler's Ass'n of New England, Inc., 37 F.3d 12, 16 (1st Cir. 1994), an automotive parts wholesale distributor alleged that the defendant health benefits plan providers had improperly limited the benefits available to the plaintiff's employee in violation of the Americans with Disabilities Act ("ADA"). The district court granted defendants' motion to dismiss on the ground that the benefits plan providers were not "employers" under the ADA. See id. at 15. The First Circuit reversed, holding that three legal theories could support such a finding: (1) the exercise of control theory – also known as the common law test; (2) the agent of the actual employer theory – also known as the *de facto* test; and (3) the interference theory. Id. at 16-18 (using Title VII decisions to define "employer" for an ADA case). The Carparts Court held that the plaintiffs asserted sufficient facts at the pleading stage to permit discovery into the defendant's status as an employer to the plaintiff's employee. Id. at 18 n.8

A few years later, in Dykes v. Dupuy, Inc., 140 F.3d 31, 38 (1st Cir. 1998), the First Circuit clarified the common law test to analyze the employee-employer relationship under federal anti-discrimination statutes:

> The test provides no shorthand formula or magic phrase that can be applied to find the answer, . . . all of the incidents of the relationship must be assessed and weighed with no one factor being decisive. The lower courts should consider: the hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

Dykes, 140 F.3d at 37-38 (quoting Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 323-24 (1992)) (internal quotations and citations omitted).

In Dykes, the regional sales representative plaintiff set his own schedule, determined which products he sold, decided which clients to solicit, paid his own business expenses, and maintained his own staff and offices. Dykes, 140 F.3d at 38. The plaintiff also had signed a contract expressly stating that he was an independent contractor and not an employee. Id. The Dykes Court upheld a grant of summary judgment because the district court correctly found the plaintiff to be an independent contractor unable to avail himself of the protections of the relevant anti-discrimination statutes. See id. at 37 n.5, 37 n.6 (Title VII and Chapter 151B do not extend to independent contractors).

Recently, the First Circuit re-examined the holding of Carparts. In Lopez v. Massachusetts, police officer plaintiffs brought a Title VII claim against the Massachusetts Human Resources Division ("HRD"), a state agency tasked with administering tests for promotions for civil servants within Massachusetts' city and town civil service departments. 588 F.3d at 74. The plaintiffs argued that HRD was their "employer" under Carparts, and that HRD engaged in discriminatory promotion practices. Id. at 83. After extensive discovery, the district court denied HRD's motion to dismiss. See id. at 73.

On interlocutory appeal, the Lopez Court held that the first and second Carparts theories should be analyzed under the same common law framework and rejected the third theory. Id. at 86 ("The *de facto* test is the same as the common law test and stresses the importance of actual circumstances of an entity's overall control over key aspects of an employment relationship with a particular set of putative employees."). For this analytical framework, the Lopez Court cited the test used in Dykes, and also instructed courts to consider the EEOC's then-current Compliance

Manual for determining whether a person was an employee.[5] Id. at 85 (citing Clackamas Gastroenterology Assocs., P.C. v. Wells, 538 U.S. 440, 444-47 (2003). Next, the First Circuit addressed the plaintiffs' suggestion that HRD must be an "employer" if it "controls even one significant aspect of . . . employment," – in Lopez, the aspect of promotion. Id. at 88 (citing Carparts, 37 F.3d at 17 ("[D]efendants would be 'employers' if they functioned as [plaintiff's] 'employer' with respect to his employee health care coverage, that is, if they exercised control over an important aspect of his employment"). Unlike the rejected interference theory, the Lopez Court did not deny that this holding remained relevant for the analysis. Id. However, the First Circuit distinguished its application because, unlike Lopez, the Carparts Court was decided on a motion to dismiss when that court "lacked sufficient facts to determine whether this test even applied to the case at hand." Id.; see also Barton v. Clancy, 588 F.3d 9, 19 (1st Cir. 2011) (affirming analytical framework). As the parties in Lopez had engaged in extensive discovery, the First Circuit only examined the evidence using only the common law multi-factor test. Id.

Following Lopez, it is the understanding of the undersigned that there are two tests in the First Circuit for determining whether a plaintiff asserting claims under federal anti-discrimination

[5] The EEOC Compliance Manuel currently lists the following non-exhaustive guidelines:

> The employer has the right to control when, where, and how the worker performs the job. The work does not require a high level of skill or expertise. The employer furnishes the tools, materials, and equipment. The work is performed on the employer's premises. There is a continuing relationship between the worker and the employer. The employer has the right to assign additional projects to the worker. The employer sets the hours of work and the duration of the job. The worker is paid by the hour, week, or month rather than the agreed cost of performing a particular job. The worker does not hire and pay assistants. The work performed by the worker is part of the regular business of the employer. The employer is in business. The worker is not engaged in his/her own distinct occupation or business. The employer provides the worker with benefits such as insurance, leave, or workers' compensation. The worker is considered an employee of the employer for tax purposes (*i.e.*, the employer withholds federal, state, and Social Security taxes). The employer can discharge the worker. The worker and the employer believe that they are creating an employer-employee relationship.

Equal Employment Opportunity Comm'n, EEOC Compliance Manual, § 2-III).

can survive dismissal. The first test, when a factual record is developed, requires a plaintiff to meet the common law multi-factor test or otherwise be subject to a motion for summary judgment. See, e.g., DeLia v. Verizon Commc'ns Inc., 656 F.3d 1, 3 (1st Cir. 2011); Barton, 632 F.3d at 11; Roberts v. Delta Air Lines, Inc., 599 F.3d 73, 74 (1st Cir. 2010); Bentley v. City of Lebanon, 10-CV-470 (PB), 2012 WL 6214437, at *1 (D.N.H. Dec. 13, 2012); Andujar-Iglesias v. D'Mart Inst., Inc., 09-1918 (JAG), 2012 WL 1450027, at *1 (D.P.R. Apr. 25, 2012); see also Alberty-Velez, 361 F.3d at 7 ("a court may decide the employee/independent contractor question as a matter of law if the factors point so favorably in one direction that a fact finder could not reasonably reach the opposite conclusion."). However, on a Rule 12 motion, before the development of a factual record, either the Carparts "one significant aspect" test or the common law multi-factor test may be used to determine whether a plaintiff states a claim upon which relief can be granted. See Lopez, 588 F.3d at 88.

The instant case shares the same procedural posture as Carparts – *e.g.* a motion to dismiss. Therefore, Plaintiff could state a claim by plausibly alleging that CCRD delegated employer functions to MART such that MART "control[led] *even one* significant aspect of . . . [Plaintiff's] employment." Carparts, 37 F.3d at 18 (emphasis added). This low standard to survive dismissal appears to have been expressly considered by the Carparts Court. See id. ("we think it premature to rule out the possibility that when additional facts are developed, [an antidiscrimination claim] might be made out."). Indeed, where courts addressed the employee/independent contractor question on Rule 12 motions, the moving party often failed. See Hagenah v. Community Enters., Inc., 15-CV-30036 (KAR), 2016 WL 1170963, at *8 (D. Mass. Mar. 23, 2016) ("This is . . . a fact intensive question more suitable for resolution on summary judgment or at trial than on a motion to dismiss."); Melendez-Fernandez v. Special Care Pharmacy Servs., 11-1662 (SEC), 2012 WL

4813528, at *1 (D.P.R. Oct. 10, 2012); but see Scott v. N.H. Police Standards & Training Council, 12-CV-435 (PB), 2013 WL 886877, at *1 (D.N.H. March 8, 2013).

Here, Plaintiff alleged that MART controlled his employment over the parties' approximately three-year relationship. [Am. Compl. at ¶¶ 135-142]. MART required Plaintiff to use its online portal system to take driving assignments and required Plaintiff to attend trainings at MART facilities to use that system. [Am. Compl. at ¶¶ 68, 115, 124]. Plaintiff asserted that MART controlled his employment by intentionally manipulating the online portal system. [Am. Compl. at ¶¶ 58, 60, 62, 72, 75, 119]. MART controlled his pay and place of employment by manipulating the time he would be assigned work, the duration of his jobs, and the towns where he would be assigned work. [Am. Compl. at ¶¶ 58, 60, 62, 72, 75, 119]. MART manipulated Plaintiff's participation in the "low-bid" system by skipping over him despite him bidding a lower rate. [Am. Compl. at ¶ 67]. MART also allegedly distributed assignments to other drivers and livery service providers in lieu of the "low bid" system, which plausibly suggests that MART directed profitable jobs to certain drivers. [Am. Compl. at ¶¶ 68, 146]. Plaintiff conceded that he could reject assignments but averred that he was penalized when he did so. [Am. Compl. at ¶¶ 126, 130, 141].

Despite these averments, the undersigned recognizes the substantial similarity between the facts within Plaintiff's amended complaint and the facts of Dykes. In this case, as in Dykes, Plaintiff controlled his assignments, controlled his expenses, and maintained his own staff. [Am. Compl. at ¶ 93]. Plaintiff was not paid a salary, but a fee for the specific assignments he accepted. Plaintiff did not allege facts which suggest that he was considered a MART employee for tax purposes, that he received employment benefits through MART, or that Plaintiff could avail himself of MART employee resources. [Am. Compl. at ¶ 136]. Importantly, Plaintiff stated that

the agreement for work is between CCRD and MART, not him and MART directly. [Am. Compl. at ¶ 44]. Thus, under the common law multi-factor test, Plaintiff failed to allege facts showing that MART controlled his employment to render it his "employer" under Title VII. However, that is not the sole standard Plaintiff needed to meet to survive a Rule 12 motion. Drawing all reasonable inferences in favor of Plaintiff, MART certainly controlled at least one significant aspect of Plaintiff's employment. As this court is required to assume Plaintiff's claims of racial animus are true, Plaintiff's amended complaint does state a claim under the "significant aspect" test stated in Carparts and acknowledged in Lopez. For the foregoing reasons, the undersigned recommends against dismissal of Plaintiff's Title VII claim against MART at this time.

**C. Chapter 151B Retaliation Claims**

Chapter 151 is a broad anti-discrimination statute prohibiting unlawful employment practices or the creation of discriminatory workplace conditions within Massachusetts. Like Title VII, Chapter 151B provides little guidance as to which individuals or entities may be found liable under the statute. Certain provisions, M.G.L. c. 151B, §§ 4(1)-(1C) for example, make unlawful conduct by "employers." When defining this term, Chapter 151B provides in relevant part:

> the term 'employer' does not include a club exclusively social, or a fraternal association or corporation, if such club, association or corporation is not organized for private profit, nor does it include any employer with fewer than six persons in his employ, but shall include the commonwealth and all political subdivisions, boards, departments and commissions thereof.

M.G.L. c. 151B, § 1(5); see also Baldwin v. Pilgrim Nuclear Power Station, 529 F. Supp. 2d 204, 209 (D. Mass. 2008) ("Chapter 151B defines 'employer' and 'employee' only in the negative.").

For the provisions applicable to "employers," "federal and Massachusetts law use roughly identical tests based on traditional agency law principles." Speen v. Crown Clothing Corp., 102 F.3d 625, 632 (D. Mass. 1996); see also Barton, 632 F.3d at 17-18 (for purposes of interpreting

term "employer," in Chapter 151B, federal courts look to federal decisions interpreting the term "employer" under federal antidiscrimination statutes).

Other provisions of Chapter 151B, such as the subsections cited in Plaintiff's amended complaint, state that "individuals," and not only "employers," may be found liable if they engage in certain practices which are unlawful under M.G.L. c. 151B. See, e.g., M.G.L. c. 151B, §§ 4(4)-4(4A). Relevant to Plaintiff's claims, Subsection 4(4) prohibits "any person" from "discriminat[ing] against any person because he has opposed any practices forbidden under this chapter or because he has filed a complaint." Subsection 4(4A) makes it unlawful for "any person" "to coerce, intimidate, threaten, or interfere with another person in the exercise or enjoyment of any right granted or protected by this chapter." Massachusetts courts have held that these provisions extend to non-employer defendants and individual defendants. See Lopez v. Massachusetts, 463 Mass. 696, 706 (2012) (defendant "need not be an employer to be subject to an interference claim under § 4(4A)"); see also Beaupre v. Cliff Smith & Assocs., 50 Mass. App. Ct. 480, 491 (2000) (noting that the Massachusetts Commission Against Discrimination ("MCAD") "has long recognized and imposed individual liability under [Chapter 151B]," including under Subsections (4) and (4A)). Accordingly, MART's argument that "it is axiomatic" that a plaintiff asserting a claim under Subsections (4) and (4A) "must have applied for employment or been or currently be an employee of the employer" is inaccurate. [Dkt. No. 33, at p. 9]. Under the more relaxed standard of Chapter 151B, MART and the individual defendants are putative defendants if Plaintiff's amended complaint stated a valid claim.

The amended complaint alleged that MART retaliated against Plaintiff for asserting his rights protected under Chapter 151B. [Am. Compl. at ¶¶ 52-54, 70-74, 120]. Plaintiff engaged in at least four allegedly protected activities: (1) on or about August 25, 2016, complaining to

individual defendant Rebecca Badgley, a MART manager, that her staff discriminated against Plaintiff based on his race [Am. Compl. at ¶ 78; Ex. 12]; (2) on or about March 22, 2017, sending MART a letter alleging a Title VI violation [Am. Compl. at ¶ 52; Exs. 2-3]; (3) on or about September 1, 2018, filing an EEOC complaint [Am. Compl. at ¶ 120; Ex. 18]; and (4) on or about December 27, 2018, sending an email communication alleging discriminatory conduct [Am. Compl. at ¶ 127; Ex. 20].[6] In each instance, Plaintiff alleged that the subject of his complaints involved his belief that other similarly situated drivers or dispatchers received favorable treatment because they were not African-American men. He asserted that subsequent to each of his complaints of racial discrimination, MART and each individual employee took retaliatory action against him by limiting his ability to work through the online portal system. Thus, Plaintiff's retaliation claims under Subsections 4(4) and 4(4A) were adequately pled. See Navarro v. U.S. Tsubaki, Inc., 577 F. Supp. 2d 487, 500 (D. Mass. 2008) ("The three preliminary elements of a [Chapter 151B] retaliation claim are (1) that the plaintiff engaged in some protected conduct, (2) that the plaintiff suffered some adverse employment action, and (3) that there was a causal connection between elements (1) and (2).").

**D. Title VI Claims**

Plaintiff alleged that Defendants violated Title VI of the Civil Rights Act of 1964 on the basis of his race. Because "individuals cannot be held liable under Title VI," the undersigned recommends dismissing this claim against the individual defendants and addresses only MART's liability. See Pollard v. Georgetown School Dist., 132 F. Supp. 3d 208, 229-230 (D. Mass. 2015)

[6] Under Chapter 151B and Title VII, the fact that a complaint is later found to be unmeritorious does not preclude a retaliation claim based on the protected activity of pursuing that complaint. See Fantini, 557 F.3d at 32 (Title VII); Ritchie v. Dep't of State Police, 60 Mass. App. Ct. 655, 664 (2004) (Chapter 151B).

(quoting Thomas v. Salem State Univ. Found., Inc., No. 11-CV-10748 (DJC), 2011 WL 5007973, at *6 (D. Mass. Oct. 18, 2011)).

Title VI states that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. The amended complaint plead no facts that MART's receipt of federal funding is for employment. Rather, it merely alleged that MART received federal funding and maintained a Title VI compliance program. [Am. Compl. at ¶¶ 176-179]. Because this is insufficient to raise a reasonable expectation that discovery will uncover evidence of a logical nexus between the federal funds received by MART and the alleged employment discrimination, Plaintiff failed to state a claim against MART under Title VI as a matter of law. See 42 U.S.C. § 2000d-3; Faculty, Alumni, & Students Opposed to Racial Preferences v. Harvard Law Review Ass'n, 18-12105 (LTS), 2019 WL 3754023, at *9 (D. Mass. Aug. 8, 2019).

**E. Intentional Infliction of Emotional Distress Claims**

Lastly, Plaintiff asserted a state law tort claim based on the foregoing allegations. "The standard for making a claim of intentional infliction of emotional distress is very high." Polay v. McMahon, 468 Mass. 379, 385 (2014) (quoting Doyle v. Hasbro, Inc., 103 F.3d 186, 195 (1st Cir. 1996)). A plaintiff must plead: "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous, was beyond all possible bounds of decency and was utterly intolerable in a civilized community; (3) that the actions of the defendant were the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe and of a nature that no reasonable man could be expected to endure it." Bennett v. City of Holyoke,

230 F. Supp. 2d 207, 228-29 (D. Mass. 2002) (quoting Agis v. Howard Johnson Co., 371 Mass. 140, 144-45 (1976)), aff'd, 362 F.3d 1 (1st Cir. 2004).

The amended complaint averred that Defendants' alleged racial discrimination and retaliation "cause[d] him severe emotional distress" manifested by "loss of sleep [], anxiety, depression, humiliation, [and] fright," such that he needed "to seek professional treatment." [Am Compl. at ¶¶ 5, 133, 297, 299]. With no other factual averments to support the severity of his mental injuries, these allegations do not suffice to state a claim for intentional infliction of emotional distress. See Anjomi v. Kalai, 828 F. Supp. 2d 410, 414 (D. Mass. 2011) (stating, in an employment discrimination case, that the mere allegation of emotional distress is not sufficient to show that the distress was so severe that no reasonable person could be expected to endure it); Emerson v. Massachusetts Port Auth., 138 F. Supp. 3d 73, 76-77 (D. Mass. 2015) (holding that emotional distress associated with employment discrimination did not rise to the requisite level of emotional distress). Thus, this court recommends granting Defendants' motions to dismiss Plaintiff's intentional infliction of emotional distress claim. However, as Plaintiff may be able to assert additional facts to cure his deficient pleadings, the undersigned recommends dismissal of this count as to MART and the individual defendants WITHOUT PREJUDICE.

**CONCLUSION**

For the reasons stated above, the undersigned recommends that this court GRANT Defendants' motions to dismiss for the following counts:

- Plaintiff's TCPA claims against MART and HBSS WITH PREJUDICE (*Count I* and *Count II* in their entirety).
- Plaintiff's Title VII claims against all individual defendants and HBSS WITH PREJUDICE (*Count III* and *Count VI* as to the individual defendants and HBSS).
- Plaintiff's Title VI claims against all defendants WITH PREJUDICE (*Count VII* in its entirety).

- Plaintiff's Chapter 151B claims against HBSS WITH PREJUDICE (*Count VIII* as to HBSS).

- Plaintiff's state law intentional infliction of emotional distress claim against HBSS WITH PREJUDICE and the claims against MART and the individual defendants WITHOUT PREJUDICE.

The undersigned recommends that this court DENY MART and the individual defendants' motion to dismiss for the following counts:

- Plaintiff's Title VII claims against MART (*Count III* and *Count VI* as to MART).

- Plaintiff's Chapter 151B claims against MART and the individual defendants (*Count VIII* as to MART and the individual defendants).

Thus, this court recommends that defendant HBSS be dismissed from the case and Plaintiff be permitted to pursue his remaining claims against MART and the individual defendants consistent with this decision.[7]

/s/ David H. Hennessy
David H. Hennessy
U.S. Magistrate Judge

[7] The parties are notified that any party who objects to these proposed findings and recommendations must file a written objection thereto within fourteen days of service of this Report and Recommendation. The written objections must identify with specificity the portions of the proposed findings, recommendations, or report to which objection is made, and the basis for such objections. See Fed. R. Civ. P. 72(b)(2). The United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation. See, e.g., United States v. Diaz-Rosado, 857 F.3d 89, 94 (1st Cir. 2017); United States v. Lugo Guerrero, 524 F.3d 5, 14 (1st Cir. 2008); Keating v. Sec'y of Health & Hum. Servs., 848 F.2d 271, 275 (1st Cir. 1988); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980); see also Thomas v. Arn, 474 U.S. 140 (1985).