# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 4:19-cv-11093TSH

PAUL JONES,
        Plaintiff

v.

MONTACHUSETT REGIONAL TRANSIT
AUTHORITY, HB SOFTWARE
SOLUTIONS, INC, REBECCA BADGLEY,
DONNA LANDRY, BONNIE MAHONEY,
KAREN CORDIO, JOANNE NORRIS,
STEPHANIE RICHARDS, TAMARA
SHUMOVSKAYA, JESSICA TORRES,
AMANDA KUKTA, ROBERT MONK,
MICHELLE MOYO, IVAN ROMAN,
CRYSTAL GEISERT, JANE DOE and JOHN
DOE,
        Defendants

AFFIDAVIT REBECCA BADGLEY

I, Rebecca Badgley, hereby depose and state as follows:

1.  I am the Director of Brokerage for the Montachusett Regional Transit Authority

    ("MART").  I have held that position for 12 years.  In that position I am responsible for

    overseeing MART's Broker program that includes communicating with Transportation

    Providers in response to their concerns when necessary.

2.  MART is a regional transportation authority established pursuant to G.L. c. 161B.

3.  MART provides public transportation to twenty-two (22) cities and towns in north central

    Massachusetts.

4.  Through its Dial-A-Mart Service, MART provides transportation that serves the needs of

    either human services agencies or target populations through eligible agency sponsored

    trips.

5.  MART also provides transportation through its operating company for the Commonwealth of Massachusetts's Human Services Transportation Division of the Executive Office of Health and Human Services ("EOHHS").  MART provides routes for the Department of Developmental Services ("DDS") as well as individual MassHealth client rides on an as needed basis.

6.  The Commonwealth has established a statewide Human Services Transportation coordination initiative, which utilizes a Broker system of managing transportation services for eligible consumers from various programs and agencies ("HST Brokerage System").  Selected Regional Transit Authorities such as MART act as HST Brokers and arrange transportation by subcontracting with qualified Transportation Providers.  The contractual agreement between the HST Broker and the Transportation Provider is referred to as the "Transportation Provider Subcontract."

7.  All Transportation Providers ("Transportation Providers" or "Vendors") are required to comply with the Transportation Provider Performance Standards ("Performance Standards").  *Exhibit 1, Performance Standards; Exhibit 2- MART Masshealth Member Information Sheet.*

8.  MART has Transportation Provider Subcontracts with over two hundred (200) Vendors.  The Performance Standards are incorporated into all Transportation Provider Subcontracts that MART has with it's over two hundred Vendors.

9.  MART entered into a Transportation Provider Subcontract with Commonwealth Community Recovery Division, Inc. ("CCRD").

10. It is my understanding that Paul Jones is the owner, dispatcher and manager for CCRD.

11. Under the Performance Standards, a Transportation Provider is defined as a "local transportation delivery entity under contract to a Broker for the direct provision of transportation services (vehicles and drivers) for HST Consumers". The Performance Standards specifically provide that the Transportation Provider is a "subcontractor to the Broker" and is subject to the provisions of the Commonwealth Terms and Conditions and Standards Contract terms. *Exhibit 1, p. 5.*

12. Pursuant to the Performance Standards, Transportation Providers are required to maintain workers compensation on all employees/agents including owner(s) in the case of a sole proprietorship and to furnish a certificate of insurance to [MART] evidencing compliance prior to transporting any Agency Consumers. *Exhibit 1, p. 13.*

13. In addition, the Performance Standards require Transportation Providers to maintain liability insurance on all vehicles used under the Transportation Provider's contract with the Broker and that Broker being named as an additional insured on the Transportation Provider's insurance policy. *Exhibit 1, p.13.*

14. MART uses an online portal system to assign rides to its Transportation Providers. The portal system assigns rides to the lowest cost qualified Transportation Provider. If the lowest cost qualified Transportation Provider does not accept the ride, the online portal system goes down the list to the next lowest cost qualified Transportation Provider.

15. Transportation Providers submit rates to MART for use in the vendor portal system. Vendors are allowed to adjust their rates quarterly. MART does not set vendor rates.

16. Transportation Providers set the hours that the Transportation Provider is willing to work. MART does not set the hours that the Transportation Provider is available to work.

17. The Transportation Provider portal starts to assign trips to Transportation Providers beginning with the lowest cost qualified vendor for trips that are three days or more in advance of the scheduled trip date.

18. For next day or same day requests for transportation, MART assigns the trips to Transportation Providers by telephone. As with the vendor portal system, MART assigns trips to its Vendors starting with the lowest cost qualified Vendor. MART attempts to contact the Transportation Providers three times by telephone to offer the trips before moving on to the next lowest cost Vendor.

19. CCRD submitted an application to become a transportation provider to MART on October 26, 2015. CCRD executed the Transportation Provider Sub-Contract with CCRD on December 12, 2015. Because there was documentation that was missing, MART did not execute the Transportation Provider Sub-Contract with CCRD until February 3, 2016.

20. Once the Contract was finalized, MART scheduled an office audit and vendor portal training among other things for Plaintiff.

21. CCRD submitted its requested rates to MART. The rates submitted by CCRD were higher than many of the other MART vendors providing services to EOHHS.

22. CCRD also set the hours it was willing to provide transportation services, which were between the hours of 7:00 a.m. to 3:00 p.m. MART did not set the hours during which CCRD could provide transportation services.

23. Because of the limits on the hours CCRD is willing to work, CCRD automatically misses opportunities to be assigned rides that are not during CCRD work hours. MART receives many requests from clients for rides before 7:00 a.m. to transport riders to methadone clinics or to dialysis.

24. Daily and Standing Order (weekly) rides are based on assignment from the low-cost auto-assign program (no human intervention) which is based upon vendor rates and capacity tables.

25. Same and next day trips are not assigned by the vendor portal but rather by telephone call, with the low-cost Vendor called first. The Vendor is called three times. If the Vendor does not pick up the telephone and accept the assignment after the third call, the next lowest cost vendor is contacted.

26. On March 22, 2016, Mr. Jones received Vendor Portal Training at MART's offices.

27. Following the Vendor Portal Training, Mr. Jones almost immediately began to complain that his company, CCRD was not being assigned a sufficient number of trips. By email dated April 16, 2016, I advised Mr. Jones that trips are assigned by the vendor portal using a low-cost vendor automated program.

28. On August 24, 2016, Mr. Jones sent an email to me in which he complained of racial discrimination since the beginning of CCRD's contract with MART. I looked into the issues raised by Mr. Jones in his email. After doing so, I responded to Mr. Jones, and advised him that after looking into his concerns and found that there was one area of the vendor portal that had been blocked, which was an oversight. I advised Mr. Jones to log into the vendor portal and make sure that he was able to adjust his capacities and see daily work as well as standing orders. *Exhibit 3 – Emails dated August 24 and 25, 2016.*

29. I met with Mr. Jones in person to discuss issues he was having, on March 5, 2017.

30. I responded in writing to Mr. Jones' letter of complaint dated March 24, 2017 addressed to the Title VI Civil Rights Officer on April 28, 2017. *Exhibit 4- Letter dated April 28, 2017.*

31. In an email dated October 2, 2017, Mr. Jones informed me that "things have changed for the worst since we had a meeting in March . . . to iron out the portal differences." In that email, Mr. Jones complained that CCRD was having problems with "non cost effective trips miles." He complained that CCRD was being fined and that CCRD trips were still "90% given to [CCRD] by the Automatic Dialing System which causes [CCRD] not to be able to compete with any other vendors" complaining that "[CCRD] calls are hand-picked and sent through the Automatic Dialing System and are not cost effective." *Exhibit 5 – Emails dated October 2 through October 13, 2017.*

32. I responded to Mr. Jones by email dated October 3, 2017. I told him that I was sorry to hear that things were not going well. I reiterated my previous suggestion to him that he branch out to other venues in addition to contracting with MART. I advised him that as we had previously discussed and confirmed with him, his company has complete access to the vendor portal. I reminded him that transportation that is scheduled 3 days or more in advance is going out through the vendor portal auto assign system based on vendor bid prices for the trips. I told him that I had taken a look at CCRD's rates and that they continued to be on the high side, which is why CCRD was seeing little to no trips in advance through the vendor portal. Further, I told advised him that CCRD was getting the bulk of its calls from the vendor call out and scheduling members due to the fact that there is same day and next day work and the other vendors are at capacity and MART has reached CCRD's trip rate for coverage. *Exhibit 5.*

33. Mr. Jones sent me an email on January 8, 2018 in which he complained that CCRD had dropped its rates but was still not receiving offers through the vendor portal. *Exhibit 6 – Emails dated January 8 and 19, 2018.*

34. I looked into Mr. Jones' concerns. I subsequently advised Mr. Jones that I had followed up on my end and that the assign program was functioning properly and rides in the area were being picked up by vendor with lower rates prior to getting to CCRD's rate structure during the running of the assign program. This was why CCRD was getting offered trips via the call out system or from staff. I advised Mr. Jones that I had looked at CCRD's rates in comparison to other vendors in the area and that CCRD's rates were still on the high side in comparison. I advised him that he was welcome to request the most updated rates. *Exhibit 6.*

35. Because some of the issues raised by Mr. Jones appeared to me to be due to his not understanding fully how to use the Vendor Portal system, I thought it would benefit him to receive one-on-one training on the system. I arranged for Mr. Jones to receive one-on-one training with Robert Monk in May 2018, *Exhibit 7 – Emails dated May 2018.*

36. Prior to the training we continued to work with Mr. Jones to assist him in the use of the vendor portal. *Exhibit 8 – Emails dated February 6 and 7, 2018.*

37. By email dated May 9, 2018, MART sent Mr. Jones a memo that had been sent to all vendors regarding billing and the schedule of fines for late invoices and fraudulent billing. *Exhibit 9 – Email dated May 9, 2018.*

38. By email dated June 24, 2019, Mr. Jones asked me to explain the shared ride policy because he believed that he was not properly getting credit for some shared ride members when they did not show up. I emailed Mr. Jones and explained the standing order to him. *Exhibit 10 – Emails dated June 24 and 25, 2019.*

39. By email dated June 27, 2019, Mr. Jones complained that CCRD's vendor portal reflected offers of trips that CCRD never accepted and complained that MART's system

had a "glitch." I again looked into the concerns raised by Mr. Jones in his email. I responded to him and informed him that I had looked into the information he provided me and told him that MART has no way of controlling what times or how frequently members book appointments and reiterated to him that everything booked is assigned via a low cost qualified bid process based off vendor rates as trips are received. In addition, I advised him again that MART does not have the ability to build CCRD's schedule for him or provide trips in a specific geographical area as the trips are all medical appointments that can change in volume and location on a daily basis". *Exhibit 11 and Exhibit 12 – Emails dated June 27, 28 and July 1, 2019.*

40. In another email dated July 1, 2019, I responded to another issue raised by Mr. Jones about vendor assignments, advising him that all of the calls that he had accepted via IVR vendor call-out, transferred through to his portal and were scheduled with his company. *Exhibits 11 and 12.*

41. Assignments made by MART to its over two hundred Vendors are based on a low cost qualified bid process based off vendor rates and availability as trips are received. As I repeatedly told Mr. Jones, CCRD's rates were simply higher than those of other eligible Vendors in the area, which is why CCRD was not being assigned as many trips as Mr. Jones would have liked. MART does not have information on the demographics of the Transportation Providers it contracts with, but is aware that seventeen of those Transportation Providers have registered their businesses with the Supplier Diversity Office (SDO) of the Operational Services Division of the Commonwealth of Massachusetts. CCRD does not appear on the list as having been certified as a diverse business by the SDO. *Exhibit 13 – List of SDO certified Transportation Providers.*

/s/ Rebecca Badgley
Rebecca Badgley

Dated: April 9, 2020

716063/MART/0006

# EXHIBIT 1

**APPENDIX 1**
Transportation Provider Performance Standards
Revised: Effective 07-01-15

INTRODUCTION

I.  **GENERAL**
    A. Definitions
    B. General Business Standards

II. **TRANSPORTATION OPERATIONS**
    A. Administration
    B. Transportation Service Standards
    C. Program Affiliation Agreements
    D. Inclement Weather
    E. Emergency, Accident and Safety Response and Reporting
    F. Insurance Requirements
    G. Communications/Dispatch

III. **VEHICLE AND EQUIPMENT REQUIREMENTS**
    A. Minimum Standards for All Vehicles
    B. Non-Ambulatory Vehicle (Chair Car) Additional Requirements and Securement Standards

IV. **PERSONNEL REQUIREMENTS**
    A. Driver Qualifications
    B. Monitor Qualifications
    C. Driver and Monitor Training
    D. Personnel Policies/Documentation

V.  **DRIVER AND MONITOR PERFORMANCE STANDARDS**

VI. **TRIP PERFORMRANCE STANDARDS**
    A. Time Measured Standards
    B. Quality Monitoring
    C. Corrective Action/Provider Accountability

VII. **REPORTS, RECORDKEEPING AND BILLING**

VIII. **DATA PRIVACY AND SECURITY**
    A. Definitions
    B. Transportation Provider's Obligations
    C. Business Associate Related Provisions
    D. Permitted Uses and Disclosures of PI by Transportation Provider
    E. Termination
    F. Effect of Termination

**APPENDIX 1**
Transportation Provider Performance Standards
Revised: Effective 07-01-15

THIS PAGE INTENTIONALLY LEFT BLANK

**APPENDIX 1**
Transportation Provider Performance Standards
Revised: Effective 07-01-15

## INTRODUCTION

The Commonwealth of Massachusetts has established a statewide Human Service Transportation (HST) coordination initiative, which utilizes a Broker system of managing transportation services for eligible Consumers from various programs and state agencies (HST Brokerage System). Selected Regional Transit Authorities act as HST Brokers and arrange transportation by subcontracting with qualified Transportation Providers. By participating in the HST Brokerage System, the Transportation Provider is under contractual agreement to provide safe, professional and on-time transportation service, which is provided with dignity and respect and in the least intrusive way possible for eligible HST Consumers. It is the Transportation Provider's responsibility to be aware of, and to comply with all terms, conditions and requirements of its contractual agreements with the HST Broker. The contractual agreement between the HST Broker and the Transportation Provider is referred to herein as the "**Transportation Provider Subcontract**."

This "Transportation Provider Performance Standards" document specifies the Commonwealth of Massachusetts' minimum performance standards and requirements for all transportation services delivered under a Transportation Provider Subcontract with an HST Broker (and identified as "Universal"), unless specifically limited and so identified herein. Standards that are limited in scope to either a specific agency or category ("Program-Based" or "Demand-Response" transportation) are labeled accordingly. Both the Universal Standards and those limited in scope to a specific Agency or category are subject to periodic revision, as needed, to further enhance the HST Transportation Program and/or to comply with federal, state or local regulations or standards.

Participating Massachusetts Agencies may also establish additional Transportation Provider performance standards that are unique to each Agency due to the specific Consumers served and/or program requirements.

## I. GENERAL

## A. DEFINITIONS

Agency (also known as Funding or Referring Agency or Department): an eligible state entity that purchases brokerage and transportation services in the HST Brokerage System for its Consumers that are provided pursuant to the Broker Contract between EOHHS and the Broker.

Ambulatory Transportation: Transportation primarily intended for persons who are able to travel without significant assistance. Such transportation is provided by any of several types of vehicles, including passenger sedans and station wagons, vans, or mini-buses, and which are licensed by the city or town in which the operating business is located.

Broker (also referred to as HST Broker or Contractor: The entity selected by EOHHS to procure and manage certain human service Consumer transportation within a defined HST service area.

Broker Contract (or HST Broker Contract or HST Broker Services Contract): the currently-effective agreement between EOHHS and the Broker whereby the Broker arranges transportation for Agency Consumers through subcontracts with Transportation Providers within a designated HST service area.

Consumer (or Agency Consumer or HST Consumer): A person eligible for Agency-funded transportation services under the HST Brokerage System. May also be referred to as a Member.

Critical Incident: Any Incident that involves an emergency or urgent event, including vehicle crash, Consumer medical emergency, suspected Consumer abuse, Consumer behavior, fall and/or injury, possible abandoned child or Consumer unaccounted for, EMT or police involvement or any loss of mobile device containing protected Consumer information.

**APPENDIX 1**
Transportation Provider Performance Standards
Revised: Effective 07-01-15

Curb-to-Curb Service -- The level of transportation service in which the Consumer/passenger is picked up at the curb by their location of origin and dropped off at the curb by their destination. The driver may help passengers with boarding and exiting but does not provide assistance in getting from the door of a building to the curb or vice versa.

Demand-Response Transportation: Transportation provided in response to an approved request for transportation of a Consumer to a covered medical service or other human service activity that occurs on an *as needed* basis.  Demand-Response Transportation includes but is not limited to: transportation to MassHealth eligible medical services, excluding day habilitation (however, transportation for mid-day medical appointments from day habilitation programs would also be considered Demand-Response); and, in limited cases, transportation for Massachusetts Commission for the Blind (MCB) and Massachusetts Rehabilitation Commission (MRC) Agency Consumers.

Destination Facility (may also be referred to as Facility or Program): Site where the human service program or medical service for the Consumer is being provided, such as a clinical site, childcare facility, or day program site and to which transportation is being provided.

Human Service Transportation (HST): Includes the transportation needs for Consumers of several human service agencies within the Executive Office of Health and Human Services (EOHHS).  The scope of the Transportation Provider Subcontract may expand to Consumers of other agencies in the future.

HST Office: The central administrative entity within EOHHS that coordinates HST contracting for state human service, elder and transportation agencies. The HST Office administers and monitors the Broker Contract.

Incident:  Any occurrence that impacts the provision of normal transportation services and thereby interferes with the strict performance of the Transportation Provider Subcontract.  Examples include, but are not limited to: vehicle accident, Consumer fall and/or injury, disruptive Consumer behavior, health, hygiene or medical event for person on board, seat belt or wheelchair securement issue, late pickup or vehicle no-show.

Monitor: An employee of the Transportation Provider who serves to assist or ensure the safety of one or more Consumers during Transportation, by following designated Consumer-specific assignments and providing supervision and assistance to all Consumers on the vehicle when necessary and providing mobility assistance upon entering or exiting the vehicle, or from the pick-up point to the Destination Facility (if door-to-door transportation is authorized).

Non-Ambulatory (Chair Car) Transportation: Transportation provided by a motor vehicle that is specifically equipped to carry one or more persons who use a wheelchair or other mobility devices and that meets the vehicle specifications in Section III.B.

One-Way Trip: Transportation of a Consumer between the pick-up point (origin) and the destination point, as indicated on the Transportation Request. The return trip to the origin point is considered a separate One-Way Trip.

Program-Based Transportation: Transportation that occurs on a regular schedule (e.g. daily) to a common program or Destination Facility, typically provided on a scheduled route, grouped trip basis.  Program-Based Transportation includes, but is not limited to, transportation to the following programs:  Department of Public Health's (DPH) Early Intervention program, Department of Developmental Services (DDS) day/work programs, Department of Mental Health (DMH) Clubhouse programs, MassHealth funded Day Habilitation, and certain programs or services through Massachusetts Commission for the Blind (MCB) and Massachusetts Rehabilitation Commission (MRC).

**APPENDIX 1**
Transportation Provider Performance Standards
Revised: Effective 07-01-15

Transportation Provider or Provider (also referred to more generally as a subcontractor of Broker): A local transportation delivery entity under contract to a Broker for the direct provision of transportation services (vehicles and drivers) for HST Consumers.

Transportation Request: Documentation prepared by an Agency and forwarded to the Broker to initiate transportation services for a Consumer. This includes the MassHealth Prescription-For-Transportation Form (PT-1) and the HST Transportation Request Form (TR). The PT-1 form is used for MassHealth Demand-Response Transportation service. The TR form is used for both Demand-Response and Program Based service. The TR form will note if the request is for Demand-Response Transportation service; otherwise the request is for Program-Based Transportation service.

Universal: When a standard is labeled "universal", that means the standard applies to all forms of transportation provided under the Transportation Provider Subcontract, including both Demand-Response and Program-Based Transportation.

## B.  GENERAL BUSINESS STANDARDS

1. **UNIVERSAL>** The Transportation Provider shall, unless otherwise exempted by law, indemnify and hold harmless the Commonwealth of Massachusetts, including, without limitation, EOHHS, the HST Office, any Agency, its agents, officers and employees against any and all claims, liabilities and costs for any personal injury or property damages, patent or copyright infringement or other damages that the Commonwealth may sustain, which arise out of or in connection with the Transportation Provider's performance under the Transportation Provider Subcontract, including but not limited to the negligence, reckless or intentional conduct of the Transportation Provider, its agents, officers, employees or subcontractors. This provision shall survive the termination of the Transportation Provider Subcontract.

2. **UNIVERSAL>** The Transportation Provider shall at no time be considered an agent or representative of a state Agency or the Commonwealth, and it shall not hold itself out as such.

3. **UNIVERSAL>** The Transportation Provider shall not have any claim against or seek payment from the Commonwealth of Massachusetts, including, without limitation, EOHHS, the HST Office, any Agency, its agents, officers and employees, for any service rendered pursuant to the Transportation Provider Subcontract with Broker, or the Broker Contract between the Broker and EOHHS. Instead, the Transportation Provider shall look solely to the Broker for payment with respect to services rendered. Furthermore, the Transportation Provider shall not maintain any action at law or in equity against the Commonwealth of Massachusetts, including, without limitation, EOHHS, the HST Office, any Agency, its agents, officers and employees, to collect any sums that are owed by the Broker under the Transportation Provider Subcontract for any reason, even in the event that the Broker fails to pay for or becomes insolvent or otherwise breaches the terms and conditions of that agreement. This provision shall survive the termination of the Transportation Provider Subcontract with the Broker.

4. **UNIVERSAL>** The Transportation Provider is a subcontractor to the Broker and is subject to the provisions of the Commonwealth Terms and Conditions and Standard Contract terms. In addition to any termination provisions established by the Broker under its Transportation Provider Subcontract with the Transportation Provider, the HST Office retains the right to require the Broker to terminate the Transportation Provider Subcontract for cause if the Transportation Provider breaches any material term or condition or fails to satisfactorily meet the general performance standards specified in this Attachment. Transportation Provider subcontracts are not transferable, unless prior approval of the HST Office is granted.

5. **UNIVERSAL>** The Transportation Provider must obtain and maintain in current status any and all business licenses, permits, certificates and registrations required by Federal, State or local laws, rules and regulations and must provide copies to the Broker upon request.

**APPENDIX 1**
Transportation Provider Performance Standards
Revised: Effective 07-01-15

6. **UNIVERSAL>** Disclosures on Ownership and Control; Business Transactions; Criminal Convictions

  A. The Transportation Provider must:

   (1) Make disclosures to the Broker required of a provider under 42 CFR 455.104 on ownership and control at any of the following times, or upon Broker or EOHHS request: (i) upon submission of an application to become a Transportation Provider; (ii) upon executing a Transportation Provider Subcontract with the Broker to be a Transportation Provider; (iii) upon request during requalification; and (iv) within 35 days after any change in ownership of the Transportation Provider;

   (2) Furnish full and complete information to the Secretary of the United States Department of Health and Human Services, the Broker or EOHHS, as applicable, required of a provider under 42 CFR 455.105 related to business transactions within 35 days of the date on a request for such information by the Secretary of the United States Department of Health and Human Services, the Broker or EOHHS;

   (3) Make disclosures to the Broker required of a provider under 42 CFR 455.106 on persons convicted of crimes before entering into or renewing a Transportation Provider Subcontract with the Broker to be a Transportation Provider, or at any time upon written request; and

   (4) Make disclosures to the Broker required of a provider under 42 CFR 1002.3(a) on relationships to excluded, penalized or convicted persons upon entering into or renewing a Transportation Provider Subcontract with the Broker to be a Transportation Provider, or at any time upon written request.

  B. Unless otherwise instructed, for purposes of making the disclosures set forth in **subsection B.6.A**, above, the Transportation Provider shall use the form required by the Broker for such purpose. The Transportation Provider or applicant must fully and accurately complete the form (or such portions as directed) and sign, date and return it to the Broker within the required time period. Notwithstanding anything to the contrary on the form, the Transportation Provider must return the completed form to the Broker, and completion of such form (or portions thereof as directed) shall be required, at the times set forth in **subsection B.6.A**, above.

  C. The Broker reserves the right to terminate the Broker's Transportation Provider Subcontract with the Transportation Provider, require the removal of Transportation Provider personnel, or take other action if the Transportation Provider fails to timely provide such information or due to the information contained in the Transportation Provider's disclosures.

## II. TRANSPORTATION OPERATIONS

### A. <u>ADMINISTRATION</u>

The Transportation Provider shall:

1. **UNIVERSAL>** Ensure that vehicles used for HST Transportation are owned, leased, or otherwise controlled by the Transportation Provider by means of a written agreement.

2. **UNIVERSAL>** Ensure that all vehicles (both primary and backup) used for HST Transportation meet the specifications as described herein in Section III, and have a sufficient number available to transport Consumers during the time established by the Broker or when an emergency arises. The Provider shall furnish to the Broker a list of all vehicles that will be used under the provisions of the Transportation Provider Subcontract and update that list whenever any changes are made. This list shall include the make, model year, vehicle identification number (VIN), license number and vehicle type for each vehicle to be used to transport HST Consumers.

**APPENDIX 1**
Transportation Provider Performance Standards
Revised: Effective 07-01-15

3. **UNIVERSAL>** Remove from service any vehicle that is unsatisfactory or questionable for safety or roadworthiness (e.g. two-way radio inoperative, inspection shows problems, due for maintenance, etc.), and comply with any instruction from the Broker to immediately remove a vehicle from service when deemed unsafe or unsuitable by the Broker.

4. **UNIVERSAL>** Ensure that all personnel meet the applicable qualification requirements. The Transportation Provider shall designate at least one employee to obtain CORI (Criminal Offender Record Information) certification, who is responsible for requesting CORIs and ensuring employment decisions are consistent with EOHHS CORI requirements specified in 101 CMR 15.00. The Provider must have a CORI policy that meets the Department of Criminal Justice Information Services' (DCJIS) requirements. The Provider's CORI procedures are subject to audit. The Provider must furnish to the Broker a list of all drivers, Monitors (where applicable), supervisors, dispatchers and other employees who provide any services associated with the provisions of the Transportation Provider Subcontract with the Broker, and update that list whenever any changes are made.

5. **UNIVERSAL>** Upon request, provide the Broker, HST Office or Agency with the credentials of any Transportation Provider employee. The Broker or Agency has the right to deny the approval of any driver or Monitor, or to require the Provider to replace any driver or Monitor in the performance of HST services, for any reason.

6. **UNIVERSAL>** Be responsible for all recruiting and hiring of backup drivers and Monitors (where applicable). Such responsibility shall not be delegated to the drivers and Monitors. The Transportation Provider shall ensure that all back up, replacement, and substitute personnel (drivers, Monitors, dispatchers, supervisors, etc.) meet all of the requirements as set forth in this document and in any attachments.

7. **UNIVERSAL>** Ensure that a training officer or other supervisor attends Broker sponsored training sessions and provides such training to drivers and Monitors (where applicable).

8. **UNIVERSAL>** Submit to the Broker for approval any policies relating to personnel, procedures or equipment that will be used in the provision of services under the Transportation Provider Subcontract with the Broker.

9. **UNIVERSAL>** Demonstrate continual compliance with HST Office, EOHHS, Agency-specific and Broker standards for transportation service, trip verification, personnel qualifications and performance, field inspections and audit, reporting, record keeping, billing and complaint response.

**B. TRANSPORTATION SERVICE STANDARDS**

The Transportation Provider shall:

1. **UNIVERSAL>** Provide Curb-to-Curb service, unless another level is specifically authorized by the Agency, in a professional, safe and courteous manner. The driver and Monitor (if present) shall assist Consumers with entry or exit of vehicle; however, the driver shall remain in or near the vehicle at all times that a Consumer is present in the vehicle and shall not enter any buildings.

2. **UNIVERSAL>** Ensure that Consumers are not transported to any destination, for any scheduled session, or released to any person without prior authorization from the Broker. The Broker has the right to approve all stops, routes and changes.

**APPENDIX 1**
Transportation Provider Performance Standards
Revised: Effective 07-01-15

3. **UNIVERSAL>** Ensure that a Consumer is never stranded. A Consumer is stranded if he or she has been transported to their scheduled service and is left without a return trip (unless alternate arrangements have been timely made and communicated among the Consumer, Destination Facility, parent/guardian and/or residential facility staff, as applicable). If the Provider is assigned a trip by the Broker and accepts it, then the Provider is obligated to complete the assignment, unless properly cancelled prior to initiation due to inclement weather.

4. **PROGRAM-BASED TRANSPORTATION ONLY>** Ensure that Consumers are never left unattended. If the vehicle arrives late (after designated start/end time) to the Destination Facility and no staff is available, it is the driver/Monitor's responsibility to escort the Consumers together to and from a responsible staff person.

5. **UNIVERSAL>** Provide and assign transportation safety Monitors upon request by the Broker. Monitor requests will be processed by the Broker and forwarded to the Transportation Provider for implementation. Additionally, Monitors may be authorized for certain individual Consumers based on their behavioral or medical needs. No more than one Monitor will be funded in a vehicle without an approved waiver from the Broker.

   **5.a. DPH (Early Intervention) ONLY>** Provide a Monitor in any vehicle whenever routing results in three or more children without a parent or guardian in a vehicle.

6. **UNIVERSAL>** Allow only persons authorized by the Broker to be transported in vehicles with Agency Consumers. The following may not be transported: children of employees or other children in their care and pets other than Consumers' service animals (e.g., guide dogs). Drivers must be aware of and comply with the Americans with Disabilities Act (ADA), and all other applicable federal and state laws and regulations pertaining to the requirement to transport and accommodate service animals.

7. **UNIVERSAL>** Ensure the number of persons in the vehicle, including the driver, shall not exceed the vehicle manufacturer's approved seating capacity.

8. **UNIVERSAL>** Report Consumer no-shows to the Broker and the Facility staff, where applicable, when the Consumer doesn't call the Transportation Provider or Broker to cancel a trip at least one (1) hour before the scheduled pick-up time. The Broker or Agency may conduct a service review for any Consumer with repeated no-shows. The Transportation Provider cannot initiate or demand a suspension of services to a Consumer.

9. **UNIVERSAL>** Ensure that services are not suspended for any Consumer without prior authorization from the Broker.

10. **UNIVERSAL>** Place in service all back up vehicles within thirty (30) minutes of such a request. If the Transportation Provider fails to comply with this provision, alternate quality service shall be authorized by the Broker at the Transportation Provider's expense.

11. **PROGRAM-BASED TRANSPORTATION ONLY>** Provide adequate back-up vehicles and personnel to comply with the service requirements as set forth in these specifications for the duration of the Transportation Provider Subcontract with the Broker. It is recommended that, at a minimum, the Provider have one comparable spare vehicle and driver for every ten (10) vehicles under contract.

12. **PROGRAM-BASED TRANSPORTATION ONLY >** Make every effort to assign consistent drivers and Monitors, where applicable, to each route. The Provider shall furnish to parents/residential staff and Facility

**APPENDIX 1**
Transportation Provider Performance Standards
Revised: Effective 07-01-15

staff the names of their drivers and Monitors and notify them in advance of any scheduled change in these personnel.

13. **PROGRAM-BASED TRANSPORTATION ONLY** > Perform all routing functions in accordance with the following safety performance standards. The Transportation Provider may alter Program-Based routes in order to ensure maximum safety for Consumers so that, wherever possible, pick-up and drop-off points are on the same side of the street as the Consumer's home or Destination Facility. Whenever possible, vehicles should pull into driveways, but only when there is sufficient space for the vehicle to turn around and exit the driveway forward facing, and in the case of private driveways, with the owner's permission. No vehicle shall back out of driveway onto the street, except as specified below in 13.a. The appropriateness of the routing and the number of vehicles used are subject to the discretion of the Broker, throughout the duration of the Transportation Provider Subcontract with the Broker. The Transportation Provider shall comply with the Agency's request not to combine routes going to different sites without the Broker's written approval.

13.a **DPH ONLY**> The Provider may allow a vehicle to back out of a driveway only when transporting children and maximum safety for boarding and exiting vehicles requires it.

13.b. **DDS ONLY**> The Provider shall adjust monthly billing to the Broker to reflect routing changes and all other alterations which take place due to the requirements of Section 13, for the corresponding month of service.

13.c. **DDS/DAYHAB ONLY**> The Provider shall exercise due diligence (including any available electronic or other scheduling means available) in maintaining routing efficiency while seeking to maintain full vehicle capacity to include the 90 minutes of routing time commencing from the time of first pickup through and until the final destination. The routing time shall be inclusive of potential double runs that may be accomplished within the contracted 90 minute routing timeframe. Routing time and not vehicle capacity shall be the final determinant in scheduling consumers on DDS or DayHab routes. Waivers of these standards must be in writing and are at the discretion of the Broker/RTA.

14. **PROGRAM-BASED TRANSPORTATION ONLY**> Respond to any program-based Transportation Request (TR) Form submitted by the Broker within two (2) business days.

15. **DEMAND RESPONSE ONLY**> Exercise due diligence in actively seeking ride share opportunities among the transportation consumers served. Ride share may not add more than 45 minutes of additional travel time for any consumer as compared to direct routing of a consumer's transportation.

16. **DEMAND RESPONSE ONLY**> Exercise due diligence in actively verifying the identity of every Consumer transported prior to the Consumer boarding the vehicle or embarking on the trip. Identity should be verified by asking the Consumer to state their name, or in the case of Consumers traveling with escorts, children, or parents, asking that the name of the Consumer for whom the trip is scheduled be given. If the name given is not the name of the Consumer for whom the trip is scheduled, transportation should not be provided.

C. **PROGRAM AFFILIATION AGREEMENTS:** **Program-Based Transportation Only:**

The Transportation Provider shall:

1. Develop with the Facility Director (or his/her designee) and execute with the Facility a written affiliation agreement regarding the following:

**APPENDIX 1**
Transportation Provider Performance Standards
Revised: Effective 07-01-15

a. Inclement weather policy – the Transportation Provider's decision to cancel transportation during inclement weather should be made two to three hours before the Facility's start time in cooperation with the Facility Director.  If the Transportation Provider determines that road conditions are too dangerous, he/she may cancel transportation even if the Facility remains open; however, the Transportation Provider must notify the Facility and parents/guardians of the cancellation.

b. Overall communication procedures, including:

- Contact persons;
- Telephone/fax numbers; and
- Emergency contacts and telephone numbers.

c. Routing and schedules – including, specific arrival and departure locations and procedures and updated routing information as necessary. Transportation Provider is not required to remain longer than 15 minutes beyond the agreed upon departure time due to Consumer behavioral concerns.

d. Incident reporting procedures – including:

- The Transportation Provider shall immediately notify the Broker and the Facility of an Incident occurring during the transit of Consumers.
- A follow-up report shall be filed with the Broker and the Facility within twenty-four (24) hours.

e. Orientation - Drivers and Monitors (at the Transportation Provider's expense) must be available to attend an orientation with Facility staff within two weeks of hiring and annually thereafter.  This may include Sensitivity and Human Rights training.  The Transportation Provider shall initiate contact with the Facility to insure compliance and to coordinate the scheduling of the orientation.  The orientation will not exceed one hour in duration and its purpose is familiarization with Facility operations and sensitivity to Consumer needs.

2. Ensure that a copy of this Affiliation Agreement is kept on file at both the Transportation Provider and Facility offices.  This Affiliation Agreement shall be submitted to the Broker before the commencement of services.  Any disputes between the Transportation Provider and the Facility should be referred immediately to the Broker.

## D. **INCLEMENT WEATHER**

1. **UNIVERSAL>** It is the Transportation Provider's responsibility to make any decision to cancel transportation during inclement weather.  The primary consideration in this decision making process must always be Consumer safety.

2. **UNIVERSAL>** The decision to cancel transportation should:

a. Consider road conditions, weather forecasts, school closings, emergency declarations, etc.;

b. Be made in consultation with the Facility/Program, if applicable; and

c. Be made as soon as possible and optimally at least two hours before the scheduled trip.

3. **UNIVERSAL>** If the Transportation Provider determines that conditions are too dangerous for the safe transportation of Consumers, the Provider may cancel transportation even if the Facility or

**APPENDIX 1**
Transportation Provider Performance Standards
Revised: Effective 07-01-15

Program/MassHealth Provider remains open; however, the Transportation Provider must notify the Consumer, Program (if applicable) and Broker of the cancellation.

4. **UNIVERSAL>** When notifying Consumers of the cancellation of transportation, the Transportation Provider must emphasize that the cancellation is only for transportation and that the Program may still be open for service.

5. **PROGRAM-BASED TRANSPORTATION ONLY>** The Transportation Provider must also adhere to specific Affiliation Agreement requirements regarding inclement weather cancellation procedures. (See **Section II.C.1.a.** above.).

E. <u>**EMERGENCY, ACCIDENT AND SAFETY RESPONSE AND REPORTING**</u>

The Transportation Provider shall:

1. **UNIVERSAL>** Ensure that drivers and Monitors (where applicable) are aware of the condition of any Consumer while in transit and if an emergency arises (including, but not limited to bleeding, breathing difficulty, unconsciousness, suicide threat, etc.) adhere to the following procedures:

   a. Driver or Monitor must notify the dispatcher/supervisor immediately and if an emergency Facility (hospital, Police Dept., Fire Dept., etc.) that is known to be staffed with emergency response personnel is within one minute's travel time of the driver's location then proceed immediately to that emergency facility.

   b. If the driver is unsure of the distance, location or appropriate staffing of the emergency Facility or circumstances prohibit transport (i.e. disabled vehicle), or the nature of the emergency (i.e. life threatening) requires immediate first aid, then the driver should notify the dispatcher and give his/her exact location and request emergency assistance (EMT, ambulance, state/local police, Fire Department, etc.).

   c. If the emergency is the result of a motor vehicle accident involving personal injury and/or property damage, the driver must remain at the scene and request emergency assistance. The driver should then administer first aid as needed and when emergency personnel arrive, explain to them in detail the Incident and the care that was provided;

   d. Throughout the emergency, all possible efforts should be made to reassure and keep calm all Consumers in the vehicle.

   e. If requested, the dispatcher/supervisor must immediately contact emergency personnel that are nearest to the driver's location and dispatch a back-up vehicle to transport any Consumers not involved in the emergency to their destinations.

   f. The dispatcher/supervisor must notify the Facility, parents or residential staff and the Broker immediately by phone and provide the names of the Consumers involved and the nature of the emergency. Extreme care should be exercised so as not to alarm the caregivers of Consumers who may be in the vehicle but not in danger.

   g. A formal written report must be submitted to the Broker within 24 hours.

**APPENDIX 1**
Transportation Provider Performance Standards
Revised: Effective 07-01-15

2.  **UNIVERSAL>** Report immediately by phone to the Broker and the Facility, if applicable, each and every Critical Incident, as defined. The Transportation Provider shall establish live verbal contact with the Broker and the Facility, if applicable. Leaving a voicemail message does not satisfy this requirement.

    a.  In the event of a motor vehicle accident with Consumers on board, seek medical help as specified in Section II.E.1 above.  If there are no obvious injuries, consult with family, day or residential staff members to determine that need.  A formal written report shall be submitted to the Broker within twenty-four (24) hours; and

    b.  For any of the following Incidents involving a Consumer, whether injury is apparent or not, ensure the Driver reports to the Facility and the dispatcher; the dispatcher must in turn notify the Broker immediately by phone:

        (1) Falling while getting into or out of the vehicle;
        (2) Falling while in the vehicle;
        (3) Any assault, including biting Incidents; or
        (4) Emergency braking of the vehicle or any other Incident that results in tipping over of a wheelchair.

3.  **UNIVERSAL>** Comply with M.G.L. chapter 119, §51A, M.G.L. chapter 19A, §15 and M.G.L. chapter 19C regarding mandated reporting of suspected abuse or neglect, as follows:

    a.  Transportation Provider employees who, in their professional capacity, have reasonable cause to believe that abuse of a disabled person, elder person, or abuse or neglect of a child has occurred shall make an oral report to their supervisor immediately and in writing within twenty-four (24) hours after the oral report;

    b.  The supervisor must notify the Referring Agency and Broker immediately by phone and submit a copy of the report within twenty-four (24) hours;

    c.  Further, the Provider shall ensure the appropriate state investigative agency is notified:

        (1) If a disabled person between the ages of 18 to 59 is involved, then notify the Disabled Persons Protection Commission (DPPC) at **1-800-426-9009;**
        (2) If abuse of an elder person (60 years of age and older) is involved, contact the Elder Abuse Hotline at **1-800-922-2275;**
        (3) If a child up to 18 years of age is involved, notify the Department of Children and Families (DCF) – Child at Risk Hotline at: **1-800-792-5200;** or
        (4) If a Consumer of any age residing in a long term care facility is involved, notify the Department of Public Health at **1-800-462-5540.**

    d.  Cooperate with the DPPC, DCF and the Agency in the investigation and disposition of any complaint or claim alleging individual abuse by a Transportation Provider employee.

4.  **UNIVERSAL>** Investigate and correct immediately any negative safety or Incident reports issued by the Broker, HST Office, Facility staff or the Provider itself and contact the Broker by telephone within one (1) business day of receipt of the form.  Verify the investigation, correction and any other  action taken in writing to the Broker within three (3) days of receipt of the report.

5.  **DDS AND DAYHAB ONLY>** Ensure that drivers and Monitors (where applicable) provide verbal reports of all acts of assault and/or seizure activity by the Consumer or any other significant Incident to their supervisor and to the Facility and/or residential program staff. The Transportation Provider must report

**APPENDIX 1**
Transportation Provider Performance Standards
Revised: Effective 07-01-15

orally to the Broker that day and must follow up with a written Incident report, submitted within twenty-four (24) hours, for all acts of assault, self-abuse, refusal to use seat belt, incontinence, seizure activity or any other significant health or safety concern.

6. **DMH ONLY>** Ensure that Drivers and Monitors (where applicable) provide verbal reports of the following incidents to their dispatcher/supervisor, and to the Facility and/or residential staff: any injury that requires medical intervention or hospitalization; any event that results in serious disability; any sexual assault or alleged sexual assault; any physical assault which results in staff or client requiring medical intervention or hospitalization; any arrest; any incident that results in police or fire intervention during transit. Verbal reports must be filed on the day of the incident and written reports must be filed with the Broker and the Facility within twenty-four (24) hours.

F. **INSURANCE REQUIREMENTS**

The Transportation Provider shall:

1. **UNIVERSAL>** Maintain Workers Compensation insurance on all employees/agents including owner(s) even in the case of a sole proprietorship who work under the provisions of the Transportation Provider Subcontract with the Broker, and furnish a certificate of insurance to the Broker evidencing compliance with this provision prior to transporting any Agency Consumers.

2. **UNIVERSAL>** Subject to subsection **F.3** below as applicable, maintain liability insurance on all vehicles used under the Transportation Provider Subcontract with Broker at a level that meets or exceeds the amount of compulsory motor vehicle liability insurance level required by state regulation. (Liability: $20,000/person and $40,000/occurrence; Property damage: $5,000). The Broker shall be named as an "additional insured" on the policy and the Provider shall submit a certificate of such insurance to the Broker before transporting any Agency Consumers.

3. **PROGRAM-BASED TRANSPORTATION ONLY>** Ensure the following limits of liability insurance are maintained as a minimum on all vehicles used for Program-Based Transportation, unless a higher level is required by federal or state regulation (such as DTE 220 CMR 152.04), by an Agency or by the Broker, in which case, the higher level must, as a minimum, be met and maintained. The Broker shall be named as an "additional insured" on the policy and the Provider shall submit a certificate of such insurance to the Broker before transporting any Agency Consumers.

| Vehicle seating capacity < 6 (including driver) | Vehicle seating capacity 6-8 (including driver) | Vehicle seating capacity 9-15 (including driver) | Vehicle seating capacity >15 (including driver) |
|---|---|---|---|
| State mandated minimum coverage: ($20,000/$40,000) Property: $5,000 | Combined liability: $500,000 Property: $50,000 | Combined liability: $1,500,000 Property: $50,000 | Combined liability: $5,000,000 Property: $50,000 |

**APPENDIX 1**
Transportation Provider Performance Standards
Revised: Effective 07-01-15

## G. COMMUNICATIONS/DISPATCH

The Transportation Provider shall:

1. **UNIVERSAL>** Establish and maintain communications capability from 8:00 AM to 5:00 PM Monday through Friday plus any additional time a Provider vehicle is still in service, except for all holidays on which the state agencies are closed, in order to receive and respond to telephone requests from the Broker, Agency and/or Consumers regarding HST Services to Consumers.

2. **UNIVERSAL>** Provide twenty-four (24) hour answering system or service to record messages and to inform Consumers of transportation options available outside of regular service hours.

3. **UNIVERSAL>** Ensure there is no contact with any Consumer or their caregiver/guardian for any reason other than to exchange information that is necessary in the provision of transportation services. Any other contact (i.e. investigation of service complaints, surveys, etc.) must have prior written approval from the Broker and Facility, if applicable.

## III. VEHICLE AND EQUIPMENT REQUIREMENTS

## A. MINIMUM STANDARDS FOR VEHICLES

1. **UNIVERSAL>** The Transportation Provider shall ensure that vehicles (both primary and backup) conform to all applicable state and federal statutes, regulations or standards, including, but not limited to the rules and regulations of the Agencies, the Broker, and the Registry of Motor Vehicles.

2. **UNIVERSAL>** All vehicles used under the terms of the Transportation Provider Subcontract with Broker must:

   a. Be garaged and registered in the Commonwealth of Massachusetts;

   b. Have passed inspection by the Registry of Motor Vehicles prior to being used under the Transportation Provider Subcontract with the Broker with written verification kept on file at the Transportation Provider's offices;

   c. Be clearly identified with the corporate or business name affixed to the vehicle in a permanent or semi-permanent manner in no less than two (2) inch high letters. One location of such name shall be on the right side of the passenger's door, and the other shall be located on the rear of the vehicle, as per Registry of Motor Vehicles regulations. No advertising or other labeling is permitted while Consumers are in the vehicle unless specifically authorized by the Broker;

   d. Be maintained in good working order (including but not limited to brakes, tires, heater, windshield, wipers, defroster, speedometer, etc.) with an established preventive maintenance program and all necessary gasoline, oil, grease, and repairs furnished through the entire period of the Transportation Provider Subcontract with Broker; and

   e. Be cleaned regularly and have exteriors which are free of grime, cracks, breaks, dents, and damaged paint that noticeably detracts from the overall appearance of the vehicle, in addition, passenger compartments must be clean and free from torn upholstery or floor coverings, damaged or broken seats, and protruding sharp edges.

**APPENDIX 1**
Transportation Provider Performance Standards
Revised: Effective 07-01-15

3. **UNIVERSAL>** Vehicles must be equipped with:

   a. A seat with installed seat belts for every vehicle occupant (including driver and Monitor), which shall be in proper working order and accessible to the occupant. The Transportation Provider shall provide a seat belt cutter within easy reach of the driver, and seat belt extensions and seat belt covers, when needed;

   b. A cellular phone or FM two-way radio licensed under the direction of the Federal Communications Commission. Mobile units shall be able to contact the base station at all times while Consumers are on board. The base station shall be manned while any vehicle is in transit and vehicles in transit and the base station must be able to communicate at all times;

   c. A working air conditioning system of sufficient capacity to cool the entire vehicle (auxiliary air may be necessary);

   d. Snow tires or their equivalent during the period November 15 through April 15 of each year;

   e. Spare tire and jack (unless covered by vendor maintenance policy);

   f. Portable step (optional for lift equipped vehicles) – Stools should be made of high-strength material, preferably metal and have rubber tips on the bottom to prevent slipping on wet or icy pavement. The design must be satisfactory to both the Transportation Provider and the Agency;

   g. Chock blocks, multifunctional fire extinguisher (universal class C, UL rated), flags, reflectors, and flashlight; and

   h. A first aid kit that meets the Red Cross family first aid kit standards plus a biohazard bag.

4. **PROGRAM-BASED TRANSPORTATION ONLY>**

   a. During the term of the Transportation Provider Subcontract with Broker, vehicles may not have a date of manufacture that is equal to or more than:

      (1) **Five (5) years** for vans, sedans & station wagons; and

      (2) **Seven (7) years** for wheelchair lift equipped vehicles and vehicles with seating capacity > 15.

   b. Notwithstanding the provisions of **4.a.** above, a Transportation Provider may submit to the Broker a formal written request for a vehicle age waiver along with proof of a Massachusetts state inspection sticker no older than 60 days from the date of the request. The Broker may grant waivers in six month increments for up to a maximum of two additional years of vehicle age, beyond the vehicle age limit set forth in subsection 4.a.i and ii, above, as applicable, upon physical inspection and written approval by the Broker for each such request. Vehicles must pass a new Massachusetts state inspection for each six-month waiver granted.

   c. Notwithstanding the provisions of **4.a.** above, for those vehicles undergoing conversion before initial use, the vehicle age may be calculated beginning from the date of registration after conversion (rather than date of manufacture), with documentation of the initial vehicle registration date kept readily available for inspection by the Broker.

**APPENDIX 1**
Transportation Provider Performance Standards
Revised: Effective 07-01-15

d. Regardless of vehicle age, the Transportation Provider must comply with any instruction from the Broker to immediately remove a vehicle from services when deemed unsafe or unsuitable by the Broker.

**B.  NON-AMBULATORY VEHICLE (CHAIR CAR) ADDITIONAL REQUIREMENTS AND SECUREMENT STANDARDS**

1. **UNIVERSAL>** Any vehicle used for Non-Ambulatory Transportation must be equipped with the following equipment specifications:

   a. A hydraulic lift with manual backup operational capacity and/or retractable ramp;

   b. A raised roof at least 12 inches high;

   c. Raised side doors at least 54 inches high; and

   d. Four securement straps, a lap belt and a shoulder belt assembly for each wheel chair. If the vehicle is equipped with a "locking bar" system, then only two securement straps are needed for that chair.

2. **UNIVERSAL>** Wheel chair securement requirements are as follows:

   a. All wheel chairs must face forward in van;

   b. All wheel chairs must be secured in the front and rear. If using a "locking bar' system, the front of the wheel chair must still be secured with straps;

   c. All Consumers must be secured into their wheel chairs using the lap/shoulder belt assembly that works in conjunction with the securement system. The lap/shoulder belt assembly must be used in addition to any other wheel chair securement devices;

   d. The use of table/tray attachments must not interfere with proper securement of Consumers by lap/shoulder belt assemblies.  They must be removed if they prevent the Consumer from being properly secured; and

   e. Do not use the shoulder belt if it extends across the Consumer's neck or face, or if there is a medical condition that interferes with its proper use. (i.e., feeding or breathing tubes).

3. **UNIVERSAL>** Drivers operating non-ambulatory vehicles for HST work under the Transportation Provider Subcontract with Broker must receive hands-on training in order to ensure that they understand and are able to properly follow the procedures for proper securement of wheelchairs in vehicles prior to transportation.

**APPENDIX 1**
Transportation Provider Performance Standards
Revised: Effective 07-01-15

## IV. PERSONNEL REQUIREMENTS

### A. DRIVER QUALIFICATIONS

1. **UNIVERSAL>** Drivers must have a valid Massachusetts Drivers License (or valid license from a contiguous state) appropriate to the type of vehicle they will be operating and at least 3 years of driving experience, including experience driving multi-passenger vehicles.

2. Drivers must be at least nineteen (19) years of age and have completed all required training specified in Section IV.C prior to HST work.

3. Drivers must furnish written references, have effective oral communication skills in English sufficient to communicate effectively with Consumers and facilities' staff and to perform their other job duties, and undergo a Criminal Offender Record Information (CORI) check, with results verified, prior to any contact with Agency Consumers. The references and CORI must remain on file at the Transportation Provider's place of business and the CORI must be conducted annually thereafter. The Transportation Provider must follow the DCJIS requirements for CORI request procedures, and hire in accordance with 101 CMR 15.00.

4. Drivers must supply written health records on their physical condition and must be physically able to assist Consumers entering and exiting vehicles.

    4.a. **DPH ONLY>** The Transportation Provider must ensure that drivers have had a physical examination before any contact with Agency Consumers (within the preceding twelve months). The examination must verify good physical health and be conducted bi-annually thereafter (if over 70 years of age the physical examination requirement will be annual). The examination must include a vision and hearing test and a Mantoux TB test. The results of the TB test must be verified negative; however, (if test results are positive the individual may still be eligible, upon approval of the Broker).

5. **UNIVERSAL>** Transportation Providers must obtain a driving history report for each of its drivers and driver applicants from all appropriate state agenc(ies) on any moving violations. The report(s) must be obtained and maintained on file at the transportation provider's place of business prior to any contact by the driver with Agency Consumers. The Transportation Provider must secure a driving history report from every state in which the driver applicant resided or was a licensed motor vehicle operator during the past 10 years. The Transportation Provider must exercise judgment in determining the appropriateness of any driver whose report(s) indicates any violation. The driving history report(s) must be updated and reviewed annually, and at a minimum, should not reflect within the previous 10 years any of the violations specified below:

    - Driving under the influence of alcohol or drugs/driving while intoxicated;
    - Reckless driving/driving to endanger;
    - Leaving the scene of an accident;
    - Driving without a license and/or insurance;
    - Driving with a suspended license; and
    - Any record with multiple or repeated violations (other than parking).

    At a minimum, if any of the above violations are found within the previous 10 years, that driver or driver applicant should be prohibited from contact with HST Consumers.

**APPENDIX 1**
Transportation Provider Performance Standards
Revised: Effective 07-01-15

6. **UNIVERSAL>** All drivers and Monitors who work under the provisions of the Transportation Provider Subcontract with an HST Broker shall adhere to the following provisions regarding drug/alcohol testing. All drug and alcohol testing must be conducted by an independent (non-affiliated/off-site) laboratory certified under the National Laboratory Certification Program (NLCP). Transportation Providers are not allowed to collect testing samples or conduct any testing, whether at the Transportation Provider's facilities or otherwise.  Drug testing must be conducted for marijuana (THC), cocaine, opiates, amphetamines and phencyclidines (PCP), and the results must be verified as 'negative.'

   a. Reasonable suspicion - Any driver or Monitor who is suspected to be under the influence of alcohol or drugs must be removed immediately from any contact with Agency Consumers and the removal must remain in effect pending the results of a drug/alcohol test.  The alcohol test must be conducted within 8 hours of the Incident and the drug test within 32 hours.  Positive test results or failure to administer the test within the prescribed time limits will result in the permanent removal of the individuals from any Agency contract work.

   b. Post accident - Any driver or Monitor involved in an accident with Agency Consumers on board the vehicle must be removed immediately from any contact with Agency Consumers, and the removal must remain in effect pending the results of a drug/alcohol test.  The alcohol test must be conducted within 8 hours of the Incident and the drug test within 32 hours.  Positive test results or failure to administer the test within the prescribed time limits will result in the permanent removal of the individuals from any Agency contract work. For this provision, an accident includes, but is not limited to, an occurrence associated with the operation of a vehicle, if as a result:

      (1) An individual dies; or

      (2) An individual suffers bodily injury and immediately receives medical treatment at or away from the scene of the accident; or

      (3) One or more vehicle(s) involved incurs disabling damage and such vehicle or vehicles are transported away from the scene by a tow truck or other vehicle; or

      (4) There has been $1000 or more of property damage.

7. **PROGRAM-BASED TRANSPORTATION ONLY>** All drivers and Monitors who work under the provisions of the Transportation Provider Subcontract with the Broker shall adhere to the following additional provisions regarding drug/alcohol testing.

   a. Pre-contact – Prior to being assigned to any work directly or indirectly involving Agency Consumers, undergo a drug test as described in **Section IV.A.6.**, above.

**B. MONITOR QUALIFICATIONS**

1. **UNIVERSAL>** Monitors must be at least nineteen (19) years of age and have completed all required training specified in Section IV.C prior to HST work.

2. **UNIVERSAL>** Monitors must furnish written references, have effective oral communication skills in English sufficient to communicate effectively with Consumers and facilities' staff and to perform their other job duties, and undergo a Criminal Offender Record Information (CORI) check, with results verified, prior to any contact with Agency Consumers.  The references and CORI must remain on file at the Transportation Provider's place of business and the CORI must be conducted annually thereafter.

**APPENDIX 1**

Transportation Provider Performance Standards
Revised: Effective 07-01-15

The Transportation Provider must follow the DCJIS requirements for CORI request procedures, and hire in accordance with 101 CMR 15.00.

3.  **UNIVERSAL>** Monitors must be physically able to assist Consumers entering and exiting vehicles.

    **3.a.  DPH ONLY>** The Provider must ensure that Monitors have a Mantoux TB test. The results of the TB test must be verified negative; however, if test results are positive the individual may still be eligible, upon approval of the Broker.

4.  **UNIVERSAL>** If any Monitor is ever to be used as a driver, he or she must meet all driver qualifications prior to work as a driver.

5.  **PROGRAM-BASED TRANSPORTATION ONLY>** Monitors are also subject to the drug/alcohol testing provisions set forth in **Section IV.A.6.**

## C.  DRIVER AND MONITOR TRAINING

The Transportation Provider shall:

1.  **UNIVERSAL>** Ensure that all drivers and Monitors have successfully completed the applicable in-service training program prior to their transporting any HST Consumers. The Broker reserves the right to request documentation of trainings conducted. The mandatory training shall include at a minimum the following and must be conducted annually thereafter:

| Program Application | TRAINING REQUIREMENT |
|---|---|
| Universal | DRIVER ONLY: Driver rules and regulations; Defensive driving & reacting to skids, and Vehicle stalling & brake failure |
| Universal | DRIVER AND MONITOR: Proper use of vehicle safety equipment; content and use of all first aid kit items; use of two-way radios, if applicable, and emergency vehicle evacuation procedures |
| Universal | DRIVER AND MONITOR: Accident procedures & Incident reporting |
| Universal | DRIVER AND MONITOR: Correct use of Consumer seat belts, including correct use of child safety restraint devices for all programs serving children |
| Universal | DRIVER AND MONITOR: Use of Wheelchair lift & proper wheelchair securement |
| Universal | DRIVER AND MONITOR: Human rights and sensitivity to Consumer needs, including disability awareness, passenger assistance and accommodations for service animals (guide dogs) in vehicles |
| Universal | DRIVER AND MONITOR: Familiarization with the HST and Agency standards, specifications and procedures, including mandated reporting of suspected abuse or neglect and suspected Medicaid member or provider fraud and abuse, driver and monitor performance standards, consumer pickup protocols, and data privacy and security rules and requirements, including compliance with the HIPAA Rules, EO 504 and all other applicable laws, regulations, policies, procedures and standards applicable to Transportation Provider (including those set forth in **Section VIII,** below) |
| Program-Based | DRIVER AND MONITOR: First aid; reaction to seizures, universal precautions and "vehicle empty" inspection procedure |
| DPH Only | DRIVER AND MONITOR: Certified in basic first aid (4 hours). The certification must be through the American Red Cross, American Heart Association, or other equivalent training approved by the Broker and must be kept current |

**APPENDIX 1**
Transportation Provider Performance Standards
Revised: Effective 07-01-15

| DPH Only | DRIVER AND MONITOR: Certified in CPR for infants and children. The certification must be through the American Red Cross, American Heart Association, or other equivalent training approved by the Broker and must be kept current |
|---|---|

2. **UNIVERSAL>** Ensure that drivers and Monitors attend Broker sponsored, coordinated, or arranged meetings as determined to be necessary by the Broker.

3. **UNIVERSAL>** Ensure that drivers have a good basic knowledge of the service area and are provided with detailed maps of the service area. Drivers and dispatchers must be aware of the locations and telephone numbers of emergency facilities (police, fire, hospital, etc.) in the service area.

4. **PROGRAM-BASED TRANSPORTATION ONLY>** Pre-qualify drivers prior to being assigned to a route:

   a. Current Transportation Providers -- driver must accompany an experience driver or supervisor on a minimum of one established route during regularly scheduled Facility hours.

   b. New Transportation Providers -- driver must accompany a supervisor on a minimum of one simulated route in the service area during regularly scheduled Facility hours.

**D. PERSONNEL POLICIES/DOCUMENTATION**

The Transportation Provider shall:

1. **UNIVERSAL>** Maintain a personnel file on each driver (including owners when they have driving responsibilities) and Monitor which shall include:

   a. Credentials;

   b. Written references;

   c. Copy of driver's license (drivers only);

   d. Results from annual CORI check;

   e. Health records, including results of drug/alcohol testing and any other agency specific requirements (annual health exam, TB test, etc.);

   f. Annual driving history reports from the appropriate state agenc(ies) (drivers only);

   g. Training records;

   h. Performance evaluation results; and

   i. Any other Broker required documents.

   This file shall be available for review by the Broker and/or HST Office, upon request.

2. **UNIVERSAL>** Develop and maintain written procedures for driver and Monitor orientation and training, and performance Monitoring.

**APPENDIX 1**
Transportation Provider Performance Standards
Revised: Effective 07-01-15

# V. DRIVER AND MONITOR PERFORMANCE STANDARDS

1. **UNIVERSAL>** Ensure that drivers and Monitors (where applicable) are clean and neat in appearance and look professional.  Blouses, shirts, skirts, slacks and pants are acceptable.  Clothing must not be ripped or torn.

2. **UNIVERSAL>** Ensure that all personnel exercise patience and sensitivity and be exemplary in speech and action whenever they are in contact with parents, Consumers and Facility staff.  Drivers and Monitors should not discuss with parents or residential staff the behavior or medical condition of any other individual other than those the parents or staff are directly responsible for.

3. **UNIVERSAL>** Ensure drivers do not use drugs or alcohol at any time when it might affect a safety sensitive duty (including, but not limited to, within the 4 hours preceding driving), and if taking medications, must still be able to perform his/her duties in a safe manner.  Any driver taking medications that may hinder performance must report such use to his/her supervisor, and not transport Agency Consumers.

    **3.a. DPH ONLY>** Ensure that drivers report in person to supervisory staff at the Transportation Provider's place of business on any day they will be transporting Agency Consumers.  This may be done at any time of the day during the Transportation Provider's normal working hours.

4. **UNIVERSAL>** Ensure that drivers and Monitors (where applicable) adhere to the following:

    a. If a driver should need to call their base using a cell phone, the vehicle must be stopped in a safe location to allow for safe usage (dialing, etc.). Drivers must **NEVER** text message while they have Consumers on board;

    b. No eating or drinking is allowed in the vehicle while any Consumer is in the vehicle (this also applies to the driver and Monitor);

    c. The doors of the vehicle are closed and locked while the vehicle is in motion (except for the rear emergency door of vehicles which must remain unlocked in transit);

    d. No fueling of the vehicle is conducted while Consumers are on board;

    e. All vehicles used to transport Consumers must be smoke free and no driver or Monitor may smoke on the grounds of the Facility, Residence or Day Care Facility;

    f. Only the driver shall occupy the driver's seat;

    g. Shut off the vehicle and remove the keys when not occupying the driver's seat (not applicable for vehicles when operating hydraulic lift);

    h. No pushing a vehicle with their vehicle or allowing the vehicle to be pushed while a Consumer is located in either vehicle;

    i. Operate vehicles at all times in compliance with all federal, state and local laws;

    j. No personal stops while transporting HST Consumers, unless specifically authorized;

**APPENDIX 1**
Transportation Provider Performance Standards
Revised: Effective 07-01-15

k.  No headphones (including Bluetooth or any other type of wireless phone headset) while on duty; and

l.  **No** firearms, alcoholic beverages, unauthorized controlled substances or highly combustible materials shall be transported in the vehicle.

5.  **UNIVERSAL>** Ensure that drivers and Monitors assist all Consumers upon entering and exiting the vehicle and assist in securing and releasing car seats and seat belts, as needed.  The driver is ultimately accountable to ensure that all passengers, both adults and children, are properly secured with seat belts or in car seats before any movement of the vehicle and en route.  Drivers and Monitors (where applicable) must not leave a vehicle unattended at all times when Consumers are in the vehicle.

6.  **UNIVERSAL>** Ensure compliance with Massachusetts Seat Belt Law & Child Passenger Safety Law - MGL, C. 90, S. 13A & C. 90, S. 7AA. The Transportation Provider is not responsible to furnish car seats, only to insure that they are being used properly when needed.  Vehicles for hire, including taxicabs are not exempt. The standards are as follows, unless an exemption under the law is applicable.

    a.  Children under 8 years of age must be properly secured in an appropriate child passenger restraint (as defined in MGL C.90 S.1), unless they are more than 57 inches tall;

    b.  Children under 13 years of age must wear a properly adjusted and fastened safety belt, unless required to be in a child passenger restraint;

    c.  Older children and adults must wear a safety belt; and

    d.  Child passenger restraints must meet current federal motor vehicle safety standards (49 CFR 571.213) and be in good working order, properly used and installed in the vehicle as specified by the manufacturer's instructions.  Child passenger restraints may not be altered or modified unless approved by the manufacturer.  Any restraint involved in a crash should no longer be used.

7.  **UNIVERSAL>** Ensure that:

    a.  No Consumer is seated in any side or rear-facing seat (only forward facing seats);

    b.  No child under 12 years of age is seated in the front passenger seat of any vehicle equipped with a front air bag on the passenger side; and

    c.  No child in a child passenger restraint is in the rear most bench seat of a fifteen-passenger van.

8.  **UNIVERSAL>** Ensure that drivers and Monitors (where applicable) do not discipline any Consumer, under any circumstances.  Circumstances that warrant action shall be reported at once to the appropriate Facility staff and to the Broker.  Any behavior or Incident that affects the safety of Consumers should be reported immediately to the dispatcher and when required, the vehicle shall pull to a safe place to address the situation.

9.  **UNIVERSAL>** Ensure that drivers carry and maintain "fact sheets" and/or Transportation Plans and daily attendance and/or trip/route sheets for all Consumers on their route.  Driver must maintain the log/trip sheet legibly and completely.

10. **UNIVERSAL>** Ensure that Monitors, in addition to all other requirements contained herein, perform the following:

**APPENDIX 1**
Transportation Provider Performance Standards
Revised: Effective 07-01-15

a.   Constantly observe/monitor the Consumer(s) to whom they are assigned while in transit;

b.   Provide one-to-one assistance to Consumers, upon assignment, but also provide supervision and assistance to other Consumers on the vehicle when necessary;

c.   Follow designated assignments and accept supervisory guidance;

d.   Attend specialized training upon request by the Broker.  The Broker reserves the right to request documentation of trainings conducted;

e.   Intervene only to prevent injury from occurring to a Consumer.  Inform the driver of any situation that threatens or appears to threaten the well being of any Consumer;

f.   Notify Facility staff of any significant Incident that occurred while in transit;

g.   Individual Monitors must sit next to the individual Consumer Monitored, or if a group Monitor, be seated in one of the middle or rear seats of the vehicle while any Consumer is in the vehicle.  Monitor should under no circumstance be seated in the front seat with the driver; and

h.   Perform any additional Consumer-specific duties.  The Broker may request that the Monitor assist the Consumer when necessary from door to door.

11.  **UNIVERSAL>** Ensure that drivers and Monitors release children and cognitively impaired Consumers only to authorized individuals and that they confirm the identity of any individual to whom they release the Consumers.  Drivers that are not familiar with a person(s) authorized to take custody of the Consumers must confirm identification of the person(s) either through a photo ID or physical description, confirmed by Facility personnel (drivers should never ask a person if they are "Ms. Jones;" rather drivers should ask the person to give their name).  Whenever there is any doubt, contact the Facility and if necessary, return the Consumer to the Facility and notify the Broker immediately.  In addition to caution, drivers and Monitors must exercise sensitivity in these situations.

12.  **UNIVERSAL>** Ensure that all equipment is properly secured at all times and kept out of the reach of Consumers.  The satisfactory condition of any vehicle and equipment is subject to the discretion of the Broker.

13.  **UNIVERSAL>** Ensure that when in transit, any medical equipment (oxygen tanks, Monitoring equipment, etc.) is positioned and secured to the floor, vehicle seat or wall of the vehicle below the window line.  Bungee cords and/or Velcro are not acceptable securement devices.

14.  **UNIVERSAL>** Ensure that drivers perform a daily vehicle inspection before picking up any Agency Consumers. The daily vehicle inspection must be documented in writing and kept on file for three months.

15.  **PROGRAM-BASED TRANSPORTATION ONLY>** Ensure that drivers and Monitors wear in plain view a uniform photo ID card clearly displaying his/her picture, full name and the Transportation Provider's name.

16.  **PROGRAM-BASED TRANSPORTATION ONLY>** Ensure that drivers, after discharging all Consumers on a route (inbound or outbound), physically inspect the entire interior section of the vehicle to ensure that all Consumers have exited and no Consumer belongings have been left behind and place a "Vehicle Empty" sign in the rear window.

**APPENDIX 1**
Transportation Provider Performance Standards
Revised: Effective 07-01-15

17. **PROGRAM-BASED TRANSPORTATION ONLY>** Ensure that whenever a driver transports a Consumer to a Residence or Facility that shows no evidence of a parent/guardian, residential staff or other authorized person, that the driver immediately notify the supervisor/dispatcher who must (unless otherwise specified in writing by the Broker):

   a. Notify the transportation coordinator or director at the Consumer's Facility;

   b. Attempt to contact the parent/Day Care provider by phone;

   c. If there are other Consumers on the vehicle instruct the driver to continue on with the route and then return;

   d. If there are no other Consumers on the vehicle and no contact with the parent/Day Care provider has been established, then notify the transportation coordinator or director at the Consumer's Facility and return the Consumer to the Facility; and

   e. If there is no authorized staff at the Consumer's Facility or if unable to contact the Facility, then notify the Broker.

At this point, if no contact can be established with the parent, residential staff, or Facility staff then the Broker will:

> **For children under 12 (DPH EI or unaccompanied MassHealth children)** - instruct the supervisor to notify the Department of Children and Families (DCF) and to turn the child over to DCF as an abandoned child (Transportation Provider must be aware of local and after hours DCF telephone numbers).

> **For DDS/MassHealth Day Habilitation Consumers** – immediately contact the area DDS Administrator on-call for resolution.

A written report must be submitted to the Broker within 24 hours of the Incident.

## VI. TRIP PERFORMANCE STANDARDS

### A. TIME MEASURED STANDARDS

1. **UNIVERSAL> On-Time Arrival.** The driver shall make his presence known to the Consumer (briefly sounding the horn, if necessary.) If the Consumer is then not present for pick up, the driver shall notify the Provider's dispatcher and await instructions from the dispatcher before departing from the pick-up location. Unless otherwise directed by the dispatcher, the driver shall wait until at least five minutes after the scheduled pick-up time before departing without the Consumer. The Transportation Provider cannot change the assigned pickup time without permission from the Broker. If the driver cannot arrive on time to the pick-up location, the Provider shall notify the Broker and attempt to contact the Consumer or Consumer's representative and the Facility, if applicable. The performance goal is 100% on-time performance and late or missed trips may subject the Provider to the Broker's Provider Accountability Policy (see Section 5.2.A.7 of the HST Broker Services Contract).

2. **PROGRAM-BASED TRANSPORTATION ONLY>** The Transportation Provider shall transport Consumers from their respective residences to the sites and at the times specified by the Broker on days that the programs are in session during the performance period of the Transportation Provider Subcontract with the Broker. Consumers will similarly be returned to their respective residences.

**APPENDIX 1**
Transportation Provider Performance Standards
Revised: Effective 07-01-15

3.  **PROGRAM-BASED TRANSPORTATION ONLY>** The Transportation Provider shall notify the Consumer or responsible person of the times that the Consumer will be transported, no later than at least twenty-four (24) hours prior to initiation of transport or any changes in the schedule during the course of the Transportation Provider Subcontract with Broker.  (For Demand-Response Transportation the Provider is not responsible for communicating with Consumers about pickup time.)

4.  **PROGRAM-BASED TRANSPORTATION ONLY>** The Transportation Provider shall ensure that Consumer pick-up and drop-off times at their residence and day program are maintained and are as constant as can be reasonably expected. The Broker/Agency may require that actual pick-up and drop-off times begin to be recorded and submitted for specific routes where problems have arisen. Additionally, if a Consumer is not immediately present, the driver should initiate a call to the dispatcher who will attempt to contact the Consumer's residence by telephone, and may be required to remain longer than five minutes for certain Consumers due to the presence of a physical limitation, behavioral challenge, or extreme weather conditions.

5.  **PROGRAM-BASED TRANSPORTATION ONLY>** Ensure that Consumers are transported within the following timelines:

    a.  Pick up at their Residence or Day Care site within 15 minutes (plus or minus) of their scheduled pick up time. In the event of a possible Consumer "no-show", Drivers must radio the dispatcher who in turn will attempt to contact the Consumer by phone. Drivers should initiate a call to the dispatcher within two minutes of arriving at a Consumer's residence. However, they need not wait more than five minutes for an acknowledgement before continuing on with the route. In no event shall a driver be considered to have fulfilled the obligation by merely sounding the horn.

    b.  Arrive at the Destination Facility for drop-off no earlier than 15 minutes prior to and no later than the Facility's scheduled starting time. At the discretion of the Facility, Consumers may be required to wait in the vehicle until the scheduled starting time.

    c.  Arrive at the Facility for the return trip no earlier than 15 minutes prior to and no later than the Facility's scheduled ending time, or other agreed upon time if multiple sites are combined on one route, when transporting Consumers from the Facility to their Residence or Day Care site.

    d.  Drop off at their Residence or Day Care site within 15 minutes (plus or minus) of their scheduled return time.

    e.  No Consumer under six (6) years of age is to be on board a vehicle for more than 45 minutes, no Consumer six (6) years of age and older is to be on board a vehicle for more than 90 minutes and in all cases transportation will be as expeditious as is practical under the circumstances.

    f.  Drivers must radio their dispatcher if their route is running more than 15 minutes late. The Dispatcher shall notify a responsible person at the Consumer's Residence and/or Facility.

6.  **PROGRAM-BASED TRANSPORTATION ONLY>** Implement the following procedures when notified that a vehicle with Consumers on board is overdue en route to a Destination Facility. The Dispatcher shall:

    a.  Attempt to establish radio contact with the driver;

    b.  Maintain contact with the person who initiated the report;

    c.  Inform Facility staff of the delay;

**APPENDIX 1**
Transportation Provider Performance Standards
Revised: Effective 07-01-15

d. **When 15 minutes has elapsed since the Facility's scheduled starting time**: continue with the above and contact all residences on the route to verify if and when the Consumer was picked up and confirm the missing vehicle's description (make, model, year, color & license #);

e. **When 30 minutes has elapsed since the Facility's scheduled starting time**: continue with the above, maintain contact with residences and dispatch a radio equipped backup vehicle to follow the missing vehicle's route; and

f. **When 45 minutes has elapsed since the Facility's scheduled starting time**: continue with the above and notify the local/state police.

The Transportation Provider shall notify the Broker and submit a written report to the Broker within 24 hours detailing the Incident, outcome, investigation and action taken.

7. **PROGRAM-BASED TRANSPORTATION ONLY>** Implement the following procedures when notified that a vehicle with Consumers on board is overdue <u>en route to a Residence or Day care site</u>:

a. Attempt to establish radio contact with the driver;

b. Maintain contact with the person who initiated the report;

c. Contact Facility staff;

d. When 30 minutes has elapsed since the designated drop-off time or 75 minutes since the Facility's scheduled ending time (whichever comes first): continue with the above and contact all residences on the route for verification that the Consumer was dropped off, dispatch a radio equipped backup vehicle to follow the missing vehicle's route and confirm the missing vehicle's description (make, model, year, color & license #).

e. When 45 minutes has elapsed since the designated drop-off time or 90 minutes since the Facility's scheduled ending time (whichever comes first), continue with the above and notify the local/state police.

The Transportation Provider shall notify the Broker and submit a written report to the Broker within 24 hours detailing the Incident, outcome, investigation and action taken.

B. <u>**QUALITY MONITORING**</u>

The Transportation Provider shall:

1. **UNIVERSAL>** Respond to complaints forwarded by the Broker within 48 hours and provide resolution and/or a corrective action plan approved by the Broker.

2. **UNIVERSAL>** Cooperate and participate in Broker or Agency on-site visits of the Transportation Provider's place of business and inspection of business records and vehicles.

3. **UNIVERSAL>** Upon request, make available any vehicles used in HST work for Broker or Agency inspection according to the contract requirements.  Implement a system of reporting and tracking such inspections.

**APPENDIX 1**
Transportation Provider Performance Standards
Revised: Effective 07-01-15

4. **PROGRAM-BASED TRANSPORTATION ONLY>** Conduct a minimum of two (2) inspections annually (that drivers or Monitors are not aware of in advance) at each contracted Facility site or en route. The inspection is to Monitor the driver's (and Monitor if applicable) performance and the condition of the vehicle and equipment. Inspections must be conducted by supervisory staff at regularly scheduled Consumer drop off or pick up times and a report on the results of each such inspection is to be forwarded to the Broker within 30 days. In cases where complaints or disputes arise, additional inspections may be required by the Broker to be held at the Facility site, Consumer's residence or at any point along the route. Inspection reports must be documented in writing and maintained for annual inspection.

C. <u>CORRECTIVE ACTION/PROVIDER ACCOUNTABILITY</u>

1. **UNIVERSAL>** If the Broker or the HST Office representative identifies, in its sole judgment, any deficiency in the Transportation Provider's performance under these terms, the Broker or HST Office may require the Provider to develop a corrective action plan to correct such deficiency within a specified timeframe.

2. **UNIVERSAL>** The Transportation Provider agrees to respond to recommendations of any on-site visit and understands that failure to respond by the requested date or to implement a corrective action plan may result in future trips not being scheduled until such time as satisfactory responses are in place, fines or penalties in accordance with the HST Broker's "Provider Accountability Policy", or contract termination, at the Broker's discretion.

## VII. REPORTS AND BILLING

1. **UNIVERSAL>** The Transportation Provider must submit all required documentation, polices and reports specified in this Attachment to the Broker within the specified time frames.

2. **UNIVERSAL>** The Transportation Provider must bill the Broker on a monthly basis for transportation services provided, in accordance with each Agency/Program's specifications and as required by the Broker. Invoices should be submitted within 30 days of completion of delivery and accompanied by any required supporting documentation.

3. **UNIVERSAL>** The Transportation Provider must ensure that all trips invoiced to the Broker have been verified. Verification systems should include, but not be limited to, the following:

   - Daily trip sheet identifying each scheduled One-Way Trip with a check box indicating if the Consumer was transported, canceled or was no-show and signed by the driver (and by program staff, if required). Trip sheets should also include Consumer pickup and drop-off times.

   - Random, on-site inspections at destination facilities by supervisory staff.

   - Random surveys of destination facilities to confirm transportation.

   - Random surveys of Consumers to confirm transportation (and pick-up and drop-off times and quality of service).

**NOTE:** Agency specific requirements may be incorporated by supplemental attachment to this document.

APPENDIX 1
Transportation Provider Performance Standards
Revised: Effective 07-01-15

# VIII.  DATA PRIVACY AND SECURITY

## A.  <u>DEFINITIONS</u>

1.  **UNIVERSAL>** The following capitalized terms, as used in this **Section VIII**, shall have the meanings ascribed to them below:

<u>Commonwealth Security Information</u>: All data that pertains to the security of the Commonwealth's information technology, specifically, information pertaining to the manner in which the Commonwealth protects its information technology systems against unauthorized access to or modification of information, whether in storage, processing or transit, and against the denial of service to authorized users, or the provision of service to authorized users, including those measures necessary to detect, document and counter such threats.

<u>EOHHS-CE</u>: Any component of EOHHS and its constituent agencies that constitutes a Covered Entity under the Privacy and Security Rules, including:  the Office of Medicaid; the Department of Developmental Services; the Department of Mental Health; the Soldiers' Home in Massachusetts; the Soldiers' Home in Holyoke; the covered components of the Department of Public Health, a hybrid agency, having designated its covered components as:  the Childhood Lead Screening Laboratory and the MDPH Public Health Hospitals (Lemuel Shattuck Hospital; Massachusetts Hospital School; Tewksbury Hospital; Western Massachusetts Hospital; and State Office of Pharmacy Services).

<u>HIPAA Rules</u>: The Privacy, Security, Breach Notification, and Enforcement Rules at 45 CFR Parts 160 and Part 164.

<u>Individual</u>: The person to whom the PI refers and shall include a person who qualifies as a personal representative in accord with 45 CFR § 164.502(g).

<u>PHI</u>: Any Protected Health Information that the Transportation Provider: (a) receives from an EOHHS-CE or the Broker on behalf of such EOHHS-CE; or (b) creates, receives, maintains or transmits for or on behalf of an EOHHS-CE or the Broker on behalf of such EOHHS-CE, in each case, in connection with the performance of any function, activity or service under the Transportation Provider Subcontract.  PHI is a subset of PI.

<u>Privacy Rule</u>: The Standards of Privacy of Individually Identifiable Health Information, at 45 CFR Parts 160 and 164.

<u>Protected Information (PI)</u>:  Any Protected Health Information, "Personal Data" as defined in Mass. Gen. Laws c. 66A, "Personal Information" as defined in Mass. Gen. Laws c. 93H, "Patient Identifying Information" as defined in 42 CFR Part 2 and any other personally identifiable information that is treated as confidential under any federal or state law or regulation (including for example any state and federal tax return information) that the Transportation Provider: (a) receives from an Agency, Broker or its contractor or (b) creates, receives, maintains or transmits for or on behalf of an Agency, Broker or its contractor in connection with the performance of any function, activity or service under the Transportation Provider Subcontract.   Information, including aggregate information, is considered PI if it is not fully de-identified in accord with 45 CFR 164.514 (a), (b), and (c).

<u>Security Rule</u>: The Security Standards for the Protection of Electronic Protected Health Information, at 45 CFR Parts 160 and 164.

**APPENDIX 1**
Transportation Provider Performance Standards
Revised: Effective 07-01-15

Subcontractor:  Any person or entity acting or serving as an agent, subcontractor or service provider of the Transportation Provider.

2. **UNIVERSAL>** The following capitalized terms, as used in this **Section VIII**, shall have the same meaning ascribed to those terms in the HIPAA Rules: Business Associate, Covered Entity, Notice of Privacy Practices, Protected Health Information, Required By Law, Secretary and Security Incident.  All other terms used but not defined in this *Section VIII* shall be construed in a manner consistent with the HIPAA Rules and all other applicable privacy or security laws or regulations (state or federal).

B. **TRANSPORTATION PROVIDER'S OBLIGATIONS**

1. **UNIVERSAL> MASS.GEN. LAWS C. 66A AND OTHER PRIVACY AND SECURITY OBLIGATIONS**

   a. Transportation Provider acknowledges that in the performance of the Transportation Provider Subcontract it will create, receive, use, disclose, maintain, or otherwise obtain "Personal Data," and that in so doing, it becomes a "Holder" of Personal Data, as such terms are used within Mass. Gen. Laws c. 66A.  Transportation Provider agrees that it shall comply with Mass. Gen. Laws c. 66A, and any other applicable privacy or security law or regulation (state or federal) governing Transportation Provider's use, disclosure, and maintenance of any PI under the Transportation Provider Subcontract, including for example, 42 CFR Part 431, Subpart F, Mass. Gen. Laws c. 93H and Executive Order 504.

   b. Transportation Provider further agrees that it shall comply with any other privacy and security obligation that is applicable to any PI as the result of EOHHS or an Agency having entered into an agreement with a third party (such as the Social Security Administration) to obtain or to access data, including, by way of illustration and not limitation, signing any written compliance acknowledgment or confidentiality agreement or complying with any other privacy and security obligation required by the third party for access to data that EOHHS or an Agency receives from the third party or for access to any system or database containing any such data or through which such data could be accessed.

2. **UNIVERSAL>OWNERSHIP OF DATA.** The Transportation Provider's access to and receipt, creation, use, disclosure and maintenance of, any PI, and any data derived or extracted from such data, arises from and is defined by the Transportation Provider's obligations under the Transportation Provider Subcontract, and the Transportation Provider does not possess any independent rights of ownership to such data.

3. **UNIVERSAL>EMPLOYEES, AGENTS AND SUBCONTRACTORS**

   a. The Transportation Provider shall ensure that any Subcontractor that receives PI from the Transportation Provider, or that creates, receives, maintains or transmits PI for or on behalf of the Transportation Provider, agrees in writing to the same restrictions and conditions that apply to the Transportation Provider under this **Section VIII** with respect to such PI, including, but not limited to, implementing reasonable safeguards to protect such information.  With respect any Subcontractor acting as the Business Associate of Transportation Provider in connection with the Transportation Provider Subcontract, the Transportation Provider shall also comply with the requirements set forth at **Section VIII.C.1.d.**, below.

   b. The Transportation Provider is solely responsible for its employees' and Subcontractors' compliance with all requirements in this **Section VIII**, and shall not be relieved of any obligation under this **Section VIII** because the data was in the hands of such entities or persons.

**APPENDIX 1**
Transportation Provider Performance Standards
Revised: Effective 07-01-15

c. The Transportation Provider must obtain the written agreement of its employees providing transportation services under the Transportation Provider Subcontract to comply with the data privacy and security requirements set forth in this **Section VIII**.

**4. UNIVERSAL>DATA SECURITY**

a. **Administrative, Physical and Technical Safeguards**

(1) The Transportation Provider shall implement administrative, physical and technical safeguards that reasonably and appropriately protect the confidentiality, integrity and availability of PI, and that prevent use or disclosure of such data other than as provided for by the Transportation Provider Subcontract. All such safeguards must meet, at a minimum, all standards set forth in the Privacy and Security Rules, as applicable to a Business Associate, and must comply with all Commonwealth security and information technology resource policies, processes and mechanisms established for access to PI, including any applicable data security policies and procedures established by Executive Order 504, EOHHS and the Information Technology Division, and the standards outlined by the National Institute of Standards and Technology publication: NIST 800-53, revision 3- Recommended Security Controls for Federal Information Systems and Organizations, Information Security, Moderate Controls. As one of its safeguards, the Transportation Provider shall not transmit PI in a non-secure manner, whether over the Internet or any wireless communication device or otherwise. The Transportation Provider shall protect from inappropriate use or disclosure any password, user ID or other mechanism or code permitting access to any database containing PI.

(2) If granted access to any EOHHS, Agency or Broker systems or databases or other information technology resources, the Transportation Provider must comply with all Commonwealth security and information technology resources policies, processes, procedures and mechanisms established for access to such systems or databases by Executive Order 504, EOHHS, the Information Technology Division, the particular Agency whose data is involved and the Broker, as applicable, and shall give EOHHS, the applicable Agency or the Broker, as appropriate, prior notice of any change in personnel whenever the change requires a termination or modification of any EOHHS, Agency or Broker password, user ID or other security mechanism or code to maintain the integrity of the system or database.

(3) The Transportation Provider must allow representatives of Broker, or at the Broker's option, EOHHS or any Agency whose data is involved, access to its premises where PI is kept for the purpose of inspecting privacy and physical security arrangements implemented by the Transportation Provider to protect such data.

(4) Upon request, the Transportation Provider shall provide the Broker with copies of all written policies, procedures, standards and guidelines related to the protection, security, use and disclosure of PI, Commonwealth Security Information or other confidential information and the security and integrity of its technology resources.

b. **Commonwealth Security Information.** If through the Transportation Provider Subcontract, the Transportation Provider obtains access to any Commonwealth Security Information, Transportation Provider is prohibited from making any disclosures of or about such information, unless in accord with EOHHS's or Broker's express written instructions. If the Transportation Provider is granted access to such information in order to perform its obligations under its Transportation Provider Subcontract, the Transportation Provider may only use such information for the purposes for which it obtained access. In using the information for such permitted purposes, the Transportation Provider shall limit access to the information only to staff or agents necessary to perform the permitted purposes. While in

APPENDIX 1
Transportation Provider Performance Standards
Revised: Effective 07-01-15

possession of such information, the Transportation Provider shall apply all privacy and security requirements set forth in this **Section VIII**, as applicable, to maintain the confidentiality, security, integrity and availability of such information.  Notwithstanding any other provision in the Transportation Provider Subcontract, the Transportation Provider shall report any non-permitted use or disclosure of such information to the Broker within twenty-four (24) hours of discovery. The Transportation Provider shall immediately take all reasonable and legal actions to retrieve such information if disclosed to any non-permitted individual or entity; shall include a summary of such retrieval actions in its required report of the non-permitted disclosure; and shall take such further retrieval action as the Broker or EOHHS shall require.  Notwithstanding any other provision in the Transportation Provider Subcontract regarding termination, the Transportation Provider may not retain any Commonwealth Security Information upon termination of such Subcontract, unless such information is expressly identified in any retention permission granted in accord with **Section VIII.F. (Effect of Termination)**.  If retention is expressly permitted, all data protections stated herein survive termination of the Transportation Provider Subcontract and shall apply for as long as the Transportation Provider retains the information.

c.   **Non-Permitted Use of Disclosure Report and Mitigation Activities**

(1)   As used in this **subsection c**, the term Event refers to the following, either individually or collectively: 1) any use or disclosure of PI by the Transportation Provider or its Subcontractors not permitted under this **Section VIII** or the Transportation Provider Subcontract; 2) any Security Incident by the same; or 2) any event that would trigger consumer or oversight agency notification obligations under 45 CFR Part 164, Part D, Mass. Gen. Laws 93H or any other applicable federal or state data privacy or security law or regulation.

(2)   Immediately upon becoming aware of an Event, the Transportation Provider shall take all appropriate lawful action necessary to: (1) retrieve, to the extent practicable, any PI involved in the Event; (2) mitigate, to the extent practicable, any known harmful effect of the Event; and (3) take such further action as may be required by any applicable state or federal law or regulation concerning the privacy and security of any PI involved in the Event.  As soon as possible, but in any event no later than two (2) business days following the date upon which the Transportation Provider becomes aware of the Event, the Transportation Provider shall report to the Broker, both verbally and in writing: (i) the date of the Event, if known, or if not known, the estimated date; (ii) the date of the discovery of the Event; (iii) the nature of the Event, including as much specific detail as possible describing the Event, as well as the nature of the PI involved (for example, types of identifiers involved such as name, address, age, social security numbers or account numbers; or medical or financial or other types of information); (iv) the number of individuals whose PI was involved in the Event; (v) a summary of the nature and scope of Transportation Provider's investigation of the Event; (vi) the harmful effects of the Event known to Transportation Provider, all actions it has taken or plans to take to mitigate such effects, and the results of all mitigation actions already taken; and (vii) a review of and any plans to implement changes to Transportation Provider's policies and procedures, including staff training, to prevent such Events in the future.  Upon Broker's or EOHHS' request, Transportation Provider shall take such further actions as requested by Broker or EOHHS, and shall cooperate with Broker and EOHHS, to further mitigate, to the extent practicable, any harmful effect of the Event.  Any actions to mitigate harmful effects of such Events undertaken by Transportation Provider on its own initiative or pursuant to Broker's or EOHHS' request under this paragraph shall not relieve Transportation Provider of its obligations to report such Events under this paragraph or any other provision of the Transportation Provider Subcontract.

**APPENDIX 1**
Transportation Provider Performance Standards
Revised: Effective 07-01-15

d.  **Consumer Notification.** In the event that EOHHS determines, in its sole discretion, that it or an Agency is required to provide notification(s) to one or more consumers or oversight agencies as a result of an Event, Transportation Provider shall, at the request of EOHHS or Broker, assist the EOHHS, the Agency or the Broker in undertaking all actions necessary to meet such notification requirements and in drafting the notices for EOHHS or Broker review and approval, but in no event shall Transportation Provider have the authority to give these notifications on behalf of EOHHS or an Agency. Transportation Provider shall reimburse Broker for reasonable costs incurred by Broker, EOHHS and the Agency associated with a such notification, but only to the extent that such costs are due to: (1) Transportation Provider's failure to meet its responsibilities under, or in violation of, any provision of this **Section VIII** or the Transportation Provider Subcontract; (2) Transportation Provider's violation of law; (3) Transportation Provider's negligence; (4) Transportation Provider's failure to protect data under its control with encryption or other security measures that constitute an explicit safe-harbor or exception to any requirement to give notice under such laws; or (5) any activity or omission of Transportation Provider or its Subcontractors resulting in or contributing to a breach triggering such laws.

e.  **Response to Legal Process/Data.** The Transportation Provider shall immediately report to the Broker, both verbally and in writing, any instance where PI, Commonwealth Security Information or any other data obtained under the Transportation Provider Subcontract is requested, subpoenaed or becomes the subject of a court or administrative order or other legal process. If the Broker or EOHHS directs the Transportation Provider to respond, the Transportation Provider shall take all necessary legal steps, including objecting to the request when appropriate, to comply with Mass. Gen. Laws c. 66A, 42 CFR 431.306(f) and any other applicable federal or state law or regulation. If the Broker or EOHHS determines that the Broker, EOHHS or the applicable Agency shall respond directly, the Transportation Provider shall fully cooperate and assist the Broker, EOHHS or the applicable Agency in its response. In no event shall the Transportation Provider's reporting obligations under this paragraph be delayed beyond two (2) business days preceding the return date in such request, subpoena or legal process, or two (2) business days from obtaining such request for data, whichever is shorter.

f.  **Individual's Authorization to Disclose PI to a Third Party.** In the event the Transportation Provider receives a request from the Individual or from a third party to release PI to a third party pursuant to a consent, authorization or other written document, the Transportation Provider shall, within three (3) business days of receipt of such consent, authorization or other written document, notify the Broker and shall cooperate with the Broker, EOHHS and the Agency whose data is involved in the request in confirming the validity and sufficiency of such document under applicable laws and regulations before releasing any PI to the Individual or third party.

g.  **Electronic and Paper Databases Updates.** Within thirty days of execution of the Transportation Provider Subcontract, Transportation Provider shall provide the Broker an accurate list of electronic and paper databases containing PI, together with a description of the various uses of the databases. The Transportation Provider shall update such lists as necessary in accord with the addition or termination of such databases.

h.  **Data Privacy and Security Custodian.** Within five (5) days of the effective date of the Transportation Provider Subcontract, the Transportation Provider shall provide the Broker in writing with the name of an individual(s), who shall act as Privacy and Security Officer(s) and be responsible for compliance with this **Section VIII**. Transportation Provider shall also notify the Broker in writing within five (5) business days of any transfer of such duties to other persons within its organization.

APPENDIX 1
Transportation Provider Performance Standards
Revised: Effective 07-01-15

**C.  BUSINESS ASSOCIATE RELATED PROVISIONS**

**1.  UNIVERSAL> TRANSPORTATION PROVIDER OBLIGATIONS**

a.  **Generally.**  In connection with the performance of any function, activity or service under the Transportation Provider Subcontract, Transportation Provider will receive Protected Health Information from, and/or create, receive, maintain or transmit Protected Health Information for or on behalf of, an EOHHS-CE or the Broker acting on its behalf.  In doing so, the Transportation Provider will be acting as the Business Associate of Broker and must comply with all provisions of this **Section VIII.C.1.** and all requirements of the HIPAA Rules applicable to a Business Associate with respect to any such EOHHS-CE and any associated PHI.

b.  **Compliance with Access for Secretary.**  Transportation Provider shall make its internal policies, procedures, practices, books and records relating to the use and disclosure of PHI available to Broker or the Secretary, in a time and manner designated by either Broker or the Secretary, for purposes of the Secretary determining compliance with the HIPAA Rules.

c.  **Individual Rights.**

(1)  Transportation Provider shall take such actions as may be requested by Broker or EOHHS for any EOHHS-CE to meet its obligations under 45 CFR §§ 164.524, 164.526 and 164.528 with respect to any such EOHHS-CE's PHI in Transportation Provider's possession.  If an Individual contacts Transportation Provider with respect to exercising any rights the Individual may have under 45 CFR §§ 164.524, 164.526 and 164.528 with respect to PHI in Transportation Provider's possession, Transportation Provider shall notify Broker within two (2) business days of the Individual's request, and cooperate with Broker, EOHHS or the applicable EOHHS-CE to meet any EOHHS-CE's obligations with respect to such request.

(2)  With respect to an Individual's right to an accounting under 45 CFR § 164.528, Transportation Provider shall document all disclosures of PHI and other data access activities as would be necessary for EOHHS or the particular EOHHS-CE whose PHI is involved to respond to a request by an Individual for an accounting in accord with 45 CFR § 164.528.

d.  **Subcontractors.**  With respect to Subcontractors of Transportation Provider, Transportation Provider must comply with **Section VIII.B.3.a.**, above.  In addition, with respect to any Subcontractor that receives Protected Health Information from the Transportation Provider, or that creates, receives, maintains or transmits Protected Health Information for or on behalf of the Transportation Provider, in connection with the Transportation Provider's performance of any function, activity or service under the Transportation Provider Subcontract, the Transportation Provider must ensure that the written agreement referenced in **Section VIII.B.3.a.** meets all requirements of a business associate agreement, as required for subcontractors of a Business Associate, under the Privacy and Security Rules (including, but not limited to, those required under 45 CFR § 164.308(b), 45 CFR 164.314(a), 45 CFR 164.502(e) and 45 CFR 164.504(e)).

**2.  UNIVERSAL> EOHHS OBLIGATIONS.**  Broker shall notify Transportation Provider of any of the following:

a.  Any limitation(s) in any EOHHS-CE's Notice of Privacy Practices, to the extent that such limitation may affect Transportation Provider's use or disclosure of Protected Health Information.

**APPENDIX 1**
Transportation Provider Performance Standards
Revised: Effective 07-01-15

b. Any changes in, or revocation of, permission by Individual to use or disclose Protected Health Information, to the extent that such changes may affect Transportation Provider's use or disclosure of Protected Health Information.

c. Any restriction to the use or disclosure of Protected Health Information that an EOHHS-CE has agreed to in accord with 45 CFR § 164.522, to the extent that such restriction may affect Transportation Provider's s use or disclosure of Protected Health Information.

**D. PERMITTED USES AND DISCLOSURES OF PI BY TRANSPORTATION PROVIDER**

**1. UNIVERSAL> AGREEMENT FUNCTIONS AND SERVICES**

a. Except as otherwise limited in this **Section VIII** or the Transportation Provider Subcontract, Transportation Provider may only use and disclose PI as follows:

(1) To perform functions, activities or services for or on behalf of, Broker (as specified in the Transportation Provider Subcontract), provided, that such use or disclosure would not: (A) violate any applicable law, including for example, the Privacy Rule, 42 CFR Subpart F or Mass. Gen. Laws c. 66A if done by the Broker, EOHHS or the applicable Agency; (2) violate the minimum necessary standards set forth in the Privacy Rule; or (3) conflict with any statements in any applicable EOHHS-CE's Notice of Privacy Practices.

(2) As required by, and in accordance with, the provisions of this **Section VIII**; and

(3) As Required by Law, consistent with any restrictions in any applicable state or federal law or regulation governing Transportation Provider's use, disclosure, or maintenance of any PI under the Transportation Provider Subcontract.

b. In performing functions, activities, or services under the Transportation Provider Subcontract, Transportation Provider represents that it shall seek from Broker only the amount of PI that is minimally necessary to perform the particular function, activity, or service. To the extent the Transportation Provider Subcontract permits Transportation Provider to request PI from any other entity or individual, Transportation Provider shall only request an amount of PI that is reasonably limited to the minimal necessary to perform the intended function, activity, or service.

**2. UNIVERSAL> RESTRICTION ON CONTACTING THE INDIVIDUAL.** Transportation Provider may not use PI to attempt to contact the Individual, unless such contact is otherwise necessary to perform functions, activities or services under the Transportation Provider Subcontract, or unless Broker or EOHHS otherwise instructs Transportation Provider to do so in writing.

**3. UNIVERSAL> PUBLICATION RESTRICTION.** Transportation Provider shall not use PI for any publication, statistical tabulation, research or similar purpose, even if the PI has been transformed into de-identified data in accord with the standards set forth in 45 CFR § 164.514(a), (b) and (c).

**APPENDIX 1**
Transportation Provider Performance Standards
Revised: Effective 07-01-15

## E.  TERMINATION

1.  **UNIVERSAL>TERMINAATION FOR VIOLATION.** Notwithstanding any other provision in the Transportation Provider Subcontract, Broker may terminate such Subcontract, immediately upon written notice, if the Broker determines, in its sole discretion, that the Transportation Provider has violated any material term in this **Section VIII** or any material term of the Transportation Provider Subcontract pertaining to the security or privacy of PI.

2.  **UNIVERSAL> CURE.** Prior to terminating the Transportation Provider Subcontract as permitted above, the Broker, in its sole discretion, may provide an opportunity for the Transportation Provider to end the violation and cure any related breach. If such an opportunity is provided, but cure is not feasible, or the Transportation Provider fails to end the violation and cure the breach within a time period set by the Broker, the Broker may terminate the Transportation Provider Subcontract immediately upon written notice.

3.  **UNIVERSAL> HHS REPORT.** In the event that termination of the Transportation Provider Subcontract for a violation of a material term is not feasible, or if cure is not feasible, the Broker or EOHHS may report such violation to the Secretary, if such violation and termination pertains to work performed for an EOHHS-CE (as defined in 45 CFR 160.103) under the Transportation Provider Subcontract.

## F.  EFFECT OF TERMINATION

1.  **UNIVERSAL> RETURN OR DESTROY DATA.** Except as provided immediately below, upon termination of the Transportation Provider Subcontract for any reason whatsoever, the Transportation Provider shall, at the Broker's option, either return or destroy all PI in any form in its possession, and the Transportation Provider shall not retain any copies of such data in any form. In no event shall the Transportation Provider destroy any PI without first obtaining the Broker's approval. In the event destruction is permitted, the Transportation Provider shall destroy PI in accord with standards set forth in NIST Special Publication 800-88 Guidelines for Media Sanitization, all applicable state retention laws, all applicable state and federal security and privacy laws and regulations (including the Privacy and Security rules), and all state data security policies including policies issued by EOHHS and the Information Technology Division. All paper copies of PI must be shredded or otherwise destroyed to a degree that will render the copies unreadable, un-usable and indecipherable without the possibility of reconstruction. Within five (5) days of any permitted destruction, the Transportation Provider shall provide the Broker with a written certification that destruction has been completed in accord with the required standards and that the Transportation Provider and its Subcontractors no longer retain such data or copies of such data. This provision shall also apply to all PI in the possession of the Transportation Provider's Subcontractors, and the Transportation Provider shall ensure that all such data in the possession of its Subcontractors has been returned or destroyed and that no Subcontractor retains any copies of such data in any form, in accord with the Broker's instructions.

2.  **UNIVERSAL> TRANSFER DATA.** Notwithstanding **subsection 1** immediately above, Transportation Provider shall, at the Broker's option upon termination of the Transportation Provider Subcontract for any reason whatsoever, transfer all PI in any form in its possession, or some portion thereof, to a third party identified by the Broker. Such transfer shall proceed in accord with all applicable security standards for transfer of PI set forth in this **Section VIII** and any other transfer directions provided by the Broker at the time. Within five (5) days of any requested transfer, the Transportation Provider shall provide the Broker with a written certification that the transfer was successfully completed. To the extent that the requested transfer involves only a portion of PI in the Transportation Provider's possession, the Transportation Provider shall, at the Broker's direction, follow **subsection 1** immediately above or **subsection 3** immediately below with respect to the remaining data. This provision shall also apply to all PI in the possession of the Transportation Provider's Subcontractors, and the Transportation Provider shall ensure

Page 35 of 36

**APPENDIX 1**
Transportation Provider Performance Standards
Revised: Effective 07-01-15

that all such data in the possession of its Subcontractors is transferred and that no Subcontractor retains any copies of such data in any form, in accord with the Broker's instructions.

3.  **UNIVERSAL> RETAIN DATA**

    a.  If the Transportation Provider determines that returning or destroying PI when required under the Transportation Provider Subcontract is not feasible, the Transportation Provider shall provide the Broker with written notification of the conditions that make return or destruction not feasible. If based on the Transportation Provider's representations, the Broker concurs that return or destruction is not feasible, the Transportation Provider shall extend all protections set forth in this **Section VIII** to all such PI and shall limit further uses and disclosures of such data to t hose purposes that make the return or destruction of such data not feasible, for as long as the Transportation Provider maintains the data.

    b.  Notwithstanding **subsections 1** and **2** above, the Transportation Provider shall, at the Broker's option upon termination of the Transportation Provider Subcontract for any reason whatsoever, retain all PI in its possession, or some portion thereof, upon termination, solely for storage purposes without any authority to use of disclose such PI. In such event, the Transportation Provider shall extend all applicable data protections in this **Section VIII** and shall not use or disclose such PI for any purpose. Upon termination of such retention period, the Transportation Provider shall, at the Broker's direction, return or destroy such PI in accord with **subsection 1** above, or transfer such data to a third party in accord with **subsection 2** above. This provision shall also apply to all PI in the possession of the Transportation Provider's Subcontractors, and Transportation Provider shall ensure that all such data in the possession of its Subcontractors is retained, transferred, returned or destroyed in accord with the Broker's direction and **subsections 1, 2** and **3**, as applicable in accord with Broker's instructions, and that no Subcontractor retains any copies of such data in any form, in accord with Broker's instructions.

# EXHIBIT 2



MONTACHUSETT REGIONAL TRANSIT AUTHORITY

## Welcome to MassHealth Transportation provided by MART!

**Hours of Operation: Monday – Friday 8:00AM to 5:00PM**
**Toll Free: 1-866-834-9991 (English: 1, Spanish: 3, Russian: 4)**
**After Hours Service: 1-866-834-9991, Option 5**
**www.mrta.us**

## Scheduling a Trip

To schedule your trip, call 1-866-834-9991; select your language option and then select option 2 for our MassHealth Call Center and then follow the appropriate recorded telephone prompts. Do not press 0 for an operator, as this will further delay your call.

*__MART requests that members schedule their transportation at least 3 business days in advance during normal business hours of 8:00AM and 5:00PM whenever possible.__* However, we will make every attempt to accommodate requests received sooner than 3 business days.

## Confirming Your Trip

To find out who your transportation vendor will be, and confirm your trip and pick up times, members may call 1-866-834-9991; select your language option and then select option 7 for our Interactive Voice Response (IVR) system to access MART's automated trip review. When using this option, please have your MassHealth card number ready and simply follow the recorded prompts. The IVR will be able to verify and confirm your trip information 1 to 3 days prior to your scheduled trip date(s). This 24 hours self-service option is a fast and easy method to verify upcoming trips. However, if you would prefer to confirm your trip directly with a customer service representative; you choose your language option, and then select option 2 for our MassHealth Call Center.

## Cancellations

Members may use the IVR (as explained above in "Confirming Your Trip") 1 to 3 days prior to your schedule trip date(s) to cancel trips; with the exception of same day trips which must be cancelled directly with a customer service representation at least one hour prior to the scheduled pick up time. If you need, or would prefer to cancel your trip(s) with a customer service representative, you may call 1-866-834-9991, choose your language option and then select option 2 for our MassHealth Call Center. *In an effort to provide improved customer service, MART encourages as much advance notice as possible when cancelling a scheduled trip.*

## Complaints

To file a complaint regarding the quality of your transportation services, contact MART immediately (not your designated transportation vendor!) at 1-866-834-9991. After you have selected your language option, select option 2 for our MassHealth Call Center, and then option 1 to reach MART's MassHealth Complaint Department. *Complaints may require up to 5 business days for resolution, and you may check on the status of the complaint at any time by following the prompts listed above.*

## Additional Information About Your Transportation

- MART is only authorized to schedule transportation for MassHealth members with an authorized PT-1 form to each provider you see, at each location. If you attempt to schedule a trip that is not authorized by MassHealth or if you have questions or concerns regarding your PT-1; you will need to call the MassHealth Customer Service Center at 1-800-841-2900.

- If you an unsure of, or unable to provide a return trip time you may schedule a "will call" trip. Please be mindful that will call return trips, you will need to make a call directly to your transportation vendor (the

company assigned to transport you) when you are ready to return. ***Note that you may encounter a wait time of up to one (1) hour from the time you call for the return trip home***.

- MART is closed on the following holidays; if you need to schedule transportation on any of these holidays, please provide as much advanced notice as possible:

  ***New Year's Day, Martin Luther King Jr. Day, Presidents Day, Patriots Day, Memorial Day, Independence Day, Labor Day, Columbus Day, Veterans Day, Thanksgiving Day and Christmas Day***

- Please note that MassHealth transportation provided by MART is curb-to-curb service. If your medical needs require additional assistance getting from your residence into a vehicle; and out of the vehicle into your medical appointment- you may request your provider prescribe an escort to travel with you to assist with ambulation. This would require your medical provider to submit a new PT-1 form. MART is not authorized to transport escorts unless authorized.

- Unauthorized stops along the way from your residence to your provider's office (and on the return trip) are not permitted.

- All MART contracted transportation vendors are required to have the name of their business clearly identified on their vehicle; on the right side of the passenger door, and on the rear of the vehicle. Members are advised not to board any vehicle that does not display the name of the company that is scheduled to transport you.

You are welcome to visit our MART website at www.mrta.us where you will learn more about MART, and also find our MassHealth Transportation Message Center. This provides members with an additional resource to contact MART customer service representatives, and provide feedback. (Please note this is not for scheduling trips!!)

We look forward to coordinating your MassHealth transportation needs! Thank you.

# EXHIBIT 3

## Deborah I. Ecker

| | |
|---|---|
| **From:** | Badgley, Rebecca <rebecca.badgley@mrta.us> |
| **Sent:** | Thursday, August 25, 2016 11:57 AM |
| **To:** | 'paul jones' |
| **Cc:** | Roman, Ivan |
| **Subject:** | RE: Paul Jones CCRD INC. racial discrimination |

Paul,

Please understand that there is no discrimination involved of any kind. Karen has been out of the office frequently as of late. After following up it is my understanding that Ivan has been assisting you and has been very responsive when you have presented issues but that he has not heard from you recently.

Looking in-depth in follow up to your email there was an area in the vendor portal that was blocked and this was simply an oversight however that might have been the cause of the situation of you not being able to adjust capacities.

Please log in and make sure that you are able to adjust your capacities and see daily work as well as standing orders.

I am not sure what you are referencing regarding at $10.00 rate as I currently see that your lowest rate is for Chicopee at $28.00.

If you have any issues after logging in please contact Ivan as I will be out of the office this afternoon.

Moving forward, you should never hesitate or wait for an extended period of time to contact myself or Donna in any situation as there is never any threat of retaliation to any vendor issues.


*Rebecca L. Badgley*
*Montachusett Regional Transit Authority*
*Director of Brokerage*
*978-665-2828*


**From:** paul jones [mailto:ccrdcorp@gmail.com]
**Sent:** Wednesday, August 24, 2016 4:49 PM
**To:** Badgley, Rebecca
**Subject:** Paul Jones CCRD INC. racial discrimination

Dear Rebbeca Badley,

1

I am sorry to inform you that I Paul Jones & CCRD INC which is a disadvantaged minority Vendor has been experiencing racial discrimination, Hostile work environment, Unfair & Deceptive Acts & Retaliation from certain individuals from the brokerage department.

CCRD Inc has been experiencing this type of conduct from the beginning of the contract, we have never been able to participate in the low bid Vendor portal system.

Example: CCRD INC has never been allow to log into the Vendor Portal & see any jobs availbe to us even when our bid was $10.00, I have protested this matter several times and have be retaliated against by not receiving any call for days and weeks.

CCRD INC last two check bi-weekly invoices has been approximately $330 and $360 (Didn't cover my gas), I have been traveling from Stoughton Massachusetts 5 days a week since April 1, 2016 to work as a non-emergency Vendor, and has been put on stand by until MART calls me daily wit a call or two.

I was told in April that "you may never get access to the portion of the Vendor Portal that displays daily available jobs as some Vendor dont" this is contrary to the terms & conditions of the contract CCRD INC signed.

This has cause me to lay off 3 employees due to no work and I have taken out two loans to pay for our expenses.

No one here has been able to draw a pay check since the beginning of the contract 5 1/2 months.

We are and have been in compliance with the contract, I now have no employees just one other volunteer, as I am my self at this stage.

This conduct is degrading and contrary to Federal & State Laws, I have not reached out to you or Donna Landry in fear of retaliation and manufacture evidence to discredit me by your staff.

I was suppose to get married in November 2016, but I have depleted all my funds for my wedding.

This has come between me and my family as I have been ashamed to admit that I have not received enough funds to draw a pay check yet.

I have been patient in hopes that Karen, Ivan Tamara and there lower employees would allow me to participate in the Lowbid system but all has failed.

I have sent email to karen several times and she has never answered them,please log in the Vendor Portal and see our stats (CCRD) and bids vs the other Vendors in the Pioneer Valley area.

I am reaching out to you in hopes that you can stop this racial discrimination acts toward me and CCRD INC, I am a Black African American male, and other non minority, minority Vendors has had access to the Vendor Portal that displays the jobs, and they have been able to receive many jobs as their capacity and low bid would allow.

in the last 90 days, I have received approximately 40 jobs when other Vendors with higher bids have received over 1200 jobs.

2

All I want is to be able to provide for my family as I have been on stand by full time since April 2016, I can no longer work in this type of environment, I am a United State Citizen and I feel as I should be treated like the other Vendors.

I decided to email someone that has the power to stop this retaliation, hostile work environment and racial discrimination that I am receiving from the staff.

I have email to show I have reached out to Karen and Ivan to get access to the Vendor Portal that shows all the daily/weekly jobs and have explainted my situation regarding work and my family and has received no reply.

I hope you dont take this email as an insult, I noone no harm I just need to be able to work witout people interfering with the terms & conditions of the contract and treating our disadvantage minority owned company like a comodity.

CCRD INC should be able to fullfill its obligations without the MART employees exercising control over CCRD as we are subcontractors.

Please reply and let me know if I can rely on you to look into this issue and stop the relaliation when we send ligitamit email to the staff, as I have a family to provide for Thank you.

**Paul Jones / Director**
**Commonwealth Community**
**Recovery Division Inc.**
**79 Thompson Street**
**Springfield, Ma 01109**
**Cell: 617-939-5417**
**Toll Free: 888-680-4667**
**Fax: 888-726-8386**
**Website: www.ccrdcorp.com**

# EXHIBIT 4

MONTACHUSETT AREA REGIONAL TRANSIT

MMMM

**Administrator**
Mohammed H. Khan

MONTACHUSETT REGIONAL TRANSIT AUTHORITY
1427R Water Street, Fitchburg, Massachusetts 01420
(978)345-7711 - 1-800-922-5636 - FAX: (978) 345-9867

April 28, 2017

Paul Jones, President/Director
Commonwealth Community Recovery Division, Inc.
79 Thompson Street
Springfield, MA 01109

Dear Mr. Jones,

MART received your letter of complaint addressed to the Title VI Civil Rights Officer on 3/24/17. Although you were able to meet in person with our Brokerage Director and the Director of the HST office regarding this complaint back on April 5, 2017; we still felt a formal response was needed. MART has been researching the circumstances described, as well as the exhibits provided, in the complaint and is now responding in earnest. The format of this response will follow each of the dates noted in your complaint letter.

## Facts Outside the 180 Day Requirements for a Title VI Violation

- **July 2, 2015:** This was an error on behalf of MART staff; the *July 1, 2015* was not changed on the front page of the contract documentation or in the footer of the contract documentation. CCRD did not submit their application to become a Transportation Provider until October 26, 2015. There was documentation which needed to be supplied and/or revised before a contract could be provided to CCRD; who then signed the contract on 12/12/15. MART did not counter-sign the contract until 2/3/16 because of incorrect/missing documentation. Following the contract finalization, MART then scheduled an office audit and vendor portal training etc. Vendor officially started providing services in April of 2016.

- **March 22, 2016:** The vendor portal training did take place in MART staff offices as our conference room was not available as call takers were located there on a temporary basis prior to the reconstruction of the call center. The other staff present was observing because she was in training to learn how to conduct vendor portal trainings. The training provided to CCRD was not different than any other vendor portal training that has been conducted with MART vendors.

- **March 29, 2016:** MART has affirmed this fact as an email trail to CCRD from Karen Cordio cannot be found.

- **April 6, 2016:** In follow up with Ivan, he stated that Mr. Jones was saying that he was only getting calls from schedulers and not receiving work through the vendor portal. Ivan tried to explain to Mr. Jones that some vendors do not see daily trips and standing order in the vendor portal as it is based on vendor rates. Ivan also informed Mr. Jones that if same day or next day trips are being offered to his company that he would receive telephone calls from the schedulers or the vendor call out for next day. All vendors given a username and password to the Vendor Portal have access to the daily and weekly pages. If no work is assigned by the low-cost vendor assign program then these pages will not contain trips, but the vendor can access the pages.

- **April 16, 2016:** This is unfortunate. However trips are given based upon your rates and our investigation shows that your rates were too high ($15 [$10 pickup fee with $1 per mile and no included miles] for a 5 mile trip in Springfield as compared to ~$5 from the lowest vendor), which resulted in the lack of work distributed through the low-cost vendor automated program.

- **June 2, 2016:** MART investigated this issue with our programmers. CCRD's max capacity was set to 0 mistakenly on 5/2/17 by Crystal. This is the cause for the message "you cannot change capacities as it has been locked by MART." MART spoke with Ivan and he remembered calling CCRD about this issue, but there is no email trail in response to your final email on 6/2/16 at 6:52pm. MART staff did not follow-up appropriately to solve this capacity issue until Rebecca changed it on 8/25/16. (See below.)

- **August 4, 2016:** Karen Cordio was out on vacation during the time this email was sent as it was not sent to any other staff. MART confirms that it went unanswered.

- **August 24, 2016:** Discrepancies with CCRD's account were found in the vendor portal and items were corrected effective 8/25/16. First issue is that CCRD had access to the Activity Tab **which is strictly a MART function** and has no value to the vendor. Further investigation shows that when the vendor profile was set up by MART staff this permission was given; which is an oversight. Additionally it appears that Crystal made an error when setting the vendor's agreed upon capacity of 5 round trips which would be reflected as 10 in our system, as everything is entered and counted as a one way. Capacity was originally set to 16 one way trips and was changed to 0 on May 2, 2016 at 12:34pm. Although this staff is no longer with the company for verification, it can only be assumed that this was a typo as it should have been 10 not 0. These items were both adjusted on 8/25/16 and there have been no other changes in the system for this vendor other than the vendor himself making adjustments to capacities in the 2D grid in February 2017. Since CCRD's capacity was accidentally set to 0, the low-cost auto assign program skipped over CCRD's rates from the period of May 2 to August 25th when it was corrected. However scheduler call-outs for same-day, next-day trips would have still occurred even with 0 capacity as the vendors' rate for a trip will still be seen in the calculated rate drop-down list for the schedulers to see and call the vendors in order from lowest.

- **August 27, 2016:** As indicated above, the activity tab is not a vendor function and many of the reports there do not give prices or specific trip information and many of the reports are simply a history of the automated process of the vendor portal assignment program. The denied trips report will show the rate for a trip which is denied by a competing vendor. This is not a discriminatory act, as none of the vendors should have access to the Activity Tab.

- **September 2, 2016:** This was a trip on 8/30/2016 for client C19269; the trip was originally booked through the answering service <u>as a one way</u>, and the vendor was paid $70.50; it is included in his August invoice.

- **September 3, 2016:** MART is unable to verify this statement as both parties named do not recall any conference call between the two of them and any vendor. The statement regarding an email on 9/16/16 is confirmed as no email trail was found going back to the vendor from the staff addressed. **To Follow-Up:** Mr. Jones, in a face-to-face meeting held at MART's Brokerage Offices on April 5, 2017, stated that he was called back (by the answering service that night) and asked to do this round trip. This has been confirmed to be the case and MART will pay the vendor an additional $70.50 for the return trip via an adjustment on his <u>2nd half of April 2017 invoice</u>.

**Title VI Violation Within 180 Day**

- **As of March 20, 2017:** Upon investigation of the circumstances and the evidence presented herein, MART cannot corroborate your charges of racial discrimination or retaliation. CCRD cannot prove that the other vendors that were seen in the portal were "non-minority" vendors. MART has over 200 vendors from every size capacity and racial background, including certified DBE's. MART does however acknowledge that certain staff members were negligent in their diligence to respond to your correspondence and address discrepancies, whether real or perceived, expediently and carefully. Communication and follow-up were lacking and staff will be retrained.

  Daily and Standing Order (weekly) rides are shown based on assignment from the low-cost auto-assign program (no human intervention) which is based upon vendor rates and capacity tables. MART attests that it has not now or in the past blocked CCRD in the Vendor Portal. CCRD has all the same access privileges as our other transportation providers that perform MassHealth rides.

- **October 1, 2016:** C30013 consumer that CCRD has been transporting since 9/10/16 this was updated on 12/8/16 by MART critical care staff to be extended to the end of the PT1 authorization date of 8/4/17. In Section E (Reimbursement For Service: ), in the "MART Additional Performance Standards" supplement to your contract, it states that monthly rate changes are not applied to standing orders or shared ride groups in sub-section 1.a. In sub-section 1.c it states that "Standing Order Trips will be stamped with the loaded mileage and fare at time of assignment and will remain in effect for the duration of the standing order." Finally is sub-section 1.d it states that "The Broker reserves the right to re-assign daily trips/standing order trips and shared ride groups with minimal notification to the vendor." MART's practice is that the vendor only has to let MART staff know if he cannot continue at the stamped price and the standing order will be put out for re-bid. MART realizes this should be a written policy and will change the standards going forward.

- **October 21, 2016:** Becky could not find that she received said email. The others did receive the email, but there is no evidence that the email was replied to. MART apologizes for this oversight.

- **December 25, 2016:** C15480 – CCRD marked the client as a no show in the vendor portal at 8:04am; there were no other scheduled rides for this consumer for this date by any vendor. MART cannot attest if another vendor transported this client from anywhere as the alleged trip in question was not booked or billed for by MART.

- **January 1, 2017:** C30640 Consumer was marked as a no show by CCRD on this date at 9:27am. Upon speaking with Paul Jones during meeting on 4/5/17 it was determined who the other individual was – C17790 this consumer was not scheduled with CCRD, he was scheduled with another vendor and the vendor had the consumer cancelled as well. CCRD transported the client without authorization and thus was not reimbursed. Our research found no replies to his email.

- **January 3, 2017:** C35427 (R100395 & R100396) was marked as COA (cancel-on-arrival) by CCRD on 1/3/17 @ 7:59am. Client is sometimes shared with C30992 (R100392 & R100393); on this date this client was also marked as cancelled by another vendor. Neither trip was performed by any vendor nor were any vendors paid to transport these clients. Neither trip was cancelled or removed by MART staff. These Standing Orders were not assigned to a vendor; they were being given to vendors daily thru the auto-assign program until they were accepted by another vendor on 1/13/17.

- **January 4, 2017:** C35427 was scheduled with CCRD and did have an escort approved. C30992 was also scheduled with CCRD and invoice confirms that CCRD was paid for both consumers.

- **January 5, 2017:** C35427 was scheduled with CCRD and did have an escort approved. C30992 was also scheduled with CCRD and invoice confirms that CCRD was paid for both consumers.

- **January 9, 2017:** C35427 was assigned to CCRD for 1/9/17 for $36.50 each way, trip was cancelled by CCRD on 1/9/17 via Vendor Portal at 7:57am. No other trips were scheduled for the consumer on this date. Trips following this date were assigned to a lower cost vendor via the auto assign program and it was accepted on 1/3/17 for a cost of $7.40 each way. The Standing Order was accepted on 1/13/17 at this same price.

- **January 11, 2017:** C40268 on 1/11/17 trip was scheduled with CCRD for a cost of $41 each way. Trip was cancelled by CCRD via the vendor portal @ 9:04am on 1/11/17. Client had no other rides scheduled this date and trips following this date were assigned via auto assign to lower cost vendors for $6.50 each way.

- **January 23, 2017:** C414 consumer was scheduled with CCRD for the first time on 1/31/17 and was marked as a no show via the vendor portal by CCRD at 9:33pm. Trips for this consumer on February 2nd, 4th, 6th, 7th, and 9th went with other vendors thru auto-assign until consumer was scheduled with CCRD by critical care staff through the S&S process due to lack of acceptance as the Standing Order. CCRD had as a daily trip thru the auto-assign from 2/11 – 2/21/17 on Tuesdays, Thursdays and Saturdays for $71 each way. The consumer called on 2/22/17 at 10:05am, spoke with Janet, and changed times of appointments. Standing Order (SO) was then put back out to bid and was picked up by lower vendor for the lower cost of $45 each way. After several no shows the standing order was cancelled on 3/22/17 after speaking with the dialysis social worker. Client has not had scheduled transportation since that date. The 5/1/17 SO was created as a copy of a previous standing on 1/6/17 and changed by CCRD on 1/23/17. But this SO was started and terminated on the same date. This consumer is not being transported by any vendor even to this date.

- **January 24, 2017:** Ivan was told by the inspector that he had not reviewed all files, therefore Ivan was following up. MART has made it a practice to review all new identified drivers for all companies that were not included in previous vendor audits due to several incidents of transportation providers not properly training and credentialing drivers. This is not specific to CCRD. This is a standing policy for all vendors.

- **February 1, 2017:** Second half of CCRD's January invoice clearly indicated that this amount is for fines from November – CM166596 $25, CM167107 $52, and CM167151 $38 which totals the $115 applied. Vendor has full access to these complaints in the vendor portal and can see the actions and fines applied.

- **February 2, 2017:** This information went out to all vendors that are sole proprietors and Transportation Providers using subcontractors. <u>This is a requirement for all vendors across the board.</u> The contract clearly states that Worker's Compensation or equivalent insurance is required; although technically there is no equivalent. This is not specific to CCRD.

- **February 12 & 19, 2017:** This is a vendor statement and an assumption made by Mr. Jones, this is not separate treatment.

- **February 28, 2017:** CCRD has full access to these complaints in the vendor portal and can see the actions and fines applied.

- **February 28, 2017:** C14532 – SO extended by MART critical care staff on 3/16/17 at 11:04am. As the vendor was previously notified by MART staff on January 23, 2017 (in your Exhibit 3); Mr. Jones need only to let MART know if he cannot continue for the agreed upon price of $45 each way, and SO will go out to bid.

- **March 3, 2017:** C33757 – consumer renewed SO via message log and trips were going out through the auto-assign daily waiting for the SO to be accepted. CCRD had a trip for 3/3/17 for $32.50 each way. On 3/3/17 @10:49am CCRD marked consumer as a COA (cancel on arrival) and cancelled the return. MART had no other trips scheduled for the consumer on this date. Trips were then accepted by lower cost vendors via the daily assign for the cost of $10 each way.

- **March 5, 2017:** Not enough information provided by CCRD to research the details regarding standing orders in this area. Standing Orders can changed at any time due to changes made by the consumer or other circumstances beyond MART's control. If a SO time is changed, the SO will be put back out to bid and offered to the lowest cost vendor. A terminated SO would simply be removed. Since this lack sufficient details no further explanation can be given.

- **March 13, 2017:** C33757 client running through daily assign waiting for SO to be accepted. CCRD had client on 3/13/17 and CCRD cancelled in the VP on 3/13/17 at 7:18am. Client then assigned to lower cost vendors with trips also being cancelled by them.

- **March 15, 2017:** C414 – All trips for this consumer were cancelled from 3/13 to 3/23. After 3/23 client has not scheduled trips.

- **March 20, 2017:** CCRD has full access to the vendor portal and is not treated differently than any other Transportation Provider. CCRD rates are high therefore there are not many trips being offered via the portal in advance. This vendor is getting calls for same day and next day when trips are available at his rates.

- **March 21, 2017:** C35427 consumer has trips scheduled with CCRD for 3/22/17. Consumer is approved for an escort. CCRD marked this trip as COA in the vendor portal at 7:52am. Consumer had no other trips scheduled on this date. This trip was not given to another vendor; it was cancelled.

In addition to the complaint letter, MART held a meeting at our Brokerage Offices on April 5, 2017 with Mr. Jones; Sharna Small-Borsellino, HST Director; Sandy Mulcahy, HST Operations Manager; and Rebecca Badgley, MART Brokerage Director. The items below were discussed and are presented here for follow-up.

Mr. Jones indicated a trip from the activity log that he felt should have been offered to him as his rates were lower.

| TRIP (SPRINGFIELD) | Trips Taken Away | AUTO-TAKEAWAY | 192.168.25.214 | 07/27/16 0533PM | T6932630 | RAFA | 37.3 |
|---|---|---|---|---|---|---|---|
| TRIP (SPRINGFIELD) | Trips Taken Away | AUTO-TAKEAWAY | 192.168.25.214 | 07/27/16 0533PM | T6932631 | RAFA | 37.3 |

MART research showed that this was a trip for 8/1/16 which was from Springfield to Greenfield, 38 miles each way. In the end was awarded to a vendor for $38.00 each way.

CCRD rates at that time were as follows:

| VENDOR | SERVICE AREA | SOURCE_CITY | DEST_CITY | VEHICLE TYPE | PICK UP FEE | MILEAGE RATE | MILEAGE INCLUDED IN PICKUP | SHARED RIDE PICK UP FEE (NO ADDITIONAL MILEAGE APPLIED TO EACH ADDITIONAL RECIPIENT) | SECOND ATTENDANT FEE |
|---|---|---|---|---|---|---|---|---|---|
| CCRD | PIONEER VALLEY | SPRINGFIELD | BOSTON | Taxi | 30 | 1.25 | 0 | 0 | 0 |
| CCRD | PIONEER VALLEY | SPRINGFIELD | SPRINGFIELD | Taxi | 32 | 1 | 0 | 0 | 0 |

CCRD was not and would not have been offered this trip as he had no Springfield to Greenfield rate or Springfield to All rate for Aug 2016.

Mr. Jones additionally requested that Becky review his rates for May 2016 as he had "rates as low as $10 and he was very low." Attached are the rates from that time frame; where you can clearly see that once mileage was brought into to the picture ($1 or $1.25 per mile without miles included in the pickup fee), there were several vendors with lower rates.

In summary, although it seems that MART staff made several errors which did cause CCRD to not be included in the daily auto-assign from May 2, 2016 thru August 25, 2016; there is no evidence of malicious intent or racial discrimination on their behalf. All of the incidents described after this date seem to be a misunderstanding of the processes that are in place for all vendors in regards to standing orders. Upon review of the contract documentation, updates will be made so that all current policies and procedures are spelled out therein so that there is no future miscommunication to any vendor.

Sincerely,

Bonnie J Mahoney
Title VI Civil Rights Officer
Grants & Communications Manager

CC:    Mohammed Khan, MART Administrator
       Bruno Fisher, MART Deputy Administrator
       Rebecca Badgley, MART Director of Brokerage Operations
       Sharna Small-Borsellino, Director Human Service Transportation Office
       Julian Tynes, Chief Diversity & Civil Rights Officer, MassDOT

Encl.

# EXHIBIT 5

**Deborah I. Ecker**

| | |
|---|---|
| **From:** | Badgley, Rebecca <rebecca.badgley@mrta.us> |
| **Sent:** | Friday, October 13, 2017 2:36 PM |
| **To:** | 'paul jones' |
| **Subject:** | RE: FW: DUANE.B 4133336520 |
| **Attachments:** | T7569794_Log.xls |

Paul,

Sorry for the delay in reply as my last two days have been filled with meetings I did have the programmer trace the trip that through our process. See attached is does show your company accepting via the vendor portal at 2:23pm. If you did not do anything in that assign batch it would just show TAKE AWAY if actions are taken it display Vendor Portal and the action either refused or accepted as you can see it indicates accepted.

Rebecca

**From:** paul jones [mailto:ccrdcorp@gmail.com]
**Sent:** Friday, October 06, 2017 5:20 PM
**To:** Badgley, Rebecca
**Subject:** Re: FW: DUANE.B 4133336520

Hello Rebecca I turned down a call from West Springfield Ma to Boston ma (Angel.T 413-262-4103) for $111 less than two hours ago and it is in my portal as if I excepted it please look into this as these calls keep popping up in my portal when I clearly mark them no.

**Paul Jones / Director**
**Commonwealth Community**
**Recovery Division Inc.**
**79 Thompson Street**
**Springfield, Ma 01109**
**Cell: 617-939-5417**
**Toll Free: 888-680-4667**
**Fax: 888-726-8386**

The information in this email is intended only for the person or entity to which it is addressed from CCRD INC. and may contain confidential and/or privileged material. Any review, retransmissions, dissemination or other use of or taking of any action in reliance upon this information by persons or entities other than the intended recipient is prohibited. If you receive this email in error, please contact the sender and delete the material from any computers.

On Tue, Oct 3, 2017 at 4:16 PM, Badgley, Rebecca <rebecca.badgley@mrta.us> wrote:

Hello Paul,

1

I am sorry to hear that things are not going well. As I previously recommended, I would suggest that maybe you branch out to other venues in addition to contracting with MART. For example, both Commonwealth Care Alliance and Tufts Unify/Network Health have One Care members that require transportation services that are very similar in nature to our transportation and you could reach out to them about becoming a vendor with them directly as well.

As previously discussed and confirmed with you, your company has complete access to the vendor portal. Transportation that is scheduled 3 days a more in advance is going out through the vendor portal auto assign based on vendor bid prices for the trips. I did take a look at your rates and they continue to be on the high side which is why you are seeing little to no trips in advance through the vendor portal. As many of the trips is being accepted by vendors with lower bid prices. You are getting the bulk of your calls from the vendor call out and scheduling members due to the fact that there is same day and next day work and the other vendors are at capacity and we have reached your company's trip rate for coverage.

I looked into the fines that you received and regarding the returned work and they are valid in nature: Tracy A. for 8/31/17 you accepted on 8/30/17 at 8:40:57am from the vendor call out SNS-IVR and then sent an email at 4:04 pm indicating that you did not have capacity to take her as you had other trips booked in area's far from her. Shamlah G for 8/30/17 you accepted from the vendor portal on 8/24/17 at 3:02:27pm and returned on 8/28/17 at 7:05pm along with Tiffany C accepted at 3:02:29pmand Victor P who you accepted on 8/28/17 at 6:00:41pm; there was not "MART Staff" intervention and there was nothing "placed in your portal", this was accepted from with-in your secure portal under your company log in.

The only issue with the automated systems was the SNS-IVR vendor call out where due to the phone prompts being the same number to listen to the job and then to accept the job and through testing it was determined that some smartphones and devices were sensitive and would take the 1 twice placing the first trip as accepted even if the vendor did not hear or mean to accept the job.

MART corrected this issues as soon as it was identified and made changes so that different numbers were required to be used these changes were completed and put into effect at the beginning of July so this has no bearing on the fines received for the return work.

Regarding the on board camera, that staff should not have fined you for that and this was addressed when your appeal was sent and I apologize for any inconvenience.

If you could give me some additional information on the individuals that you say cancelled I will be happy to look into those. If a member cancels in advance we do not make a telephone call to the vendor as it is cancelled in our system and would then no longer show on you end of day report. However, if a client cancels after 3pm in the afternoon for the next day the staff then call the vendor directly as he/she may have already starting to

work on driver's schedules for the next day, but prior to that time vendors are not even allowed to download schedules from the vendor portal.

If I can be of any further assistance please feel free to contact me.

*Rebecca L. Badgley*

*Montachusett Regional Transit Authority*

*Director of Brokerage*

*978-665-2828*

**From:** paul jones [mailto:ccrdcorp@gmail.com]
**Sent:** Monday, October 02, 2017 9:13 PM
**To:** Badgley, Rebecca; Small-Borsellino, Sharna (EHS); sandy.mulcahy@state.ma.us;
joseph.l.harrington@state.ma.us
**Subject:** Re: FW: DUANE.B 4133336520

Hellp Rebbecca,

Thanks for the reply as I had the wrong email address, I am writing to inform you that things have changed for the worst since we had the meeting in March with Sharna Small & Sandy Mulcahy to iron out the portal differences.

As of Monday I have laid off 2 drivers due to not enough work for them this is financially killing CCRD, as gas and Insurance has gone up , we are back down to one driver and a part time volunteer after two years of working with MART not enough work and or access to the portal.

CCRD INC has had problems with non cost effective trips miles popping up in our portal and when we inform the scheduling department we are charged $100 for each call. They are called returned when we never accepted

3

the calls **(See $400 Fine attached)** this has never happened to CCRD before, but it was an issue with MARTS portal a few months ago calls being assigned to vendors portals inadvertently.

This is a green light to reduce CCRD work and to fine us. I informed Ivan Roman in August when these issues came up that we did not accept these trips as we did not have the capacity to take on trips outside of the area where we were working that day. I have been inadvertently emailing you since July with the wrong email address.

CCRD has also been given a $100 fine for having a dash cam in our vehicles to protect the drivers and also the clients, we were told that our 2008 Ford Edge that we pay a car note for belongs to MART and is a MART vehicle, a $100 fine was given to CCRD and we appealed, the fine was change in the portal to FILE and stated "Just make sure stickers are in car informing clients" which they are, that issue was very stressful for 3 weeks (We have original image of fine being accessed).

CCRD trips are still 90% given to us by the Automatic Dialing System which causes us not to be able to compete with any other vendors, 95% of our calls are hand picked and sent through the Automatic Dialing System and are not cost effective.

This causes CCRD not to be able to book cost effective trips for our drivers and to create a schedule that is cost effective, this is really killing our company as other vendors have the ability to book cost effective trips through the vendor portal for their drivers thus saving gas and & tear on vehicles,This allows a company to go from two vehicles to sometimes as much as 10 vehicles, if this portal is taken away no growth can come to a vendor like CCRD.

Also if you look at the portal we have had several trips that clients state that they had cancelled the trip days before but CCRD was never informed thus waisting gas this is an every day occurrence, two clients have informed me this evening that they have cancelled tomorrows trips with MART, this causes us to waist gas every day.

Yes we have turned down a few calls in the last 90 days because they are not cost effective and or in the same area where our trips are that day, those trips were not in the best interest of CCRD.

I am asking for help in this matter if things don't change I have to take vehicles off the road and lay off my drivers as this is the sixth driver that was laid off because of lack of work, I dont understand why CCRD cant seem to be consist ant like other vendors that have even started in the last six months, CCRD has not been able to make a profit since becoming a vendor with MART, we barely cover our expenses something is very wrong,I am

I am reaching out again to ask for help with these problems as CCRD cannot grow or have enough work for 3 drivers after almost 2 years because of access to the portal to book cost effective trips Thank you.

Paul Jones / Director
Commonwealth Community
Recovery Division Inc.
79 Thompson Street
Springfield, Ma 01109
Cell: 617-939-5417
Toll Free: 888-680-4667
Fax: 888-726-8386

The information in this email is intended only for the person or entity to which it is addressed from CCRD INC. and may contain confidential and/or privileged material. Any review, retransmissions, dissemination or other use of or taking of any action in reliance upon this information by persons or entities other than the intended recipient is prohibited. If you receive this email in error, please contact the sender and delete the material from any computers.

On Mon, Oct 2, 2017 at 2:36 PM, Badgley, Rebecca <rebecca.badgley@mrta.us> wrote:

Paul,

This member has been excluded at your company's request and you will not be offered his trips in the future. Issues of this nature are handled by our Quality Assurance Department so it was actually handled from the complaint that you put in the vendor portal Friday night.

Please make sure that you have my email address correct as I did not received this initial correspondence it is as follows: Rebecca.Badgley@mrta.us

Respectfully,

*Rebecca L. Badgley*

5

*Montachusett Regional Transit Authority*

*Director of Brokerage*

*978-665-2828*

**From:** Mulcahy, Sandy (EHS) [mailto:sandy.mulcahy@state.ma.us]
**Sent:** Monday, October 02, 2017 11:44 AM
**To:** Badgley, Rebecca
**Subject:** FW: DUANE.B 4133336520

Hi Becky, has this been addressed?

**Sandra J. Mulcahy**

Brokerage Operations Manager

EOHHS Human Service Transportation Office

100 Hancock Street, 6th Floor

Quincy, MA 02171

*Phone: 617-847-6559 / Fax: 617-847-6550*

*Sandy.Mulcahy@state.ma.us*



6

**From:** paul jones [mailto:ccrdcorp@gmail.com]
**Sent:** Friday, September 29, 2017 10:48 PM
**To:** Mart Robecca Badgley; Small-Borsellino, Sharna (EHS); Mulcahy, Sandy (EHS); Harrington, Joseph (EHS)
**Subject:** DUANE.B 4133336520

Dear Robecca Badgley,

I am writing to inform you that I Paul Jones reported on September 27, 2017 that athe above client had a pick up at 830a and called the office at aproximitly 7:50an and called me racial slurs, MART called a few minutes later and I informed them what happen the phone operator stated that she would inform her supervisor, a few minutes later DUANE.B 4133336520 was removed from my portal.

Today I downloaded my Saturday Schueduel and we have received this client once again after he has used racial slurs and demanded to only be picked up by a white driver, I am writing to ask that this person be removed perminitly from CCRD INC portal to protect us from this abuse and unfounded complaints from this client.

Any questions you have regarding this matter please feel free to contact me Thank you.

**Paul Jones / Director**
**Commonwealth Community**
**Recovery Division Inc.**
**79 Thompson Street**
**Springfield, Ma 01109**
**Cell:** 617-939-5417
**Toll Free:** 888-680-4667
**Fax:** 888-726-8386

The information in this email is intended only for the person or entity to which it is addressed from CCRD INC. and may contain confidential and/or privileged material. Any review, retransmissions, dissemination or other use of or taking of any action in reliance upon this information by persons or entities other than the intended recipient is prohibited. If you receive this email in error, please contact the sender and delete the material from any computers.

EXHIBIT 6

**Deborah I. Ecker**

| | |
|---|---|
| **From:** | Badgley, Rebecca <rebecca.badgley@mrta.us> |
| **Sent:** | Friday, January 19, 2018 10:33 AM |
| **To:** | 'paul jones' |
| **Subject:** | RE: CCRD INC rates have dropped we still have not receive offers through the vendor portal |

Hello Paul,

I have followed up here on this end and the assign program is functioning properly and rides in the area are being picked up by vendor with lower rates prior getting to your rate structure during the running of the assign program, which would be why you are getting offered via the call out or from staff. Only trips 3 day plus run through the portal assign. I then took a look at your rate in comparison to other vendors in the area and you rates are still on the high side in comparison to other. You are welcome to request the most update rates from Ivan at any time. Rebecca

**From:** paul jones [mailto:ccrdcorp@gmail.com]
**Sent:** Monday, January 08, 2018 12:01 PM
**To:** Badgley, Rebecca
**Subject:** CCRD INC rates have dropped we still have not receive offers through the vendor portal

Hello Rebecca Badgley CCRD INC has dropped its rates but we are still not able to pick rides from the portal please advise Thank you.

**Paul Jones / Director**
**Commonwealth Community**
**Recovery Division Inc.**
**79 Thompson Street**
**Springfield, Ma 01109**
**Cell: 617-939-5417**
**Toll Free: 888-680-4667**
**Fax: 888-726-8386**

The information in this email is intended only for the person or entity to which it is addressed from CCRD INC. and may contain confidential and/or privileged material. Any review, retransmissions, dissemination or other use of or taking of any action in reliance upon this information by persons or entities other than the intended recipient is prohibited. If you receive this email in error, please contact the sender and delete the material from any computers.

# EXHIBIT 7

**Deborah I. Ecker**

| | |
|---|---|
| **From:** | Badgley, Rebecca <rebecca.badgley@mrta.us> |
| **Sent:** | Thursday, May 10, 2018 10:15 AM |
| **To:** | paul jones |
| **Cc:** | Monk, Robert |
| **Subject:** | RE: CCRD INC Vendor Portal Training |

Paul,

I am going to have Robert Monk call you and schedule a date and time with you for a one on one retraining session.

Rebecca

**From:** paul jones [mailto:ccrdcorp@gmail.com]
**Sent:** Thursday, May 10, 2018 10:11 AM
**To:** Badgley, Rebecca
**Subject:** Re: CCRD INC Vendor Portal Training

Mornings would be better for me

**Paul Jones / Director**
**Commonwealth Community**
**Recovery Division Inc.**
**79 Thompson Street**
**Springfield, Ma 01109**
**Cell: 617-939-5417**
**Toll Free: 888-680-4667**
**Fax: 888-726-8386**

The information in this email is intended only for the person or entity to which it is addressed from CCRD INC. and may contain confidential and/or privileged material. Any review, retransmissions, dissemination or other use of or taking of any action in reliance upon this information by persons or entities other than the intended recipient is prohibited. If you receive this email in error, please contact the sender and delete the material from any computers.

On Thu, May 10, 2018 at 10:09 AM, Badgley, Rebecca <rebecca.badgley@mrta.us> wrote:

Paul,

Is there a particular day of the week that works best for you? Do you prefer morning or afternoon?

1

Rebecca

**From:** paul jones [mailto:ccrdcorp@gmail.com]
**Sent:** Thursday, May 10, 2018 9:54 AM
**To:** Badgley, Rebecca
**Subject:** CCRD INC Vendor Portal Training

Hello Rebecca I was told to contact you regarding Vendor Portal Training for CCRD INC, please let me know Thank you.

**Paul Jones / Director**
**Commonwealth Community**
**Recovery Division Inc.**
79 Thompson Street
Springfield, Ma 01109
**Cell: 617-939-5417**
**Toll Free: 888-680-4667**
**Fax: 888-726-8386**

The information in this email is intended only for the person or entity to which it is addressed from CCRD INC. and may contain confidential and/or privileged material. Any review, retransmissions, dissemination or other use of or taking of any action in reliance upon this information by persons or entities other than the intended recipient is prohibited. If you receive this email in error, please contact the sender and delete the material from any computers.

2

# EXHIBIT 8

**Deborah I. Ecker**

| | |
|---|---|
| **From:** | Badgley, Rebecca <rebecca.badgley@mrta.us> |
| **Sent:** | Wednesday, February 7, 2018 8:31 AM |
| **To:** | 'paul jones' |
| **Subject:** | FW: FW: Portal is not working tried 2 different computers- CCRD |

Paul did you use the entire address with the https:

https://partners.mrta.us:444/itmsvp

**From:** Roman, Ivan
**Sent:** Tuesday, February 06, 2018 3:52 PM
**To:** 'paul jones'
**Cc:** Monk, Robert
**Subject:** RE: FW: Portal is not working tried 2 different computers- CCRD

Hi Paul,

I am going to forward your email to Becky to see if there is anything else they can look into.

Sincerely,

**Ivan Roman**
**Asst. Project Coordinator (MART)**
**Phone 978-353-0333 ext. 2854**
**Fax 978-342-1063**

**From:** paul jones [mailto:ccrdcorp@gmail.com]
**Sent:** Tuesday, February 06, 2018 3:36 PM
**To:** Roman, Ivan
**Subject:** Re: FW: Portal is not working tried 2 different computers- CCRD

Ivan I have not been able to get in and stay in MARTS website, My computer works fine for all other website on the Enternet, everytime I log in to MARTS website once I am in it kkicks me out and send a link that states ;

# This site can't be reached

**partners.mrta.us** refused to connect.

Try:

- Checking the connection
- Checking the proxy and the firewall

ERR_CONNECTION_REFUSED

**Paul Jones / Director**
**Commonwealth Community**
**Recovery Division Inc.**
**79 Thompson Street**
**Springfield, Ma 01109**
**Cell: 617-939-5417**
**Toll Free: 888-680-4667**
**Fax: 888-726-8386**

The information in this email is intended only for the person or entity to which it is addressed from CCRD INC. and may contain confidential and/or privileged material. Any review, retransmissions, dissemination or other use of or taking of any action in reliance upon this information by persons or entities other than the intended recipient is prohibited. If you receive this email in error, please contact the sender and delete the material from any computers.

On Tue, Feb 6, 2018 at 10:24 AM, Roman, Ivan <Ivan.Roman@mrta.us> wrote:

Hi Paul,

We have checked the external link and it appears to be working fine. The link you provided is a direct link to your trips location but you should be trying to get to your log-in screen which should be accessible by utilizing the link provided below.

https://partners.mrta.us:444/itmsvp

If you are still unable to get in let me know but we also recommend touching base with your IT staff as it can be an internal issue as well.

For future reference when emailing a general issue please utilize the DMAcontract@mrta.us email to ensure the quickest response possible and to ensure receipt of your email by MART staff in the event I am absent.

Thank you for contacting MART.

Sincerely,

**Ivan Roman**

**Asst. Project Coordinator (MART)**

**Phone 978-353-0333 ext. 2854**

**Fax 978-342-1063**

**From:** Roman, Ivan
**Sent:** Tuesday, February 06, 2018 10:05 AM
**To:** 'paul jones'
**Cc:** Monk, Robert
**Subject:** RE: Portal is not working tried 2 different computers- CCRD

Hi Paul,

I am looking into this and will get back to you shortly. In the meantime I recommend restarting your computer as sometimes resetting works.

Sincerely,

**Ivan Roman**

**Asst. Project Coordinator (MART)**

**Phone 978-353-0333 ext. 2854**

**Fax 978-342-1063**

**From:** paul jones [mailto:ccrdcorp@gmail.com]
**Sent:** Tuesday, February 06, 2018 9:59 AM
**To:** Roman, Ivan
**Subject:** Portal is not working tried 2 different computers

Ivan the portal is not letting me in I tried two computers please asist me Thank you

https://partners.mrta.us:444/ITMSVP/Trips/VendTripsForm.aspx

**Paul Jones / Director**
**Commonwealth Community**
**Recovery Division Inc.**
**79 Thompson Street**
**Springfield, Ma 01109**
**Cell: 617-939-5417**
**Toll Free: 888-680-4667**
**Fax: 888-726-8386**

The information in this email is intended only for the person or entity to which it is addressed from CCRD INC. and may contain confidential and/or privileged material. Any review, retransmissions, dissemination or other use of or taking of any action in reliance upon this information by persons or entities other than the intended recipient is prohibited. If you receive this email in error, please contact the sender and delete the material from any computers.

# EXHIBIT 9

## Deborah I. Ecker

| | |
|---|---|
| **From:** | Mahoney, Bonnie <Bonnie.Mahoney@MRTA.US> |
| **Sent:** | Wednesday, May 9, 2018 9:14 AM |
| **To:** | 'paul jones' |
| **Subject:** | FW: Vendor Notification |
| **Attachments:** | Policy for closing Invoices on the 1st of the month & the 16th of the month |

**Importance:**    High

Dear Mr. Jones,

In answer to your email request (attached) from May 3, 2018 please find the policy memo below, which was originally distributed via email to all vendors back on 9/10/15. It was also posted on the Vendor Portal.

The part in red below was added since to provide further clarification.

Bonnie J Mahoney
Records Access Officer
**Montachusett RTA**
1427R Water Street
Fitchburg, MA 01420
Office: 978-345-7711 X2290


**Sent:** Thursday, September 10, 2015 12:56 PM
**Subject:** Vendor Notification
**Importance:** High


Attention all MART Transportation Providers:
There have been several complaints from providers that MART is in violation of our contract and not making payments as contractually required.

This correspondence will serve as clarification. Transportation Providers contracts with MART state that you will be paid within 45 days of an approved invoice. MART has not been non compliant and we are paying vendors in accordance with what is contractually required.

The following is MART's policy regarding vendor billing and payment schedule using the 1st half of September billing cycle as an example:

The billing cycle closes on the 15th (and last day) of every month. Vendor invoices would be due to MART two (2) business days following the close and would be expected to be ready to start review by the 18th. Five (5) business days following the billing cycle, MART will review and approve all vendor invoices therefore, invoices would be reviewed by 9/22/15. Vendor payments would then be made within 45 days from that date which means vendor payments by 11/6/15.

MART has also implemented a new fine policy for late invoicing and fraudulent billing. See the following:

FINES FOR LATE INVOICES

1

Late Invoice process will be documented by Finance Representative for signing off and sending out to vendors accordingly.

1 FINE $100
2 FINE $300
3 FINE $500
4 FINE Determined by program manager

<u>FRAUDULENT BILLING</u>

As follows DMA has already set up a fraudulent billing structure for moving forward, we would like to have all programs to follow suit accordingly, and be able to set this up for start of next billing cycle (2nd half September 2015).

1 FINE $250
2 FINE $500
3 FINE $750
4 FINE $1000 and a 15 day suspension next incident of fraudulent billing will result in contract termination
5 fine$1500 and termination of contract.

If you have questions or require further clarification please feel free to contact the appropriate department manager.

*Rebecca L. Badgley*
*Montachusett Regional Transit Authority*
*Director of Brokerage*
*978-665-2828*

EXHIBIT 10

**Deborah I. Ecker**

| | |
|---|---|
| **From:** | Badgley, Rebecca <rebecca.badgley@mrta.us> |
| **Sent:** | Tuesday, June 25, 2019 12:13 PM |
| **To:** | 'paul jones' |
| **Subject:** | RE: Shared Rides Compensation please respond |

For Standing order shared ride groups with a contract it is the same – If it is a to person group and on one of the days one person does not go the full amount would apply to the one that did go.

As previously indicated this is not the case for the individual daily shared rides.

**From:** paul jones [mailto:ccrdcorp@gmail.com]
**Sent:** Tuesday, June 25, 2019 11:46 AM
**To:** Badgley, Rebecca
**Subject:** Re: Shared Rides Compensation please respond

Can you please give me an example if Vendor only has shared ride contracts for two individuals instead of Four thank you

Sent from my iPhone

On Jun 25, 2019, at 10:32 AM, Badgley, Rebecca <rebecca.badgley@mrta.us> wrote:

Paul,

Standing order shared ride group policy is as follows:
Vendor's are given a contract for the standing order at a group price. Vendor's are paid that group price per day regardless of the daily attendance. Example: a 4 person group is $40 one-way on a day that everyone goes that $40 is split up amongst all 4 people - applying $10 per person in the billing transfer. If on Tuesday only 2 member's go that $40 is split applying $20 per person etc.

MART will monitor the groups and if members consistently are not going the group my end up being dissolved to which you would receive notification or it could be reconfigured adding a different member at which time you would again be notified as it would result in and new contract for that group.

Individual Daily Shared rides going out via the vendor portal are not a group price with a contract they are two individual rides found to fit together for that day and are offered to vendors at a full fare for the 1st individual and shared rate for the 2nd if a member cancels or does not go then the vendor's contracted rates are applied to the member that does go.

If you have further questions please feel free to contact me.

Rebecca L. Badgley
MART Director of Brokerage Operations
978-665-2828

1

**From:** paul jones [mailto:ccrdcorp@gmail.com]
**Sent:** Monday, June 24, 2019 4:42 PM
**To:** Badgley, Rebecca; Monk, Robert; Moyo, Michelle; Shumovskaya, Tamara
**Subject:** Re: Shared Rides Compensation please respond

Dear Rebecca Badgley,
My question is that we would like to get the policy of your shared ride (Group Program), because when I went to the 3rd vendor portal training Robert Monk informed all vendors at the portal training that if we excepted a Shared Ride group we would be compensated if one of the members did not show up.

I notice that we have not been getting credit for some of shared ride group members when they don't show up, so I ask Tamara for clarification regarding the Shared Ride program and she said that vendors only get credit when one member or more don't show up ONLY IF THE GROUP IS THREE MEMBERS OR MORE.

So I am writing to ask if we could get the policy so that we can have a clear understanding of MARTS Shared Ride Program, because if we don't get paid when members don't come there is no benefit is participating in the Shared Ride program regarding transporting two individuals because by excepting a shared ride group our prices are reduced.

We are just asking for your Shared Ride policy in writing so that I can go over it with my staff so we can have a clear understanding in the Shared Ride program we are participating in at MART Thank very much for contacting me regarding this matter.

**Paul Jones / Director**
**Commonwealth Community**
**Recovery Division Inc.**
**79 Thompson Street**
**Springfield, Ma 01109**
**Cell: 617-939-5417**
**Toll Free: 888-680-4667**
**Fax: 888-726-8386**

The information in this email is intended only for the person or entity to which it is addressed from CCRD INC. and may contain confidential and/or privileged material. Any review, retransmissions, dissemination or other use of or taking of any action in reliance upon this information by persons or entities other than the intended recipient is prohibited. If you receive this email in error, please contact the sender and delete the material from any computers.

On Mon, Jun 24, 2019 at 4:30 PM Badgley, Rebecca <rebecca.badgley@mrta.us> wrote:

Good Afternoon Paul,

For clarification is your question in regards to the standing order shared ride groups or the individual daily shared rides that are being offered to you on the vendor portal with a Z?

Rebecca L. Badgley

MART Director of Brokerage Operations

978-665-2828

**From:** paul jones [mailto:ccrdcorp@gmail.com]
**Sent:** Monday, June 24, 2019 12:28 PM
**To:** Shumovskaya, Tamara; Monk, Robert; Moyo, Michelle
**Subject:** Re: Shared Rides Compensation please respond

please let us know the procedure because if we can't get paid for individuals that cancel their ride, we see no point in participating in the shared ride program, there are absolutely no benefits to it for us, its less money for our company Thank you.

**Commonwealth Community**
**Recovery Division Inc.**
**79 Thompson Street**
**Springfield, Ma 01109**
**Cell: 617-939-5417**
**Toll Free: 888-680-4667**
**Fax: 888-726-8386**

The information in this email is intended only for the person or entity to which it is addressed from CCRD INC. and may contain confidential and/or privileged material. Any review, retransmissions, dissemination or other use of or taking of any action in reliance upon this information by persons or entities other than the intended recipient is prohibited. If you receive this email in error, please contact the sender and delete the material from any computers.

On Mon, Jun 24, 2019 at 10:16 AM Shumovskaya, Tamara <Tamara.Shumovskaya@mrta.us> wrote:

Hi Paul,

We will look in to it and someone will get back to you.

Regards,

Tamara

**From:** paul jones [mailto:ccrdcorp@gmail.com]
**Sent:** Friday, June 21, 2019 1:27 PM
**To:** Shumovskaya, Tamara
**Subject:** Re: Shared Rides Compensation please respond

So it's only for three or more in a trip not 2, I was informed that it was for all shared rides, can you send policy documents on shared rides so there is no more confusion, thank you

Sent from my iPhone

On Jun 20, 2019, at 8:15 AM, Shumovskaya, Tamara <Tamara.Shumovskaya@mrta.us> wrote:

> Hi Paul,
>
> I will forward your email to our billing department.
>
> When you have a shared ride group ( three and more people) and one member is not utilizing transportation you are still getting paid group cost that split between rest of members in the group.
>
> Billing Department will need group number or members names to review it for you.
>
> Thank you for contacting MART
>
>
> **Tamara Shumovskaya**
>
> **Scheduling Department Manager**
>
> Montachusett Regional Transit Authority
>
> 100 Main St, Fitchburg, MA

4

tamara.shumovskaya@mrta.us

978-665-2877

**From:** paul jones [mailto:ccrdcorp@gmail.com]
**Sent:** Wednesday, June 19, 2019 5:13 PM
**To:** Shumovskaya, Tamara
**Subject:** Re: Shared Rides Compensation please respond

Wow that's gonna be time consuming I seen my spread sheet today from June
1st to the 15th and some where missing I also look at some previous invoice
spread sheets from some time ago and the shared ride clients that I Cancelled or
put no show we wasn't credited for either

Sent from my iPhone

On Jun 19, 2019, at 3:50 PM, Shumovskaya, Tamara
<Tamara.Shumovskaya@mrta.us> wrote:

> Hi Paul,
>
> Could you please provide us with more information so
> we can look at it?
>
> What dates or what period of time do you refer to?
>
> What group# or member's last name you are inquiring
> about?
>
> **Tamara Shumovskaya**
>
> **Scheduling Department Manager**
>
> Montachusett Regional Transit Authority

5

100 Main St, Fitchburg, MA

tamara.shumovskaya@mrta.us

978-665-2877

**From:** paul jones [mailto:ccrdcorp@gmail.com]
**Sent:** Wednesday, June 19, 2019 2:37 PM
**To:** Diamond, Cindy; Shumovskaya, Tamara; Moyo, Michelle; Monk, Robert; Kukta, Amanda; Torres, Jessica
**Subject:** Shared Rides Compensation please respond

Good afternoon I writing to inform you that we have not been getting credit on our shared rides when 1 person cancels, we don't and have not been getting paid for the whole group this has been going on for a while now.

We are asking that we get compensated for the whole shared ride group when one doesn't show going back since we excepted the shared ride group, the records reflect that when 1 client cancels or is a no show we don't or didn't get paid for the whole shared ride group.

I was informed some time ago that when we have a shared ride and one cancels we still get paid for the whole shared ride group if I am wrong please educate me so I can have an understanding of why we are not getting compensated for the whole shared ride group Thank you.

If I am wrong

Paul Jones / Director
Commonwealth Community
Recovery Division Inc.
79 Thompson Street

6

Springfield, Ma 01109
Cell: 617-939-5417
Toll Free: 888-680-4667
Fax: 888-726-8386

The information in this email is intended only for the person or entity to which it is addressed from CCRD INC. and may contain confidential and/or privileged material. Any review, retransmissions, dissemination or other use of or taking of any action in reliance upon this information by persons or entities other than the intended recipient is prohibited. If you receive this email in error, please contact the sender and delete the material from any computers.

# EXHIBIT 11

## Deborah I. Ecker

| | |
|---|---|
| **From:** | Badgley, Rebecca <rebecca.badgley@mrta.us> |
| **Sent:** | Monday, July 1, 2019 2:59 PM |
| **To:** | 'paul jones' |
| **Subject:** | RE: All trips we booked today is gone out of portal |
| **Attachments:** | CCRD IVR HST_Vendor_Assignment_Audit.xlsx |

Paul,

I have looked into this and attached you will find the log for your company from the IVR vendor call-out from Friday 6/28/19. You will not the following the IVR called with a back offering at 6:11, 6:16 and 6:21 that was not responded to they are indicated as timeout – when no response is received it will call at 5 min intervals total 3 times prior to moving on. Another call at 6:26 which you accepted 2 clients etc. This is the log for Friday with trips being offered for the weekend a Monday. All calls that you accepted via this venue did transfer through to your portal and were scheduled with your company. I have confirmed this personally.

If I can be of further assistance please let me know.


Rebecca L. Badgley
MART Director of Brokerage Operations
978-665-2828


**From:** paul jones [mailto:ccrdcorp@gmail.com]
**Sent:** Friday, June 28, 2019 12:19 PM
**To:** Badgley, Rebecca
**Subject:** Re: All trips we booked today is gone out of portal

Yes but I booked so many more for Monday I been booking since approximately 620 am this morning, the trips are not there I believe I started out with approximate 40 trips this morning that was already in my portal.

**Paul Jones / Director**
**Commonwealth Community**
**Recovery Division Inc.**
**79 Thompson Street**
**Springfield, Ma 01109**
**Cell: 617-939-5417**
**Toll Free: 888-680-4667**
**Fax: 888-726-8386**

The information in this email is intended only for the person or entity to which it is addressed from CCRD INC. and may contain confidential and/or privileged material. Any review, retransmissions, dissemination or other use of or taking of any action in reliance upon this information by persons or entities other than the intended recipient is prohibited. If you receive this email in error, please contact the sender and delete the material from any computers.

On Fri, Jun 28, 2019 at 12:04 PM Badgley, Rebecca <rebecca.badgley@mrta.us> wrote:

Paul, I just looked in your portal and see approximately 51 one way trips for Monday

-----Original Message-----
From: paul jones [mailto:ccrdcorp@gmail.com]
Sent: Friday, June 28, 2019 11:46 AM
To: Shumovskaya, Tamara; Torres, Jessica; DMAScheduling; Kukta, Amanda; Moyo, Michelle; Monk, Robert; Badgley, Rebecca; Badgley, Rebecca; DMAComplaints
Subject: All trips we booked today is gone out of portal

I am writing to rectify the situation I have been answering the phone since 620 am this morning all the trips I booked for Monday July 1,2019 is gone out of the our vendor Portal we only have 24 round trips , I now will have no choice but to lay off all but 2 employees for next week unless things change this is not fair.

I have waisted an entire morning booking calls an none were placed in ccrd inc portal .
Sent from my iPhone

# EXHIBIT 12

**Deborah I. Ecker**

| | |
|---|---|
| **From:** | Badgley, Rebecca <rebecca.badgley@mrta.us> |
| **Sent:** | Monday, July 1, 2019 4:35 PM |
| **To:** | 'paul jones'; Shumovskaya, Tamara; Kukta, Amanda; Torres, Jessica; DMAScheduling; DMAComplaints; Monk, Robert; Moyo, Michelle; Norris, Joanne; Khan, Mohammed; 'Small-Borsellino, Sharna (EHS)' |
| **Subject:** | RE: Portal reflects offers of trips never excepted at after 5:30 |
| **Attachments:** | CCRD ANNOUNCEMENT LOG.docx; VendActivityLogRpt_06272019-07012019_1225.xlsx |

Paul,

I have been looking into the information that you presented in your email please see below in blue.

In addition to my comments below on the individual issues noted below, I have done some additional research and found the following:

On 6/28 between the IVR call out and Vendor Portal your company was offered a total of 169 trips and accepted 60.

For travel date 6/27, out of 284 offered, your company accepted 77 – and all were accepted via the vendor portal

For travel date 7/01 out of 157 trips offered, your company accepted 57.

Based on what I can see you are being offered a fair amount of work based on your rates and capacities.

MART has no way of controlling what times or how frequently members book appointments and as you are aware everything booked is assigned via a low cost qualified bid process based off vendor rates as trips are received.

I do see that you have had a slight reduction in volume of trips based off what you provided in April and May in comparison to June but there are times that we do see a reduction in trip volumes.

I know that you have stated previously that you would take trips in other areas if there were more than one or two. We don't have the ability to build your schedule for you or provide trips in a specific geographical area as these are all medical appointments that can change in volume and location on a daily basis.

If I can be of further assistance please let me know.

Rebecca L. Badgley
MART Director of Brokerage Operations
978-665-2828

**From:** paul jones [mailto:ccrdcorp@gmail.com]
**Sent:** Thursday, June 27, 2019 9:18 PM

1

**To:** Shumovskaya, Tamara; Kukta, Amanda; Torres, Jessica; DMAScheduling; DMAComplaints; Monk, Robert; Moyo, Michelle; Norris, Joanne; Badgley, Rebecca; Badgley, Rebecca; Khan, Mohammed; Small-Borsellino, Sharna (EHS)
**Subject:** Portal reflects offers of trips never excepted at after 5:30

I am again writing to rectify a situation, I logged on to MARTS vendor portal at 5:19 pm, I declined and excepted trips, I logged out approximately 5:26 pm.

I now went in my vendor portal about 8:30 pm and it states $180.00 trips were not excepted (Taken away) either they were put in my portal after I logged off (After 5:26 pm) or there is another glitch in your system again, this type of action is painting CCRD INC as a company that doesn't want work.

In regards to you logging in on 6/27/19 at 5:19am and accepting and rejecting and then seeing that $180 trips were pulled when logging back in at 8:30pm. I am unsure how that can be the case, I have pulled the announcement log for your company from 6/24 through 6/28 (see screen shot attached CCRD Announcement log). You will see that there were only four announcements on 6/27, at the bottom of the first page you will see two announcements, the first - 4 trips for 7/1 were have been taken away totaling $60 and the second - 8 trips for 7/2 totaling $132 have been taken away.

These happened and were posted prior to you logging in at 5:19pm. At the top of the second page you will see the first two line items the first showing that 2 trips being taken away for 7/5 worth $30 and 2 trips for 7/7 worth $30 being taken away. These all have taken place during the normal automated process via the vendor portal take away schedule.

I have also attached your vendor activity log which shows you logging in a 4:07pm and downloading your schedule for the next day and rejecting a shared ride at 4:10p

CCRD is in no way being painted as a company that does not want to work, all vendors have the right to accept and reject work that is being offered to them.

If you look at our portal we only have 38 trips each day for the next two weeks I expect this type of treatment to increase going forward, I believe this treatment and all treatment CCRD INC has been experiencing is not an accident.

I will be writing to rectify (Point out) all situations going forward because it is my belief CCRD INC has since 2016 been a target of some of MARTS employees.

90 percent of all trips we were offered today was between 8am-10am, so we had no choice but to turn them down because we can't squeeze anymore trips at that time, so its seems that this is strategically done to make us look bad, same trips back to back daily, no offering through the vendor portal throughout the day, we are offered client we have filed complaints against or have returned for multiple No Shows and offerings only in 3 towns, example **Hardy. R 4134272597 whom we just gave back because she was a no show over 10 times MART vendor portal has offered her to us 3 times in the last 6 hours, she was supposed to get reassigned.**

Regarding Hardy R – if you turn back a standing or due to member being a no show that Standing order will be removed at your request and it was. However, the member will not be excluded from being offered to you in the future unless you specify indicated that you do not want to transport this member at all moving forward. Which I cannot find that you requested that initially in this case.

It's not fair that we have to go through this just to participate in receiving trips to employ 5 people 3 who have been laid off due to no work in the last 3 weeks, this treatment is stagnating our success with your company and has been since April 2016.

This is email is created ONLY to rectify and inform MART employees of all the things that we face on a daily bases to participate in your Federal Funded Program.

I cannot and will not sit by idly and be treated in this way without making it known, hopefully someone will get the courage to step up and rectify the situation, CCRD INC employees should not go home every day wondering if there is enough work for them the next day, this treatment has been successful in causing approximately 75% of our employees to quit their job here at CCRD INC since April 2016 simply is not fair.

I will continue to send emails to shed light on the daily treatment we are receiving from MARTS Brokerage department.


Paul Jones / Director
Commonwealth Community
Recovery Division Inc.
79 Thompson Street
Springfield, Ma 01109
Cell: 617-939-5417
Toll Free: 888-680-4667
Fax: 888-726-8386


The information in this email is intended only for the person or entity to which it is addressed from CCRD INC. and may contain confidential and/or privileged material. Any review, retransmissions, dissemination or other use of or taking of any action in reliance upon this information by persons or entities other than the intended recipient is prohibited. If you receive this email in error, please contact the sender and delete the material from any computers.

## Deborah I. Ecker

| | |
|---|---|
| **From:** | Fisher, Bruno <Bruno.Fisher@MRTA.US> |
| **Sent:** | Thursday, July 18, 2019 12:32 PM |
| **To:** | Robin Stein |
| **Cc:** | Mark R. Reich; Jessica D. Bardi; Deborah I. Ecker |
| **Subject:** | FW: Portal reflects offers of trips never excepted at after 5:30 |
| **Attachments:** | CCRD ANNOUNCEMENT LOG.docx; VendActivityLogRpt_06272019-07012019_1225.xlsx |

**From:** Badgley, Rebecca
**Sent:** Wednesday, July 17, 2019 11:43 PM
**To:** Fisher, Bruno
**Subject:** FW: Portal reflects offers of trips never excepted at after 5:30

**From:** Badgley, Rebecca
**Sent:** Monday, July 01, 2019 4:35 PM
**To:** 'paul jones'; Shumovskaya, Tamara; Kukta, Amanda; Torres, Jessica; DMAScheduling; DMAComplaints; Monk, Robert; Moyo, Michelle; Norris, Joanne; Khan, Mohammed; Small-Borsellino, Sharna (EHS)
**Subject:** RE: Portal reflects offers of trips never excepted at after 5:30

Paul,

I have been looking into the information that you presented in your email please see below in blue.

In addition to my comments below on the individual issues noted below, I have done some additional research and found the following:

On 6/28 between the IVR call out and Vendor Portal your company was offered a total of 169 trips and accepted 60.

For travel date 6/27, out of 284 offered, your company accepted 77 – and all were accepted via the vendor portal

For travel date 7/01 out of 157 trips offered, your company accepted 57.

Based on what I can see you are being offered a fair amount of work based on your rates and capacities.

MART has no way of controlling what times or how frequently members book appointments and as you are aware everything booked is assigned via a low cost qualified bid process based off vendor rates as trips are received.

I do see that you have had a slight reduction in volume of trips based off what you provided in April and May in comparison to June but there are times that we do see a reduction in trip volumes.

I know that you have stated previously that you would take trips in other areas if there were more than one or two. We don't have the ability to build your schedule for you or provide trips in a specific geographical area as these are all medical appointments that can change in volume and location on a daily basis.

If I can be of further assistance please let me know.

Rebecca L. Badgley
MART Director of Brokerage Operations
978-665-2828

**From:** paul jones [mailto:ccrdcorp@gmail.com]
**Sent:** Thursday, June 27, 2019 9:18 PM
**To:** Shumovskaya, Tamara; Kukta, Amanda; Torres, Jessica; DMAScheduling; DMAComplaints; Monk, Robert; Moyo, Michelle; Norris, Joanne; Badgley, Rebecca; Badgley, Rebecca; Khan, Mohammed; Small-Borsellino, Sharna (EHS)
**Subject:** Portal reflects offers of trips never excepted at after 5:30

I am again writing to rectify a situation, I logged on to MARTS vendor portal at 5:19 pm, I declined and excepted trips, I logged out approximately 5:26 pm.

I now went in my vendor portal about 8:30 pm and it states $180.00 trips were not excepted (Taken away) either they were put in my portal after I logged off (After 5:26 pm) or there is another glitch in your system again, this type of action is painting CCRD INC as a company that doesn't want work.

In regards to you logging in on 6/27/19 at 5:19am and accepting and rejecting and then seeing that $180 trips were pulled when logging back in at 8:30pm. I am unsure how that can be the case, I have pulled the announcement log for your company from 6/24 through 6/28 (see screen shot attached CCRD Announcement log). You will see that there were only four announcements on 6/27, at the bottom of the first page you will see two announcements, the first - 4 trips for 7/1 were have been taken away totaling $60 and the second - 8 trips for 7/2 totaling $132 have been taken away.

These happened and were posted prior to you logging in at 5:19pm. At the top of the second page you will see the first two line items the first showing that 2 trips being taken away for 7/5 worth $30 and 2 trips for 7/7 worth $30 being taken away. These all have taken place during the normal automated process via the vendor portal take away schedule.

I have also attached your vendor activity log which shows you logging in a 4:07pm and downloading your schedule for the next day and rejecting a shared ride at 4:10p

CCRD is in no way being painted as a company that does not want to work, all vendors have the right to accept and reject work that is being offered to them.

If you look at our portal we only have 38 trips each day for the next two weeks I expect this type of treatment to increase going forward, I believe this treatment and all treatment CCRD INC has been experiencing is not an accident.

I will be writing to rectify (Point out) all situations going forward because it is my belief CCRD INC has since 2016 been a target of some of MARTS employees.

2

90 percent of all trips we were offered today was between 8am-10am, so we had no choice but to turn them down because we can't squeeze anymore trips at that time, so its seems that this is strategically done to make us look bad, same trips back to back daily, no offering through the vendor portal throughout the day, we are offered client we have filed complaints against or have returned for multiple No Shows and offerings only in 3 towns, example **Hardy. R 4134272597 whom we just gave back because she was a no show over 10 times MART vendor portal has offered her to us 3 times in the last 6 hours, she was supposed to get reassigned.**

Regarding Hardy R – if you turn back a standing or due to member being a no show that Standing order will be removed at your request and it was. However, the member will not be excluded from being offered to you in the future unless you specify indicated that you do not want to transport this member at all moving forward. Which I cannot find that you requested that initially in this case.

It's not fair that we have to go through this just to participate in receiving trips to employ 5 people 3 who have been laid off due to no work in the last 3 weeks, this treatment is stagnating our success with your company and has been since April 2016.

This is email is created ONLY to rectify and inform MART employees of all the things that we face on a daily bases to participate in your Federal Funded Program.

I cannot and will not sit by idly and be treated in this way without making it known, hopefully someone will get the courage to step up and rectify the situation, CCRD INC employees should not go home every day wondering if there is enough work for them the next day, this treatment has been successful in causing approximately 75% of our employees to quit their job here at CCRD INC since April 2016 simply is not fair.

I will continue to send emails to shed light on the daily treatment we are receiving from MARTS Brokerage department.

**Paul Jones / Director**
**Commonwealth Community**
**Recovery Division Inc.**
**79 Thompson Street**
**Springfield, Ma 01109**
**Cell: 617-939-5417**
**Toll Free: 888-680-4667**
**Fax: 888-726-8386**

The information in this email is intended only for the person or entity to which it is addressed from CCRD INC. and may contain confidential and/or privileged material. Any review, retransmissions, dissemination or other use of or taking of any action in reliance upon this information by persons or entities other than the intended recipient is prohibited. If you receive this email in error, please contact the sender and delete the material from any computers.

# EXHIBIT 13

| Provider Name | Address | City | State Zip | County | First Name | Last Name | Telephone | Fax | Email | Website | DDT_17N | VDEP_17N | PRC_17N | Non Profit_17N | DDS Cert. Date | Description of Services |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Alliance Community Connections, Inc. | | | MA | | | | | | | | | | | | | |
| Ascata Transportation Services, LLC | | Swampscott | MA | Essex | | | | | | | | | | | | |
| Cape Ann Transportation Operating Co., Inc. | | Gloucester | MA | Essex | Robert B. | Ryan | | | | | | | | | | |
| Care & Beyond Home Care, LLC | | | MA | Middlesex | | | | | | | | | | | | |
| Center of Hope Foundation, Inc. | | Southbridge | MA | | | | | | | | | | | | | |
| Chatham Transportation, LLC | | Fitchburg | MA | Worcester | Sarah | | | | | | | | | | | |
| Access Health Services, LLC d/b/a Angel Care Inc. | | Holyoke | MA | | Francis | Ngobo | | | | | | | | | | |
| CLEANtel, Inc. | | | MA | Middlesex | Tracy | Grant | | | | | | | | | | |
| JRL Transportation, Inc. | | Spencer | MA | Worcester | | | | | | | | | | | | |
| Medicil, Inc. | | Framingham | MA | Middlesex | George | Abdelssayed | | | | | | | | | | |
| | | | MA | | Patricia | Holloway | | | | | | | | | | |
| Equinox Transportation, LLC | | Shrewsbury | MA | Worcester | Carla | Stewart | | | | | | | | | | |
| SunCatchers Pathways for Community Access, Inc. | | Springfield | MA | Hampden | Paul | Bailey | | | | | | | | | | |
| Stavros Independent Living, LLC | | Westborough | MA | Worcester | Leigh | Nofziker | | | | | | | | | | |
| Victory Human Services, Inc. | | Dorchester | MA | Suffolk | Albert | Toussaint | | | | | | | | | | |
| Whitcomb Medical Transportation, LLC | | Worcester | MA | Worcester | Adam | Kowalski | | | | | | | | | | |