# EXHIBIT C

Rebecca Badgley
June 22, 2021

```
                                              Page 1
 1              UNITED STATES DISTRICT COURT

 2                DISTRICT OF MASSACHUSETTS

 3

 4                      Civil Action No. 4:19-cv-11093-TSH

 5

 6    ********************************

 7    PAUL JONES,                      *

 8                   Plaintiff,        *

 9    v.                               *

10    MONTACHUSETTS REGIONAL TRANSIT   *

11    AUTHORITY, et al.                *

12                   Defendants        *

13    ********************************

14

15

16           30(b)(6) DEPOSITION OF REBECCA BADGLEY:

17             APPEARING REMOTELY FROM

18             Fitchburg, Massachusetts

19             June 22, 2021    9:59 a.m.

20

21    Reported By:

22    Ellen M. Muir

23    APPEARING REMOTELY FROM PLYMOUTH COUNTY,

24    MASSACHUSETTS
```

**Rebecca Badgley**
**June 22, 2021**

---

Page 2

```
 1        REMOTE APPEARANCES:
 2
 3        Representing the Plaintiff (pro se):
 4             PAUL JONES
 5             572 Park Street
 6             Stoughton, MA 02072
 7             617.939.5417
 8             pj2276@gmail.com
 9
10        Representing the Defendants:
11             KP LAW, P.C.
12             101 Arch Street, 12th Floor
13             Boston, MA 02110
14             BY: DEBORAH I. ECKER, ESQ.
15             617.556.0007
16             decker@k-plaw.com
17
18
19
20
21
22
23
24
```

---

Page 3

```
 1                    I N D E X
 2
 3        WITNESS:        REBECCA BADGLEY
 4
 5        EXAMINATION BY:              PAGE:
 6        Mr. Jones              4
 7
 8        (Exhibits marked off the record)
 9        EXHIBIT:  DESCRIPTION:        PAGE:
10        1.    Amendment to complaint &     88
11              Defendant's Responses to
12              Plaintiff's Request for
13              Documents
14        2.    Defendant's Answers to Plaintiff's  88
15              First Set of Interrogatories &
16              Defendant's Response to Plaintiff's
17              First Request for Admissions
18        3.    GMail e-mail, End of Day Report   88
19              for DMA work, August
20        4.    Gmail e-mails between Mr. Jones &  88
21              Rebecca Badgley
22
23        (Exhibits marked electronically by stenographer)
24
```

---

Page 4

```
 1        REBECCA BADGLEY, Deponent, having first been
 2        satisfactorily identified and duly sworn, deposes and
 3        states as follows:
 4
 5        EXAMINATION BY MR. JONES:
 6        Q.  Hello, I'm going to go to Exhibit 1
 7        first, page 41. Exhibit 1 is 2019 -- it's 2018
 8        amendment to the contract, but it takes effect 2019.
 9        My first question is, what would you like me to call
10        you, Ms. Badgley or Rebecca?
11        A.  Whichever is fine, Paul.
12        Q.  Okay. Rebecca. Rebecca, does this
13        document look familiar to you?
14        A.  Yes, that's the FY19 contract amendment
15        to be effective July 1.
16        Q.  Okay. July 1 of 2018, correct?
17        A.  Correct.
18        Q.  Fiscal year 2019 amendments?
19        A.  Yep.
20        Q.  Now, is your 2019 amendments, is it --
21        has it governed the venders in your brokerage program
22        at Montachusetts Regional Transit Agency?
23        A.  It's an amendment to their original
24        contract that was through FY22.
```

---

Page 5

```
 1        Q.  So this governs them, correct?
 2        A.  It's the regulations that are required to
 3        be followed, yes, sir.
 4        Q.  Okay. All right. Now, you're going to
 5        go down to page 41 of this document, which is 2019
 6        amendments. Rebecca, can you please read 1A, what's
 7        required for the reporting requirement "A," please?
 8        A.  "End of month odometer reading on
 9        vehicles used for brokerage contract. Update vehicle
10        inventory with new or deleted vehicles."
11        Q.  Okay. "End of month odometer reading on
12        vehicles." Can you explain what does that mean?
13        A.  The odometer reading would be the number
14        of miles on your vehicle's odometer at the end of
15        the month.
16        Q.  So is it a fact that this is saying that
17        for each vehicle the vender would have to produce an
18        end of the month odometer reading for each and every
19        vehicle?
20        A.  Correct. But it's not something that we
21        enacted, Paul.
22        Q.  Well, just answer the question, please.
23        MS. ECKER:  She is answering so let her
24        finish. Did you have something else, Rebecca?
```

**Catuogno Court Reporting - A Service of InfraWare**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

**Rebecca Badgley**
**June 22, 2021**

---

Page 6

```
 1        A.   That wasn't the FY19 amendment.  But it
 2   wasn't something that we ended up enacting and
 3   requesting of the venders.
 4        Q.   Okay.  But, look, this is my deposition
 5   I'm asking a question, so basically I just want a
 6   simple answer.  If you guys want a deposition, you
 7   guys can schedule one or whatever, so I want to get
 8   through this quick because it costs me money.  So
 9   please just answer the questions.  So, again, the end
10   of the month odometer reading you're stating that
11   each vender has to give for each vehicle a document
12   that states how much the mileage is at the end of the
13   month, correct?
14        A.   Yes, for the vehicles used on the
15   brokerage MART.
16        Q.   Okay.  Now, "B" can you please read line
17   "B" for me, please?
18        A.   "Total vehicle hours, total vehicle hours
19   that the vehicle was on the road in service to MART
20   for the month.  Example:  Time driver leaves the
21   garage to begin brokerage work until break and time
22   back in service till next break or end of day."
23        Q.   Okay.  So line "B" basically says every
24   day the vender and the drivers would have to keep
```

Page 7

```
 1   vehicle hours worked, correct?
 2        A.   When in service for MART, yes.
 3        Q.   Yes.  Okay.  Can you read line "C,"
 4   please?
 5        A.   "Accident vehicle miles, the odometer
 6   reading of the vehicle at the time of the accident."
 7        Q.   Okay.  This is required for each vehicle
 8   if it gets into an accident, correct?
 9        A.   For MART work, yes.
10        Q.   Yes.  Okay.  "D" can you please read "D"?
11        A.   "Report dead head miles for wheelchair
12   vans or vehicles with a capacity of 14 or more
13   passengers, reporting of mileage from start to first
14   pickup and from last drop-off to garage at the end of
15   the day, unless there is a significant break, then
16   would mean same after break."
17        Q.   That doesn't apply to Commonwealth
18   Community Recovery Division, the vender here, because
19   we don't have passenger vans with 14 or more.
20        MR. JONES:  Can you scroll down so we can
21   see the other, the rest of the document,
22   please, Ellen.
23        THE STENOGRAPHER:  Yep.
24        Q.   Rebecca, can you please read line "E" of
```

Page 8

```
 1   this document?
 2        A.   "Percentage of fully allocated expenses
 3   in service to MART broken down by the following
 4   categories.  See example below:  Based off of 40,000
 5   monthly invoice."
 6        Q.   Can you explain exactly what line "E"
 7   means, Rebecca?
 8        A.   It's a percentage of the allocated
 9   expenses that you have when in service for the MART
10   brokerage.
11        Q.   So you guys would like a report of this,
12   correct?
13        A.   Yes.  At the time we put it in that's
14   what we were looking for.  As I stated earlier it was
15   never requested or enacted for.
16        Q.   So vehicle 1 -- I mean, E-1 can you read
17   that line, please?
18        A.   "Vehicle operations, driver salary,
19   dispatch salary and fuel, 32,000, 80 percent."
20        Q.   Okay.  So this is the example of what the
21   requirements would be for 2009, correct, for vehicle
22   operations, driver salaries, dispatcher salaries and
23   fuel?
24        A.   Based off your invoicing to MART.
```

Page 9

```
 1        Q.   You would want a report for the driver's
 2   salary, the dispatcher's salary and the fuel,
 3   correct?
 4        A.   A percentage of those items based off
 5   your invoice for the month.
 6        Q.   Yes.  But in the report you would want a
 7   breakdown of the driver's salary, correct?
 8        A.   What is considered to be vehicle
 9   operations, which includes driver salary, dispatch
10   salary and fuel.
11        Q.   And you would want a breakdown of a
12   dispatcher salary, correct?
13        A.   That's included in the vehicle
14   operations.  It's not an individual breakdown.
15        Q.   Right.  I'm just asking one question at a
16   time so we can get everything on the record.  You
17   would also want a breakdown of the fuel on a monthly
18   basis, correct, used for transporting MART's clients?
19        A.   Correct.
20        Q.   Can you read "E-2, please.
21        A.   "Vehicle maintenance, oil changes, tires,
22   mechanic salary."
23        Q.   Okay.  So, basically, you would want a
24   report, a fee for vehicle maintenance for the oil
```

**Catuogno Court Reporting - A Service of InfraWare**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

**Rebecca Badgley**
**June 22, 2021**

Page 10

1  changes for the month, correct?
2      A.  A percentage, again, of your total
3  invoice related to the MART trips for the month.
4      Q.  So you would want a breakdown, a report
5  of the oil changes that the vender used for the
6  month, correct?
7      A.  That would be what is considered vehicle
8  maintenance.  We're not asking you to list individual
9  oil changes.
10     Q.  Okay.  All right.  Let's go on to number
11  E-3.
12     A.  "Nonvehicle maintenance, janitor salary,
13  utility bills, cleaning supplies, etc."
14     Q.  Okay.  Can you explain what number 3
15  means when you say you need a breakdown, a percentage
16  of what we spent the money on for janitor salary,
17  because transportation companies don't have janitor
18  salaries.  Can you explain that, please?
19     A.  You may not but some do.  That's an
20  example of what percentage of your monthly invoice
21  would go to nonvehicle maintenance.
22     Q.  Nonvehicle maintenance.  So are you
23  saying janitor salary for office?
24     A.  Yes, the facilities.

Page 11

1      Q.  Okay.  For the facilities?
2      A.  Uh-huh.
3      Q.  Okay.  Utility bills, the breakdown for
4  utility bills you guys are asking for and that is
5  also for the facilities, correct?
6      A.  Correct.  Your nonvehicle maintenance.
7      Q.  Okay.  And the cleaning supplies, is that
8  for nonvehicle maintenance as well?
9      A.  Correct.
10     Q.  Okay.  Can you please read E-4, general
11  admissions -- administration.
12     A.  "General administration, office staff,
13  salaries, profit, admin, overhead."
14     Q.  So I'm trying to get an understanding of
15  what D-4, general admissions.  Can you please give me
16  an understanding of when you guys say "office staff
17  salaries," what is MART looking for in this E-4?
18     A.  Again, those particular items are just a
19  percentage of your monthly invoice to MART for MART
20  services.
21     Q.  So office staff salary.  As you know we
22  had a couple -- well, you probably don't know but we
23  had a couple of staff that wasn't with MART; would
24  that be included?

Page 12

1      A.  No.  That were working on the MART
2  contract?
3      Q.  Yes.
4      A.  No.
5      Q.  So you would only want a breakdown of the
6  office staff salaries that work with MART, correct?
7      A.  Correct.
8      Q.  Okay.  Profits.  You would also want a
9  breakdown of the monthly profits that the vender
10  made, correct?
11     A.  A percentage of your monthly invoice to
12  MART, are all those items are.
13     Q.  Profit.  Let's focus on profit.  MART
14  would want a breakdown of the profit for the monthly
15  invoice that we received from MART, correct?
16     A.  That is one of the items under general
17  administration, yeah.
18     Q.  It's profit, correct?
19     A.  Yeah.
20     Q.  Okay.  Administration overhead, can you
21  give me a definition of administration overhead?
22     A.  Your costs.
23     Q.  For?
24     A.  To run your office, your administration.

Page 13

1      Q.  Okay.  Can you make that a little
2  clearer; I need a breakdown of what administration
3  overhead cost includes and means, for the record?
4      A.  Well, I'm not a hundred percent sure how
5  you run your business but that could be different --
6  could be even different supplies for your office.
7      Q.  It could be what?
8      A.  It could be different supplies for your
9  office.
10     Q.  Such as?
11     A.  Anything, paper, pens.
12     Q.  Papers, pens?
13     A.  Could be anything.
14     Q.  Office supplies?
15     A.  Yes.
16     Q.  Okay.  Let's go to line "F," fuel costs.
17  Can you please read that line and tell me exactly...
18     A.  "Fuel costs, total cost of fuel for the
19  month."
20     Q.  Would you please tell me exactly for the
21  record what does that line mean?
22     A.  Again, it would be for your monthly
23  invoices to MART, the total cost of the fuel.
24     Q.  So am I correct you're saying that you

Rebecca Badgley
June 22, 2021

Page 14

1  want a monthly report that breaks down the total fuel
2  costs that we use under the MART contract?
3      A.   Correct.
4      Q.   Okay.
5           MR. JONES:  Ellen, can we go to the next
6  page?
7      Q.   Can you please, Rebecca, read line G,
8  "gallons of fuel."
9      A.   "Gallons of fuel, total number of gallons
10 of fuel purchased."
11     Q.   So each month -- I just want to make it
12 clear for the record.  Each month MART wants a
13 breakdown of the gallons of fuel purchased through
14 work done for MART, correct?
15     A.   Correct.
16     Q.   Okay.  Can you please read "H"?
17     A.   "Miles per gallon average, number of
18 miles that a vehicle travels on one gallon of fuel
19 for each vehicle used for brokerage contract."
20     Q.   Okay.  So line "H," "miles per gallon" am
21 I correct by saying that MART wants a monthly
22 breakdown of the number of miles for travel while
23 working for MART on one gallon of fuel report each
24 month, correct?

Page 15

1      A.   Yes.  For each vehicle used under the
2  contract, that is what was in the amendment.
3      Q.   Okay.  So let's just back up a little
4  bit.  Can you state your full name for the record?
5      A.   Rebecca Badgley.
6      Q.   And what is your position at MART?
7      A.   I am the director of the brokerage.
8      Q.   Okay.  How long have you worked there?
9      A.   I've worked at MART for 32 years.
10     Q.   For 32 years.  Did you -- did you -- oh,
11 does it require you to have any degrees, college or
12 courses or anything?
13     A.   At the time that I was hired, no, it did
14 not.
15          MS. ECKER:  Can I just ask that we stop
16 screen sharing so I can see all --
17          MR. JONES:  Excuse me?
18          MS. ECKER:  Can you stop screen sharing
19 so I can see you and the witness if you're not
20 going to use the exhibit?
21          MR. JONES:  No, we're going to go back
22 to, I mean, the exhibit.  I just want to, you
23 know, I did not ask her some questions
24 regarding her job and, you know, because she is

Page 16

1  the witness, I just want to make sure she's
2  prepared.
3          MS. ECKER:  Okay.
4      Q.   You've been there 32 years.  What is your
5  job description at MART, Montachusetts Regional
6  Transportation, brokerage?
7      A.   I'm the director of the brokerage
8  operation.  I oversee the contract that we have with
9  the State of Massachusetts --
10     Q.   Okay.
11     A.   -- for human service transportation?
12     Q.   Are there anyone in the room with you
13 right now, Rebecca?
14     A.   No, there is not.
15     Q.   Okay.  So it is safe to say that you
16 oversee the department that makes all the phone
17 calls, the call center?
18     A.   I oversee all aspects of the brokerage,
19 so, yes, that includes call centers, scheduling.
20     Q.   Okay.  I'm pretty sure -- did you get a
21 chance to see the complaint that I filed in federal
22 court?
23     A.   Yes.
24     Q.   Okay.  Did you -- do you oversee all of

Page 17

1  the defendants on the complaint, such as Michelle
2  Morio, Stephanie -- all of the people in the
3  complaint, do you oversee them?
4      A.   I am not their director manager, but I
5  oversee them as a whole, yes.
6      Q.   Okay.  All right.  Now, we can get back
7  to the exhibit, Exhibit 1.  Can you scroll down to --
8          MR. JONES:  Ellen, can you scroll down to
9  the interrogatories, that end of the document.
10 I don't know what page it's on.
11          THE STENOGRAPHER:  Hold on.
12          MS. ECKER:  I'm trying to understand what
13 your Exhibit 1 is.
14          MR. JONES:  This is my deposition.  I'm
15 asking the questions here.  But if -- I'll
16 explain the document to you.  Just, if you have
17 a question, just get to the point.  This
18 document is Exhibit 1.  It is 2019, again
19 amendments, the interrogatories and the
20 admissions.  Okay.
21          MS. ECKER:  Okay.  How many pages is it?
22          MR. JONES:  Excuse me?
23          MS. ECKER:  How many pages is it?
24          MR. JONES:  It's 56 pages.  See at the

Catuogno Court Reporting - A Service of InfraWare
Springfield, MA  Worcester, MA  Boston, MA  Providence, RI

Rebecca Badgley
June 22, 2021

### Page 18

1    top it says 56.  No, it's -- if you can scroll
2    down -- is that the last page, Ellen?
3        THE STENOGRAPHER:  Yes, that's the last
4    page.
5        MR. JONES:  It's 56 pages.  Does that
6    answer your question?
7        MS. ECKER:  No, but I'm assuming it's
8    going to be an official document so I'll know
9    when I get a copy of it, so that's fine.  Go
10   ahead.
11       MR. JONES:  So I answered your question,
12   correct?
13       MS. ECKER:  You didn't because -- and
14   this isn't your fault.  It's difficult on a
15   Zoom deposition, but it looks to me as if
16   you've combined some documents together, so I'm
17   just trying to understand what's contained in
18   your Exhibit 1 so I know if it's complete, if
19   it's not, so I have a copy.  So not a big deal.
20   At the end of the deposition I am sure the
21   stenographer will provide me a copy.
22       MR. JONES:  Yeah, if you pay.
23       MS. ECKER:  Either way I get a copy of
24   the exhibits.  But I will pay the stenographer.

### Page 19

1    I always do.
2    Q.    Let's go to the interrogatories.
3        MR. JONES:  And for the record, all of
4    these documents were requested and sent from
5    you.
6        MS. ECKER:  Well, I don't know that,
7    that's the problem with not having this all
8    mixed and matched.  So I'll take your word for
9    it, but I don't know what is in this document,
10   is my point.
11       MR. JONES:  Okay.
12       MS. ECKER:  But I'll take your word for
13   it.
14       MR. JONES:  We've already been down that
15   road.  I told you and I'm telling you that
16   these are the documents that when I propounded
17   my first set of discovery request from you.
18       MS. ECKER:  Okay.
19       MR. JONES:  Ellen, if you can scroll up a
20   bit, so the admissions.  Can we take a
21   15-minute break so I can set up my other
22   Exhibit 2 to go through it so I can answer all
23   of Attorney Ecker's questions that she had for
24   Exhibit 1?

### Page 20

1        MS. ECKER:  I don't have any questions
2    for Exhibit 1.  We can take a break but don't
3    do it just to answer my questions.  I just what
4    to know what the exhibit is.
5        MR. JONES:  I would like to take a break
6    so I can get my Exhibit 2 together, so I can
7    put together everything that I need.  So let's
8    get back on the record in 15 minutes.  Is that
9    fine with you, Ellen, Rebecca, Ms. Ecker?
10       MS. ECKER:  That's fine with me.  We'll
11   be back at 10:45.
12       MR. JONES:  Okay.
13
14       (Five-minute break was taken)
15
16       MR. JONES:  We're going to stay on
17   Exhibit 1 for a few more minutes just -- okay.
18   Q.    Rebecca, I have a question regarding
19   reporting.  We're going to stay on this reporting.
20   Can you explain to me what end-of-day reporting that
21   was requested from MART, the definition of it and
22   meaning of it?
23   A.    What section are you referring to, Paul?
24   Q.    I'm referring to the end of the day

### Page 21

1    report.
2    A.    The end-of-day report would be your
3    end-of-day report when you download your schedules
4    for the next day.
5    Q.    Okay.  Does it -- is it fair to say the
6    end of the day reports all of the trips the drivers
7    and the venders went on -- the venders completed for
8    the day?
9    A.    No.  When we reference the
10   end-of-day report --
11   Q.    Yeah.
12   A.    -- in those additional provider
13   performance standards, we're referring to what would
14   be CCRD or whomever the vender is; when you download
15   your trips for the next day at the end of the day,
16   that's your end-of-day report.
17   Q.    So does the end of the day report
18   consistent of all the trips that the vender performed
19   for the day?
20   A.    It would be all of the trips that are
21   assigned to you for the next day.
22   Q.    So basic it's just, to me, the schedule?
23   A.    We don't ask you to submit end-of-day
24   reports to us.

**Catuogno Court Reporting - A Service of InfraWare**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

**Rebecca Badgley**
**June 22, 2021**

Page 22

1  Q.   Okay.  I have —
2      MR. JONES:  Ellen, I have an e-mail that
3  I would like to submit to you, and I need you
4  to mark it as Exhibit 3.  What is procedure?
5  How do I do that?
6      (Discussion between stenographer and
7      Mr. Jones)
8
9      MR. JONES:  Okay.  Do you see this?  It
10  says, "Gmail end of the day report for DMA,
11  work August," Ellen?
12      THE STENOGRAPHER:  Yeah.  End of day
13  report 1, the one that's highlighted?
14      MR. JONES:  Yeah.
15      THE STENOGRAPHER:  Yep, it's there.
16  Q.   Okay.  Rebecca, can you — this is an
17  e-mail that I received from Richard, Stephens (sic).
18  Can you just read the names that are on the e-mail
19  that's highlighted right there?
20      A.   Stephanie Richards.  And it's cc'd to DMA
21  Contract.
22      Q.   Okay.  What is the date?
23      A.   The date is July 28, 2020.
24      Q.   Okay.  Can you please read the part that

Page 23

1  I just highlighted.  It starts with a good morning?
2      A.   "Good morning.  Just a quick note, and
3  thank you to all who have been submitting their
4  report as requested.  The end of the day report
5  should be received  via e-mail prior to 8 a.m. the
6  following business day.  MART needs to send an update
7  to HST by 9 a.m. the following day of transport, so
8  for today 7/28/2020.  Please make sure you send by 8
9  a.m. on Wednesday, 7/29."
10      Q.   Isn't it a fact that this e-mail states
11  that the end of the day report is requested every day
12  at 8 a.m. the following business day?
13      A.   That's correct.  That was the additional
14  request that was not part of the FY19 amendment that
15  we were going over, that was in regards to COVID
16  reporting.
17      Q.   Okay.  Do you know when this started, the
18  end of the day report request started approximately?
19      A.   Give me one second and I can verify that.
20      Q.   Yes.
21      MR. JONES:  Ellen, can you mark this as
22  Exhibit 3.
23      A.   I believe the initial request came in
24  around the 20th of July from HST.

Page 24

1  Q.   Okay.  So for the record, 20th of July
2  that's when the end of the reports request for each
3  vender started, correct?
4      A.   Correct.
5      Q.   Okay.
6      MR. JONES:  So I'm going to stop sharing
7  that document.  Did it stop sharing, Ellen?
8      THE STENOGRAPHER:  Yes.
9      MR. JONES:  Okay.
10      Q.   All right.  We're going to go back to --
11      MR. JONES:  Can we share, go back to
12  Exhibit 1.
13      Q.   Rebecca, can you please.  For the record,
14  give me a description of your audit -- procedure for
15  auditing a vender for, you know, audits, you know, do
16  they inspect -- do you have an inspector that does
17  it; can you explain?
18      A.   Yes.  We have a team of inspectors who
19  perform the annual back audit for venders.  The audit
20  is performed at the venders site and it's a review of
21  all the contractual requirements to ensure that the
22  annual retrainings have been done for all the
23  drivers, staff and that they have all the training
24  that's required; and that you're meeting all of these

Page 25

1  specifications that are within the contract.
2      Q.   Okay.  Do you guys ever require -- is
3  that the only requirements?
4      A.   I'm sorry?
5      Q.   Is that the only way MART perform audits,
6  is through the inspector?
7      A.   Yes, as a general rule.
8      Q.   That's the general rule?
9      A.   Yes.
10      Q.   And how many times a year is that
11  required?
12      A.   When a vender first onboards, we do an
13  onboarding audit before they're assigned work.  And
14  then it's done annually thereafter.  And sometimes
15  additional follow-up is required and we have to go
16  back out and double check things that maybe weren't
17  present at the time we went out initially.
18      Q.   Okay.  If you guys see, to look to my
19  left, I have another computer over here that I'm
20  working on that have the exhibits up.  So for the
21  record, once a year and before the vender starts, the
22  auditor -- a team of auditors  come out and audit the
23  company at the facility, correct?
24      A.   Correct.

**Catuogno Court Reporting - A Service of InfraWare**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

**Rebecca Badgley**
**June 22, 2021**

---

**Page 26**

1    Q.   Do you have any in-house people that do
2  audits, anybody at the brokerage department that
3  stays, you know, that will perform an audit there?
4    A.   We have some that have those capabilities
5  but it's generally the inspector that is going out to
6  do those audits.
7    Q.   So under the contract and the contract
8  amendments, audits are for the job of the auditor,
9  the inspectors, correct?
10   A.   Correct.
11   Q.   Okay.  And is that a rule, right, under
12  the regulations?
13   A.   It's required that we do annual debt
14  audits at the venders facility.  We do have in-house
15  staff -- not sure what you're referring but we do
16  have in-house staff, compliant staff that as venders
17  are onboarding new drivers or new vehicles, that may
18  not be seen in audit.  They will review and make sure
19  that that individual has all the requirements.
20   Q.   Is that only at the beginning or --
21   A.   Throughout the --
22   Q.   Beginning of --
23   A.   That's through the life of the contract
     if you're adding individuals to the contract.

---

**Page 27**

1    Q.   Okay.  Is that -- do you know if that's
2  in your contract in amendments?
3    A.   It's in the contract that you're required
4  to update your vehicle and driver lot that changes
5  are made and that all of those trainings and
6  requirements are required prior to putting them in
7  service with the consumers.
8    Q.   Is the audit requirement and the contract
9  and amendments?
10   A.   Yes, it's in the transportation provider
11  performance.
12   Q.   Okay.  In the Transportation provider
13  performance contract amendment does it state that the
14  inspector only does the audits?
15   A.   No, I don't believe it does.  It just
16  refers to the annual debt audits and inspections.  It
17  doesn't classify who's performing them.
18   Q.   Okay.  Next question is regarding
19  training.  Can you tell me -- vender training at your
20  facility.  Can you tell me the procedure of vender
21  training on the vender portal at your facility,
22  please?
23   A.   When a new vender onboards, before
24  they're assigned work, we have them come to our

---

**Page 28**

1  facility and they go through a vender portal
2  training, which is where it's described how they will
3  accept the work that's being offered to them, how the
4  billing will be done, how you file and respond to
5  complaints.
6    Q.   Okay.  During this vender portal
7  training, do you have screens and computers for the
8  venders to look at, for an example, of how a vender
9  portal looks like?
10   A.   Yes.
11   Q.   Okay.  Is that a requirement?
12   A.   What, that we have a screen?
13   Q.   That you have a computer simulator that
14  shows your vender portal during training?
15   A.   It's not a requirement.  The vender
16  portal training is not a requirement.  It's a
17  courtesy that we do with the venders so that they
18  understand how the systems work and can accept their
19  jobs and respond to claims.  There's no specific
20  requirement within the contract; that's generally
21  done before you start accepting work.
22   Q.   Okay.  Isn't it a fact that the vender
23  reporting requirements are in your contract and
24  amendments that state that you would have to, through

---

**Page 29**

1  the vender portal, require -- through the vender
2  portal -- training before you can get any rides?
3    A.   I don't believe it's stated within the
4  contract itself.  But when a new vender comes
5  onboard, we actually go through their application
6  first, that's the first step; once the application is
7  approved, we send out the contract.  Once the
8  contract is back and signed, we send out for the
9  initial audit at the vender facility.  And then if
10  everything is complete, then we have the vender come
11  in for a vender portal training prior to being
12  assigned work.
13   Q.   Okay.  What is the procedure for a vender
14  to drop a client?  Can a vender just drop a client as
15  far as if he doesn't want to transport this client
16  anymore or does he have to seek MART's approval?
17   A.   If there's a particular individual that
18  you no longer want to transport, you can notify us
19  and we'll remove them from being offered to you in
20  the future.
21   Q.   Do the venders have to get permission
22  from MART before they drop them?
23   A.   No.
24   Q.   So the vender has the power to drop any

---

8  (Pages 26 to 29)

**Rebecca Badgley**
**June 22, 2021**

Page 30

1    client that they want without MART's approval?
2        A.   Are you referring to cancelling a trip
3    that you've expected or just no longer continuing to
4    transport an individual?
5        Q.   The question is, can the vender no
6    longer -- choose to no longer transport a client
7    without MART's authorization?
8        A.   If you already have them for a scheduled
9    tripped, you would have to inform us.  You don't
10   require our authorization.
11       Q.   Okay.  Again, I'm trying to narrow this.
12   The vender has a client.  There's a problem.  Can the
13   vender drop the client for the next future trips
14   without consulting with MART?
15       A.   MART has to be notified so that the
16   individual's trips are rescheduled.
17       Q.   Okay.  Can the vender drop the client
18   without MART's authorization, yes or no?
19       MS. ECKER:  Objection.  She's answered
20   this question.
21       MR. JONES:  No, she hasn't.
22       MS. ECKER:  Well, she has.  But she can
23   answer it again.
24       A.   We don't have to give you authorization,

Page 31

1    Paul, but we have to be notified.
2        Q.   Okay.  Now we're getting somewhere.  So
3    MART -- what you're saying is MART does not have to
4    give the vender authorization to drop a client,
5    correct?
6        A.   Correct.
7        Q.   Now, I have a question.  The next
8    question, does MART have the authority to hire and
9    fire any of the vender's employees?
10       A.   We are not the hiring or the firing
11   authority.  But by contract, we have the right to
12   request removal from an individual working on our
13   contract.
14       Q.   So are you saying that MART has the right
15   to remove a driver from the contract?
16       A.   From working on the MART contract, yes.
17   It is in their contract that MART and/or E-O-H-H-S.
18       Q.   Well, MART is --
19       A.   Can fire or removal.
20       Q.   So MART or E-H-S-S -- what was that,
21   E-S-H-S?
22       A.   E-O-H-H-S, the Executive Office of Health
23   and Human Services.
24       Q.   Okay.  But my specific question is, does

Page 32

1    MART have the authority to remove a vender or a
2    driver from performing any trips with MART, yes or
3    no?
4        A.   Yes.
5        Q.   Okay.  The next question is on the
6    capacity  tab from the vender portal.  Can you
7    explain for the record what is the capacity tab and
8    what it does?
9        A.   So the capacity tab on the vender portal
10   would be the amount of work that the vender is able
11   to perform throughout the course of the day.
12       Q.   Do the vender have the capability to
13   change the capacity tab to reflect how much work he
14   would like?
15       A.   They did early on but that was locked
16   from being changed about two years ago, I think.
17       Q.   So two years ago the capacity tab was no
18   longer available to venders to change?
19       A.   Correct.
20       Q.   Did you notify venders of this change?
21       A.   We notified venders that we were going
22   through capacity and that we would be making
23   adjustments here.
24       Q.   So you notified venders that they would

Page 33

1    no longer be able to control the capacity tab,
2    correct?
3        A.   Correct.
4        Q.   And when did you say this happened?
5        A.   It was a couple of years ago, two years
6    ago.
7        Q.   Have you ever received e-mails from me
8    inquiring about this specific thing, why I couldn't
9    change my capacity tab?
10       A.   Honestly, off the top of my head, I
11   received several e-mails from you over time Paul; but
12   I don't know if that were related to the capacity.
13       Q.   Okay.  You state that all venders was
14   notified of this, correct, that the capacity -- that
15   they couldn't change their capacity tab any longer?
16       A.   We sent notices out to venders that we
17   were going to be adjusting the capacity, based off
18   the fleet side.
19       Q.   So would you -- would it be a fair to say
20   that MART controlled the amount of work that a vender
21   would request in his capacity tab?
22       A.   Yes, we did control that based on the
23   size of the venders fleet.
24       Q.   I see.  So what would be the procedure if

**Catuogno Court Reporting - A Service of InfraWare**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

**Rebecca Badgley**
**June 22, 2021**

---

Page 34

1  I wanted to change my capacity tab after the changes
2  went through that only MART could control the
3  capacity tab?
4      A.   You could e-mail the contracts department
5  and request that they be adjusted.
6      Q.   So is it fair to say once that -- I'm
7  sorry. Are you finished?
8      A.   Yes.
9      Q.   Is it fair to say once a vender e-mail
10  the proper department, his capacity tab would be
11  changed only if MART thought his fleet size could
12  handle the change?
13      A.   Correct.
14      Q.   So, basically, MART controlled the work
15  based on the fleet size?
16      A.   Correct.
17      Q.   So MART could control each venders
18  capacity of work given to them based on how many
19  vehicles they had on the road?
20      A.   A number of vehicles and the size of the
21  vehicles, yes.
22      Q.   Basically, MART controlled the work that
23  a vender could receive?
24      A.   The amount that would be offered, yes.

---

Page 35

1      Q.   So MART control the amount of work that
2  could be offered to a vender?
3      A.   Correct.
4      Q.   Okay. Sorry, I just got to look at my
5  computer because I got everything written down.
6  Okay. Now, on the vender portal, how far out can a
7  vender go to accept work, one day, two days, a week,
8  two weeks?
9      A.   On the vender protal, work is assigned
10  near the low cost assignment and, initially, work was
11  being offered seven days out in advance. We
12  increased that to 14 days in advance.
13      Q.   Okay. So have you ever increased it to
14  30?
15      A.   No.
16      Q.   So the limit is a vender can go out 14
17  days to create a schedule for itself, correct?
18      A.   The vender can go out 14 days to see if
19  there's work being offered to him based off the
20  business. And that's three days out. It doesn't
21  include same day trip or next day trip.
22      Q.   What's three days out?
23      A.   The vender portal, Trip assignment is
24  three days out. It doesn't include -- for example,

---

Page 36

1  it doesn't include today's work or work for tomorrow.
2      Q.   I understand that.
3      A.   Yes.
4      Q.   Now -- so can you explain to me are you
5  familiar with the employees that MART instructed me
6  to no longer let them work with MART clients?
7      A.   We keep a list here, yes.
8      Q.   You say you keep a list?
9      A.   If we removed somebody from working on
10  the contract, we keep that information here, yes. Do
11  I know off the top of my head, no.
12      Q.   Okay. So is it fair to say if MART had
13  me remove an individual, a driver, that that
14  individual couldn't drive for a number of years
15  contracting with MART?
16      A.   If an individual has been permanently
17  removed from working on the MART contract, yes. If
18  they were to work for another vender, we would not
19  let them come onboard.
20      Q.   So it's a fact that you're telling me
21  that if MART removed one of my drivers, CCRD drivers,
22  Commonwealth, the vender, that driver couldn't go
23  work for another vender, correct?
24      A.   It would depend on the actual removal.

---

Page 37

1  At times we remove drivers pending a retraining or
2  pending investigation, things of that nature; but if
3  it's a permanent removal from working on the MART
4  contract, then they would not be able to go work for
5  another.
6      Q.   Question. Answers. So MART has the
7  power to hire -- I mean, to fire, disengage our
8  employees, drivers, correct?
9      A.   No.
10      Q.   Does MART have the authority to fire the
11  employees that drive MART's clients?
12      A.   No, we are not the hiring agency or the
13  firing agency. We have the right to remove them from
14  working on our contract.
15      Q.   What is the definition of removal, with
16  removing or working on your contract; what's that
17  definition?
18      A.   It means that they can't transport the
19  clients that are being assigned to the company by
20  MART.
21      Q.   Any longer, correct?
22      A.   Correct.
23      Q.   So that's firing, correct?
24      A.   No. We're removing them from our

---

10  (Pages 34 to 37)

Rebecca Badgley
June 22, 2021

## Page 38

1   contract. If the vender only works for MART and has
2   no other work to give them, and that's the ultimate
3   thing that happens, that's not us doing that. We're
4   not the hiring or the firing agency. We're just
5   the --
6       Q.   So, basically, are you firing them from
7   transporting MART's clients?
8       A.   We're removing them from transporting our
9   clientele.
10      Q.   What is the definition of removing in the
11  context of this thing?
12      A.   It's labelled within your contract that
13  we have the right to remove them from working on
14  transporting our consumers.
15      Q.   Rebecca, please answer the question.
16      MS. ECKER: She has answered the
17  question.   That's four times now. You can
18  ask it one more time.
19      MR. JONES: I'm not here to fight. This
20  is a deposition; I would like the question
21  answered.
22      MS. ECKER: And she has answered it. But
23  go ahead.
24      MR. JONES: No, she didn't answer.

## Page 39

1       MS. ECKER: She didn't answer it the way
2   you wanted it answered, that's different. But
3   go ahead.
4       Q.   I want to know the definition of removal.
5       A.   Taking the individual away from
6   transporting our consumers.
7       Q.   That's it. There you go. Okay. Can you
8   please tell me how your D-S-S program works regarding
9   venders?
10      A.   Our, what, program?
11      Q.   D-S-S?
12      A.   I don't have a DSS program.
13      Q.   D-D-S?
14      A.   DDS?
15      Q.   Yeah.
16      A.   Okay.
17      Q.   What does D-D-S stand for?
18      A.   Department of Developmental Services.
19      Q.   Now, you have a transporting program for
20  their clients, correct?
21      A.   Correct.
22      Q.   How does that program work, as far as
23  venders transporting the clients, what is the
24  requirements of the vender?

## Page 40

1       A.   The requirements are clearly listed
2   within the contract. There's a certain -- just like
3   all of our venders, the drivers are required
4   drivers -- drivers and/or monitors are required to
5   have certain training. There's vehicle age
6   requirements for that program, different insurances
7   for that program based off the size of the vehicle.
8   The program-based transportation was actually put out
9   on an RFR on a five-year bid. So routes were
10  assigned to venders. They stopped the response to
11  that RFR, and there's generally not new work going
12  out for that program on a regular basis.
13      Q.   Okay. Can you tell me the requirements
14  of the wait time for a driver, MART requirements for
15  a wait time for a driver when he's picking up a
16  client from home t o go to an appointment?
17      A.   The contract states they're required to
18  wait five minutes past the pickup time and then
19  you're supposed to contact your dispatcher, attempt
20  to reach the client; and if there's no response, you
21  can continue on.
22      Q.   So MART -- is it fair to say MART
23  requires the driver to wait five minutes past the
24  time?

## Page 41

1       A.   As the schedule pickup time and then the
2   attempt to contact the client.
3       Q.   Okay. Can you tell me how you're fine
4   system works when you fine a vender for a no show?
5       A.   If there is a vender no show, it's
6   actually recorded in the complaint.
7       Q.   So, basically, I just want to touch on
8   ways that a vender can get fined. So the first
9   question is, if a client reports that a vender was a
10  no show and the vender actually showed up and the
11  vender informed MART that he showed up, would MART
12  fine the vender and require the vender to submit
13  proof that he actually showed up?
14      A.   If a client calls and says that a
15  vender's a no show, you know, depending on what the
16  sequence that that happened, if it's five minutes
17  around the pickup time, it depends on when we get a
18  call, that a complaint will get filed. The vender
19  will have an opportunity to respond to that
20  complaint. And sometimes we do ask for additional
21  proof, GPS records, things of that nature.
22      Q.   So you ask for proof from the driver and
23  the vender of GPS that shows that he was there?
24      A.   Correct.

**Catuogno Court Reporting - A Service of InfraWare**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

Rebecca Badgley
June 22, 2021

Page 42

1    Q.   In order not to get fined?
2    A.   Correct.
3    Q.   So if the vender or the driver can't
4  produce pictures that he was there, is that a — will
5  he get fined?
6    A.   If in the end the consumer reported the
7  vender a no show and did not make their appointment,
8  and the vender doesn't have anything additional to
9  support the fact that they were there, they could
10 receive a fine, yes.
11   Q.   So is it fair to say if the vender
12 doesn't have proof through GPS that he was there,
13 they --
14   A.   Could provide a GPS record. They could
15 provide a time stamp photograph. They could provide
16 confirmation that somebody else that may have been in
17 the vehicle at the time.
18   Q.   Is this a requirement in the amendments
19 or the contract?
20   A.   Well, you're supposed to provide on-time
21 service, and we're following up to a complaint.
22   Q.   Is proof of GPS or time stamp picture in
23 the contract or the amendments?
24   A.   I'm not a hundred percent sure. I know

Page 43

1  it is in current. I don't know what you're referring
2  to or...
3    Q.   Any year. Any contract or amendments, is
4  that in there where a vender has to show proof by GPS
5  or time stamp picture in order to avoid a fine for a
6  no show to a client?
7    A.   Again, I'm honestly not a hundred percent
8  sure how it's worded in there or if it specifies
9  those particular items.
10   Q.   Okay. Well, I'm not talking about the
11 wording. Basically, we want to -- I'm talking about
12 proof. I understand, you know, you're not a -- you
13 don't remember how the wording is for contracts, but
14 I'm trying to just nail it down. If in your
15 amendments or the contract, either year, is that
16 requirement in there that a vender or a driver has to
17 produce the GPS verification in order to avoid a
18 fine?
19   A.   I don't think that it specifies a GPS
20 verification in order to avoid a fine.
21   Q.   Okay.
22   A.   It's a follow-up to a customer complaint.
23   Q.   Okay. Does your contract or any
24 amendment, any years state that a vender or a driver

Page 44

1  has to produce a time stamp picture in order to avoid
2  a fine for a no show when a client makes a report?
3    A.   Again, I don't think it specifies any
4  time stamped picture.
5    Q.   You say you don't think. That means
6  you're not sure, correct?
7    A.   Correct. I don't have any amendment in
8  front of me.
9    Q.   Okay. All right. One second. I'm just
10 looking on my computer for the next questions.
11   MS. ECKER: Can we just stop the screen
12 sharing if possible?
13   MR. JONES: What's the problem?
14   MS. ECKER: When you screen share, if the
15 exhibit's still up, I can't see everybody
16 talking. So if you're not going to use the
17 exhibit, I would appreciate it if we're not
18 screen sharing.
19   MR. JONES: But I might use it because
20 I'm going through my questions and then I can
21 reference the part to you.
22   MS. ECKER: Okay.
23   Q.   Okay. The next question is regarding
24 next day offers through your IV system — IVR system.

Page 45

1  How does that work?
2    A.   Then the next day offers through the IVR?
3    Q.   Yes, the next day offers?
4    A.   Okay. So the next day are being
5  handled -- they start off being handled by our IVR
6  system, which is a callout system, which starts at
7  6:30 in the morning. It works very similar to the
8  vender portal as far as low cost assignment; but it's
9  actually physically calling the vender.
10   Q.   Okay.
11   A.   And it will call the vender up to three
12 times. They have an opportunity to decline doing it
13 right then if they don't -- if they're in the middle
14 of something, it will call them up to three times
15 before it moves on. And the system reads the trip
16 information to the vender, and they have the ability
17 to accept or decline the client trip being offered.
18   Q.   What was the procedure to stop the
19 callout system from calling venders and drivers?
20   A.   You would have to notify the contract
21 department.
22   Q.   Can you go in and just mark your portal
23 full?
24   A.   If you mark your portal full for the day,

12  (Pages 42 to 45)

**Catuogno Court Reporting - A Service of InfraWare**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

Rebecca Badgley
June 22, 2021

Page 46

1   yeah, it would stop calling.
2       Q.   It would stop calling?
3       A.   Yes.
4       Q.   Would it stop offering you work also
5   through the vender portal?
6       A.   The vender portal wouldn't be processing
7   any work for the next day. The vender portal is
8   three days, same day and next day is going -- same
9   day is going out by the live scheduling agent. And
10  the next day is going out by the IVR callout as well
11  as live scheduling.
12      Q.   But my question is, if a vender or driver
13  marks his portal full to avoid the phone calls coming
14  in, will that also trigger the vender portal from
15  offering any work, next day, week out, 14 days out?
16      A.   No. If a company marks themselves as
17  full for a particular day, it will stop offering work
18  for that particular day.
19      Q.   Okay. Thank you. Commonwealth Community
20  Recovery Division, I'm just going to call them CCD --
21  CCRD for short, okay, for the record. We had some
22  problems in the past with work being placed in our
23  portals. Do you recall that?
24      A.   Yes, I do remember that there were a

Page 47

1   couple of incidents, yes.
2       Q.   Yes.
3       A.   I don't recall specifics.
4       Q.   Right. But you do recall that we had
5   unauthorized work that we didn't accept put into your
6   portal, correct?
7       A.   I remember you having complaint as such,
8   yes.
9       Q.   Okay. Do you ever remember when MART
10  corrected it and acknowledged that we didn't accept
11  the work?
12      A.   I know that there was a group that I
13  researched for you, and there were -- they had been
14  accepted by your IP as your log-in.
15      Q.   So the question again, do you recall any
16  work that after research you found that we did not
17  accept that was putting out?
18      A.   I don't recall, no.
19      Q.   Okay. I have a question on insurance
20  policy for venders working with MART. What is the
21  requirements of Massachusetts, not MART,
22  requirements; is it 20, slash, 40?
23      A.   Based off the vehicle size, yes, those
24  are the state requirements.

Page 48

1       Q.   Okay. Does MART follow the state
2   requirements or they require more?
3       A.   At one point it was the state minimum for
4   the MassHealth Demand Response as a higher level for
5   the program base. But that insurance requirement was
6   changed a couple of years ago where we required more.
7       Q.   Okay. So is it safe to say that MART
8   requires more insurance requirements than the state
9   requirements as of 2020?
10      A.   Than the state minimum, yes, absolutely.
11      Q.   Okay. Does MART require more insurance
12  coverage than the state requires for 2019?
13      A.   I believe, yes.
14      Q.   Does MART require -- strike that.
15           Did MART require more insurance coverage
16  than the state required for 2018?
17      A.   I'm honestly not a hundred percent sure.
18  I don't remember which contract we increased that in.
19      Q.   Is it a fact that when a vender accepts a
20  trip from MART for a specific time, MART doesn't
21  change the time unless you ask the vender, who rather
22  than -- if you don't understand the question, I'll
23  rephrase it.
24      A.   Please rephrase it because I'm not a

Page 49

1   hundred percent sure.
2       Q.   Okay. Is it a fact that once a vender
3   accepts a trip from MART for a specific pickup time,
4   like 8 a.m., does MART have to get authorization from
5   the vender to say if they wanted to change the pickup
6   to 5:30 a.m.?
7       A.   They would -- normally, any changes that
8   made highlight to the venders through the venders
9   portal in a different color; so it would really
10  depend on how far out that trip is. If the trip is
11  for the next day, or same say, they will call the
12  vender.
13      Q.   So MART has to -- so is it safe to say
14  that MART has the authority to change the pickup time
15  or the return time without the vender's
16  acknowledgment?
17      A.   Only for advanced trips.
18      Q.   So is it a fact that MART can change the
19  times without authorization of the vender?
20      A.   Yeah, in advance you have the ability to
21  see that change and notify that you can no longer
22  accommodate. If it happens for the next day or same
23  day, they would call you immediately.
24      Q.   So, basically, I'm trying to get an

**Catuogno Court Reporting - A Service of InfraWare**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

**Rebecca Badgley**
**June 22, 2021**

Page 50

1  answer here.  Does MART have the authority to change
2  the pickup time or the drop-off time that the vender
3  agreed to do, whether it's a day or two or a week or
4  two weeks out, do they have the authority to change
5  the schedule of the vender without authorization from
6  the vender, yes or no?
7      A.  It's not a matter of authority.  It would
8  be a consumer calling and changing their time.
9      Q.  Once the consumer calls and change the
10  time, does MART have the authority to change the time
11  without seeing if the vender is available?
12      A.  I think I answered that.  That's posed to
13  you, if it's in advance and if you can't accommodate,
14  you can decline it.  If it's same day or next day,
15  they will call you and see if you can accommodate the
16  change that was made by the customer.
17      Q.  The issue I'm trying to get at is not if
18  it's a day or the two days or 7 days or 14 days out.
19  Does MART have the authority to change a vender's
20  schedule?
21      MS. ECKER:  Objection.  Asked and
22  answered.  You can answer again.
23      A.  We're not changing the vender schedule.
24  We're changing the customer's schedule.  And the

Page 51

1  protocol would be you would see the change in the
2  vender portal in a different color, if it was
3  advanced trip, signalling to you that there has been
4  a change.  If you can't accommodate that change, you
5  let us know and we reassign the trip.  If the change
6  happens the same day or the next day, they will call
7  and ask the vender if he is able to accommodate the
8  change.
9      Q.  Okay.  Can you please do me a favor and
10  just answer the question; and if you don't understand
11  the question, ask me to rephrase it or -- because --
12      A.  I understand your question, Mr. Jones.
13  But my response is not going to change, because it's
14  not that we have the authority; we are changing the
15  trip based off the customer's request.  If the trip
16  is already assigned to a vender in the same day or
17  next day, we immediately call the vender to see if he
18  can meet those accommodations.  If it is in advance,
19  you'll see the change in a different color in your
20  portal and can decline to continue with that trip for
21  the future.
22      Q.  So it's safe to say you do contact the
23  vender to see if he's available?
24      A.  If it is for the same day or next day.

Page 52

1      Q.  So if it's 7 or 14 days out, you don't
2  call the vender?
3      A.  No, because you will see the change in
4  the portal for that trip.  And if you can't
5  accommodate that change, you have the right to turn
6  it back.
7      Q.  Okay.  Without -- if we turn it back,
8  will we receive a fine?
9      A.  If there was a change made to it?  No.
10      Q.  Yes.
11      MR. JONES:  Okay.  It's 11:41.  Can we
12  take a break to -- lunch break till about 12 --
13  what would be the proper time, Ellen, or
14  Attorney Ecker?
15      MS. ECKER:  How much longer do you think
16  you have, Mr. Jones?
17      MR. JONES:  I have no idea.  I'm going
18  through my list.
19      MR. ECKER:  Well, are we talking the
20  entire afternoon.  I'm just trying to get a
21  sense of...
22      MR. JONES:  I have no idea.  I have a
23  list.  I'm about halfway through it, so if we
24  can just keep moving things along.  We should

Page 53

1  be out of here in a few hours.  How long do you
2  guys need for a lunch break?
3      MS. ECKER:  I don't need one.  I don know about
4  if we do 12:15 -- we'll be back at 12:15, if
5  that's all right with the stenographer?  I can
6  go through.
7      MR. JONES:  Let's take a break until
8  12:15.  Okay?
9      MS. ECKER:  Yes.
10      MR. JONES:  Thank you.
11
12      (Break at 11:43 p.m.)
13      (Back on at 12:17 p.m.)
14
15      Q.  I would like to share a document that I
16  would like to mark for exhibit --
17      MR. JONES:  We already did Exhibit 3,
18  Ellen, correct?
19      THE STENOGRAPHER:  Yes.  You were going
20  to send that one to me.
21      MR. JONES:  Yeah, I'm going to send it to
22  you.  But I want to mark exhibit -- so the last
23  exhibit was 3, right?
24      THE STENOGRAPHER:  Yes.

14  (Pages 50 to 53)

Rebecca Badgley
June 22, 2021

Page 54

1     MR. JONES: So I have a document that I
2   would like to share and ask a question on. I'm
3   going to send this one. This is Exhibit 4.
4   Wrong one. Wrong one. I'm not seeing the
5   files here. All right. This is -- Ellen, this
6   is going to be marked as Exhibit 4. This is
7   an e-mail that I received from Rebecca.
8     Q.   And the question for this, do you see the
9   e-mail, Rebecca?
10    A.   Yes.
11    Q.   Okay. Now, earlier, I asked you about do
12  you recall any trips getting placed in the portal
13  without authorization, and you said. I don't
14  remember what you said, but I'm going to ask the
15  question again. Is there -- do you recall any trips
16  being placed in a portal without our authorization?
17    A.   My answer earlier was that I did not
18  recall any specifics but here in the e-mail, upon
19  investigation, it says that I found one.
20    Q.   So this e-mail can you please read a part
21  that that's highlighted. Well, first of all, can you
22  read the top, where it's from to who and a date?
23    A.   It's from myself to you on September 19,
24  at 9:25 a.m.

Page 55

1     Q.   Okay. And can you read the highlighted
2   part of the e-mail?
3     A.   It says, "Paul, our follow-up
4   investigation has been completed and it has been
5   found that this trip was placed by staff into your
6   portal at 10:34 on 9/17/19 without required vender
7   confirmation. Appropriate actions have been taken
8   with the staff person."
9     Q.   Is this a normal occurrence with staff
10  putting trips into the vender's portals without
11  requirement of confirmation?
12    A.   Not that I found, no.
13    Q.   Do you recall this happened to me several
14  times, maybe -- you sent an e-mail like this several
15  times before?
16    A.   No, I do not recall.
17    Q.   Okay. So it's a fact that, -- isn't it a
18  fact that on September 17, 2009 this was placed in
19  the vender portal without vender confirmation?
20    A.   It says it was found, that this trip was
21  placed by staff into the portal.
22    Q.   Okay. Let's try this again. Isn't it a
23  fact that this e-mail confirms that a trip, some
24  trips were placed in the vender portal without my

Page 56

1   confirmation or CCRD's confirmation?
2     A.   Yes, that's what this e-mail states.
3     Q.   And it says "the appropriate action has
4   been taken with the staff person." What type of
5   action was taken with the staff you found out that
6   they had placed trips in the portal that the vender
7   did not confirm?
8     MS. ECKER: I'm going to object to that
9   question, and I'm going to instruct her not to
10  answer. Not only is it beyond the areas of
11  inquiry by the court order, but it's also
12  confidential personnel information.
13    MR. JONES: How is it confidential
14  information and it says right here "appropriate
15  action." I want to know what the objection is?
16    MS. ECKER: Right. That means it's
17  confidential. The action that has been taken
18  was a personnel action against the employee and
19  that is confidential. It doesn't relate in
20  addition to the issues that we're here to
21  discuss today.
22    MR. JONES: We're here to discuss
23  control. This points out control that one of
24  her staff was controlling us by putting back in

Page 57

1   our portal without our authorization. It's a
2   control issue.
3     MS. ECKER: Well, I disagree with your
4   characterization. But regardless of the
5   characterization, any discipline given to a
6   MART employee does not relate to whether you
7   are a MART employee or control and is
8   confidential.
9     MR. JONES: Okay. That's on the record.
10    Q.   Again, Rebecca. It's a fact that MART
11  added work to the vender without confirmation?
12    A.   It's a fact that an employee added this
13  trip without confirmation.
14    Q.   Okay. That's fine. Now, does MART
15  require a high level of skills for drivers or
16  venders. Do they need like a college degree to be a
17  driver or a vender?
18    A.   We don't -- there are certain
19  requirements for training and.
20    Q.   No, that wasn't the question. The
21  question is, I'm going to state it. Does MART
22  require a college degree for a vender to be a vender
23  with MART?
24    A.   No, there's no such requirement in place.

**Catuogno Court Reporting - A Service of InfraWare**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

Rebecca Badgley
June 22, 2021

Page 58

1    Q.   Okay.  Does MART require a college
2  degree, high school diploma for any driver to drive
3  for MART?
4    A.   They're not driving for MART.  We're not
5  the hiring authority.  They're driving for CCRD.
6  Those requirements would come from you.
7    Q.   Do MART require any of CCRD drivers to
8  have a high school diploma or a college degree to
9  drive their clients?
10    A.   That is not defined in the specs, no.
11    Q.   So that's a no?
12    A.   That is not defined in the specs that are
13  required of the vender.
14    Q.   Is that a yes or a no?
15    A.   That's a no.  It's not required in the
16  specs of your contract.
17    Q.   Okay.  All right.  What time does your
18  IVR system start calling venders and drivers for next
19  day trips each day?
20    A.   I believe I answered that earlier, it's
21  6:30 in the morning it starts.
22    Q.   So you start at 6:30 in the morning.  Did
23  you ever start later than that?
24    A.   It only starts a little bit later other

Page 59

1  than that on a date that rates might be being applied
2  or if there was an issue with the system.
3    Q.   Suppose a vender opens a little later, is
4  not open at 6:30, does the call still come through?
5    A.   If they're signed up to get work through
6  the IVR, yes, it does.
7    Q.   If a vender opens at 7, does the call
8  still start at 6:30?
9    A.   Yes.
10    Q.   And up to what time do the calls stop for
11  the IRV system -- IVR system for next day calls?
12    A.   That can vary.  Because it's working on
13  next day work.  So as soon as all the work is
14  completed it stops.
15    Q.   Is it fair to say that a vender or driver
16  can receive a call at 6 p.m. at night?
17    A.   They could if there was a high volume of
18  work for the next day, yes.
19    Q.   I'm going to ask that question, please
20  just answer the question.
21    MS. ECKER:  I'm going to object.  You
22  keep saying "I'm going to ask it again, please
23  answer the question."  She's answered the
24  question.

Page 60

1    MR. JONES:  She's adding comments.
2    MS. ECKER:  Mr. Jones, she's answering
3  your questions.  She's actually been very
4  patient.  But go ahead you can answer it again.
5    MR. JONES:  She is adding comments.  I'm
6  asking a simple question and she's adding
7  comments.
8    Q.   Can your IVR system call at 6 p.m. at
9  night, yes or no?
10    A.   Yes.
11    Q.   Can your IVR system call at 7 p.m. at
12  night, yes or no?
13    A.   Yes.
14    Q.   Can your IVR system even call after a
15  vender is closed?
16    A.   Yes, it could.
17    Q.   Okay.  Here we go.  Make this real short
18  and sweet.  MART is in the business of
19  transportation, correct?
20    A.   Correct.
21    Q.   How long has MART been in business with
22  transportation approximately?
23    A.   For the service that you're doing?
24    Q.   Montachusetts Regional Transit Authority,

Page 61

1  period, how long have they been in the business of
2  transportation, 10, 20, 30?  It doesn't have to be
3  exact.
4    A.   50 years probably.
5    Q.   Did you say 50, Rebecca?
6    A.   Oh, yeah.
7    Q.   So it's a fact that MART has been in the
8  transportation business for 50 years?
9    A.   Since it's inception, yes.
10    Q.   Okay.  So it's a fact that MART has been
11  in the transportation business for at least 50 years?
12    A.   Yes.
13    Q.   Okay.  So seeing that MART's IVR system
14  calls venders and drivers daily, this is a continuing
15  thing Monday through Friday on a daily basis,
16  correct?
17    A.   Correct.
18    Q.   Okay.  So, basically, every day MART is
19  calling -- strike that.
20    So MART -- strike that.
21    MART has a continuing relationship with
22  the drivers and the vender?
23    A.   I'm not understanding your question.
24    Q.   I'm just saying that, you know, the

**Catuogno Court Reporting - A Service of InfraWare**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

Rebecca Badgley
June 22, 2021

Page 62

1   question is, MART has relationship on an ongoing
2   basis with the vender, meaning that the vender just
3   doesn't get in touch with MART and get all this work.
4   This is a continuing relationship between MART and
5   the venders and the drivers on a daily basis?
6        MS. ECKER: Objection.
7        A.   It's a relationship with MART and the
8   vender.
9        Q.   Okay.
10       A.   On a daily basis.
11       Q.   Thank you.  How often is the vender paid
12  through MART, is it to be paid hourly, weekly,
13  monthly, biweekly?
14       A.   The service that your company provided
15  was for the MassHealth PT One Demand Response, which
16  is a 15-day billing cycle.  The first or the 15th of
17  the month is the first cycle.  The 15th should be end
18  of the month, is the next cycle and then there's
19  payable for the contractual obligation; they're paid
20  within 45 days following an improved invoice.
21       Q.   So, basically, the work that the vender,
22  CCRD, and their employees perform is part of MART's
23  everyday business?
24       MS. ECKER: Objection.

Page 63

1        MR. JONES:  On what grounds?
2        MS. ECKER:  Form of the question.  But
3   she can answer.  I didn't instruct her not to
4   answer.
5        MR. JONES:  You instructed her not to
6   answer that?
7        MS. ECKER:  She can answer the question.
8   I'm just objecting for the record.
9        A.   So repeat your question, Paul.
10       Q.   So the work that CCRD and I do is a
11  regular part of MART's business?
12       MS. ECKER:  Objection.
13       A.   Correct.
14       Q.   One second.  I want to ask a question on
15  one more report that is required from MART.  It's an
16  employee report – driver's report.  Strike that.
17  I'm going to ask a question on a report that is also
18  from the venders to MART that MART requested.  Can
19  you explain the employee report?
20       A.   I am not sure what you're talking about.
21  You'll have to give me an example of what you're
22  referring to.
23       Q.   No problem.  The drivers report, you
24  know, when you send over the drivers hire date, drug

Page 64

1   screens that's required?
2        A.   When you're adding a new driver?
3        Q.   Yes.
4        A.   Okay.
5        Q.   Can you explain that report in detail?
6        A.   We don't label it as a report.  There's
7   specific things that are required within the contract
8   prior to you, as a vender, putting the driver in
9   contact with the agency consumers that are under the
10  contract.  So you have to send a updated RMV report,
11  the date that you ran the CORI.  You have to at a
12  minimum have a fingerprint receipt, and the required
13  training and confirmation of the result of the test
14  for the preemployment.
15       Q.   Is that before we can -- the employee,
16  the driver, can actually start driving with MART
17  required to send to you guys?
18       A.   You're supposed to update your vehicle
19  log as you hire so we verify that they have all the
20  requirements.
21       Q.   What type -- what is the name of this
22  document?  You said it's not a report.  What do you
23  name it?
24       A.   It's not a report.  It's contractual

Page 65

1   requirements.
2        Q.   Is it an employee log?  What's the name
3   of it?  I'm going to put a name on it.
4        A.   It's not a report.  We house the backup
5   information here in a database, but it's not -- we
6   don't require that you submit a report.  We require
7   that you submit particular items that are clearly
8   defined within your contract.
9        Q.   Well, is it called an employee log, yes
10  or no?
11       A.   We keep a record here.  We don't call it
12  anything.  It's in your database.
13       Q.   So it's not called an employee log,
14  correct?
15       A.   In the contract it's your employee log
16  that you update.
17       Q.   Okay.  Rebecca, I'm trying to get a name
18  of this.  I have e-mails that says send over employee
19  log, and it says that an employee log is attached to
20  it.  So I'm trying to understand, because you're
21  the --
22       A.   Within the contract, Paul, it's your
23  company's updated employee log that they're
24  referring.

**Catuogno Court Reporting - A Service of InfraWare**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

Rebecca Badgley
June 22, 2021

Page 66

1     Q.  I don't care -- the question's not whose
2 it is. The question is the name of it, because I
3 just want to write it down for, you know, exhibit
4 purposes and things like that.
5     A.  In your contract it is referred to as
6 your employee log.
7     Q.  So employee log is the name, correct?
8     A.  Yeah.
9     Q.  Okay. When is this required to be sent
10 to MART?
11     A.  Your contract clearly defines that you're
12 supposed to submit it when you make changes to it.
13     Q.  So is it a fact that before we hire an
14 employee -- a driver -- I'm sorry, strike that.
15     Is it a fact that before we hire a
16 driver, we have to submit all these documents like an
17 RMV-1 and whatever else is required to MART for
18 approval?
19     A.  You can -- you're required to perform all
20 those items before you put the individual in contact
21 with our consumers.
22     Q.  Okay. Does MART have to approve it if
23 the driver is approved?
24     A.  When you send us your updates, we look at

Page 67

1 all that documentation and say that they meet
2 guidelines; if they don't meet guidelines, then we
3 tell you you have to remove them, that they can't
4 transport MART's members.
5     Q.  So MART has the authority -- strike that.
6     So we have to go to an approval process
7 with MART before we hire a driver and let them come
8 in contact with MART's employees; is that clear?
9     A.  You don't have to seek our approval to
10 hire your employees. You're supposed follow all
11 those things that are identified in the contract
12 prior to putting them in contact with agency
13 consumers.
14     Q.  Do you have to receive all your
15 credentialing before we put them in contact with
16 MART's consumers?
17     A.  Not necessarily. If you've done what's
18 required of your contract; when you send it, we're
19 going to verify it.
20     Q.  So is that a yes or no?
21     A.  We don't have to approve that. You are
22 the hiring authority.
23     Q.  Do you -- do MART have to approve --
24 strike that?

Page 68

1     I'm trying to ask you if -- it's just a
2 simple straightforward question. Do Commonwealth
3 Community Recovery Division have to get approval from
4 MART before we let a driver come in contact with a
5 consumer, yes or no?
6     A.  No. CCRD has to follow their contract
7 and have all those items in place prior to putting
8 the individual into service.
9     Q.  Okay. A few more questions here. Is a
10 GPS system required to transport MART clients?
11     A.  It's in the current contract.
12     Q.  Is it required?
13     A.  I think I answered that earlier saying I
14 don't think it was in there as a requirement.
15     Q.  No, we were -- what we were just talking
16 about earlier with the GPS was regarding
17 cancellations and things like that, if there was a
18 requirement for a cancellation. Now I'm asking is
19 there a requirement to transport MART's clients?
20     A.  There currently is.
21     Q.  As of?
22     A.  It's in the new contract.
23     Q.  For 2021?
24     A.  2022.

Page 69

1     Q.  2022?
2     A.  Yeah.
3     Q.  So it's in there. Okay.
4     A.  Yes. And I believe in '19 or '20 we were
5 launching our driver app, so you would have to have a
6 GPS-enabled phone.
7     Q.  On your driver's app, was that a
8 requirement that every driver use?
9     A.  We were just launching it so we were
10 putting it in place.
11     Q.  When did it launch?
12     A.  We started launching it last year.
13     Q.  So now is it a requirement for all
14 drivers to have?
15     A.  FY22.
16     Q.  That's great, save venders a lot of
17 money. I got a few more questions, and we can wrap
18 this thing up.
19     MR. JONES: So, now, Ellen what we need
20 to do is put up -- I'm going to send you
21 Exhibit 3 and 4; I made a note of that. And so
22 basically I just want to put up Exhibit 2 --
23 I'm sorry. Hold on one second. Exhibit 1, the
24 interrogatories, I have a question on that.

18  (Pages 66 to 69)

Rebecca Badgley
June 22, 2021

## Page 70

1   Interrogatories and admissions is on Exhibit 2.
2   So we can get rid of Exhibit 1, Ellen, and go
3   to Exhibit 2 so I can ask these final
4   questions. Exhibit 2, everyone sees it?
5        MS. ECKER: Yes.
6   A.   Yes.
7   Q.   Okay. This document is, Exhibit 2 it has
8   the answers that were sent from the defendant to me,
9   the interrogatories, admissions and -- this has the
10  interrogatories and admissions. So I have a few
11  questions. Have you ever seen this document before,
12  Rebecca?
13  A.   Yes, I have.
14  Q.   Okay. See my mouse?
15  A.   Yes.
16  Q.   Can you just read what it is, the title
17  of this document?
18  A.   "Defendant ANSWERS to Plaintiff's First
19  Set of Interrogatories."
20  Q.   Okay. Who answered these?
21  A.   Myself.
22  Q.   Okay. Can you read Interrogatory No. 2,
23  please.
24  A.   "Please explain why after plaintiff

## Page 71

1   contacted Rebecca Badgley, Michelle Moyo and others,
2   that he was unable to edit the CCRD capacity tabs and
3   was denied access to do so and was told that MART
4   does not give the vender ability to change they
5   capacity, that is something that only MART has access
6   to. With regards to standing orders, you will need
7   to contact the scheduling department. Thank you,"
8   which was "cc" to the brokeragecontract@mrta.us, and
9   which was seen by over 15 MART employees."
10  Q.   Okay. That was the question that I
11  asked. When did you answer these? I'm going to go
12  down to the date -- strike that.
13       It said you answered this on April 28,
14  2020 -- no, nope. I'm sorry.
15  A.   No, it says that I answered it on May
16  25th.
17  Q.   Nope. May 25th?
18  A.   That's when I physically signed my name.
19  Q.   Yes. So what was the date you answered
20  these on?
21  A.   May 25th.
22  Q.   Okay. Now, earlier, I asked you about
23  the capacity tab, and you said, oh, it was changed
24  two years ago where venders or employees of venders

## Page 72

1   couldn't change it, only MART could, right?
2   A.   A year and a half, two years ago, yes.
3   Q.   Are you sure?
4   A.   I'm pretty sure, yes.
5   Q.   Okay. Are you sure, yes or no?
6   A.   I don't recall the exact date. It was
7   approximately two years ago.
8   Q.   Approximately two years ago?
9   A.   Yes.
10  Q.   Are you sure that you electronically
11  signed these on May 25, 2021?
12  A.   Yes.
13  Q.   And you answered them as well, correct?
14  A.   Correct.
15  Q.   Let's go back to No. 2 for the answer.
16  Can you read the answer, please, No. 2.
17  A.   "Defendant objects to the interrogatory
18  to the extent that it does not contain the entire
19  e-mail referenced, which is a document that speaks
20  for itself, and was not attached to the plaintiff
21  first set of interrogatories to the defendant.
22       "Without waiving this or any other
23  objections, the defendant responds to the
24  interrogatory as follows: MART's venders are able to

## Page 73

1   make changes to their capacity manager to reflect
2   time and days of the week they are willing to accept
3   work by visiting the vender portal and editing the
4   capacity management tab. The venders are not able to
5   change the actual capacity figure in the vender
6   portal software system."
7   Q.   Okay. So according to this answer, MART
8   venders are able to make changes to their capacity
9   tab?
10  A.   Manage it --
11  Q.   To reflect times and days of the week?
12  A.   Yes.
13  Q.   Correct?
14  A.   Yes.
15  Q.   Didn't earlier you tell me we weren't
16  able to change the capacity tab to reflect --
17  A.   It says you weren't able to change your
18  capacity for the amount of work, that is specific to
19  the dates and times of the week that you're --
20  Q.   Why don't you strike that and I'll do it
21  over that way -- so it's a fact that MART venders
22  are able to make changes to their capacity manager to
23  reflect the times and dates of the week they are
24  available, correct?

Catuogno Court Reporting - A Service of InfraWare
Springfield, MA  Worcester, MA  Boston, MA  Providence, RI

Rebecca Badgley
June 22, 2021

Page 74

1  A.  Correct.
2  Q.  Okay.  So now I want to ask -- we're
3  going to go down to the admissions.  Are you familiar
4  with this document, Rebecca?
5  A.  Yes.
6  Q.  Can you read Request 1, please.  Let me
7  make it a little bit bigger.
8  A.  No, that's fine.  I can see it.  "Admit
9  that MART coordinates the time of pickup and drop-off
10  and return of all their clients that calls MART
11  directly for transportation services through their
12  transportation brokerage program for trips that are
13  assigned to transportation venders."
14  Q.  And the response, please.
15  A.  "Admitted."
16  Q.  Okay.  Request No. 2, can you read it,
17  please?
18  A.  "Admit that that capacity tab controls
19  the time a vender is operating hours displayed to
20  MART in the amount of jobs and money a vender can
21  schedule and earn with MART's transportation
22  program."
23  Q.  Answer?
24  A.  "Denied."

Page 75

1  Q.  The response, please?
2  A.  It says "denied."
3  Q.  Now, can you please tell me why this was
4  denied?
5  A.  Well, ultimately, you choose.  We offer
6  you work and you choose whether you're going to
7  accept or decline.
8  Q.  I'm referencing a question.  "Admit that
9  the capacity tab controls the time," stop.  Does the
10  capacity tab controls the time?
11  MS. DECKER:  I'm going to object if
12  you're asking her only a portion because
13  you're -- it doesn't have a period after that.
14  You asked her about the entire request for
15  admissions.  If you're asking all of the
16  request, that's fine.
17  MR. JONES:  No problem.
18  Q.  "Admit that the capacity tab controls the
19  time a vender operating hours displays to MART."
20  Rebecca?
21  A.  The capacity tab contains your hours of
22  service.
23  Q.  I'm taking this question all the way up
24  to "and."  So, basically, I'm trying to get an

Page 76

1  understanding here.  Is this correct or isn't
2  correct?  You denied it so...
3  MS. ECKER:  She denied the entire
4  paragraph, that was my objection.  If you want
5  to ask her a question that's not specifically
6  this request, you can do that, but she denied
7  the entire request.
8  MR. JONES:  Okay.
9  Q.  So can you read it one more time, please?
10  A.  "Admit that the capacity tab controls the
11  time a vender operating hours displays to MART and
12  the amount of jobs and money a vender can schedule
13  and earn with MART's transportation program."
14  Q.  And the response was denied --
15  A.  Correct.
16  Q.  -- correct?  In your own words, tell me
17  what the capacity tab controls?
18  A.  So the capacity tab shows the hours that
19  you're operating --
20  Q.  No.  What it controls.  Please --
21  MS. ECKER:  She just answered your
22  question.  Let her finish.
23  MR. JONES:  Please, Ms. Ecker, you don't
24  have to be disrespectful.  But can we please be

Page 77

1  cordial.
2  MS. ECKER:  I'm just saying you asked a
3  question.  Please let her finish her answer.
4  MR. JONES:  But it's the manner in which
5  you're saying it.  Can we just be cordial here,
6  please.
7  MR. ECKER:  We are being cordial.  I'm
8  not trying to talk over you.  But you asked a
9  question, please let her answer it.
10  MR. JONES:  Thank you.  That's much
11  better.
12  Q.  So I'm going to ask you the question
13  again.
14  A.  It displays the times that your company
15  operates and what your capacities are; but,
16  ultimately, you, as a vender, control what you accept
17  or decline from what's being offered to you.
18  Q.  Can you repeat that?
19  A.  I said the capacity tab shows what your
20  hours of operation are and what your capacity is, but
21  you, as the transportation provider, control what you
22  accept or decline.
23  Q.  Okay.  You said -- my question was, what
24  does the capacity tab control?  You answered the

20  (Pages 74 to 77)

**Catuogno Court Reporting - A Service of InfraWare**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

Rebecca Badgley
June 22, 2021

Page 78

1  question that says what the capacity tab shows, shows
2  and control are two different things. I want to know
3  what the capacity tab controls not what the capacity
4  tab shows. So, please, the question again is, in
5  your own words, what does the capacity tab control?
6      MS. ECKER: Objection. You can answer,
7  if you can.
8      A. Companies are provided a volume of work
9  based off their capacity; that's the only thing that
10 it controls, is the volume of work that is assigned.
11     Q. Okay.
12     A. You control what you accept or decline in
13 what you do.
14     Q. Okay. You just said that the capacity
15 tab controls the volume of work; is that correct?
16     A. Being offered. If you as a company,
17 Mr. Jones, can only handle a hundred trips per day --
18     Q. That's not the question that I asked,
19 Rebecca?
20     A. You're asking --
21     Q. I did not ask that question.
22     MS. ECKER: Mr. Jones, let her finish.
23     MR. JONES: No, it's -- I'm not
24 because --

Page 79

1      MS. ECKER: Let her finish. Mr. Jones,
2  let her finish.
3      MR. JONES: I did not ask that question.
4      MS. ECKER: Mr. Jones, let her finish.
5      MR. JONES: My question is, what does the
6  capacity tab control, and she said a volume of
7  work being offered. And -- is that correct?
8      MS. ECKER: And she didn't finish her
9  answer. So, for the record, please have her
10 finish her answer to you. Go ahead, Rebecca.
11     A. It is not going to offer the vender over
12 what their capacity is for the day.
13     Q. That's not my question. Listen, my
14 question is, what does the capacity tab control?
15     A. The capacity that you, as a company, and
16 your fleet size can handle in the course of a day.
17     Q. Okay. Thank you. Now, what does the
18 capacity tab show?
19     MS. ECKER: Objection.
20     A. I already answered that, the hours --
21 operating hours and capacity.
22     Q. Okay. Question answered. All right.
23 Read number 3 for me.
24     A. "Admit that MART employees sent an e-mail

Page 80

1  in 2017 stating all venders must create and submit a
2  log to MART on a monthly basis at the end of the
3  month, odometer reading, updated vehicle inventory,
4  total vehicle hours and hours that the vehicle is on
5  the road in service to MART for the month. Example,
6  time driver leaves garage to begin work until break
7  and time back in service until next break. Vehicle
8  accident miles, the odometer reading of the vehicle
9  at the time of an accident, report dead head miles
10 for wheelchair van, reporting of mileage from start
11 to first pick-up and from last drop-off to garage at
12 the end of the day unless there is a significant
13 break, then would need same after break.
14     Percentage of fully allocated expenses in
15 service to MART broken down by the following
16 categories. 1. Vehicle operations, driver salary,
17 dispatcher salary, fuel. 2. Vehicle maintenance,
18 oil changes, tires, mechanic salary. 3. NonVehicle
19 maintenance, janitor salary, utility bills, cleaning
20 supplies. 4. General administration, office staff
21 salaries, profits, admin overhead, "f," fuel cost,
22 total cost of fuel for the month, "g" gallons of
23 fuel, total number of gallons of fuel purchased, "h,"
24 miles per gallon, average number of miles that a

Page 81

1  vehicle travelled on one gallon of fuel for each
2  vehicle used for brokerage contract."
3      Q. And the question was -- what was her
4  response?
5      A. "Admitted that MART request brokers
6  provide MART the information set forth above. Denied
7  that the above is a complete and accurate recitation
8  of an e-mail sent by a MART employee in 2017, which
9  e-mail is a document that speaks for itself and was
10 not attached to Plaintiff's Request for Admissions."
11     Q. Okay. Would you admit that Request No. 3
12 is in your 2019 amendments not contract?
13     A. Yes.
14     Q. So for the record you admit that Question
15 No. 3 is in your 2019 amendments, just to be clear?
16     A. Yes, it was in the 2019 amendment.
17     Q. Okay. Do you admit this is a requirement
18 for MART venders and their drivers in the 2019
19 amendments?
20     A. Yes, it was in the amendment. But I
21 believe I indicated earlier that we didn't require
22 it. We didn't force venders to submit.
23     Q. Hold on. So you're saying that the
24 governing document in 2019 had this in it, but it

Catuogno Court Reporting - A Service of InfraWare
Springfield, MA  Worcester, MA  Boston, MA  Providence, RI

**Rebecca Badgley**
**June 22, 2021**

Page 82

1    wasn't a requirement?
2        A.  We did not force the venders to submit
3    it, that is correct.
4        Q.  The question is, is it a requirement?
5        A.  It was in the amendment.  I've answered
6    the question.  My response is not going to change.
7    It is in the amendment.
8        Q.  It is a requirement in the 2019
9    amendments, yes or no?
10       A.  It was in the additional provider
11   performance standard under required reporting.  But
12   we did not request the venders to submit nor force
13   them to.
14       Q.  Rebecca, this is a very simple question.
15       MS. ECKER:  And she's answered the
16   question.
17       MR. JONES:  No, she didn't.
18       MS. ECKER:  Mr. Jones, she's going --
19       MR. JONES:  She --
20       MS. ECKER:  Mr. Jones, let me finish for
21   the record so the stenographer doesn't have us
22   talking over one another.  You repeatedly do
23   this.  You ask the question.  She answers the
24   question.  For whatever reason, you don't like

Page 83

1    the answer; you ask again and we go back and
2    forth.  I will let you ask it one more time
3    before I --
4        MR. JONES:  This is a yes or a no
5    question.
6        MS. ECKER:  But it's not.  And I think
7    that's what you're not understanding.  Just
8    because you say it is a yes or no question,
9    doesn't mean the witness has to answer yes or
10   no, so that's your interpretation.  But it's
11   not necessarily a yes or no answer every time
12   you ask a question.  But go ahead, ask again.
13       Q.  Rebecca, is No. 3 that you just read with
14   all these requirements in the 2019 MART amendments?
15       A.  Yes, it is in there but we did not
16   require it to be submitted.
17       Q.  Thank you.  We're going go to No. 5.  Can
18   you read that please, Request No. 5?
19       A.  "Admit that the skills required to
20   participate in MART's transportation program as a
21   transportation provider does not require a degree in
22   a particular skill the constitute a regular and
23   essential part of MART's business operations."
24       Q.  Okay.  Earlier, you said that MART was in

Page 84

1    the transportation business, correct?
2        A.  Correct.
3        Q.  For approximately 50 years, correct?
4        A.  MART, a regional transit authority, yes.
5        Q.  MART is -- you said MART has been in the
6    business for approximately 50 years, correct?
7        A.  Correct.
8        Q.  And you also earlier stated that MART
9    didn't require a vender to have a degree, high school
10   diploma or anything like that, correct?
11       A.  Correct.
12       Q.  But, yet, on No. 5 when I asked, "Admit
13   that MART -- that the skills required to participant
14   at MART programs, transportation programs as a
15   transportation venders does not require a degree in a
16   particular skill and constitute a regular and
17   essential part of MART's business operations."  You
18   denied No. 5, right?
19       A.  Correct.
20       Q.  Thank you.  I got a question.  Can you
21   explain what a standing order is?
22       A.  A standing order is a repeating trip
23   schedule.  So an example of that would be an
24   individual going three days a week same days, same

Page 85

1    times, same appointments, such as dialysis or
2    something of that nature.
3        Q.  So if I accepted -- if Commonwealth
4    Community Recovery Division accepted a trip and I was
5    a driver, say I was the only driver, and I had a
6    standing order for seven days a week, under your
7    definition I would have to take that client every day
8    of that standing order?
9        A.  Correct.
10       Q.  Okay.  So isn't it a fact MART requires
11   vender portal training at least once when you first
12   start, a vender starts?
13       A.  Yeah.  I answered that earlier.  We have
14   them come in for vender portal training before their
15   work is assigned.
16       Q.  Okay.  Can you read No. 8, please?
17       A.  "Admited that MART requires it's vendors
18   to abide by safety requirements, to have certain
19   policies of insurance, to meet certain vehicle
20   requirements and offers other vendor portal and
21   orientation training."
22       Q.  You didn't finish it.
23       MS. ECKER:  I think she might have.
24       A.  I think I started with the response.  I'm

**Catuogno Court Reporting - A Service of InfraWare**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

Rebecca Badgley
June 22, 2021

Page 86

1   sorry.
2       Q.   Yeah. Can you — Request No. 8.
3       A.   Request No. 8, "Admit that MART provides
4   Vendor safety requirements, insurance requirements,
5   vehicle requirements, CCRD INC employee
6   requirements, vendor portal, orientation training,
7   requires a vendor to work every day if they have a
8   standing order for seven day a week, which is
9   mandatory for all venders."
10      Q.   And the response please for No. 8 can you
11  read?
12      A.   "Admitted that MART requires its vendors
13  to abide by safety requirements, to have certain
14  policies of insurance, to meet certain vehicle
15  requirements and offers vendor portal and orientation
16  training. The remaining allegations are denied."
17      MR. JONES:  Ellen, did you get the last
18  sentence of that because I didn't hear.
19      THE STENOGRAPHER:  She's reading it from
20  the document, so yeah.
21      MR. JONES:  Can you repeat the last
22  sentence she said, Ellen.
23      Q.   Can you please read No. 9.  I'm sorry.
24  Let me make a note.  No. 9 has Response No. 9 and

Page 87

1   Response No. 9.  It's supposed to say Request No. 9.
2   So can you read the top one?
3       A.   "Admit that CCRD or their employees
4   possess no proprietary interest in their respective
5   delivery routes that MART assigns and all customers
6   (clients) belong not to CCRD but to MA."
7       Q.   Okay.  Just to make a clarification, "MA"
8   stands for MART.
9       A.   Okay.
10      Q.   And can you -- did you know that when you
11  answered this?
12      A.   I assumed that you meant that the
13  consumers belonged to the State of Mass. and the
14  agency that they're covered by, so.
15      Q.   Okay.  So I can you read the response,
16  please?
17      A.   "Admitted that CCRD has no proprietary
18  interest in the trips offered by MART and accepted by
19  CCRD. The remaining allegations are denied."
20      Q.   Also, basically, I misnumbered these and
21  the responses so they were -- okay.  I already --
22  strike that.  Okay.  So that's admitted.  We can wrap
23  it up for the day.
24      MR. JONES:  Ellen, I'm going to send you

Page 88

1   Exhibits 3 and 4.  Thank you very much ladies
2   for your patience with me.
3       THE STENOGRAPHER:  Attorney Ecker, would
4   you want a copy of this?
5       MS. ECKER:  Yes, please.
6       THE STENOGRAPHER:  Exhibits also?
7       MS. ECKER:  Yes, please.
8
9       (Deposition concluded at 1:16 p.m.)
10      (Exhibits 1-4, marked off the record)
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 89

1           C E R T I F I C A T E
2
3   COMMONWEALTH OF MASSACHUSETTS
4   PLYMOUTH, SS.
5       I, Ellen M. Muir, a Shorthand Reporter, do
6   hereby certify:
7       REBECCA BADGLEY, the witness whose testimony is
8   hereinbefore set forth, was duly sworn by me,
9   pursuant to Mass. R. Civ. P. 27, 30, 30A, and 31, and
10  that such testimony is a true and accurate record of
11  my stenotype notes taken in the foregoing matter, to
12  the best of my knowledge, skill and ability.
13      I further certify that I am not related to any
14  parties to this action by blood or marriage; and that
15  I am in no way interested in the outcome of this
16  matter.
17      IN WITNESS WHEREOF, I have hereunto set my hand
18  This 5th day of July, 2021.
19
20
21
22
23  Ellen M. Muir          My Commission expires:
24  Notary Public          May 8, 2026

Catuogno Court Reporting - A Service of InfraWare
Springfield, MA  Worcester, MA  Boston, MA  Providence, RI

**Rebecca Badgley**
**June 22, 2021**

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS


Civil Action No. 4:19-cv-11093-TSH


*********************************

PAUL JONES,                          *

           Plaintiff,                *

v.                                   *

MONTACHUSETTS REGIONAL TRANSIT       *

AUTHORITY, et al.                    *

           Defendants                *

*********************************




     30(b)(6) DEPOSITION OF REBECCA BADGLEY:

          APPEARING REMOTELY FROM

          Fitchburg, Massachusetts

          June 22, 2021    9:59 a.m.


Reported By:

Ellen M. Muir

APPEARING REMOTELY FROM PLYMOUTH COUNTY,

MASSACHUSETTS

**Rebecca Badgley**
**June 22, 2021**

```
                                                        Page 2
 1    REMOTE APPEARANCES:

 2

 3    Representing the Plaintiff (pro se):

 4         PAUL JONES

 5         572 Park Street

 6         Stoughton, MA 02072

 7         617.939.5417

 8         pj2276@gmail.com

 9

10    Representing the Defendants:

11         KP LAW, P.C.

12         101 Arch Street, 12th Floor

13         Boston, MA 02110

14         BY:  DEBORAH I. ECKER, ESQ.

15         617.556.0007

16         decker@k-plaw.com

17

18

19

20

21

22

23

24
```

**Rebecca Badgley**
**June 22, 2021**

```
                                                    Page 3
  1                         I N D E X

  2

  3    WITNESS:              REBECCA BADGLEY

  4

  5    EXAMINATION BY:                          PAGE:

  6    Mr. Jones                                4

  7

  8    (Exhibits marked off the record)

  9    EXHIBIT:   DESCRIPTION:                  PAGE:

 10    1.         Amendment to complaint &      88

 11               Defendant's Responses to

 12               Plaintiff's Request for

 13               Documents

 14    2.         Defendant's Answers to Plaintiff's  88

 15               First Set of Interrogatories &

 16               Defendant's Response to Plaintiff's

 17               First Request for Admissions

 18    3.         GMail e-mail, End of Day Report      88

 19               for DMA work, August

 20    4.         Gmail e-mails between Mr. Jones &    88

 21               Rebecca Badgley

 22

 23    (Exhibits marked electronically by stenographer)

 24
```

**Catuogno Court Reporting - A Service of InfraWare**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

Rebecca Badgley
June 22, 2021

Page 4

1          REBECCA BADGLEY, Deponent, having first been

2     satisfactorily identified and duly sworn, deposes and

3     states as follows:

4

5          EXAMINATION BY MR. JONES:

6          Q.     Hello, I'm going to go to Exhibit 1

7     first, page 41.  Exhibit 1 is 2019 -- it's 2018

8     amendment to the contract, but it takes effect 2019.

9     My first question is, what would you like me to call

10    you, Ms. Badgley or Rebecca?

11         A.     Whichever is fine, Paul.

12         Q.     Okay.  Rebecca.  Rebecca, does this

13    document look familiar to you?

14         A.     Yes, that's the FY19 contract amendment

15    to be effective July 1.

16         Q.     Okay.  July 1 of 2018, correct?

17         A.     Correct.

18         Q.     Fiscal year 2019 amendments?

19         A.     Yep.

20         Q.     Now, is your 2019 amendments, is it --

21    has it governed the venders in your brokerage program

22    at Montachusetts Regional Transit Agency?

23         A.     It's an amendment to their original

24    contract that was through FY22.

**Catuogno Court Reporting - A Service of InfraWare**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

**Rebecca Badgley**
**June 22, 2021**

Page 5

1    Q.    So this governs them, correct?

2    A.    It's the regulations that are required to

3    be followed, yes, sir.

4    Q.    Okay.  All right.  Now, you're going to

5    go down to page 41 of this document, which is 2019

6    amendments.  Rebecca, can you please read 1A, what's

7    required for the reporting requirement "A," please?

8    A.    "End of month odometer reading on

9    vehicles used for brokerage contract.  Update vehicle

10   inventory with new or deleted vehicles."

11   Q.    Okay.  "End of month odometer reading on

12   vehicles."  Can you explain what does that mean?

13   A.    The odometer reading would be the number

14   of  miles on your vehicle's odometer at the end of

15   the month.

16   Q.    So is it a fact that this is saying that

17   for each vehicle the vender would have to produce an

18   end of the month odometer reading for each and every

19   vehicle?

20   A.    Correct.  But it's not something that we

21   enacted, Paul.

22   Q.    Well, just answer the question, please.

23         MS. ECKER:  She is answering so let her

24   finish.  Did you have something else, Rebecca?

**Catuogno Court Reporting - A Service of InfraWare**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

Rebecca Badgley
June 22, 2021

Page 6

1      A.    That wasn't the FY19 amendment.  But it

2  wasn't something that we ended up enacting and

3  requesting of the venders.

4      Q.    Okay.  But, look, this is my deposition

5  I'm asking a question, so basically I just want a

6  simple answer.  If you guys want a deposition, you

7  guys can schedule one or whatever, so I want to get

8  through this quick because it costs me money.  So

9  please just answer the questions.  So, again, the end

10 of the month odometer reading you're stating that

11 each vender has to give for each vehicle a document

12 that states how much the mileage is at the end of the

13 month, correct?

14     A.    Yes, for the vehicles used on the

15 brokerage MART.

16     Q.    Okay.  Now, "B" can you please read line

17 "B" for me, please?

18     A.    "Total vehicle hours, total vehicle hours

19 that the vehicle was on the road in service to MART

20 for the month.  Example:  Time driver leaves the

21 garage to begin brokerage work until break and time

22 back in service till next break or end of day."

23     Q.    Okay.  So line "B" basically says every

24 day the vender and the drivers would have to keep

**Catuogno Court Reporting – A Service of InfraWare**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

Rebecca Badgley
June 22, 2021

1   vehicle hours worked, correct?

2        A.    When in service for MART, yes.

3        Q.    Yes.  Okay.  Can you read line "C,"

4   please?

5        A.    "Accident vehicle miles, the odometer

6   reading of the vehicle at the time of the accident."

7        Q.    Okay.  This is required for each vehicle

8   if it gets into an accident, correct?

9        A.    For MART work, yes.

10       Q.    Yes.  Okay.  "D" can you please read "D"?

11       A.    "Report dead head miles for wheelchair

12  vans or vehicles with a capacity of 14 or more

13  passengers, reporting of mileage from start to first

14  pickup and from last drop-off to garage at the end of

15  the day, unless there is a significant break, then

16  would mean same after break."

17       Q.    That doesn't apply to Commonwealth

18  Community Recovery Division, the vender here, because

19  we don't have passenger vans with 14 or more.

20            MR. JONES:  Can you scroll down so we can

21       see the other, the rest of the document,

22       please, Ellen.

23            THE STENOGRAPHER:  Yep.

24       Q.    Rebecca, can you please read line "E" of

Rebecca Badgley
June 22, 2021

Page 8

1      this document?

2          A.    "Percentage of fully allocated expenses

3      in service to MART broken down by the following

4      categories.  See example below:  Based off of 40,000

5      monthly invoice."

6          Q.    Can you explain exactly what line "E"

7      means, Rebecca?

8          A.    It's a percentage of the allocated

9      expenses that you have when in service for the MART

10     brokerage.

11         Q.    So you guys would like a report of this,

12     correct?

13         A.    Yes.  At the time we put it in that's

14     what we were looking for.  As I stated earlier it was

15     never requested or enacted for.

16         Q.    So vehicle 1 -- I mean, E-1 can you read

17     that line, please?

18         A.    "Vehicle operations, driver salary,

19     dispatch salary and fuel, 32,000, 80 percent."

20         Q.    Okay.  So this is the example of what the

21     requirements would be for 2009, correct, for vehicle

22     operations, driver salaries, dispatcher salaries and

23     fuel?

24         A.    Based off your invoicing to MART.

Rebecca Badgley
June 22, 2021

Page 9

1    Q.    You would want a report for the driver's

2  salary, the dispatcher's salary and the fuel,

3  correct?

4    A.    A percentage of those items based off

5  your invoice for the month.

6    Q.    Yes.  But in the report you would want a

7  breakdown of the driver's salary, correct?

8    A.    What is considered to be vehicle

9  operations, which includes driver salary, dispatch

10  salary and fuel.

11    Q.    And you would want a breakdown of a

12  dispatcher salary, correct?

13    A.    That's included in the vehicle

14  operations.  It's not an individual breakdown.

15    Q.    Right.  I'm just asking one question at a

16  time so we can get everything on the record.  You

17  would also want a breakdown of the fuel on a monthly

18  basis, correct, used for transporting MART's clients?

19    A.    Correct.

20    Q.    Can you read "E-2, please.

21    A.    "Vehicle maintenance, oil changes, tires,

22  mechanic salary."

23    Q.    Okay.  So, basically, you would want a

24  report, a fee for vehicle maintenance for the oil

Rebecca Badgley
June 22, 2021

Page 10

1   changes for the month, correct?

2       A.   A percentage, again, of your total

3   invoice related to the MART trips for the month.

4       Q.   So you would want a breakdown, a report

5   of the oil changes that the vender used for the

6   month, correct?

7       A.   That would be what is considered vehicle

8   maintenance.  We're not asking you to list individual

9   oil changes.

10      Q.   Okay.  All right.  Let's go on to number

11  E-3.

12      A.   "Nonvehicle maintenance, janitor salary,

13  utility bills, cleaning supplies, etc."

14      Q.   Okay.  Can you explain what number 3

15  means when you say you need a breakdown, a percentage

16  of what we spent the money on for janitor salary,

17  because transportation companies don't have janitor

18  salaries.  Can you explain that, please?

19      A.   You may not but some do.  That's an

20  example of what percentage of your monthly invoice

21  would go to nonvehicle maintenance.

22      Q.   Nonvehicle maintenance.  So are you

23  saying janitor salary for office?

24      A.   Yes, the facilities.

Rebecca Badgley
June 22, 2021

Page 11

1     Q.     Okay.  For the facilities?

2     A.     Uh-huh.

3     Q.     Okay.  Utility bills, the breakdown for

4  utility bills you guys are asking for and that is

5  also for the facilities, correct?

6     A.     Correct.  Your nonvehicle maintenance.

7     Q.     Okay.  And the cleaning supplies, is that

8  for nonvehicle maintenance as well?

9     A.     Correct.

10     Q.     Okay.  Can you please read E-4, general

11  admissions -- administration.

12     A.     "General administration, office staff,

13  salaries, profit, admin, overhead.

14     Q.     So I'm trying to get an understanding of

15  what D-4, general admissions.  Can you please give me

16  an understanding of when you guys say "office staff

17  salaries," what is MART looking for in this E-4?

18     A.     Again, those particular items are just a

19  percentage of your monthly invoice to MART for MART

20  services.

21     Q.     So office staff salary.  As you know we

22  had a couple -- well, you probably don't know but we

23  had a couple of staff that wasn't with MART; would

24  that be included?

Rebecca Badgley
June 22, 2021

Page 12

1      A.    No.  That were working on the MART

2   contract?

3      Q.    Yes.

4      A.    No.

5      Q.    So you would only want a breakdown of the

6   office staff salaries that work with MART, correct?

7      A.    Correct.

8      Q.    Okay.  Profits.  You would also want a

9   breakdown of the monthly profits that the vender

10  made, correct?

11     A.    A percentage of your monthly invoice to

12  MART, are all those items are.

13     Q.    Profit.  Let's focus on profit.  MART

14  would want a breakdown of the profit for the monthly

15  invoice that we received from MART, correct?

16     A.    That is one of the items under general

17  administration, yeah.

18     Q.    It's profit, correct?

19     A.    Yeah.

20     Q.    Okay.  Administration overhead, can you

21  give me a definition of administration overhead?

22     A.    Your costs.

23     Q.    For?

24     A.    To run your office, your administration.

Rebecca Badgley
June 22, 2021

Page 13

1    Q.    Okay.  Can you make that a little

2    clearer; I need a breakdown of what administration

3    overhead cost includes and means, for the record?

4    A.    Well, I'm not a hundred percent sure how

5    you run your business but that could be different --

6    could be even different supplies for your office.

7    Q.    It could be what?

8    A.    It could be different supplies for your

9    office.

10   Q.    Such as?

11   A.    Anything, paper, pens.

12   Q.    Papers, pens?

13   A.    Could be anything.

14   Q.    Office supplies?

15   A.    Yes.

16   Q.    Okay.  Let's go to line "F," fuel costs.

17   Can you please read that line and tell me exactly...

18   A.    "Fuel costs, total cost of fuel for the

19   month."

20   Q.    Would you please tell me exactly for the

21   record what does that line mean?

22   A.    Again, it would be for your monthly

23   invoices to MART, the total cost of the fuel.

24   Q.    So am I correct you're saying that you

**Catuogno Court Reporting - A Service of InfraWare**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

Rebecca Badgley
June 22, 2021

Page 14

1   want a monthly report that breaks down the total fuel

2   costs that we use under the MART contract?

3          A.     Correct.

4          Q.     Okay.

5                 MR. JONES:  Ellen, can we go to the next

6          page?

7          Q.     Can you please, Rebecca, read line G,

8    "gallons of fuel."

9          A.     "Gallons of fuel, total number of gallons

10   of fuel purchased."

11         Q.     So each month -- I just want to make it

12   clear for the record.  Each month MART wants a

13   breakdown of the gallons of fuel purchased through

14   work done for MART, correct?

15         A.     Correct.

16         Q.     Okay.  Can you please read "H"?

17         A.     "Miles per gallon average, number of

18   miles that a vehicle travels on one gallon of fuel

19   for each vehicle used for brokerage contract."

20         Q.     Okay.  So line "H," "miles per gallon" am

21   I correct by saying that MART wants a monthly

22   breakdown of the number of miles for travel while

23   working for MART on one gallon of fuel report each

24   month, correct?

Rebecca Badgley
June 22, 2021

Page 15

1    A.    Yes.   For each vehicle used under the
2    contract, that is what was in the amendment.
3          Q.    Okay.  So let's just back up a little
4    bit.  Can you state your full name for the record?
5          A.    Rebecca Badgley.
6          Q.    And what is your position at MART?
7          A.    I am the director of the brokerage.
8          Q.    Okay.  How long have you worked there?
9          A.    I've worked at MART for 32 years.
10         Q.    For 32 years.  Did you -- did you -- oh,
11   does it require you to have any degrees, college or
12   courses or anything?
13         A.    At the time that I was hired, no, it did
14   not.
15               MS. ECKER:  Can I just ask that we stop
16         screen sharing so I can see all --
17               MR. JONES:  Excuse me?
18               MS. ECKER:  Can you stop screen sharing
19         so I can see you and the witness if you're not
20         going to use the exhibit?
21               MR. JONES:  No, we're going to go back
22         to, I mean, the exhibit.  I just want to, you
23         know, I did not ask her some questions
24         regarding her job and, you know, because she is

Rebecca Badgley
June 22, 2021

Page 16

1       the witness, I just want to make sure she's

2       prepared.

3             MS. ECKER:   Okay.

4       Q.      You've been there 32 years.  What is your

5   job description at MART, Montachusetts Regional

6   Transportation, brokerage?

7       A.      I'm the director of the brokerage

8   operation.  I oversee the contract that we have with

9   the State of Massachusetts --

10      Q.      Okay.

11      A.      -- for human service transportation?

12      Q.      Are there anyone in the room with you

13  right now, Rebecca?

14      A.      No, there is not.

15      Q.      Okay.  So it is safe to say that you

16  oversee the department that makes all the phone

17  calls, the call center?

18      A.      I oversee all aspects of the brokerage,

19  so, yes, that includes call centers, scheduling.

20      Q.      Okay.  I'm pretty sure -- did you get a

21  chance to see the complaint that I filed in federal

22  court?

23      A.      Yes.

24      Q.      Okay.  Did you -- do you oversee all of

Rebecca Badgley
June 22, 2021

Page 17

1   the defendants on the complaint, such as Michelle

2   Morio, Stephanie -- all of the people in the

3   complaint, do you oversee them?

4         A.    I am not their director manager, but I

5   oversee them as a whole, yes.

6         Q.    Okay.  All right.  Now, we can get back

7   to the exhibit, Exhibit 1.  Can you scroll down to --

8            MR. JONES:  Ellen, can you scroll down to

9         the interrogatories, that end of the document.

10        I don't know what page it's on.

11           THE STENOGRAPHER:  Hold on.

12           MS. ECKER:  I'm trying to understand what

13        your Exhibit 1 is.

14           MR. JONES:  This is my deposition.  I'm

15        asking the questions here.  But if -- I'll

16        explain the document to you.  Just, if you have

17        a question, just get to the point.  This

18        document is Exhibit 1.  It is 2019, again

19        amendments, the interrogatories and the

20        admissions.  Okay.

21           MS. ECKER:  Okay.  How many pages is it?

22           MR. JONES:  Excuse me?

23           MS. ECKER:  How many pages is it?

24           MR. JONES:  It's 56 pages.  See at the

**Rebecca Badgley**
**June 22, 2021**

1    top it says 56.  No, it's -- if you can scroll

2    down -- is that the last page, Ellen?

3            THE STENOGRAPHER:  Yes, that's the last

4    page.

5            MR. JONES:  It's 56 pages.  Does that

6    answer your question?

7            MS. ECKER:  No, but I'm assuming it's

8    going to be an official document so I'll know

9    when I get a copy of it, so that's fine.  Go

10   ahead.

11           MR. JONES:  So I answered your question,

12   correct?

13           MS. ECKER:  You didn't because -- and

14   this isn't your fault.  It's difficult on a

15   Zoom deposition, but it looks to me as if

16   you've combined some documents together, so I'm

17   just trying to understand what's contained in

18   your Exhibit 1 so I know if it's complete, if

19   it's not, so I have a copy.  So not a big deal.

20   At the end of the deposition I am sure the

21   stenographer will provide me a copy.

22           MR. JONES:  Yeah, if you pay.

23           MS. ECKER:  Either way I get a copy of

24   the exhibits.  But I will pay the stenographer.

Rebecca Badgley
June 22, 2021

Page 19

1      I always do.

2      **Q.    Let's go to the interrogatories.**

3            MR. JONES:  And for the record, all of

4      these documents were requested and sent from

5      you.

6            MS. ECKER:  Well, I don't know that,

7      that's the problem with not having this all

8      mixed and matched.  So I'll take your word for

9      it, but I don't know what is in this document,

10     is my point.

11           MR. JONES:  Okay.

12           MS. ECKER:  But I'll take your word for

13     it.

14           MR. JONES:  We've already been down that

15     road.  I told you and I'm telling you that

16     these are the documents that when I propounded

17     my first set of discovery request from you.

18           MS. ECKER:  Okay.

19           MR. JONES:  Ellen, if you can scroll up a

20     bit, so the admissions.  Can we take a

21     15-minute break so I can set up my other

22     Exhibit 2 to go through it so I can answer all

23     of Attorney Ecker's questions that she had for

24     Exhibit 1?

**Catuogno Court Reporting - A Service of InfraWare**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

Rebecca Badgley
June 22, 2021

Page 20

1      MS. ECKER:  I don't have any questions

2   for Exhibit 1.  We can take a break but don't

3   do it just to answer my questions.  I just what

4   to know what the exhibit is.

5      MR. JONES:  I would like to take a break

6   so I can get my Exhibit 2 together, so I can

7   put together everything that I need.  So let's

8   get back on the record in 15 minutes.  Is that

9   fine with you, Ellen, Rebecca, Ms. Ecker?

10     MS. ECKER:  That's fine with me.  We'll

11  be back at 10:45.

12     MR. JONES:  Okay.

13

14     (Five-minute break was taken)

15

16     MR. JONES:  We're going to stay on

17  Exhibit 1 for a few more minutes just -- okay.

18     Q.    Rebecca, I have a question regarding

19  reporting.  We're going to stay on this reporting.

20  Can you explain to me what end-of-day reporting that

21  was requested from MART, the definition of it and

22  meaning of it?

23     A.    What section are you referring to, Paul?

24     Q.    I'm referring to the end of the day

**Catuogno Court Reporting - A Service of InfraWare**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

Rebecca Badgley
June 22, 2021

1    report.

2         A.    The end-of-day report would be your

3    end-of-day report when you download your schedules

4    for the next day.

5         Q.    Okay.  Does it -- is it fair to say the

6    end of the day reports all of the trips the drivers

7    and the venders went on -- the venders completed for

8    the day?

9         A.    No.  When we reference the

10   end-of-day report --

11        Q.    Yeah.

12        A.    -- in those additional provider

13   performance standards, we're referring to what would

14   be CCRD or whomever the vender is; when you download

15   your trips for the next day at the end of the day,

16   that's your end-of-day report.

17        Q.    So does the end of the day report

18   consistent of all the trips that the vender performed

19   for the day?

20        A.    It would be all of the trips that are

21   assigned to you for the next day.

22        Q.    So basic it's just, to me, the schedule?

23        A.    We don't ask you to submit end-of-day

24   reports to us.

**Catuogno Court Reporting - A Service of InfraWare**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

Rebecca Badgley
June 22, 2021

1    Q.    Okay.  I have --

2          MR. JONES:  Ellen, I haven an e-mail that

3    I would like to submit to you, and I need you

4    to mark it as Exhibit 3.  What is procedure?

5    How do I do that?

6          (Discussion between stenographer and

7               Mr. Jones)

8

9          MR. JONES:  Okay.  Do you see this?  It

10   says, "Gmail end of the day report for DMA,

11   work August," Ellen?

12         THE STENOGRAPHER:  Yeah.  End of day

13   report 1, the one that's highlighted?

14         MR. JONES:  Yeah.

15         THE STENOGRAPHER:  Yep, it's there.

16   Q.    Okay.  Rebecca, can you -- this is an

17   e-mail that I received from Richard, Stephens (sic).

18   Can you just read the names that are on the e-mail

19   that's highlighted right there?

20   A.    Stephanie Richards.  And it's cc'd to DMA

21   Contract.

22   Q.    Okay.  What is the date?

23   A.    The date is July 28, 2020.

24   Q.    Okay.  Can you please read the part that

Rebecca Badgley
June 22, 2021

Page 23

1   I just highlighted.   It starts with a good morning?

2        A.      "Good morning.  Just a quick note, and

3   thank you to all who have been submitting their

4   report as requested.  The end of the day report

5   should be received via e-mail prior to 8 a.m. the

6   following business day.  MART needs to send an update

7   to HST by 9 a.m. the following day of transport, so

8   for today 7/28/2020.  Please make sure you send by 8

9   a.m. on Wednesday, 7/29."

10        Q.      Isn't it a fact that this e-mail states

11   that the end of the day report is requested every day

12   at 8 a.m. the following business day?

13        A.      That's correct.  That was the additional

14   request that was not part of the FY19 amendment that

15   we were going over, that was in regards to COVID

16   reporting.

17        Q.      Okay.  Do you know when this started, the

18   end of the day report request started approximately?

19        A.      Give me one second and I can verify that.

20        Q.      Yes.

21        MR. JONES:  Ellen, can you mark this as

22        Exhibit 3.

23        A.      I believe the initial request came in

24   around the 20th of July from HST.

Rebecca Badgley
June 22, 2021

Page 24

1      Q.      Okay.  So for the record, 20th of July

2  that's when the end of the reports request for each

3  vender started, correct?

4      A.      Correct.

5      Q.      Okay.

6          MR. JONES:  So I'm going to stop sharing

7  that document.  Did it stop sharing, Ellen?

8          THE STENOGRAPHER:  Yes.

9          MR. JONES:  Okay.

10     Q.      All right.  We're going to go back to --

11         MR. JONES:  Can we share, go back to

12     Exhibit 1.

13     Q.      Rebecca, can you please.  For the record,

14  give me a description of your audit -- procedure for

15  auditing a vender for, you know, audits, you know, do

16  they inspect -- do you have an inspector that does

17  it; can you explain?

18     A.      Yes.  We have a team of inspectors who

19  perform the annual back audit for venders.  The audit

20  is performed at the venders site and it's a review of

21  all the contractual requirements to ensure that the

22  annual retrainings have been done for all the

23  drivers, staff and that they have all the training

24  that's required; and that you're meeting all of these

**Rebecca Badgley**
**June 22, 2021**

```
 1    specifications that are within the contract.
 2         Q.    Okay.  Do you guys ever require -- is
 3    that the only requirements?
 4         A.    I'm sorry?
 5         Q.    Is that the only way MART perform audits,
 6    is through the inspector?
 7         A.    Yes, as a general rule.
 8         Q.    That's the general rule?
 9         A.    Yes.
10         Q.    And how many times a year is that
11    required?
12         A.    When a vender first onboards, we do an
13    onboarding audit before they're assigned work.  And
14    then it's done annually thereafter.  And sometimes
15    additional follow-up is required and we have to go
16    back out and double check things that maybe weren't
17    present at the time we went out initially.
18         Q.    Okay.  If you guys see, to look to my
19    left, I have another computer over here that I'm
20    working on that have the exhibits up.  So for the
21    record, once a year and before the vender starts, the
22    auditor -- a team of auditors  come out and audit the
23    company at the facility, correct?
24         A.    Correct.
```

**Catuogno Court Reporting - A Service of InfraWare**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

Rebecca Badgley
June 22, 2021

Page 26

1      Q.      Do you have any in-house people that do

2  audits, anybody at the brokerage department that

3  stays, you know, that will perform an audit there?

4      A.      We have some that have those capabilities

5  but it's generally the inspector that is going out to

6  do those audits.

7      Q.      So under the contract and the contract

8  amendments, audits are for the job of the auditor,

9  the inspectors, correct?

10     A.      Correct.

11     Q.      Okay.  And is that a rule, right, under

12  the regulations?

13     A.      It's required that we do annual debt

14  audits at the venders facility.  We do have in-house

15  staff -- not sure what you're referring but we do

16  have in-house staff, compliant staff that as venders

17  are onboarding new drivers or new vehicles, that may

18  not be seen in audit.  They will review and make sure

19  that that individual has all the requirements.

20     Q.      Is that only at the beginning or --

21     A.      Throughout the --

22     Q.      Beginning of --

23     A.      That's through the life of the contract

24  if you're adding individuals to the contract.

Rebecca Badgley
June 22, 2021

Page 27

1    Q.    Okay.  Is that -- do you know if that's

2    in your contract in amendments?

3        A.    It's in the contract that you're required

4    to update your vehicle and driver lot that changes

5    are made and that all of those trainings and

6    requirements are required prior to putting them in

7    service with the consumers.

8        Q.    Is the audit requirement and the contract

9    and amendments?

10       A.    Yes, it's in the transportation provider

11   performance.

12       Q.    Okay.  In the Transportation provider

13   performance contract amendment does it state that the

14   inspector only does the audits?

15       A.    No, I don't believe it does.  It just

16   refers to the annual debt audits and inspections.  It

17   doesn't classify who's performing them.

18       Q.    Okay.  Next question is regarding

19   training.  Can you tell me -- vender training at your

20   facility.  Can you tell me the procedure of vender

21   training on the vender portal at your facility,

22   please?

23       A.    When a new vender onboards, before

24   they're assigned work, we have them come to our

**Catuogno Court Reporting - A Service of InfraWare**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

Rebecca Badgley
June 22, 2021

Page 28

1   facility and they go through a vender portal

2   training, which is where it's described how they will

3   accept the work that's being offered to them, how the

4   billing will be done, how you file and respond to

5   complaints.

6        Q.    Okay.  During this vender portal

7   training, do you have screens and computers for the

8   venders to look at, for an example, of how a vender

9   portal looks like?

10       A.    Yes.

11       Q.    Okay.  Is that a requirement?

12       A.    What, that we have a screen?

13       Q.    That you have a computer simulator that

14  shows your vender portal during training?

15       A.    It's not a requirement.  The vender

16  portal training is not a requirement.  It's a

17  courtesy that we do with the venders so that they

18  understand how the systems work and can accept their

19  jobs and respond to claims.  There's no specific

20  requirement within the contract; that's generally

21  done before you start accepting work.

22       Q.    Okay.  Isn't it a fact that the vender

23  reporting requirements are in your contract and

24  amendments that state that you would have to, through

1    the vender portal, require -- through the vender

2    portal -- training before you can get any rides?

3         A.    I don't believe it's stated within the

4    contract itself.  But when a new vender comes

5    onboard, we actually go through their application

6    first, that's the first step; once the application is

7    approved, we send out the contract.  Once the

8    contract is back and signed, we send out for the

9    initial audit at the vender facility.  And then if

10   everything is complete, then we have the vender come

11   in for a vender portal training prior to being

12   assigned work.

13        Q.    Okay.  What is the procedure for a vender

14   to drop a client?  Can a vender just drop a client as

15   far as if he doesn't want to transport this client

16   anymore or does he have to seek MART's approval?

17        A.    If there's a particular individual that

18   you no longer want to transport, you can notify us

19   and we'll remove them from being offered to you in

20   the future.

21        Q.    Do the venders have to get permission

22   from MART before they drop them?

23        A.    No.

24        Q.    So the vender has the power to drop any

Rebecca Badgley
June 22, 2021

Page 30

1    client that they want without MART's approval?

2        A.    Are you referring to cancelling a trip

3    that you've expected or just no longer continuing to

4    transport an individual?

5        Q.    The question is, can the vender no

6    longer -- choose to no longer transport a client

7    without MART's authorization?

8        A.    If you already have them for a scheduled

9    tripped, you would have to inform us.  You don't

10   require our authorization.

11       Q.    Okay.  Again, I'm trying to narrow this.

12   The vender has a client.  There's a problem.  Can the

13   vender drop the client for the next future trips

14   without consulting with MART?

15       A.    MART has to be notified so that the

16   individual's trips are rescheduled.

17       Q.    Okay.  Can the vender drop the client

18   without MART's authorization, yes or no?

19           MS. ECKER:  Objection.  She's answered

20       this question.

21           MR. JONES:  No, she hasn't.

22           MS. ECKER:  Well, she has.  But she can

23       answer it again.

24       A.    We don't have to give you authorization,

Rebecca Badgley
June 22, 2021

Page 31

1    Paul, but we have to be notified.

2         Q.    Okay.  Now we're getting somewhere.  So

3    MART -- what you're saying is MART does not have to

4    give the vender authorization to drop a client,

5    correct?

6         A.    Correct.

7         Q.    Now, I have a question.  The next

8    question, does MART have the authority to hire and

9    fire any of the vender's employees?

10        A.    We are not the hiring or the firing

11   authority.  But by contract, we have the right to

12   request removal from an individual working on our

13   contract.

14        Q.    So are you saying that MART has the right

15   to remove a driver from the contract?

16        A.    From working on the MART contract, yes.

17   It is in their contract that MART and/or E-O-H-H-S.

18        Q.    Well, MART is --

19        A.    Can fire or removal.

20        Q.    So MART or E-H-S-S -- what was that,

21   E-S-H-S?

22        A.    E-O-H-H-S, the Executive Office of Health

23   and Human Services.

24        Q.    Okay.  But my specific question is, does

**Catuogno Court Reporting - A Service of InfraWare**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

Rebecca Badgley
June 22, 2021

Page 32

1   MART have the authority to remove a vender or a

2   driver from performing any trips with MART, yes or

3   no?

4        A.    Yes.

5        Q.    Okay.  The next question is on the

6   capacity tab from the vender portal.  Can you

7   explain for the record what is the capacity tab and

8   what it does?

9        A.    So the capacity tab on the vender portal

10  would be the amount of work that the vender is able

11  to perform throughout the course of the day.

12       Q.    Do the vender have the capability to

13  change the capacity tab to reflect how much work he

14  would like?

15       A.    They did early on but that was locked

16  from being changed about two years ago, I think.

17       Q.    So two years ago the capacity tab was no

18  longer available to venders to change?

19       A.    Correct.

20       Q.    Did you notify venders of this change?

21       A.    We notified venders that we were going

22  through capacity and that we would be making

23  adjustments here.

24       Q.    So you notified venders that they would

Rebecca Badgley
June 22, 2021

Page 33

1   no longer be able to control the capacity tab,

2   correct?

3       A.    Correct.

4       Q.    And when did you say this happened?

5       A.    It was a couple of years ago, two years

6   ago.

7       Q.    Have you ever received e-mails from me

8   inquiring about this specific thing, why I couldn't

9   change my capacity tab?

10      A.    Honestly, off the top of my head, I

11  received several e-mails from you over time Paul; but

12  I don't know if that were related to the capacity.

13      Q.    Okay.  You state that all venders was

14  notified of this, correct, that the capacity -- that

15  they couldn't change their capacity tab any longer?

16      A.    We sent notices out to venders that we

17  were going to be adjusting the capacity, based off

18  the fleet side.

19      Q.    So would you -- would it be a fair to say

20  that MART controlled the amount of work that a vender

21  would request in his capacity tab?

22      A.    Yes, we did control that based on the

23  size of the venders fleet.

24      Q.    I see.  So what would be the procedure if

Rebecca Badgley
June 22, 2021

Page 34

1  I wanted to change my capacity tab after the changes

2  went through that only MART could control the

3  capacity tab?

4      A.    You could e-mail the contracts department

5  and request that they be adjusted.

6      Q.    So is it fair to say once that -- I'm

7  sorry.  Are you finished?

8      A.    Yes.

9      Q.    Is it fair to say once a vender e-mail

10 the proper department, his capacity tab would be

11 changed only if MART thought his fleet size could

12 handle the change?

13     A.    Correct.

14     Q.    So, basically, MART controlled the work

15 based on the fleet size?

16     A.    Correct.

17     Q.    So MART could control each venders

18 capacity of work given to them based on how many

19 vehicles they had on the road?

20     A.    A number of vehicles and the size of the

21 vehicles, yes.

22     Q.    Basically, MART controlled the work that

23 a vender could receive?

24     A.    The amount that would be offered, yes.

Rebecca Badgley
June 22, 2021

Page 35

1        Q.     So MART control the amount of work that

2   could be offered to a vender?

3        A.     Correct.

4        Q.     Okay.  Sorry, I just got to look at my

5   computer because I got everything written down.

6   Okay.  Now, on the vender portal, how far out can a

7   vender go to accept work, one day, two days, a week,

8   two weeks?

9        A.     On the vender protal, work is assigned

10  near the low cost assignment and, initially, work was

11  being offered seven days out in advance.  We

12  increased that to 14 days in advance.

13       Q.     Okay.  So have you ever increased it to

14  30?

15       A.     No.

16       Q.     So the limit is a vender can go out 14

17  days to create a schedule for itself, correct?

18       A.     The vender can go out 14 days to see if

19  there's work being offered to him based off the

20  business.  And that's three days out.  It doesn't

21  include same day trip or next day trip.

22       Q.     What's three days out?

23       A.     The vender portal, Trip assignment is

24  three days out.  It doesn't include -- for example,

**Catuogno Court Reporting - A Service of InfraWare**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

**Rebecca Badgley**
**June 22, 2021**

Page 36

1    it doesn't include today's work or work for tomorrow.

2        Q.    I understand that.

3        A.    Yes.

4        Q.    Now -- so can you explain to me are you

5    familiar with the employees that MART instructed me

6    to no longer let them work with MART clients?

7        A.    We keep a list here, yes.

8        Q.    You say you keep a list?

9        A.    If we removed somebody from working on

10   the contract, we keep that information here, yes.  Do

11   I know off the top of my head, no.

12       Q.    Okay.  So is it fair to say if MART had

13   me remove an individual, a driver, that that

14   individual couldn't drive for a number of years

15   contracting with MART?

16       A.    If an individual has been permanently

17   removed from working on the MART contract, yes.  If

18   they were to work for another vender, we would not

19   let them come onboard.

20       Q.    So it's a fact that you're telling me

21   that if MART removed one of my drivers, CCRD drivers,

22   Commonwealth, the vender, that driver couldn't go

23   work for another vender, correct?

24       A.    It would depend on the actual removal.

Rebecca Badgley
June 22, 2021

Page 37

1    At times we remove drivers pending a retraining or

2    pending investigation, things of that nature; but if

3    it's a permanent removal from working on the MART

4    contract, then they would not be able to go work for

5    another.

6          Q.    Question.  Answers.  So MART has the

7    power to hire -- I mean, to fire, disengage our

8    employees, drivers, correct?

9          A.    No.

10         Q.    Does MART have the authority to fire the

11   employees that drive MART's clients?

12         A.    No, we are not the hiring agency or the

13   firing agency.  We have the right to remove them from

14   working on our contract.

15         Q.    What is the definition of removal, with

16   removing or working on your contract; what's that

17   definition?

18         A.    It means that they can't transport the

19   clients that are being assigned to the company by

20   MART.

21         Q.    Any longer, correct?

22         A.    Correct.

23         Q.    So that's firing, correct?

24         A.    No.  We're removing them from our

**Catuogno Court Reporting - A Service of InfraWare**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

Rebecca Badgley
June 22, 2021

Page 38

1    contract.  If the vender only works for MART and has

2    no other work to give them, and that's the ultimate

3    thing that happens, that's not us doing that.  We're

4    not the hiring or the firing agency.  We're just

5    the --

6        Q.    So, basically, are you firing them from

7    transporting MART's clients?

8        A.    We're removing them from transporting our

9    clientele.

10       Q.    What is the definition of removing in the

11   context of this thing?

12       A.    It's labelled within your contract that

13   we have the right to remove them from working on

14   transporting our consumers.

15       Q.    Rebecca, please answer the question.

16           MS. ECKER:  She has answered the

17       question.   That's four times now.  You can

18       ask it one more time.

19           MR. JONES:  I'm not here to fight.  This

20       is a deposition; I would like the question

21       answered.

22           MS. ECKER:  And she has answered it.  But

23       go ahead.

24           MR. JONES:  No, she didn't answer.

Rebecca Badgley
June 22, 2021

Page 39

1           MS. ECKER:  She didn't answer it the way

2      you wanted it answered, that's different.  But

3      go ahead.

4      Q.    I want to know the definition of removal.

5      A.    Taking the individual away from

6  transporting our consumers.

7      Q.    That's it.  There you go.  Okay.  Can you

8  please tell me how your D-S-S program works regarding

9  venders?

10     A.    Our, what, program?

11     Q.    D-S-S?

12     A.    I don't have a DSS program.

13     Q.    D-D-S?

14     A.    DDS?

15     Q.    Yeah.

16     A.    Okay.

17     Q.    What does D-D-S stand for?

18     A.    Department of Developmental Services.

19     Q.    Now, you have a transporting program for

20  their clients, correct?

21     A.    Correct.

22     Q.    How does that program work, as far as

23  venders transporting the clients, what is the

24  requirements of the vender?

**Rebecca Badgley**
**June 22, 2021**

1      A.     The requirements are clearly listed

2   within the contract.  There's a certain -- just like

3   all of our venders, the drivers are required

4   drivers -- drivers and/or monitors are required to

5   have certain training.  There's vehicle age

6   requirements for that program, different insurances

7   for that program based off the size of the vehicle.

8   The program-based transportation was actually put out

9   on an RFR on a five-year bid.  So routes were

10  assigned to venders.  They stopped the response to

11  that RFR, and there's generally not new work going

12  out for that program on a regular basis.

13      Q.     Okay.  Can you tell me the requirements

14  of the wait time for a driver, MART requirements for

15  a wait time for a driver when he's picking up a

16  client from home t o go to an appointment?

17      A.     The contract states they're required to

18  wait five minutes past the pickup time and then

19  you're supposed to contact your dispatcher, attempt

20  to reach the client; and if there's no response, you

21  can continue on.

22      Q.     So MART -- is it fair to say MART

23  requires the driver to wait five minutes past the

24  time?

Rebecca Badgley
June 22, 2021

Page 41

1      A.    As the schedule pickup time and then the

2   attempt to contact the client.

3      Q.    Okay.  Can you tell me how you're fine

4   system works when you fine a vender for a no show.

5      A.    If there is a vender no show, it's

6   actually recorded in the complaint.

7      Q.    So, basically, I just want to touch on

8   ways that a vender can get fined.  So the first

9   question is, if a client reports that a vender was a

10  no show and the vender actually showed up and the

11  vender informed MART that he showed up, would MART

12  fine the vender and require the vender to submit

13  proof that he actually showed up?

14     A.    If a client calls and says that a

15  vender's a no show, you know, depending on what the

16  sequence that that happened, if it's five minutes

17  around the pickup time, it depends on when we get a

18  call, that a complaint will get filed.  The vender

19  will have an opportunity to respond to that

20  complaint.  And sometimes we do ask for additional

21  proof, GPS records, things of that nature.

22     Q.    So you ask for proof from the driver and

23  the vender of GPS that shows that he was there?

24     A.    Correct.

Rebecca Badgley
June 22, 2021

Page 42

1      Q.      In order not to get fined?

2      A.      Correct.

3      Q.      So if the vender or the driver can't

4  produce pictures that he was there, is that a -- will

5  he get fined?

6      A.      If in the end the consumer reported the

7  vender a no show and did not make their appointment,

8  and the vender doesn't have anything additional to

9  support the fact that they were there, they could

10  receive a fine, yes.

11      Q.      So is it fair to say if the vender

12  doesn't have proof through GPS that he was there,

13  they --

14      A.      Could provide a GPS record.  They could

15  provide a time stamp photograph.  They could provide

16  confirmation that somebody else that may have been in

17  the vehicle at the time.

18      Q.      Is this a requirement in the amendments

19  or the contract?

20      A.      Well, you're supposed to provide on-time

21  service, and we're following up to a complaint.

22      Q.      Is proof of GPS or time stamp picture in

23  the contract or the amendments?

24      A.      I'm not a hundred percent sure.  I know

Rebecca Badgley
June 22, 2021

Page 43

1    it is in current.  I don't know what you're referring

2    to or...

3         Q.    Any year.  Any contract or amendments, is

4    that in there where a vender has to show proof by GPS

5    or time stamp picture in order to avoid a fine for a

6    no show to a client?

7         A.    Again, I'm honestly not a hundred percent

8    sure how it's worded in there or if it specifies

9    those particular items.

10        Q.    Okay.  Well, I'm not talking about the

11   wording.  Basically, we want to -- I'm talking about

12   proof.  I understand, you know, you're not a -- you

13   don't remember how the wording is for contracts, but

14   I'm trying to just nail it down.  If in your

15   amendments or the contract, either year, is that

16   requirement in there that a vender or a driver has to

17   produce the GPS verification in order to avoid a

18   fine?

19        A.    I don't think that it specifies a GPS

20   verification in order to avoid a fine.

21        Q.    Okay.

22        A.    It's a follow-up to a customer complaint.

23        Q.    Okay.  Does your contract or any

24   amendment, any years state that a vender or a driver

Rebecca Badgley
June 22, 2021

Page 44

1   has to produce a time stamp picture in order to avoid

2   a fine for a no show when a client makes a report?

3          A.     Again, I don't think it specifies any

4   time stamped picture.

5          Q.     You say you don't think.  That means

6   you're not sure, correct?

7          A.     Correct.  I don't have any amendment in

8   front of me.

9          Q.     Okay.  All right.  One second.  I'm just

10  looking on my computer for the next questions.

11              MS. ECKER:  Can we just stop the screen

12       sharing if possible?

13              MR. JONES:  What's the problem?

14              MS. ECKER:  When you screen share, if the

15       exhibit's still up, I can't see everybody

16       talking.  So if you're not going to use the

17       exhibit, I would  appreciate it if we're not

18       screen sharing.

19              MR. JONES:  But I might use it because

20       I'm going through my questions and then I can

21       reference the part to you.

22              MS. ECKER:  Okay.

23         Q.     Okay.  The next question is regarding

24  next day offers through your IV system -- IVR system.

Rebecca Badgley
June 22, 2021

Page 45

1   How does that work?

2          A.     Then the next day offers through the IVR?

3          Q.     **Yes, the next day offers?**

4          A.     Okay.  So the next day are being

5   handled -- they start off being handled by our IVR

6   system, which is a callout system, which starts at

7   6:30 in the morning.  It works very similar to the

8   vender portal as far as low cost assignment; but it's

9   actually physically calling the vender.

10         Q.     **Okay.**

11         A.     And it will call the vender up to three

12  times.  They have an opportunity to decline doing it

13  right then if they don't -- if they're in the middle

14  of something, it will call them up to three times

15  before it moves on.  And the system reads the trip

16  information to the vender, and they have the ability

17  to accept or decline the client trip being offered.

18         Q.     **What was the procedure to stop the**

19  **callout system from calling venders and drivers?**

20         A.     You would have to notify the contract

21  department.

22         Q.     **Can you go in and just mark your portal**

23  **full?**

24         A.      If you mark your portal full for the day,

**Rebecca Badgley**
**June 22, 2021**

Page 46

1    yeah, it would stop calling.

2         Q.    It would stop calling?

3         A.    Yes.

4         Q.    Would it stop offering you work also

5    through the vender portal?

6         A.    The vender portal wouldn't be processing

7    any work for the next day.  The vender portal is

8    three days, same day and next day is going -- same

9    day is going out by the live scheduling agent.  And

10   the next day is going out by the IVR callout as well

11   as live scheduling.

12        Q.    But my question is, if a vender or driver

13   marks his portal full to avoid the phone calls coming

14   in, will that also trigger the vender portal from

15   offering any work, next day, week out, 14 days out?

16        A.    No.  If a company marks themselves as

17   full for a particular day, it will stop offering work

18   for that particular day.

19        Q.    Okay.  Thank you.  Commonwealth Community

20   Recovery Division, I'm just going to call them CCD --

21   CCRD for short, okay, for the record.  We had some

22   problems in the past with work being placed in our

23   portals.  Do you recall that?

24        A.    Yes, I do remember that there were a

**Catuogno Court Reporting - A Service of InfraWare**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

**Rebecca Badgley**
**June 22, 2021**

Page 47

1  couple of incidents, yes.

2       Q.    Yes.

3       A.    I don't recall specifics.

4       Q.    Right.  But you do recall that we had

5  unauthorized work that we didn't accept put into your

6  portal, correct?

7       A.    I remember you having complaint as such,

8  yes.

9       Q.    Okay.  Do you ever remember when MART

10 corrected it and acknowledged that we didn't accept

11 the work?

12      A.    I know that there was a group that I

13 researched for you, and there were -- they had been

14 accepted by your IP as your log-in.

15      Q.    So the question again, do you recall any

16 work that after research you found that we did not

17 accept that was putting out?

18      A.    I don't recall, no.

19      Q.    Okay.  I have a question on insurance

20 policy for venders working with MART.  What is the

21 requirements of Massachusetts, not MART,

22 requirements; is it 20, slash, 40?

23      A.    Based off the vehicle size, yes, those

24 are the state requirements.

Rebecca Badgley
June 22, 2021

Page 48

1     Q.    Okay.  Does MART follow the state

2  requirements or they require more?

3     A.    At one point it was the state minimum for

4  the MassHealth Demand Response as a higher level for

5  the program base.  But that insurance requirement was

6  changed a couple of years ago where we required more.

7     Q.    Okay.  So is it safe to say that MART

8  requires more insurance requirements than the state

9  requirements as of 2020?

10     A.    Than the state minimum, yes, absolutely.

11     Q.    Okay.  Does MART require more insurance

12  coverage than the state requires for 2019?

13     A.    I believe, yes.

14     Q.    Does MART require -- strike that.

15         Did MART require more insurance coverage

16  than the state required for 2018?

17     A.    I'm honestly not a hundred percent sure.

18  I don't remember which contract we increased that in.

19     Q.    Is it a fact that when a vender accepts a

20  trip from MART for a specific time, MART doesn't

21  change the time unless you ask the vender, who rather

22  than -- if you don't understand the question, I'll

23  rephrase it.

24     A.    Please rephrase it because I'm not a

Rebecca Badgley
June 22, 2021

Page 49

1   hundred percent sure.

2        Q.     Okay.  Is it a fact that once a vender

3   accepts a trip from MART for a specific pickup time,

4   like 8 a.m., does MART have to get authorization from

5   the vender to say if they wanted to change the pickup

6   to 5:30 a.m.?

7        A.     They would -- normally, any changes that

8   made highlight to the venders through the vender

9   portal in a different color; so it would really

10  depend on how far out that trip is.  If the trip is

11  for the next day, or same say, they will call the

12  vender.

13       Q.     So MART has to -- so is it safe to say

14  that MART has the authority to change the pickup time

15  or the return time without the vender's

16  acknowledgment?

17       A.     Only for advanced trips.

18       Q.     So is it a fact that MART can change the

19  times without authorization of the vender?

20       A.     Yeah, in advance you have the ability to

21  see that change and notify that you can no longer

22  accommodate.  If it happens for the next day or same

23  day, they would call you immediately.

24       Q.     So, basically, I'm trying to get an

Rebecca Badgley
June 22, 2021

Page 50

1    answer here.  Does MART have the authority to change

2    the pickup time or the drop-off time that the vender

3    agreed to do, whether it's a day or two or a week or

4    two weeks out, do they have the authority to change

5    the schedule of the vender without authorization from

6    the vender, yes or no?

7        A.    It's not a matter of authority.  It would

8    be a consumer calling and changing their time.

9        Q.    Once the consumer calls and change the

10   time, does MART have the authority to change the time

11   without seeing if the vender is available?

12       A.    I think I answered that.  That's posed to

13   you, if it's in advance and if you can't accommodate,

14   you can decline it.  If it's same day or next day,

15   they will call you and see if you can accommodate the

16   change that was made by the customer.

17       Q.    The issue I'm trying to get at is not if

18   it's a day or the two days or 7 days or 14 days out.

19   Does MART have the authority to change a vender's

20   schedule?

21           MS. ECKER:  Objection.  Asked and

22       answered.  You can answer again.

23       A.    We're not changing the vender schedule.

24   We're changing the customer's schedule.  And the

Rebecca Badgley
June 22, 2021

1   protocol would be you would see the change in the

2   vender portal in a different color, if it was

3   advanced trip, signalling to you that there has been

4   a change.  If you can't accommodate that change, you

5   let us know and we reassign the trip.  If the change

6   happens the same day or the next day, they will call

7   and ask the vender if he is able to accommodate the

8   change.

9        Q.    Okay.  **Can you please do me a favor and**

10  **just answer the question; and if you don't understand**

11  **the question, ask me to rephrase it or -- because --**

12       A.    I understand your question, Mr. Jones.

13  But my response is not going to change, because it's

14  not that we have the authority; we are changing the

15  trip based off the customer's request.  If the trip

16  is already assigned to a vender in the same day or

17  next day, we immediately call the vender to see if he

18  can meet those accommodations.  If it is in advance,

19  you'll see the change in a different color in your

20  portal and can decline to continue with that trip for

21  the future.

22       Q.    **So it's safe to say you do contact the**

23  **vender to see if he's available?**

24       A.    If it is for the same day or next day.

Rebecca Badgley
June 22, 2021

1      Q.    So if it's 7 or 14 days out, you don't

2  call the vender?

3      A.    No, because you will see the change in

4  the portal for that trip.  And if you can't

5  accommodate that change, you have the right to turn

6  it back.

7      Q.    Okay.  Without -- if we turn it back,

8  will we receive a fine?

9      A.    If there was a change made to it?  No.

10     Q.    Yes.

11      MR. JONES:  Okay.  It's 11:41.  Can we

12     take a break to -- lunch break till about 12 --

13     what would be the proper time, Ellen, or

14     Attorney Ecker?

15      MS. ECKER:  How much longer do you think

16     you have, Mr. Jones?

17      MR. JONES:  I have no idea.  I'm going

18     through my list.

19      MR. ECKER:  Well, are we talking the

20     entire afternoon.  I'm just trying to get a

21     sense of...

22      MR. JONES:  I have no idea.  I have a

23     list.  I'm about halfway through it, so if we

24     can just keep moving things along.  We should

Rebecca Badgley
June 22, 2021

Page 53

1       be out of here in a few hours.  How long do you

2       guys need for a lunch break?

3               MS. ECKER:  I don't need one.  How about

4       if we do 12:15 -- we'll be back at 12:15, if

5       that's all right with the stenographer?  I can

6       go through.

7               MR. JONES:  Let's take a break until

8       12:15.  Okay?

9               MS. ECKER:  Yes.

10              MR. JONES:  Thank you.

11

12              (Break at 11:43 p.m.)

13              (Back on at 12:17 p.m.)

14

15       Q.     I would like to share a document that I

16    would like to mark for exhibit --

17              MR. JONES:  We already did Exhibit 3,

18       Ellen, correct?

19              THE STENOGRAPHER:  Yes.  You were going

20       to send that one to me.

21              MR. JONES:  Yeah, I'm going to send it to

22       you.  But I want to mark exhibit -- so the last

23       exhibit was 3, right?

24              THE STENOGRAPHER:  Yes.

Rebecca Badgley
June 22, 2021

Page 54

1          MR. JONES:  So I have a document that I

2     would like to share and ask a question on.  I'm

3     going to send this one.  This is Exhibit 4.

4     Wrong one.  Wrong one.  I'm not seeing the

5     files here.  All right.  This is -- Ellen, this

6     is going to be marked as Exhibit 4.  This is

7     an e-mail that I received from Rebecca.

8          Q.    And the question for this, do you see the

9     e-mail, Rebecca?

10         A.    Yes.

11         Q.    Okay.  Now, earlier, I asked you about do

12    you recall any trips getting placed in the portal

13    without authorization, and you said.  I don't

14    remember what you said, but I'm going to ask the

15    question again.  Is there -- do you recall any trips

16    being placed in a portal without our authorization?

17         A.    My answer earlier was that I did not

18    recall any specifics but here in the e-mail, upon

19    investigation, it says that I found one.

20         Q.    So this e-mail can you please read a part

21    that that's highlighted.  Well, first of all, can you

22    read the top, where it's from to who and a date?

23         A.    It's from myself to you on September 19,

24    at 9:25 a.m.

Rebecca Badgley
June 22, 2021

Page 55

1    Q.    Okay.  And can you read the highlighted

2    part of the e-mail?

3        A.    It says, "Paul, our follow-up

4    investigation has been completed and it has been

5    found that this trip was placed by staff into your

6    portal at 10:34 on 9/17/19 without required vender

7    confirmation.  Appropriate actions have been taken

8    with the staff person."

9        Q.    Is this a normal occurrence with staff

10   putting trips into the vender's portals without

11   requirement of confirmation?

12       A.    Not that I found, no.

13       Q.    Do you recall this happened to me several

14   times, maybe -- you sent an e-mail like this several

15   times before?

16       A.    No, I do not recall.

17       Q.    Okay.  So it's a fact that, -- isn't it a

18   fact that on September 17, 2009 this was placed in

19   the vender portal without vender confirmation?

20       A.    It says it was found, that this trip was

21   placed by staff into the portal.

22       Q.    Okay.  Let's try this again.  Isn't it a

23   fact that this e-mail confirms that a trip, some

24   trips were placed in the vender portal without my

**Catuogno Court Reporting - A Service of InfraWare**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

Rebecca Badgley
June 22, 2021

Page 56

1    confirmation or CCRD's confirmation?

2          A.    Yes, that's what this e-mail states.

3          Q.    And it says "the appropriate action has

4    been taken with the staff person."  What type of

5    action was taken with the staff you found out that

6    they had placed trips in the portal that the vender

7    did not confirm?

8                MS. ECKER:  I'm going to object to that

9          question, and I'm going to instruct her not to

10         answer.  Not only is it beyond the areas of

11         inquiry by the court order, but it's also

12         confidential personnel information.

13               MR. JONES:  How is it confidential

14         information and it says right here "appropriate

15         action."  I want to know what the objection is?

16               MS. ECKER:  Right.  That means it's

17         confidential.  The action that has been taken

18         was a personnel action against the employee and

19         that is confidential.  It doesn't relate in

20         addition to the issues that we're here to

21         discuss today.

22               MR. JONES:  We're here to discuss

23         control.  This points out control that one of

24         her staff was controlling us by putting back in

Rebecca Badgley
June 22, 2021

Page 57

1          our portal without our authorization.  It's a

2          control issue.

3                MS. ECKER:  Well, I disagree with your

4          characterization.  But regardless of the

5          characterization, any discipline given to a

6          MART employee does not relate to whether you

7          are a MART employee or control and is

8          confidential.

9                MR. JONES:  Okay.  That's on the record.

10         Q.     Again, Rebecca.  It's a fact that MART

11    added work to the vender without confirmation?

12         A.     It's a fact that an employee added this

13    trip without confirmation.

14         Q.     Okay.  That's fine.  Now, does MART

15    require a high level of skills for drivers or

16    venders.  Do they need like a college degree to be a

17    driver or a vender?

18         A.     We don't -- there are certain

19    requirements for training and.

20         Q.     No, that wasn't the question.  The

21    question is, I'm going to state it.  Does MART

22    require a college degree for a vender to be a vender

23    with MART?

24         A.     No, there's no such requirement in place.

**Rebecca Badgley**
**June 22, 2021**

Page 58

1      Q.      Okay.  Does MART require a college

2   degree, high school diploma for any driver to drive

3   for MART?

4      A.      They're not driving for MART.  We're not

5   the hiring authority.  They're driving for CCRD.

6   Those requirements would come from you.

7      Q.      Do MART require any of CCRD drivers to

8   have a high school diploma or a college degree to

9   drive their clients?

10     A.      That is not defined in the specs, no.

11     Q.      So that's a no?

12     A.      That is not defined in the specs that are

13  required of the vender.

14     Q.      Is that a yes or a no?

15     A.      That's a no.  It's not required in the

16  specs of your contract.

17     Q.      Okay.  All right.  What time does your

18  IVR system start calling venders and drivers for next

19  day trips each day?

20     A.      I believe I answered that earlier, it's

21  6:30  in the morning it starts.

22     Q.      So you start at 6:30 in the morning.  Did

23  you ever start later than that?

24     A.      It only starts a little bit later other

Rebecca Badgley
June 22, 2021

Page 59

1   than that on a date that rates might be being applied

2   or if there was an issue with the system.

3       Q.   Suppose a vender opens a little later, is

4   not open at 6:30, does the call still come through?

5       A.   If they're signed up to get work through

6   the IVR, yes, it does.

7       Q.   If a vender opens at 7, does the call

8   still start at 6:30?

9       A.   Yes.

10      Q.   And up to what time do the calls stop for

11  the IRV system -- IVR system for next day calls?

12      A.   That can vary.  Because it's working on

13  next day work.  So as soon as all the work is

14  completed it stops.

15      Q.   Is it fair to say that a vender or driver

16  can receive a call at 6 p.m. at night?

17      A.   They could if there was a high volume of

18  work for the next day, yes.

19      Q.   I'm going to ask that question, please

20  just answer the question.

21          MS. ECKER:  I'm going to object.  You

22          keep saying "I'm going to ask it again, please

23          answer the question."  She's answered the

24          question.

Rebecca Badgley
June 22, 2021

Page 60

1          MR. JONES:  She's adding comments.

2          MS. ECKER:  Mr. Jones, she's answering

3     your questions.  She's actually been very

4     patient.  But go ahead you can answer it again.

5          MR. JONES:  She is adding comments.  I'm

6     asking a simple question and she's adding

7     comments.

8          Q.    Can your IVR system call at 6 p.m. at

9  night, yes or no?

10         A.    Yes.

11         Q.    Can your IVR system call at 7 p.m. at

12 night, yes or no?

13         A.    Yes.

14         Q.    Can your IVR system even call after a

15 vender is closed?

16         A.    Yes, it could.

17         Q.    Okay.  Here we go.  Make this real short

18 and sweet.  MART is in the business of

19 transportation, correct?

20         A.    Correct.

21         Q.    How long has MART been in business with

22 transportation approximately?

23         A.    For the service that you're doing?

24         Q.    Montachusetts Regional Transit Authority,

Rebecca Badgley
June 22, 2021

```
 1    period, how long have they been in the business of
 2    transportation, 10, 20, 30?  It doesn't have to be
 3    exact.
 4         A.    50 years probably.
 5         Q.    Did you say 50, Rebecca?
 6         A.    Oh, yeah.
 7         Q.    So it's a fact that MART has been in the
 8    transportation business for 50 years?
 9         A.    Since it's inception, yes.
10         Q.    Okay.  So it's a fact that MART has been
11    in the transportation business for at least 50 years?
12         A.    Yes.
13         Q.    Okay.  So seeing that MART's IVR system
14    calls venders and drivers daily, this is a continuing
15    thing Monday through Friday on a daily basis,
16    correct?
17         A.    Correct.
18         Q.    Okay.  So, basically, every day MART is
19    calling -- strike that.
20               So MART -- strike that.
21               MART has a continuing relationship with
22    the drivers and the vender?
23         A.    I'm not understanding your question.
24         Q.    I'm just saying that, you know, the
```

**Catuogno Court Reporting - A Service of InfraWare**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

Rebecca Badgley
June 22, 2021

Page 62

1    question is, MART has relationship on an ongoing

2    basis with the vender, meaning that the vender just

3    doesn't get in touch with MART and get all this work.

4    This is a continuing relationship between MART and

5    the venders and the drivers on a daily basis?

6            MS. ECKER:  Objection.

7        A.    It's a relationship with MART and the

8    vender.

9        Q.    Okay.

10       A.    On a daily basis.

11       Q.    Thank you.  How often is the vender paid

12   through MART, is it to be paid hourly, weekly,

13   monthly, biweekly?

14       A.    The service that your company provided

15   was for the MassHealth PT One Demand Response, which

16   is a 15-day billing cycle.  The first or the 15th of

17   the month is the first cycle.  The 15th should be end

18   of the month, is the next cycle and then there's

19   payable for the contractual obligation; they're paid

20   within 45 days following an improved invoice.

21       Q.    So, basically, the work that the vender,

22   CCRD, and their employees perform is part of MART's

23   everyday business?

24            MS. ECKER:  Objection.

**Catuogno Court Reporting - A Service of InfraWare**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

Rebecca Badgley
June 22, 2021

Page 63

1          MR. JONES:  On what grounds?

2          MS. ECKER:  Form of the question.  But

3     she can answer.  I didn't instruct her not to

4     answer.

5          MR. JONES:  You instructed her not to

6     answer that?

7          MS. ECKER:  She can answer the question.

8     I'm just objecting for the record.

9     A.    So repeat your question, Paul.

10    Q.    So the work that CCRD and I do is a

11    regular part of MART's business?

12         MS. ECKER:  Objection.

13    A.    Correct.

14    Q.    One second.  I want to ask a question on

15    one more report that is required from MART.  It's an

16    employee report -- driver's report.  Strike that.

17    I'm going to ask a question on a report that is also

18    from the venders to MART that MART requested.  Can

19    you explain the employee report?

20    A.    I am not sure what you're talking about.

21    You'll have to give me an example of what you're

22    referring to.

23    Q.    No problem.  The drivers report, you

24    know, when you send over the drivers hire date, drug

Rebecca Badgley
June 22, 2021

Page 64

1    screens that's required?

2         A.    When you're adding a new driver?

3         Q.    Yes.

4         A.    Okay.

5         Q.    Can you explain that report in detail?

6         A.    We don't label it as a report.  There's

7    specific things that are required within the contract

8    prior to you, as a vender, putting the driver in

9    contact with the agency consumers that are under the

10   contract.  So you have to send a updated RMV report,

11   the date that you ran the CORI.  You have to at a

12   minimum have a fingerprint receipt, and the required

13   training and confirmation of the result of the test

14   for the preemployment.

15        Q.    Is that before we can -- the employee,

16   the driver, can actually start driving with MART

17   required to send to you guys?

18        A.    You're supposed to update your vehicle

19   log as you hire so we verify that they have all the

20   requirements.

21        Q.    What type -- what is the name of this

22   document?  You said it's not a report.  What do you

23   name it?

24        A.    It's not a report.  It's contractual

Rebecca Badgley
June 22, 2021

Page 65

1   requirements.

2       Q.    Is it an employee log?  What's the name

3   of it?  I'm going to put a name on it.

4       A.    It's not a report.  We house the backup

5   information here in a database, but it's not -- we

6   don't require that you submit a report.  We require

7   that you submit particular items that are clearly

8   defined within your contract.

9       Q.    Well, is it called an employee log, yes

10  or no?

11      A.    We keep a record here.  We don't call it

12  anything.  It's in your database.

13      Q.    So it's not called an employee log,

14  correct?

15      A.    In the contract it's your employee log

16  that you update.

17      Q.    Okay.  Rebecca, I'm trying to get a name

18  of this.  I have e-mails that says send over employee

19  log, and it says that an employee log is attached to

20  it.  So I'm trying to understand, because you're

21  the --

22      A.    Within the contract, Paul, it's your

23  company's updated employee log that they're

24  referring.

Rebecca Badgley
June 22, 2021

Page 66

1    Q.    I don't care -- the question's not whose

2  it is.  The question is the name of it, because I

3  just want to write it down for, you know, exhibit

4  purposes and things like that.

5    A.    In your contract it is referred to as

6  your employee log.

7    Q.    So employee log is the name, correct?

8    A.    Yeah.

9    Q.    Okay.  When is this required to be sent

10  to MART?

11    A.    Your contract clearly defines that you're

12  supposed to submit it when you make changes to it.

13    Q.    So is it a fact that before we hire an

14  employee -- a driver -- I'm sorry, strike that.

15         Is it a fact that before we hire a

16  driver, we have to submit all these documents like an

17  RMV-1 and whatever else is required to MART for

18  approval?

19    A.    You can -- you're required to perform all

20  those items before you put the individual in contact

21  with our consumers.

22    Q.    Okay.  Does MART have to approve it if

23  the driver is approved?

24    A.    When you send us your updates, we look at

Rebecca Badgley
June 22, 2021

Page 67

1    all that documentation and say that they meet

2    guidelines; if they don't meet guidelines, then we

3    tell you you have to remove them, that they can't

4    transport MART's members.

5         Q.    So MART has the authority -- strike that.

6               So we have to go to an approval process

7    with MART before we hire a driver and let them come

8    in contact with MART's employees; is that clear?

9         A.    You don't have to seek our approval to

10   hire your employees.  You're supposed follow all

11   those things that are identified in the contract

12   prior to putting them in contact with agency

13   consumers.

14        Q.    Do you have to receive all your

15   credentialing before we put them in contact with

16   MART's consumers?

17        A.    Not necessarily.  If you've done what's

18   required of your contract; when you send it, we're

19   going to verify it.

20        Q.    So is that a yes or no?

21        A.    We don't have to approve that.  You are

22   the hiring authority.

23        Q.    Do you -- do MART have to approve --

24   strike that?

**Rebecca Badgley**
**June 22, 2021**

Page 68

1    I'm trying to ask you if -- it's just a

2    simple straightforward question.  Do Commonwealth

3    Community Recovery Division have to get approval from

4    MART before we let a driver come in contact with a

5    consumer, yes or no?

6        A.    No.  CCRD has to follow their contract

7    and have all those items in place prior to putting

8    the individual into service.

9        Q.    Okay.  A few more questions here.  Is a

10   GPS system required to transport MART clients?

11       A.    It's in the current contract.

12       Q.    Is it required?

13       A.    I think I answered that earlier saying I

14   don't think it was in there as a requirement.

15       Q.    No, we were -- what we were just talking

16   about earlier with the GPS was regarding

17   cancellations and things like that, if there was a

18   requirement for a cancellation.  Now I'm asking is

19   there a requirement to transport MART's clients?

20       A.    There currently is.

21       Q.    As of?

22       A.    It's in the new contract.

23       Q.    For 2021?

24       A.    2022.

**Catuogno Court Reporting - A Service of InfraWare**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

Rebecca Badgley
June 22, 2021

Page 69

1      Q.      2022?

2      A.      Yeah.

3      Q.      So it's in there.  Okay.

4      A.      Yes.  And I believe in '19 or '20 we were

5   launching our driver app, so you would have to have a

6   GPS-enabled phone.

7      Q.      On your driver's app, was that a

8   requirement that every driver use?

9      A.      We were just launching it so we were

10  putting it in place.

11     Q.      When did it launch?

12     A.      We started launching it last year.

13     Q.      So now is it a requirement for all

14  drivers to have?

15     A.      FY22.

16     Q.      That's great, save venders a lot of

17  money.  I got a few more questions, and we can wrap

18  this thing up.

19          MR. JONES:  So, now, Ellen what we need

20          to do is put up -- I'm going to send you

21          Exhibit 3 and 4; I made a note of that.  And so

22          basically I just want to put up Exhibit 2 --

23          I'm sorry.  Hold on one second.  Exhibit 1, the

24          interrogatories, I have a question on that.

Rebecca Badgley
June 22, 2021

Page 70

1      Interrogatories and admissions is on Exhibit 2.

2      So we can get rid of Exhibit 1, Ellen, and go

3      to Exhibit 2 so I can ask these final

4      questions.  Exhibit 2, everyone sees it?

5           MS. ECKER:  Yes.

6      A.    Yes.

7      Q.    Okay.  This document is, Exhibit 2 it has

8  the answers that were sent from the defendant to me,

9  the interrogatories, admissions and -- this has the

10  interrogatories and admissions.  So I have a few

11  questions.  Have you ever seen this document before,

12  Rebecca?

13      A.    Yes, I have.

14      Q.    Okay.  See my mouse?

15      A.    Yes.

16      Q.    Can you just read what it is, the title

17  of this document?

18      A.    "Defendant ANSWERS to Plaintiff's First

19  Set of Interrogatories."

20      Q.    Okay.  Who answered these?

21      A.    Myself.

22      Q.    Okay.  Can you read Interrogatory No. 2,

23  please.

24      A.    "Please explain why after plaintiff

**Rebecca Badgley**
**June 22, 2021**

1  contacted Rebecca Badgley, Michelle Moyo and others,

2  that he was unable to edit the CCRD capacity tabs and

3  was denied access to do so and was told that MART

4  does not give the vender ability to change they

5  capacity, that is something that only MART has access

6  to.  With regards to standing orders, you will need

7  to contact the scheduling department.  Thank you,"

8  which was "cc" to the brokeragecontract@mrta.us, and

9  which was seen by over 15 MART employees."

10        Q.    Okay.  That was the question that I

11  asked.  When did you answer these?  I'm going to go

12  down to the date -- strike that.

13              It said you answered this on April 28,

14  2020 -- no, nope.  I'm sorry.

15        A.    No, it says that I answered it on May

16  25th.

17        Q.    Nope.  May 25th?

18        A.    That's when I physically signed my name.

19        Q.    Yes.  So what was the date you answered

20  these on?

21        A.    May 25th.

22        Q.    Okay.  Now, earlier, I asked you about

23  the capacity tab, and you said, oh, it was changed

24  two years ago where venders or employees of venders

Rebecca Badgley
June 22, 2021

1   couldn't change it, only MART could, right?

2        A.    A year and a half, two years ago, yes.

3        Q.    Are you sure?

4        A.    I'm pretty sure, yes.

5        Q.    Okay.  Are you sure, yes or no?

6        A.    I don't recall the exact date.  It was

7   approximately two years ago.

8        Q.    Approximately two years ago?

9        A.    Yes.

10        Q.    Are you sure that you electronically

11   signed these on May 25, 2021?

12        A.    Yes.

13        Q.    And you answered them as well, correct?

14        A.    Correct.

15        Q.    Let's go back to No. 2 for the answer.

16   Can you read the answer, please, No. 2.

17        A.    "Defendant objects to the interrogatory

18   to the extent that it does not contain the entire

19   e-mail referenced, which is a document that speaks

20   for itself, and was not attached to the plaintiff

21   first set of interrogatories to the defendant.

22              "Without waiving this or any other

23   objections, the defendant responds to the

24   interrogatory as follows:  MART's venders are able to

Rebecca Badgley
June 22, 2021

Page 74

1       A.    Correct.

2       Q.    Okay.  So now I want to ask -- we're

3   going to go down to the admissions.  Are you familiar

4   with this document, Rebecca?

5       A.    Yes.

6       Q.    Can you read Request 1, please.  Let me

7   make it a little bit bigger.

8       A.    No, that's fine.  I can see it.  "Admit

9   that MART coordinates the time of pickup and drop-off

10  and return of all their clients that calls MART

11  directly for transportation services through their

12  transportation brokerage program for trips that are

13  assigned to transportation venders."

14      Q.    And the response, please.

15      A.    "Admitted."

16      Q.    Okay.  Request No. 2, can you read it,

17  please?

18      A.    "Admit that that capacity tab controls

19  the time a vender is operating hours displayed to

20  MART in the amount of jobs and money a vender can

21  schedule and earn with MART's transportation

22  program."

23      Q.    Answer?

24      A.    "Denied."

Rebecca Badgley
June 22, 2021

Page 73

1    make changes to their capacity manager to reflect

2    time and days of the week they are willing to accept

3    work by visiting the vender portal and editing the

4    capacity management tab.  The venders are not able to

5    change the actual capacity figure in the vender

6    portal software system."

7         Q.    Okay.  So according to this answer, MART

8    venders are able to make changes to their capacity

9    tab?

10        A.    Manage it --

11        Q.    To reflect times and days of the week?

12        A.    Yes.

13        Q.    Correct?

14        A.    Yes.

15        Q.    Didn't earlier you tell me we weren't

16   able to change the capacity tab to reflect --

17        A.    It says you weren't able to change your

18   capacity for the amount of work, that is specific to

19   the dates and times of the week that you're --

20        Q.    Why don't you strike that and I'll do it

21   over  that way -- so it's a fact that MART venders

22   are able to make changes to their capacity manager to

23   reflect the times and dates of the week they are

24   available, correct?

**Rebecca Badgley**
**June 22, 2021**

1     Q.     The response, please?

2     A.     It says "denied."

3     Q.     Now, can you please tell me why this was

4     denied?

5          A.     Well, ultimately, you choose.  We offer

6     you work and you choose whether you're going to

7     accept or decline.

8          Q.     I'm referencing a question.  "Admit that

9     the capacity tab controls the time," stop.  Does the

10    capacity tab controls the time?

11               MS. DECKER:  I'm going to object if

12          you're asking her only a portion because

13          you're -- it doesn't have a period after that.

14          You asked her about the entire request for

15          admissions.  If you're asking all of the

16          request, that's fine.

17               MR. JONES:  No problem.

18         Q.     "Admit that the capacity tab controls the

19    time a vender operating hours displays to MART."

20    Rebecca?

21         A.     The capacity tab contains your hours of

22    service.

23         Q.     I'm taking this question all the way up

24    to "and."  So, basically, I'm trying to get an

**Catuogno Court Reporting - A Service of InfraWare**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

1    understanding here.  Is this correct or isn't

2    correct?  You denied it so...

3              MS. ECKER:  She denied the entire

4         paragraph, that was my objection.  If you want

5         to ask her a question that's not specifically

6         this request, you can do that, but she denied

7         the entire request.

8              MR. JONES:  Okay.

9         Q.    So can you read it one more time, please?

10        A.    "Admit that the capacity tab controls the

11   time a vender operating hours displays to MART and

12   the amount of jobs and money a vender can schedule

13   and earn with MART's transportation program."

14        Q.    And the response was denied --

15        A.    Correct.

16        Q.    -- correct?  In your own words, tell me

17   what the capacity tab controls?

18        A.    So the capacity tab shows the hours that

19   you're operating --

20        Q.    No.  What it controls.  Please --

21             MS. ECKER:  She just answered your

22        question.  Let her finish.

23             MR. JONES:  Please, Ms. Ecker, you don't

24        have to be disrespectful.  But can we please be

**Rebecca Badgley**
**June 22, 2021**

```
1        cordial.

2              MS. ECKER:  I'm just saying you asked a

3        question.  Please let her finish her answer.

4              MR. JONES:  But it's the manner in which

5        you're saying it.  Can we just be cordial here,

6        please.

7              MR. ECKER:  We are being cordial.  I'm

8        not trying to talk over you.  But you asked a

9        question, please let her answer it.

10             MR. JONES:  Thank you.  That's much

11       better.

12        Q.    So I'm going to ask you the question

13   again.

14        A.    It displays the times that your company

15   operates and what your capacities are; but,

16   ultimately, you, as a vender, control what you accept

17   or decline from what's being offered to you.

18        Q.    Can you repeat that?

19        A.    I said the capacity tab shows what your

20   hours of operation are and what your capacity is, but

21   you, as the transportation provider, control what you

22   accept or decline.

23        Q.    Okay.  You said -- my question was, what

24   does the capacity tab control?  You answered the
```

**Rebecca Badgley**
**June 22, 2021**

1    question that says what the capacity tab shows, shows

2    and control are two different things.  I want to know

3    what the capacity tab controls not what the capacity

4    tab shows.  So, please, the question again is, in

5    your own words, what does the capacity tab control?

6            MS. ECKER:  Objection.  You can answer,

7       if you can.

8       A.    Companies are provided a volume of work

9    based off their capacity; that's the only thing that

10   it controls, is the volume of work that is assigned.

11      Q.    Okay.

12      A.    You control what you accept or decline in

13   what you do.

14      Q.    Okay.  You just said that the capacity

15   tab controls the volume of work; is that correct?

16      A.    Being offered.  If you as a company,

17   Mr. Jones, can only handle a hundred trips per day --

18      Q.    That's not the question that I asked,

19   Rebecca?

20      A.    You're asking --

21      Q.    I did not ask that question.

22            MS. ECKER:  Mr. Jones, let her finish.

23            MR. JONES:  No, it's -- I'm not

24       because --

**Catuogno Court Reporting - A Service of InfraWare**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

**Rebecca Badgley**
**June 22, 2021**

```
 1              MS. ECKER:  Let her finish.  Mr. Jones,
 2       let her finish.
 3              MR. JONES:  I did not ask that question.
 4              MS. ECKER:  Mr. Jones, let her finish.
 5              MR. JONES:  My question is, what does the
 6       capacity tab control, and she said a volume of
 7       work being offered.  And -- is that correct?
 8              MS. ECKER:  And she didn't finish her
 9       answer.  So, for the record, please have her
10       finish her answer to you.  Go ahead, Rebecca.
11       A.     It is not going to offer the vender over
12  what their capacity is for the day.
13       Q.     That's not my question.  Listen, my
14  question is, what does the capacity tab control?
15       A.     The capacity that you, as a company, and
16  your fleet size can handle in the course of a day.
17       Q.     Okay.  Thank you.  Now, what does the
18  capacity tab show?
19              MS. ECKER:  Objection.
20       A.     I already answered that, the hours --
21  operating hours and capacity.
22       Q.     Okay.  Question answered.  All right.
23  Read number 3 for me.
24       A.     "Admit that MART employees sent an e-mail
```

**Rebecca Badgley**
**June 22, 2021**

Page 80

```
1    in 2017 stating all venders must create and submit a

2    log to MART on a monthly basis at the end of the

3    month, odometer reading, updated vehicle inventory,

4    total vehicle hours and hours that the vehicle is on

5    the road in service to MART for the month.  Example,

6    time driver leaves garage to begin work until break

7    and time back in service until next break.  Vehicle

8    accident miles, the odometer reading of the vehicle

9    at the time of an accident, report dead head miles

10   for wheelchair van, reporting of mileage from start

11   to first pick-up and from last drop-off to garage at

12   the end of the day unless there is a significant

13   break, then would need same after break.

14             Percentage of fully allocated expenses in

15   service to MART broken down by the following

16   categories.  1.  Vehicle operations, driver salary,

17   dispatcher salary, fuel.  2.  Vehicle maintenance,

18   oil changes, tires, mechanic salary.  3.  NonVehicle

19   maintenance, janitor salary, utility bills, cleaning

20   supplies.  4. General administration, office staff

21   salaries, profits, admin overhead, "f," fuel cost,

22   total cost of fuel for the month, "g" gallons of

23   fuel, total number of gallons of fuel purchased, "h,"

24   miles per gallon, average number of miles that a
```

**Rebecca Badgley**
**June 22, 2021**

Page 81

1  vehicle travelled on one gallon of fuel for each

2  vehicle used for brokerage contract."

3       Q.    And the question was -- what was her

4  response?

5       A.    "Admitted that MART request brokers

6  provide MART the information set forth above.  Denied

7  that the above is a complete and accurate recitation

8  of an e-mail sent by a MART employee in 2017, which

9  e-mail is a document that speaks for itself and was

10 not attached to Plaintiff's Request for Admissions."

11      Q.    Okay.  Would you admit that Request No. 3

12 is in your 2019 amendments not contract?

13      A.    Yes.

14      Q.    So for the record you admit that Question

15 No. 3 is in your 2019 amendments, just to be clear?

16      A.    Yes, it was in the 2019 amendment.

17      Q.    Okay.  Do you admit this is a requirement

18 for MART venders and their drivers in the 2019

19 amendments?

20      A.    Yes, it was in the amendment.  But I

21 believe I indicated earlier that we didn't require

22 it.  We didn't force venders to submit.

23      Q.    Hold on.  So you're saying that the

24 governing document in 2019 had this in it, but it

**Rebecca Badgley**
**June 22, 2021**

Page 82

```
 1   wasn't a requirement?

 2        A.   We did not force the venders to submit

 3   it, that is correct.

 4        Q.   The question is, is it a requirement?

 5        A.   It was in the amendment.  I've answered

 6   the question.  My response is not going to change.

 7   It is in the amendment.

 8        Q.   It is a requirement in the 2019

 9   amendments, yes or no?

10        A.   It was in the additional provider

11   performance standard under required reporting.  But

12   we did not request the venders to submit nor force

13   them to.

14        Q.   Rebecca, this is a very simple question.

15        MS. ECKER:  And she's answered the

16        question.

17        MR. JONES:  No, she didn't.

18        MS. ECKER:  Mr. Jones, she's going --

19        MR. JONES:  She --

20        MS. ECKER:  Mr. Jones, let me finish for

21        the record so the stenographer doesn't have us

22        talking over one another.  You repeatedly do

23        this.  You ask the question.  She answers the

24        question.  For whatever reason, you don't like
```

Rebecca Badgley
June 22, 2021

Page 83

1          the answer; you ask again and we go back and

2          forth.  I will let you ask it one more time

3          before I --

4               MR. JONES:  This is a yes or a no

5          question.

6               MS. ECKER:  But it's not.  And I think

7          that's what you're not understanding.  Just

8          because you say it is a yes or no question,

9          doesn't mean the witness has to answer yes or

10         no, so that's your interpretation.  But it's

11         not necessarily a yes or no answer every time

12         you ask a question.  But go ahead, ask again.

13         Q.     Rebecca, is No. 3 that you just read with

14    all these requirements in the 2019 MART amendments?

15         A.     Yes, it is in there but we did not

16    require it to be submitted.

17         Q.     Thank you.  We're going go to No. 5.  Can

18    you read that please, Request No. 5?

19         A.     "Admit that the skills required to

20    participate in MART's transportation program as a

21    transportation provider does not require a degree in

22    a particular skill the constitute a regular and

23    essential part of MART's business operations."

24         Q.     Okay.  Earlier, you said that MART was in

**Rebecca Badgley**
**June 22, 2021**

Page 84

1    the transportation business, correct?

2         A.    Correct.

3         Q.    For approximately 50 years, correct?

4         A.    MART, a regional transit authority, yes.

5         Q.    MART is -- you said MART has been in the

6    business for approximately 50 years, correct?

7         A.    Correct.

8         Q.    And you also earlier stated that MART

9    didn't require a vender to have a degree, high school

10   diploma or anything like that, correct?

11        A.    Correct.

12        Q.    But, yet, on No. 5 when I asked, "Admit

13   that MART -- that the skills required to participant

14   at MART programs, transportation programs as a

15   transportation venders does not require a degree in a

16   particular skill and constitute a regular and

17   essential part of MART's business operations."  You

18   denied No. 5, right?

19        A.    Correct.

20        Q.    Thank you.  I got a question.  Can you

21   explain what a standing order is?

22        A.    A standing order is a repeating trip

23   schedule.  So an example of that would be an

24   individual going three days a week same days, same

Rebecca Badgley
June 22, 2021

Page 85

1  times, same appointments, such as dialysis or

2  something of that nature.

3      Q.    So if I accepted -- if Commonwealth

4  Community Recovery Division accepted a trip and I was

5  a driver, say I was the only driver, and I had a

6  standing order for seven days a week, under your

7  definition I would have to take that client every day

8  of that standing order?

9      A.    Correct.

10     Q.    Okay.  So isn't it a fact MART requires

11 vender portal training at least once when you first

12 start, a vender starts?

13     A.    Yeah.  I answered that earlier.  We have

14 them come in for vender portal training before their

15 work is assigned.

16     Q.    Okay.  Can you read No. 8, please?

17     A.    "Admited that MART requires it's vendors

18 to abide by safety requirements, to have certain

19 policies of insurance, to meet certain vehicle

20 requirements and offers other vendor portal and

21 orientation training."

22     Q.    You didn't finish it.

23          MS. ECKER:  I think she might have.

24     A.    I think I started with the response.  I'm

**Rebecca Badgley**
**June 22, 2021**

Page 86

1    sorry.

2        Q.    Yeah.  Can you -- Request No. 8.

3        A.    Request No. 8, "Admit that MART provides

4    Vendor safety requirements, insurance requirements,

5    vehicle  requirements, CCRD INC employee

6    requirements, vendor portal, orientation training,

7    requires a vendor to work every day if they have a

8    standing order for seven day a week, which is

9    mandatory for all venders."

10        Q.    And the response please for No. 8 can you

11    read?

12        A.    "Admitted that MART requires its vendors

13    to abide by safety requirements, to have certain

14    policies of insurance, to meet certain vehicle

15    requirements and offers vendor portal and orientation

16    training.  The remaining allegations are denied."

17            MR. JONES:  Ellen, did you get the last

18        sentence of that because I didn't hear.

19            THE STENOGRAPHER:  She's reading it from

20        the document, so yeah.

21            MR. JONES:  Can you repeat the last

22        sentence she said, Ellen.

23        Q.    Can you please read No. 9.  I'm sorry.

24    Let me make a note.  No. 9 has Response No. 9 and

**Rebecca Badgley**
**June 22, 2021**

1   Response No. 9.  It's supposed to say Request No. 9.

2   So can you read the top one?

3          A.    "Admit that CCRD or their employees

4   possess no proprietary interest in their respective

5   delivery routes that MART assigns and all customers

6   (clients) belong not to CCRD but to MA."

7          Q.    Okay.  Just to make a clarification, "MA"

8   stands for MART.

9          A.    Okay.

10         Q.    And can you -- did you know that when you

11  answered this?

12         A.    I assumed that you meant that the

13  consumers belonged to the State of Mass. and the

14  agency that they're covered by, so.

15         Q.    Okay.  So I can you read the response,

16  please?

17         A.    "Admitted that CCRD has no proprietary

18  interest in the trips offered by MART and accepted by

19  CCRD.  The remaining allegations are denied."

20         Q.    Also, basically, I misnumbered these and

21  the responses so they were -- okay.  I already --

22  strike that.  Okay.  So that's admitted.  We can wrap

23  it up for the day.

24               MR. JONES:  Ellen, I'm going to send you

**Catuogno Court Reporting - A Service of InfraWare**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

**Rebecca Badgley**
**June 22, 2021**

Page 88

1    Exhibits 3 and 4.  Thank you very much ladies

2    for your patience with me.

3          THE STENOGRAPHER:  Attorney Ecker, would

4    you want a copy of this?

5          MS. ECKER:  Yes, please.

6          THE STENOGRAPHER:  Exhibits also?

7          MS. ECKER:  Yes, please.

8

9          (Deposition concluded at 1:16 p.m.)

10          (Exhibits 1-4, marked off the record)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**Rebecca Badgley**
**June 22, 2021**

```
 1                    C E R T I F I C A T E

 2

 3   COMMONWEALTH OF MASSACHUSETTS

 4   PLYMOUTH, SS.

 5          I, Ellen M. Muir, a Shorthand Reporter, do

 6   hereby certify:

 7          REBECCA BADGLEY, the witness whose testimony is

 8   hereinbefore set forth, was duly sworn by me,

 9   pursuant to Mass. R. Civ. P. 27, 30, 30A, and 31, and

10   that such testimony is a true and accurate record of

11   my stenotype notes taken in the foregoing matter, to

12   the best of my knowledge, skill and ability.

13          I further certify that I am not related to any

14   parties to this action by blood or marriage; and that

15   I am in no way interested in the outcome of this

16   matter.

17          IN WITNESS WHEREOF, I have hereunto set my hand

18   This 5th day of July, 2021.

19

20

21

22

23   Ellen M. Muir              My Commission expires:

24   Notary Public              May 8, 2026
```

**Catuogno Court Reporting - A Service of InfraWare**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**