# Exhibit 7

PDF processed with CutePDF evaluation edition www.CutePDF.com

Rebecca Badgley
June 22, 2021

Page 1

1              UNITED STATES DISTRICT COURT

2                DISTRICT OF MASSACHUSETTS

3

4                     Civil Action No. 4:19-cv-11093-TSH

5

6      *********************************

7      PAUL JONES,                    *

8                   Plaintiff,        *

9      v.                             *

10     MONTACHUSETTS REGIONAL TRANSIT  *

11     AUTHORITY, et al.              *

12                   Defendants       *

13     *********************************

14

15

16           30(b)(6) DEPOSITION OF REBECCA BADGLEY:

17              APPEARING REMOTELY FROM

18              Fitchburg, Massachusetts

19              June 22, 2021    9:59 a.m.

20

21     Reported By:

22     Ellen M. Muir

23     APPEARING REMOTELY FROM PLYMOUTH COUNTY,

24     MASSACHUSETTS

**Rebecca Badgley**
**June 22, 2021**

Page 2

```
 1   REMOTE APPEARANCES:

 2

 3   Representing the Plaintiff (pro se):

 4        PAUL JONES

 5        572 Park Street

 6        Stoughton, MA 02072

 7        617.939.5417

 8        pj2276@gmail.com

 9

10   Representing the Defendants:

11        KP LAW, P.C.

12        101 Arch Street, 12th Floor

13        Boston, MA 02110

14        BY:  DEBORAH I. ECKER, ESQ.

15        617.556.0007

16        decker@k-plaw.com

17

18

19

20

21

22

23

24
```

**Catuogno Court Reporting - A Service of InfraWare**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

**Rebecca Badgley**
**June 22, 2021**

```
 1                    I N D E X

 2

 3   WITNESS:            REBECCA BADGLEY

 4

 5   EXAMINATION BY:                      PAGE:

 6   Mr. Jones                           4

 7

 8   (Exhibits marked off the record)

 9   EXHIBIT:   DESCRIPTION:              PAGE:

10   1.         Amendment to complaint &     88

11              Defendant's Responses to

12              Plaintiff's Request for

13              Documents

14   2.         Defendant's Answers to Plaintiff's  88

15              First Set of Interrogatories &

16              Defendant's Response to Plaintiff's

17              First Request for Admissions

18   3.         GMail e-mail, End of Day Report     88

19              for DMA work, August

20   4.         Gmail e-mails between Mr. Jones &    88

21              Rebecca Badgley

22

23   (Exhibits marked electronically by stenographer)

24
```

**Catuogno Court Reporting - A Service of InfraWare**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

**Rebecca Badgley**
**June 22, 2021**

Page 4

```
 1         REBECCA BADGLEY, Deponent, having first been
 2    satisfactorily identified and duly sworn, deposes and
 3    states as follows:
 4
 5         EXAMINATION BY MR. JONES:
 6         Q.    Hello, I'm going to go to Exhibit 1
 7    first, page 41.  Exhibit 1 is 2019 -- it's 2018
 8    amendment to the contract, but it takes effect 2019.
 9    My first question is, what would you like me to call
10    you, Ms. Badgley or Rebecca?
11         A.    Whichever is fine, Paul.
12         Q.    Okay.  Rebecca.  Rebecca, does this
13    document look familiar to you?
14         A.    Yes, that's the FY19 contract amendment
15    to be effective July 1.
16         Q.    Okay.  July 1 of 2018, correct?
17         A.    Correct.
18         Q.    Fiscal year 2019 amendments?
19         A.    Yep.
20         Q.    Now, is your 2019 amendments, is it --
21    has it governed the venders in your brokerage program
22    at Montachusetts Regional Transit Agency?
23         A.    It's an amendment to their original
24    contract that was through FY22.
```

**Rebecca Badgley**
**June 22, 2021**

Page 5

1      Q.    So this governs them, correct?

2      A.    It's the regulations that are required to

3   be followed, yes, sir.

4      Q.    **Okay.  All right.  Now, you're going to**

5   **go down to page 41 of this document, which is 2019**

6   **amendments. Rebecca, can you please read 1A, what's**

7   **required for the reporting requirement "A," please?**

8      A.    "End of month odometer reading on

9   vehicles used for brokerage contract.  Update vehicle

10   inventory with new or deleted vehicles."

11      Q.    **Okay.  "End of month odometer reading on**

12   **vehicles."  Can you explain what does that mean?**

13      A.    The odometer reading would be the number

14   of  miles on your vehicle's odometer at the end of

15   the month.

16      Q.    **So is it a fact that this is saying that**

17   **for each vehicle the vender would have to produce an**

18   **end of the month odometer reading for each and every**

19   **vehicle?**

20      A.    Correct.  But it's not something that we

21   enacted, Paul.

22      Q.    **Well, just answer the question, please.**

23            MS. ECKER:  She is answering so let her

24            finish.  Did you have something else, Rebecca?

**Rebecca Badgley**
**June 22, 2021**

Page 6

1      A.     That wasn't the FY19 amendment.  But it

2   wasn't something that we ended up enacting and

3   requesting of the venders.

4      **Q.     Okay.  But, look, this is my deposition**

5   **I'm asking a question, so basically I just want a**

6   **simple answer.  If you guys want a deposition, you**

7   **guys can schedule one or whatever, so I want to get**

8   **through this quick because it costs me money.  So**

9   **please just answer the questions.  So, again, the end**

10  **of the month odometer reading you're stating that**

11  **each vender has to give for each vehicle a document**

12  **that states how much the mileage is at the end of the**

13  **month, correct?**

14     A.     Yes, for the vehicles used on the

15  brokerage MART.

16     **Q.     Okay.  Now, "B" can you please read line**

17  **"B" for me, please?**

18     A.     "Total vehicle hours, total vehicle hours

19  that the vehicle was on the road in service to MART

20  for the month.  Example:  Time driver leaves the

21  garage to begin brokerage work until break and time

22  back in service till next break or end of day."

23     **Q.     Okay.  So line "B" basically says every**

24  **day the vender and the drivers would have to keep**

Rebecca Badgley
June 22, 2021

Page 7

1    vehicle hours worked, correct?

2         A.    When in service for MART, yes.

3         Q.    Yes.  Okay.  Can you read line "C,"

4    please?

5         A.    "Accident vehicle miles, the odometer

6    reading of the vehicle at the time of the accident."

7         Q.    Okay.  This is required for each vehicle

8    if it gets into an accident, correct?

9         A.    For MART work, yes.

10        Q.    Yes.  Okay.  "D" can you please read "D"?

11        A.    "Report dead head miles for wheelchair

12   vans or vehicles with a capacity of 14 or more

13   passengers, reporting of mileage from start to first

14   pickup and from last drop-off to garage at the end of

15   the day, unless there is a significant break, then

16   would mean same after break."

17        Q.    That doesn't apply to Commonwealth

18   Community Recovery Division, the vender here, because

19   we don't have passenger vans with 14 or more.

20             MR. JONES:  Can you scroll down so we can

21        see the other, the rest of the document,

22        please, Ellen.

23             THE STENOGRAPHER:  Yep.

24        Q.    Rebecca, can you please read line "E" of

Rebecca Badgley
June 22, 2021

1  this document?

2       A.    "Percentage of fully allocated expenses

3  in service to MART broken down by the following

4  categories.  See example below:  Based off of 40,000

5  monthly invoice."

6       Q.    **Can you explain exactly what line "E"**

7  **means, Rebecca?**

8       A.    It's a percentage of the allocated

9  expenses that you have when in service for the MART

10  brokerage.

11      Q.    **So you guys would like a report of this,**

12  **correct?**

13      A.    Yes.  At the time we put it in that's

14  what we were looking for.  As I stated earlier it was

15  never requested or enacted for.

16      Q.    **So vehicle 1 -- I mean, E-1 can you read**

17  **that line, please?**

18      A.    "Vehicle operations, driver salary,

19  dispatch salary and fuel, 32,000, 80 percent."

20      Q.    **Okay.  So this is the example of what the**

21  **requirements would be for 2009, correct, for vehicle**

22  **operations, driver salaries, dispatcher salaries and**

23  **fuel?**

24      A.    Based off your invoicing to MART.

**Rebecca Badgley**
**June 22, 2021**

Page 9

1          Q.     You would want a report for the driver's

2    salary, the dispatcher's salary and the fuel,

3    correct?

4          A.     A percentage of those items based off

5    your invoice for the month.

6          Q.     Yes.  But in the report you would want a

7    breakdown of the driver's salary, correct?

8          A.     What is considered to be vehicle

9    operations, which includes driver salary, dispatch

10   salary and fuel.

11         Q.     And you would want a breakdown of a

12   dispatcher salary, correct?

13         A.     That's included in the vehicle

14   operations.  It's not an individual breakdown.

15         Q.     Right.  I'm just asking one question at a

16   time so we can get everything on the record.  You

17   would also want a breakdown of the fuel on a monthly

18   basis, correct, used for transporting MART's clients?

19         A.     Correct.

20         Q.     Can you read "E-2, please.

21         A.     "Vehicle maintenance, oil changes, tires,

22   mechanic salary."

23         Q.     Okay.  So, basically, you would want a

24   report, a fee for vehicle maintenance for the oil

**Rebecca Badgley**
**June 22, 2021**

Page 10

1   changes for the month, correct?

2         A.    A percentage, again, of your total

3   invoice related to the MART trips for the month.

4         Q.    So you would want a breakdown, a report

5   of the oil changes that the vender used for the

6   month, correct?

7         A.    That would be what is considered vehicle

8   maintenance.  We're not asking you to list individual

9   oil changes.

10        Q.    Okay.  All right.  Let's go on to number

11  E-3.

12        A.    "Nonvehicle maintenance, janitor salary,

13  utility bills, cleaning supplies, etc."

14        Q.    Okay.  Can you explain what number 3

15  means when you say you need a breakdown, a percentage

16  of what we spent the money on for janitor salary,

17  because transportation companies don't have janitor

18  salaries.  Can you explain that, please?

19        A.    You may not but some do.  That's an

20  example of what percentage of your monthly invoice

21  would go to nonvehicle maintenance.

22        Q.    Nonvehicle maintenance.  So are you

23  saying janitor salary for office?

24        A.    Yes, the facilities.

**Catuogno Court Reporting - A Service of InfraWare**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

Rebecca Badgley
June 22, 2021

Page 11

1       Q.      Okay.  For the facilities?

2       A.      Uh-huh.

3       Q.      Okay.  Utility bills, the breakdown for

4    utility bills you guys are asking for and that is

5    also for the facilities, correct?

6       A.      Correct.  Your nonvehicle maintenance.

7       Q.      Okay.  And the cleaning supplies, is that

8    for nonvehicle maintenance as well?

9       A.      Correct.

10      Q.      Okay.  Can you please read E-4, general

11   admissions -- administration.

12      A.      "General administration, office staff,

13   salaries, profit, admin, overhead.

14      Q.      So I'm trying to get an understanding of

15   what D-4, general admissions.  Can you please give me

16   an understanding of when you guys say "office staff

17   salaries," what is MART looking for in this E-4?

18      A.      Again, those particular items are just a

19   percentage of your monthly invoice to MART for MART

20   services.

21      Q.      So office staff salary.  As you know we

22   had a couple -- well, you probably don't know but we

23   had a couple of staff that wasn't with MART; would

24   that be included?

**Rebecca Badgley**
**June 22, 2021**

Page 12

1      A.    No.  That were working on the MART
2   contract?
3      Q.    **Yes.**
4      A.    No.
5      Q.    **So you would only want a breakdown of the**
6   **office staff salaries that work with MART, correct?**
7      A.    Correct.
8      Q.    **Okay.  Profits.  You would also want a**
9   **breakdown of the monthly profits that the vender**
10  **made, correct?**
11     A.    A percentage of your monthly invoice to
12  MART, are all those items are.
13     Q.    **Profit.  Let's focus on profit.  MART**
14  **would want a breakdown of the profit for the monthly**
15  **invoice that we received from MART, correct?**
16     A.    That is one of the items under general
17  administration, yeah.
18     Q.    **It's profit, correct?**
19     A.    Yeah.
20     Q.    **Okay.  Administration overhead, can you**
21  **give me a definition of administration overhead?**
22     A.    Your costs.
23     Q.    **For?**
24     A.    To run your office, your administration.

**Rebecca Badgley**
**June 22, 2021**

Page 13

```
 1        Q.    Okay.  Can you make that a little
 2   clearer; I need a breakdown of what administration
 3   overhead cost includes and means, for the record?
 4        A.    Well, I'm not a hundred percent sure how
 5   you run your business but that could be different --
 6   could be even different supplies for your office.
 7        Q.    It could be what?
 8        A.    It could be different supplies for your
 9   office.
10        Q.    Such as?
11        A.    Anything, paper, pens.
12        Q.    Papers, pens?
13        A.    Could be anything.
14        Q.    Office supplies?
15        A.    Yes.
16        Q.    Okay.  Let's go to line "F," fuel costs.
17   Can you please read that line and tell me exactly...
18        A.    "Fuel costs, total cost of fuel for the
19   month."
20        Q.    Would you please tell me exactly for the
21   record what does that line mean?
22        A.    Again, it would be for your monthly
23   invoices to MART, the total cost of the fuel.
24        Q.    So am I correct you're saying that you
```

**Rebecca Badgley**
**June 22, 2021**

Page 14

1   want a monthly report that breaks down the total fuel

2   costs that we use under the MART contract?

3        A.   Correct.

4        Q.   Okay.

5             MR. JONES:  Ellen, can we go to the next

6        page?

7        Q.   Can you please, Rebecca, read line G,

8   "gallons of fuel."

9        A.   "Gallons of fuel, total number of gallons

10  of fuel purchased."

11       Q.   So each month -- I just want to make it

12  clear for the record.  Each month MART wants a

13  breakdown of the gallons of fuel purchased through

14  work done for MART, correct?

15       A.   Correct.

16       Q.   Okay.  Can you please read "H"?

17       A.   "Miles per gallon average, number of

18  miles that a vehicle travels on one gallon of fuel

19  for each vehicle used for brokerage contract."

20       Q.   Okay.  So line "H," "miles per gallon" am

21  I correct by saying that MART wants a monthly

22  breakdown of the number of miles for travel while

23  working for MART on one gallon of fuel report each

24  month, correct?

**Rebecca Badgley**
**June 22, 2021**

1          A.    Yes.  For each vehicle used under the

2    contract, that is what was in the amendment.

3          **Q.    Okay.  So let's just back up a little**

4    **bit.  Can you state your full name for the record?**

5          A.    Rebecca Badgley.

6          **Q.    And what is your position at MART?**

7          A.    I am the director of the brokerage.

8          **Q.    Okay.  How long have you worked there?**

9          A.    I've worked at MART for 32 years.

10          **Q.    For 32 years.  Did you -- did you -- oh,**

11    **does it require you to have any degrees, college or**

12    **courses or anything?**

13          A.    At the time that I was hired, no, it did

14    not.

15                MS. ECKER:  Can I just ask that we stop

16          screen sharing so I can see all --

17                MR. JONES:  Excuse me?

18                MS. ECKER:  Can you stop screen sharing

19          so I can see you and the witness if you're not

20          going to use the exhibit?

21                MR. JONES:  No, we're going to go back

22          to, I mean, the exhibit.  I just want to, you

23          know, I did not ask her some questions

24          regarding her job and, you know, because she is

**Rebecca Badgley**
**June 22, 2021**

Page 16

1      the witness, I just want to make sure she's

2      prepared.

3              MS. ECKER:  Okay.

4      **Q.    You've been there 32 years.  What is your**

5   **job description at MART, Montachusetts Regional**

6   **Transportation, brokerage?**

7      A.    I'm the director of the brokerage

8   operation.  I oversee the contract that we have with

9   the State of Massachusetts --

10     **Q.    Okay.**

11     A.    -- for human service transportation?

12     **Q.    Are there anyone in the room with you**

13  **right now, Rebecca?**

14     A.    No, there is not.

15     **Q.    Okay.  So it is safe to say that you**

16  **oversee the department that makes all the phone**

17  **calls, the call center?**

18     A.    I oversee all aspects of the brokerage,

19  so, yes, that includes call centers, scheduling.

20     **Q.    Okay.  I'm pretty sure -- did you get a**

21  **chance to see the complaint that I filed in federal**

22  **court?**

23     A.    Yes.

24     **Q.    Okay.  Did you -- do you oversee all of**

Rebecca Badgley
June 22, 2021

Page 17

1    the defendants on the complaint, such as Michelle

2    Morio, Stephanie -- all of the people in the

3    complaint, do you oversee them?

4         A.    I am not their director manager, but I

5    oversee them as a whole, yes.

6         Q.    Okay.  All right.  Now, we can get back

7    to the exhibit, Exhibit 1.  Can you scroll down to --

8              MR. JONES:  Ellen, can you scroll down to

9         the interrogatories, that end of the document.

10         I don't know what page it's on.

11              THE STENOGRAPHER:  Hold on.

12              MS. ECKER:  I'm trying to understand what

13         your Exhibit 1 is.

14              MR. JONES:  This is my deposition.  I'm

15         asking the questions here.  But if -- I'll

16         explain the document to you.  Just, if you have

17         a question, just get to the point.  This

18         document is Exhibit 1.  It is 2019, again

19         amendments, the interrogatories and the

20         admissions.  Okay.

21              MS. ECKER:  Okay.  How many pages is it?

22              MR. JONES:  Excuse me?

23              MS. ECKER:  How many pages is it?

24              MR. JONES:  It's 56 pages.  See at the

**Rebecca Badgley**
**June 22, 2021**

Page 18

```
 1        top it says 56.  No, it's -- if you can scroll

 2        down -- is that the last page, Ellen?

 3              THE STENOGRAPHER:  Yes, that's the last

 4        page.

 5              MR. JONES:  It's 56 pages.  Does that

 6        answer your question?

 7              MS. ECKER:  No, but I'm assuming it's

 8        going to be an official document so I'll know

 9        when I get a copy of it, so that's fine.  Go

10        ahead.

11              MR. JONES:  So I answered your question,

12        correct?

13              MS. ECKER:  You didn't because -- and

14        this isn't your fault.  It's difficult on a

15        Zoom deposition, but it looks to me as if

16        you've combined some documents together, so I'm

17        just trying to understand what's contained in

18        your Exhibit 1 so I know if it's complete, if

19        it's not, so I have a copy.  So not a big deal.

20        At the end of the deposition I am sure the

21        stenographer will provide me a copy.

22              MR. JONES:  Yeah, if you pay.

23              MS. ECKER:  Either way I get a copy of

24        the exhibits.  But I will pay the stenographer.
```

Rebecca Badgley
June 22, 2021

Page 19

1     I always do.

2     **Q.     Let's go to the interrogatories.**

3          MR. JONES:  And for the record, all of

4     these documents were requested and sent from

5     you.

6          MS. ECKER:  Well, I don't know that,

7     that's the problem with not having this all

8     mixed and matched.  So I'll take your word for

9     it, but I don't know what is in this document,

10    is my point.

11         MR. JONES:  Okay.

12         MS. ECKER:  But I'll take your word for

13    it.

14         MR. JONES:  We've already been down that

15    road.  I told you and I'm telling you that

16    these are the documents that when I propounded

17    my first set of discovery request from you.

18         MS. ECKER:  Okay.

19         MR. JONES:  Ellen, if you can scroll up a

20    bit, so the admissions.  Can we take a

21    15-minute break so I can set up my other

22    Exhibit 2 to go through it so I can answer all

23    of Attorney Ecker's questions that she had for

24    Exhibit 1?

Rebecca Badgley
June 22, 2021

Page 20

1           MS. ECKER:  I don't have any questions

2       for Exhibit 1.  We can take a break but don't

3       do it just to answer my questions.  I just what

4       to know what the exhibit is.

5           MR. JONES:  I would like to take a break

6       so I can get my Exhibit 2 together, so I can

7       put together everything that I need.  So let's

8       get back on the record in 15 minutes.  Is that

9       fine with you, Ellen, Rebecca, Ms. Ecker?

10          MS. ECKER:  That's fine with me.  We'll

11      be back at 10:45.

12          MR. JONES:  Okay.

13

14          (Five-minute break was taken)

15

16          MR. JONES:  We're going to stay on

17      Exhibit 1 for a few more minutes just -- okay.

18      **Q.    Rebecca, I have a question regarding**

19   **reporting.  We're going to stay on this reporting.**

20   **Can you explain to me what end-of-day reporting that**

21   **was requested from MART, the definition of it and**

22   **meaning of it?**

23          A.    What section are you referring to, Paul?

24          **Q.    I'm referring to the end of the day**

**Rebecca Badgley**
**June 22, 2021**

```
 1   report.

 2        A.    The end-of-day report would be your

 3   end-of-day report when you download your schedules

 4   for the next day.

 5        Q.    Okay.  Does it -- is it fair to say the

 6   end of the day reports all of the trips the drivers

 7   and the venders went on -- the venders completed for

 8   the day?

 9        A.    No.  When we reference the

10   end-of-day report --

11        Q.    Yeah.

12        A.    -- in those additional provider

13   performance standards, we're referring to what would

14   be CCRD or whomever the vender is; when you download

15   your trips for the next day at the end of the day,

16   that's your end-of-day report.

17        Q.    So does the end of the day report

18   consistent of all the trips that the vender performed

19   for the day?

20        A.    It would be all of the trips that are

21   assigned to you for the next day.

22        Q.    So basic it's just, to me, the schedule?

23        A.    We don't ask you to submit end-of-day

24   reports to us.
```

**Catuogno Court Reporting - A Service of InfraWare**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

Rebecca Badgley
June 22, 2021

Page 22

```
 1        Q.    Okay.  I have --

 2              MR. JONES:  Ellen, I haven an e-mail that

 3        I would like to submit to you, and I need you

 4        to mark it as Exhibit 3.  What is procedure?

 5        How do I do that?

 6              (Discussion between stenographer and

 7                   Mr. Jones)

 8

 9              MR. JONES:  Okay.  Do you see this?  It

10        says, "Gmail end of the day report for DMA,

11        work August," Ellen?

12              THE STENOGRAPHER:  Yeah.  End of day

13        report 1, the one that's highlighted?

14              MR. JONES:  Yeah.

15              THE STENOGRAPHER:  Yep, it's there.

16        Q.    Okay.  Rebecca, can you -- this is an

17   e-mail that I received from Richard, Stephens (sic).

18   Can you just read the names that are on the e-mail

19   that's highlighted right there?

20        A.    Stephanie Richards.  And it's cc'd to DMA

21   Contract.

22        Q.    Okay.  What is the date?

23        A.    The date is July 28, 2020.

24        Q.    Okay.  Can you please read the part that
```

Rebecca Badgley
June 22, 2021

Page 23

1    I just highlighted.  It starts with a good morning?

2         A.    "Good morning.  Just a quick note, and

3    thank you to all who have been submitting their

4    report as requested.  The end of the day report

5    should be received  via e-mail prior to 8 a.m. the

6    following business day.  MART needs to send an update

7    to HST by 9 a.m. the following day of transport, so

8    for today 7/28/2020.  Please make sure you send by 8

9    a.m. on Wednesday, 7/29."

10        Q.    Isn't it a fact that this e-mail states

11   that the end of the day report is requested every day

12   at 8 a.m. the following business day?

13        A.    That's correct.  That was the additional

14   request that was not part of the FY19 amendment that

15   we were going over, that was in regards to COVID

16   reporting.

17        Q.    Okay.  Do you know when this started, the

18   end of the day report request started approximately?

19        A.    Give me one second and I can verify that.

20        Q.    Yes.

21             MR. JONES:  Ellen, can you mark this as

22        Exhibit 3.

23        A.    I believe the initial request came in

24   around the 20th of July from HST.

**Rebecca Badgley**
**June 22, 2021**

Page 24

1          Q.     Okay.  So for the record, 20th of July

2     that's when the end of the reports request for each

3     vender started, correct?

4          A.     Correct.

5          Q.     Okay.

6                 MR. JONES:  So I'm going to stop sharing

7          that document.  Did it stop sharing, Ellen?

8                 THE STENOGRAPHER:  Yes.

9                 MR. JONES:  Okay.

10         Q.     All right.  We're going to go back to --

11                MR. JONES:  Can we share, go back to

12         Exhibit 1.

13         Q.     Rebecca, can you please.  For the record,

14    give me a description of your audit -- procedure for

15    auditing a vender for, you know, audits, you know, do

16    they inspect -- do you have an inspector that does

17    it; can you explain?

18         A.     Yes.  We have a team of inspectors who

19    perform the annual back audit for venders.  The audit

20    is performed at the venders site and it's a review of

21    all the contractual requirements to ensure that the

22    annual retrainings have been done for all the

23    drivers, staff and that they have all the training

24    that's required; and that you're meeting all of these

**Rebecca Badgley**
**June 22, 2021**

Page 25

1    specifications that are within the contract.

2         Q.    Okay.  Do you guys ever require -- is

3    that the only requirements?

4         A.    I'm sorry?

5         Q.    Is that the only way MART perform audits,

6    is through the inspector?

7         A.    Yes, as a general rule.

8         Q.    That's the general rule?

9         A.    Yes.

10         Q.    And how many times a year is that

11    required?

12         A.    When a vender first onboards, we do an

13    onboarding audit before they're assigned work.  And

14    then it's done annually thereafter.  And sometimes

15    additional follow-up is required and we have to go

16    back out and double check things that maybe weren't

17    present at the time we went out initially.

18         Q.    Okay.  If you guys see, to look to my

19    left, I have another computer over here that I'm

20    working on that have the exhibits up.  So for the

21    record, once a year and before the vender starts, the

22    auditor -- a team of auditors  come out and audit the

23    company at the facility, correct?

24         A.    Correct.

Rebecca Badgley
June 22, 2021

Page 26

```
1       Q.     Do you have any in-house people that do

2   audits, anybody at the brokerage department that

3   stays, you know, that will perform an audit there?

4       A.     We have some that have those capabilities

5   but it's generally the inspector that is going out to

6   do those audits.

7       Q.     So under the contract and the contract

8   amendments, audits are for the job of the auditor,

9   the inspectors, correct?

10      A.     Correct.

11      Q.     Okay.  And is that a rule, right, under

12  the regulations?

13      A.     It's required that we do annual debt

14  audits at the venders facility.  We do have in-house

15  staff -- not sure what you're referring but we do

16  have in-house staff, compliant staff that as venders

17  are onboarding new drivers or new vehicles, that may

18  not be seen in audit.  They will review and make sure

19  that that individual has all the requirements.

20      Q.     Is that only at the beginning or --

21      A.     Throughout the --

22      Q.     Beginning of --

23      A.     That's through the life of the contract

24  if you're adding individuals to the contract.
```

Rebecca Badgley
June 22, 2021

Page 27

1      Q.    Okay.  Is that -- do you know if that's

2   in your contract in amendments?

3      A.    It's in the contract that you're required

4   to update your vehicle and driver lot that changes

5   are made and that all of those trainings and

6   requirements are required prior to putting them in

7   service with the consumers.

8      Q.    Is the audit requirement and the contract

9   and amendments?

10     A.    Yes, it's in the transportation provider

11  performance.

12     Q.    Okay.  In the Transportation provider

13  performance contract amendment does it state that the

14  inspector only does the audits?

15     A.    No, I don't believe it does.  It just

16  refers to the annual debt audits and inspections.  It

17  doesn't classify who's performing them.

18     Q.    Okay.  Next question is regarding

19  training.  Can you tell me -- vender training at your

20  facility.  Can you tell me the procedure of vender

21  training on the vender portal at your facility,

22  please?

23     A.    When a new vender onboards, before

24  they're assigned work, we have them come to our

**Rebecca Badgley**
**June 22, 2021**

Page 28

1  facility and they go through a vender portal

2  training, which is where it's described how they will

3  accept the work that's being offered to them, how the

4  billing will be done, how you file and respond to

5  complaints.

6       Q.    Okay.  During this vender portal

7  **training, do you have screens and computers for the**

8  **venders to look at, for an example, of how a vender**

9  **portal looks like?**

10      A.    Yes.

11      Q.    **Okay.  Is that a requirement?**

12      A.    What, that we have a screen?

13      Q.    **That you have a computer simulator that**

14 **shows your vender portal during training?**

15      A.    It's not a requirement.  The vender

16 portal training is not a requirement.  It's a

17 courtesy that we do with the venders so that they

18 understand how the systems work and can accept their

19 jobs and respond to claims.  There's no specific

20 requirement within the contract; that's generally

21 done before you start accepting work.

22      Q.    Okay.  **Isn't it a fact that the vender**

23 **reporting requirements are in your contract and**

24 **amendments that state that you would have to, through**

**Rebecca Badgley**
**June 22, 2021**

Page 29

1    the vender portal, require -- through the vender

2    portal -- training before you can get any rides?

3        A.    I don't believe it's stated within the

4    contract itself.  But when a new vender comes

5    onboard, we actually go through their application

6    first, that's the first step; once the application is

7    approved, we send out the contract.  Once the

8    contract is back and signed, we send out for the

9    initial audit at the vender facility.  And then if

10   everything is complete, then we have the vender come

11   in for a vender portal training prior to being

12   assigned work.

13       Q.    Okay.  What is the procedure for a vender

14   to drop a client?  Can a vender just drop a client as

15   far as if he doesn't want to transport this client

16   anymore or does he have to seek MART's approval?

17       A.    If there's a particular individual that

18   you no longer want to transport, you can notify us

19   and we'll remove them from being offered to you in

20   the future.

21       Q.    Do the venders have to get permission

22   from MART before they drop them?

23       A.    No.

24       Q.    So the vender has the power to drop any

Rebecca Badgley
June 22, 2021

Page 30

1    client that they want without MART's approval?

2         A.    Are you referring to cancelling a trip

3    that you've expected or just no longer continuing to

4    transport an individual?

5         Q.    The question is, can the vender no

6    longer -- choose to no longer transport a client

7    without MART's authorization?

8         A.    If you already have them for a scheduled

9    tripped, you would have to inform us.  You don't

10   require our authorization.

11        Q.    Okay.  Again, I'm trying to narrow this.

12   The vender has a client.  There's a problem.  Can the

13   vender drop the client for the next future trips

14   without consulting with MART?

15        A.    MART has to be notified so that the

16   individual's trips are rescheduled.

17        Q.    Okay.  Can the vender drop the client

18   without MART's authorization, yes or no?

19             MS. ECKER:  Objection.  She's answered

20        this question.

21             MR. JONES:  No, she hasn't.

22             MS. ECKER:  Well, she has.  But she can

23        answer it again.

24        A.    We don't have to give you authorization,

**Catuogno Court Reporting - A Service of InfraWare**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

Rebecca Badgley
June 22, 2021

Page 31

1    Paul, but we have to be notified.

2         Q.   Okay.  Now we're getting somewhere.  So

3    MART -- what you're saying is MART does not have to

4    give the vender authorization to drop a client,

5    correct?

6         A.   Correct.

7         Q.   Now, I have a question.  The next

8    question, does MART have the authority to hire and

9    fire any of the vender's employees?

10        A.   We are not the hiring or the firing

11   authority.  But by contract, we have the right to

12   request removal from an individual working on our

13   contract.

14        Q.   So are you saying that MART has the right

15   to remove a driver from the contract?

16        A.   From working on the MART contract, yes.

17   It is in their contract that MART and/or E-O-H-H-S.

18        Q.   Well, MART is --

19        A.   Can fire or removal.

20        Q.   So MART or E-H-S-S -- what was that,

21   E-S-H-S?

22        A.   E-O-H-H-S, the Executive Office of Health

23   and Human Services.

24        Q.   Okay.  But my specific question is, does

**Rebecca Badgley**
**June 22, 2021**

Page 32

1   MART have the authority to remove a vender or a

2   driver from performing any trips with MART, yes or

3   no?

4          A.    Yes.

5          Q.    Okay.  The next question is on the

6   capacity tab from the vender portal.  Can you

7   explain for the record what is the capacity tab and

8   what it does?

9          A.    So the capacity tab on the vender portal

10  would be the amount of work that the vender is able

11  to perform throughout the course of the day.

12         Q.    Do the vender have the capability to

13  change the capacity tab to reflect how much work he

14  would like?

15         A.    They did early on but that was locked

16  from being changed about two years ago, I think.

17         Q.    So two years ago the capacity tab was no

18  longer available to venders to change?

19         A.    Correct.

20         Q.    Did you notify venders of this change?

21         A.    We notified venders that we were going

22  through capacity and that we would be making

23  adjustments here.

24         Q.    So you notified venders that they would

Rebecca Badgley
June 22, 2021

Page 33

1   no longer be able to control the capacity tab,

2   correct?

3          A.     Correct.

4          Q.     **And when did you say this happened?**

5          A.     It was a couple of years ago, two years

6   ago.

7          Q.     **Have you ever received e-mails from me**

8   **inquiring about this specific thing, why I couldn't**

9   **change my capacity tab?**

10         A.     Honestly, off the top of my head, I

11  received several e-mails from you over time Paul; but

12  I don't know if that were related to the capacity.

13         Q.     **Okay.  You state that all venders was**

14  **notified of this, correct, that the capacity -- that**

15  **they couldn't change their capacity tab any longer?**

16         A.     We sent notices out to venders that we

17  were going to be adjusting the capacity, based off

18  the fleet side.

19         Q.     **So would you -- would it be a fair to say**

20  **that MART controlled the amount of work that a vender**

21  **would request in his capacity tab?**

22         A.     Yes, we did control that based on the

23  size of the venders fleet.

24         Q.     **I see.  So what would be the procedure if**

Rebecca Badgley
June 22, 2021

Page 34

1   I wanted to change my capacity tab after the changes

2   went through that only MART could control the

3   capacity tab?

4        A.    You could e-mail the contracts department

5   and request that they be adjusted.

6        Q.    So is it fair to say once that -- I'm

7   sorry.  Are you finished?

8        A.    Yes.

9        Q.    Is it fair to say once a vender e-mail

10  the proper department, his capacity tab would be

11  changed only if MART thought his fleet size could

12  handle the change?

13       A.    Correct.

14       Q.    So, basically, MART controlled the work

15  based on the fleet size?

16       A.    Correct.

17       Q.    So MART could control each venders

18  capacity of work given to them based on how many

19  vehicles they had on the road?

20       A.    A number of vehicles and the size of the

21  vehicles, yes.

22       Q.    Basically, MART controlled the work that

23  a vender could receive?

24       A.    The amount that would be offered, yes.

Rebecca Badgley
June 22, 2021

Page 35

1      Q.     So MART control the amount of work that

2   could be offered to a vender?

3      A.     Correct.

4      Q.     Okay.  Sorry, I just got to look at my

5   computer because I got everything written down.

6   Okay.  Now, on the vender portal, how far out can a

7   vender go to accept work, one day, two days, a week,

8   two weeks?

9      A.     On the vender protal, work is assigned

10  near the low cost assignment and, initially, work was

11  being offered seven days out in advance.  We

12  increased that to 14 days in advance.

13     Q.     Okay.  So have you ever increased it to

14  30?

15     A.     No.

16     Q.     So the limit is a vender can go out 14

17  days to create a schedule for itself, correct?

18     A.     The vender can go out 14 days to see if

19  there's work being offered to him based off the

20  business.  And that's three days out.  It doesn't

21  include same day trip or next day trip.

22     Q.     What's three days out?

23     A.     The vender portal, Trip assignment is

24  three days out.  It doesn't include -- for example,

**Rebecca Badgley**
**June 22, 2021**

Page 36

```
 1    it doesn't include today's work or work for tomorrow.
 2           Q.      I understand that.
 3           A.      Yes.
 4           Q.      Now -- so can you explain to me are you
 5    familiar with the employees that MART instructed me
 6    to no longer let them work with MART clients?
 7           A.      We keep a list here, yes.
 8           Q.      You say you keep a list?
 9           A.      If we removed somebody from working on
10    the contract, we keep that information here, yes.  Do
11    I know off the top of my head, no.
12           Q.      Okay.  So is it fair to say if MART had
13    me remove an individual, a driver, that that
14    individual couldn't drive for a number of years
15    contracting with MART?
16           A.      If an individual has been permanently
17    removed from working on the MART contract, yes.  If
18    they were to work for another vender, we would not
19    let them come onboard.
20           Q.      So it's a fact that you're telling me
21    that if MART removed one of my drivers, CCRD drivers,
22    Commonwealth, the vender, that driver couldn't go
23    work for another vender, correct?
24           A.      It would depend on the actual removal.
```

**Rebecca Badgley**
**June 22, 2021**

Page 37

```
 1   At times we remove drivers pending a retraining or
 2   pending investigation, things of that nature; but if
 3   it's a permanent removal from working on the MART
 4   contract, then they would not be able to go work for
 5   another.
 6          Q.    Question.  Answers.  So MART has the
 7   power to hire -- I mean, to fire, disengage our
 8   employees, drivers, correct?
 9          A.    No.
10          Q.    Does MART have the authority to fire the
11   employees that drive MART's clients?
12          A.    No, we are not the hiring agency or the
13   firing agency.  We have the right to remove them from
14   working on our contract.
15          Q.    What is the definition of removal, with
16   removing or working on your contract; what's that
17   definition?
18          A.    It means that they can't transport the
19   clients that are being assigned to the company by
20   MART.
21          Q.    Any longer, correct?
22          A.    Correct.
23          Q.    So that's firing, correct?
24          A.    No.  We're removing them from our
```

Rebecca Badgley
June 22, 2021

Page 38

1  contract.  If the vender only works for MART and has

2  no other work to give them, and that's the ultimate

3  thing that happens, that's not us doing that.  We're

4  not the hiring or the firing agency.  We're just

5  the --

6      Q.    **So, basically, are you firing them from**

7  **transporting MART's clients?**

8      A.    We're removing them from transporting our

9  clientele.

10     Q.    **What is the definition of removing in the**

11 **context of this thing?**

12     A.    It's labelled within your contract that

13 we have the right to remove them from working on

14 transporting our consumers.

15     Q.    **Rebecca, please answer the question.**

16         MS. ECKER:  She has answered the

17         question.    That's four times now.  You can

18         ask it one more time.

19         MR. JONES:  I'm not here to fight.  This

20         is a deposition; I would like the question

21         answered.

22         MS. ECKER:  And she has answered it.  But

23         go ahead.

24         MR. JONES:  No, she didn't answer.

**Catuogno Court Reporting - A Service of InfraWare**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

Rebecca Badgley
June 22, 2021

```
                                                    Page 39
 1            MS. ECKER:  She didn't answer it the way

 2        you wanted it answered, that's different.  But

 3        go ahead.

 4        Q.     I want to know the definition of removal.

 5        A.     Taking the individual away from

 6   transporting our consumers.

 7        Q.     That's it.  There you go.  Okay.  Can you

 8   please tell me how your D-S-S program works regarding

 9   venders?

10        A.     Our, what, program?

11        Q.     D-S-S?

12        A.     I don't have a DSS program.

13        Q.     D-D-S?

14        A.     DDS?

15        Q.     Yeah.

16        A.     Okay.

17        Q.     What does D-D-S stand for?

18        A.     Department of Developmental Services.

19        Q.     Now, you have a transporting program for

20   their clients, correct?

21        A.     Correct.

22        Q.     How does that program work, as far as

23   venders transporting the clients, what is the

24   requirements of the vender?
```

Rebecca Badgley
June 22, 2021

```
                                                        Page 40
 1        A.    The requirements are clearly listed
 2   within the contract.  There's a certain -- just like
 3   all of our venders, the drivers are required
 4   drivers -- drivers and/or monitors are required to
 5   have certain training.  There's vehicle age
 6   requirements for that program, different insurances
 7   for that program based off the size of the vehicle.
 8   The program-based transportation was actually put out
 9   on an RFR on a five-year bid.  So routes were
10   assigned to venders.  They stopped the response to
11   that RFR, and there's generally not new work going
12   out for that program on a regular basis.
13        Q.    Okay.  Can you tell me the requirements
14   of the wait time for a driver, MART requirements for
15   a wait time for a driver when he's picking up a
16   client from home t o go to an appointment?
17        A.    The contract states they're required to
18   wait five minutes past the pickup time and then
19   you're supposed to contact your dispatcher, attempt
20   to reach the client; and if there's no response, you
21   can continue on.
22        Q.    So MART -- is it fair to say MART
23   requires the driver to wait five minutes past the
24   time?
```

Rebecca Badgley
June 22, 2021

Page 41

1       A.    As the schedule pickup time and then the

2   attempt to contact the client.

3       Q.    Okay.  Can you tell me how you're fine

4   system works when you fine a vender for a no show.

5       A.    If there is a vender no show, it's

6   actually recorded in the complaint.

7       Q.    So, basically, I just want to touch on

8   ways that a vender can get fined.  So the first

9   question is, if a client reports that a vender was a

10   no show and the vender actually showed up and the

11   vender informed MART that he showed up, would MART

12   fine the vender and require the vender to submit

13   proof that he actually showed up?

14       A.    If a client calls and says that a

15   vender's a no show, you know, depending on what the

16   sequence that that happened, if it's five minutes

17   around the pickup time, it depends on when we get a

18   call, that a complaint will get filed.  The vender

19   will have an opportunity to respond to that

20   complaint.  And sometimes we do ask for additional

21   proof, GPS records, things of that nature.

22       Q.    So you ask for proof from the driver and

23   the vender of GPS that shows that he was there?

24       A.    Correct.

Rebecca Badgley
June 22, 2021

Page 42

1   Q.   In order not to get fined?

2   A.   Correct.

3   Q.   So if the vender or the driver can't

4   produce pictures that he was there, is that a -- will

5   he get fined?

6   A.   If in the end the consumer reported the

7   vender a no show and did not make their appointment,

8   and the vender doesn't have anything additional to

9   support the fact that they were there, they could

10  receive a fine, yes.

11  Q.   So is it fair to say if the vender

12  doesn't have proof through GPS that he was there,

13  they --

14  A.   Could provide a GPS record.  They could

15  provide a time stamp photograph.  They could provide

16  confirmation that somebody else that may have been in

17  the vehicle at the time.

18  Q.   Is this a requirement in the amendments

19  or the contract?

20  A.   Well, you're supposed to provide on-time

21  service, and we're following up to a complaint.

22  Q.   Is proof of GPS or time stamp picture in

23  the contract or the amendments?

24  A.   I'm not a hundred percent sure.  I know

Rebecca Badgley
June 22, 2021

Page 43

1   it is in current.  I don't know what you're referring
2   to or...
3        Q.    Any year.  Any contract or amendments, is
4   that in there where a vender has to show proof by GPS
5   or time stamp picture in order to avoid a fine for a
6   no show to a client?
7        A.    Again, I'm honestly not a hundred percent
8   sure how it's worded in there or if it specifies
9   those particular items.
10       Q.    Okay.  Well, I'm not talking about the
11   wording.  Basically, we want to -- I'm talking about
12   proof.  I understand, you know, you're not a -- you
13   don't remember how the wording is for contracts, but
14   I'm trying to just nail it down.  If in your
15   amendments or the contract, either year, is that
16   requirement in there that a vender or a driver has to
17   produce the GPS verification in order to avoid a
18   fine?
19       A.    I don't think that it specifies a GPS
20   verification in order to avoid a fine.
21       Q.    Okay.
22       A.    It's a follow-up to a customer complaint.
23       Q.    Okay.  Does your contract or any
24   amendment, any years state that a vender or a driver

**Rebecca Badgley**
**June 22, 2021**

Page 44

1    **has to produce a time stamp picture in order to avoid**

2    **a fine for a no show when a client makes a report?**

3         A.   Again, I don't think it specifies any

4    time stamped picture.

5         **Q.   You say you don't think.  That means**

6    **you're not sure, correct?**

7         A.   Correct.  I don't have any amendment in

8    front of me.

9         **Q.   Okay.  All right.  One second.  I'm just**

10   **looking on my computer for the next questions.**

11             MS. ECKER:  Can we just stop the screen

12        sharing if possible?

13             MR. JONES:  What's the problem?

14             MS. ECKER:  When you screen share, if the

15        exhibit's still up, I can't see everybody

16        talking.  So if you're not going to use the

17        exhibit, I would  appreciate it if we're not

18        screen sharing.

19             MR. JONES:  But I might use it because

20        I'm going through my questions and then I can

21        reference the part to you.

22             MS. ECKER:  Okay.

23        **Q.   Okay.  The next question is regarding**

24   **next day offers through your IV system -- IVR system.**

Rebecca Badgley
June 22, 2021

Page 45

1    How does that work?

2        A.    Then the next day offers through the IVR?

3        Q.    Yes, the next day offers?

4        A.    Okay.  So the next day are being

5    handled -- they start off being handled by our IVR

6    system, which is a callout system, which starts at

7    6:30 in the morning.  It works very similar to the

8    vender portal as far as low cost assignment; but it's

9    actually physically calling the vender.

10       Q.    Okay.

11       A.    And it will call the vender up to three

12   times.  They have an opportunity to decline doing it

13   right then if they don't -- if they're in the middle

14   of something, it will call them up to three times

15   before it moves on.  And the system reads the trip

16   information to the vender, and they have the ability

17   to accept or decline the client trip being offered.

18       Q.    What was the procedure to stop the

19   callout system from calling venders and drivers?

20       A.    You would have to notify the contract

21   department.

22       Q.    Can you go in and just mark your portal

23   full?

24       A.    If you mark your portal full for the day,

Rebecca Badgley
June 22, 2021

Page 46

1  yeah, it would stop calling.

2          Q.     It would stop calling?

3          A.     Yes.

4          Q.     Would it stop offering you work also

5  through the vender portal?

6          A.     The vender portal wouldn't be processing

7  any work for the next day.  The vender portal is

8  three days, same day and next day is going -- same

9  day is going out by the live scheduling agent.  And

10  the next day is going out by the IVR callout as well

11  as live scheduling.

12         Q.     But my question is, if a vender or driver

13  marks his portal full to avoid the phone calls coming

14  in, will that also trigger the vender portal from

15  offering any work, next day, week out, 14 days out?

16         A.     No.  If a company marks themselves as

17  full for a particular day, it will stop offering work

18  for that particular day.

19         Q.     Okay.  Thank you.  Commonwealth Community

20  Recovery Division, I'm just going to call them CCD --

21  CCRD for short, okay, for the record.  We had some

22  problems in the past with work being placed in our

23  portals.  Do you recall that?

24         A.     Yes, I do remember that there were a

Rebecca Badgley
June 22, 2021

Page 47

1    couple of incidents, yes.

2        **Q.    Yes.**

3        A.    I don't recall specifics.

4        **Q.    Right.  But you do recall that we had**

5    **unauthorized work that we didn't accept put into your**

6    **portal, correct?**

7        A.    I remember you having complaint as such,

8    yes.

9        **Q.    Okay.  Do you ever remember when MART**

10   **corrected it and acknowledged that we didn't accept**

11   **the work?**

12       A.    I know that there was a group that I

13   researched for you, and there were -- they had been

14   accepted by your IP as your log-in.

15       **Q.    So the question again, do you recall any**

16   **work that after research you found that we did not**

17   **accept that was putting out?**

18       A.    I don't recall, no.

19       **Q.    Okay.  I have a question on insurance**

20   **policy for venders working with MART.  What is the**

21   **requirements of Massachusetts, not MART,**

22   **requirements; is it 20, slash, 40?**

23       A.    Based off the vehicle size, yes, those

24   are the state requirements.

Rebecca Badgley
June 22, 2021

Page 48

1       Q.    Okay.  Does MART follow the state

2  requirements or they require more?

3       A.    At one point it was the state minimum for

4  the MassHealth Demand Response as a higher level for

5  the program base.  But that insurance requirement was

6  changed a couple of years ago where we required more.

7       Q.    Okay.  So is it safe to say that MART

8  requires more insurance requirements than the state

9  requirements as of 2020?

10      A.    Than the state minimum, yes, absolutely.

11      Q.    Okay.  Does MART require more insurance

12  coverage than the state requires for 2019?

13      A.    I believe, yes.

14      Q.    Does MART require -- strike that.

15            Did MART require more insurance coverage

16  than the state required for 2018?

17      A.    I'm honestly not a hundred percent sure.

18  I don't remember which contract we increased that in.

19      Q.    Is it a fact that when a vender accepts a

20  trip from MART for a specific time, MART doesn't

21  change the time unless you ask the vender, who rather

22  than -- if you don't understand the question, I'll

23  rephrase it.

24      A.    Please rephrase it because I'm not a

Rebecca Badgley
June 22, 2021

Page 49

```
 1   hundred percent sure.
 2        Q.    Okay.  Is it a fact that once a vender
 3   accepts a trip from MART for a specific pickup time,
 4   like 8 a.m., does MART have to get authorization from
 5   the vender to say if they wanted to change the pickup
 6   to 5:30 a.m.?
 7        A.    They would -- normally, any changes that
 8   made highlight to the venders through the vender
 9   portal in a different color; so it would really
10   depend on how far out that trip is.  If the trip is
11   for the next day, or same say, they will call the
12   vender.
13        Q.    So MART has to -- so is it safe to say
14   that MART has the authority to change the pickup time
15   or the return time without the vender's
16   acknowledgment?
17        A.    Only for advanced trips.
18        Q.    So is it a fact that MART can change the
19   times without authorization of the vender?
20        A.    Yeah, in advance you have the ability to
21   see that change and notify that you can no longer
22   accommodate.  If it happens for the next day or same
23   day, they would call you immediately.
24        Q.    So, basically, I'm trying to get an
```

Rebecca Badgley
June 22, 2021

Page 50

1    answer here.  Does MART have the authority to change

2    the pickup time or the drop-off time that the vender

3    agreed to do, whether it's a day or two or a week or

4    two weeks out, do they have the authority to change

5    the schedule of the vender without authorization from

6    the vender, yes or no?

7         A.   It's not a matter of authority.  It would

8    be a consumer calling and changing their time.

9         Q.   Once the consumer calls and change the

10   time, does MART have the authority to change the time

11   without seeing if the vender is available?

12        A.   I think I answered that.  That's posed to

13   you, if it's in advance and if you can't accommodate,

14   you can decline it.  If it's same day or next day,

15   they will call you and see if you can accommodate the

16   change that was made by the customer.

17        Q.   The issue I'm trying to get at is not if

18   it's a day or the two days or 7 days or 14 days out.

19   Does MART have the authority to change a vender's

20   schedule?

21             MS. ECKER:  Objection.  Asked and

22        answered.  You can answer again.

23        A.   We're not changing the vender schedule.

24   We're changing the customer's schedule.  And the

**Rebecca Badgley**
**June 22, 2021**

Page 51

1   protocol would be you would see the change in the

2   vender portal in a different color, if it was

3   advanced trip, signalling to you that there has been

4   a change.  If you can't accommodate that change, you

5   let us know and we reassign the trip.  If the change

6   happens the same day or the next day, they will call

7   and ask the vender if he is able to accommodate the

8   change.

9        Q.    Okay.  Can you please do me a favor and

10   just answer the question; and if you don't understand

11   the question, ask me to rephrase it or -- because --

12        A.    I understand your question, Mr. Jones.

13   But my response is not going to change, because it's

14   not that we have the authority; we are changing the

15   trip based off the customer's request.  If the trip

16   is already assigned to a vender in the same day or

17   next day, we immediately call the vender to see if he

18   can meet those accommodations.  If it is in advance,

19   you'll see the change in a different color in your

20   portal and can decline to continue with that trip for

21   the future.

22        Q.    So it's safe to say you do contact the

23   vender to see if he's available?

24        A.    If it is for the same day or next day.

**Rebecca Badgley**
**June 22, 2021**

Page 52

```
 1        Q.    So if it's 7 or 14 days out, you don't
 2   call the vender?
 3        A.    No, because you will see the change in
 4   the portal for that trip.  And if you can't
 5   accommodate that change, you have the right to turn
 6   it back.
 7        Q.    Okay.  Without -- if we turn it back,
 8   will we receive a fine?
 9        A.    If there was a change made to it?  No.
10        Q.    Yes.
11             MR. JONES:  Okay.  It's 11:41.  Can we
12        take a break to -- lunch break till about 12 --
13        what would be the proper time, Ellen, or
14        Attorney Ecker?
15             MS. ECKER:  How much longer do you think
16        you have, Mr. Jones?
17             MR. JONES:  I have no idea.  I'm going
18        through my list.
19             MR. ECKER:  Well, are we talking the
20        entire afternoon.  I'm just trying to get a
21        sense of...
22             MR. JONES:  I have no idea.  I have a
23        list.  I'm about halfway through it, so if we
24        can just keep moving things along.  We should
```

**Rebecca Badgley**
**June 22, 2021**

```
                                                    Page 53
 1        be out of here in a few hours.  How long do you

 2        guys need for a lunch break?

 3              MS. ECKER:  I don't need one.  How about

 4        if we do 12:15 -- we'll be back at 12:15, if

 5        that's all right with the stenographer?  I can

 6        go through.

 7              MR. JONES:  Let's take a break until

 8        12:15.  Okay?

 9              MS. ECKER:  Yes.

10              MR. JONES:  Thank you.

11

12              (Break at 11:43 p.m.)

13              (Back on at 12:17 p.m.)

14

15        Q.    I would like to share a document that I

16     would like to mark for exhibit --

17              MR. JONES:  We already did Exhibit 3,

18        Ellen, correct?

19              THE STENOGRAPHER:  Yes.  You were going

20        to send that one to me.

21              MR. JONES:  Yeah, I'm going to send it to

22        you.  But I want to mark exhibit -- so the last

23        exhibit was 3, right?

24              THE STENOGRAPHER:  Yes.
```

**Rebecca Badgley**
**June 22, 2021**

Page 54

```
 1              MR. JONES:  So I have a document that I
 2         would like to share and ask a question on.  I'm
 3         going to send this one.  This is Exhibit 4.
 4         Wrong one.  Wrong one.  I'm not seeing the
 5         files here.  All right.  This is -- Ellen, this
 6         is going to be marked  as Exhibit 4.  This is
 7         an e-mail that I received from Rebecca.
 8         Q.    And the question for this, do you see the
 9    e-mail, Rebecca?
10         A.    Yes.
11         Q.    Okay.  Now, earlier, I asked you about do
12    you recall any trips getting placed in the portal
13    without authorization, and you said.  I don't
14    remember what you said, but I'm going to ask the
15    question again.  Is there -- do you recall any trips
16    being placed in a portal without our authorization?
17         A.    My answer earlier was that I did not
18    recall any specifics but here in the e-mail, upon
19    investigation, it says that I found one.
20         Q.    So this e-mail can you please read a part
21    that that's highlighted.  Well, first of all, can you
22    read the top, where it's from to who and a date?
23         A.    It's from myself to you on September 19,
24    at 9:25 a.m.
```

**Rebecca Badgley**
**June 22, 2021**

Page 55

```
1        Q.     Okay.  And can you read the highlighted

2    part of the e-mail?

3        A.     It says, "Paul, our follow-up

4    investigation has been completed and it has been

5    found that this trip was placed by staff into your

6    portal at 10:34 on 9/17/19 without required vender

7    confirmation.  Appropriate actions have been taken

8    with the staff person."

9        Q.     Is this a normal occurrence with staff

10   putting trips into the vender's portals without

11   requirement of confirmation?

12       A.     Not that I found, no.

13       Q.     Do you recall this happened to me several

14   times, maybe -- you sent an e-mail like this several

15   times before?

16       A.     No, I do not recall.

17       Q.     Okay.  So it's a fact that, -- isn't it a

18   fact that on September 17, 2009 this was placed in

19   the vender portal without vender confirmation?

20       A.     It says it was found, that this trip was

21   placed by staff into the portal.

22       Q.     Okay.  Let's try this again.  Isn't it a

23   fact that this e-mail confirms that a trip, some

24   trips were placed in the vender portal without my
```

Rebecca Badgley
June 22, 2021

Page 56

1     confirmation or CCRD's confirmation?

2          A.     Yes, that's what this e-mail states.

3          Q.     And it says "the appropriate action has

4     been taken with the staff person."  What type of

5     action was taken with the staff you found out that

6     they had placed trips in the portal that the vender

7     did not confirm?

8               MS. ECKER:  I'm going to object to that

9          question, and I'm going to instruct her not to

10         answer.  Not only is it beyond the areas of

11         inquiry by the court order, but it's also

12         confidential personnel information.

13              MR. JONES:  How is it confidential

14         information and it says right here "appropriate

15         action."  I want to know what the objection is?

16              MS. ECKER:  Right.  That means it's

17         confidential.  The action that has been taken

18         was a personnel action against the employee and

19         that is confidential.  It doesn't relate in

20         addition to the issues that we're here to

21         discuss today.

22              MR. JONES:  We're here to discuss

23         control.  This points out control that one of

24         her staff was controlling us by putting back in

**Rebecca Badgley**
**June 22, 2021**

Page 57

```
 1       our portal without our authorization.  It's a

 2       control issue.

 3               MS. ECKER:  Well, I disagree with your

 4       characterization.  But regardless of the

 5       characterization, any discipline given to a

 6       MART employee does not relate to whether you

 7       are a MART employee or control and is

 8       confidential.

 9               MR. JONES:  Okay.  That's on the record.

10       Q.     Again, Rebecca.  It's a fact that MART

11   added work to the vender without confirmation?

12       A.     It's a fact that an employee added this

13   trip without confirmation.

14       Q.     Okay.  That's fine.  Now, does MART

15   require a high level of skills for drivers or

16   venders.  Do they need like a college degree to be a

17   driver or a vender?

18       A.     We don't -- there are certain

19   requirements for training and.

20       Q.     No, that wasn't the question.  The

21   question is, I'm going to state it.  Does MART

22   require a college degree for a vender to be a vender

23   with MART?

24       A.     No, there's no such requirement in place.
```

**Catuogno Court Reporting - A Service of InfraWare**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

Rebecca Badgley
June 22, 2021

Page 58

1      Q.    Okay.  Does MART require a college
2  degree, high school diploma for any driver to drive
3  for MART?
4      A.    They're not driving for MART.  We're not
5  the hiring authority.  They're driving for CCRD.
6  Those requirements would come from you.
7      Q.    Do MART require any of CCRD drivers to
8  have a high school diploma or a college degree to
9  drive their clients?
10      A.    That is not defined in the specs, no.
11      Q.    So that's a no?
12      A.    That is not defined in the specs that are
13  required of the vender.
14      Q.    Is that a yes or a no?
15      A.    That's a no.  It's not required in the
16  specs of your contract.
17      Q.    Okay.  All right.  What time does your
18  IVR system start calling venders and drivers for next
19  day trips each day?
20      A.    I believe I answered that earlier, it's
21  6:30  in the morning it starts.
22      Q.    So you start at 6:30 in the morning.  Did
23  you ever start later than that?
24      A.    It only starts a little bit later other

Rebecca Badgley
June 22, 2021

Page 59

1    than that on a date that rates might be being applied

2    or if there was an issue with the system.

3         Q.    Suppose a vender opens a little later, is

4    not open at 6:30, does the call still come through?

5         A.    If they're signed up to get work through

6    the IVR, yes, it does.

7         Q.    If a vender opens at 7, does the call

8    still start at 6:30?

9         A.    Yes.

10        Q.    And up to what time do the calls stop for

11   the IRV system -- IVR system for next day calls?

12        A.    That can vary.  Because it's working on

13   next day work.  So as soon as all the work is

14   completed it stops.

15        Q.    Is it fair to say that a vender or driver

16   can receive a call at 6 p.m. at night?

17        A.    They could if there was a high volume of

18   work for the next day, yes.

19        Q.    I'm going to ask that question, please

20   just answer the question.

21            MS. ECKER:  I'm going to object.  You

22            keep saying "I'm going to ask it again, please

23            answer the question."  She's answered the

24            question.

Rebecca Badgley
June 22, 2021

```
                                                    Page 60
 1              MR. JONES:  She's adding comments.
 2              MS. ECKER:  Mr. Jones, she's answering
 3         your questions.  She's actually been very
 4         patient.  But go ahead you can answer it again.
 5              MR. JONES:  She is adding comments.  I'm
 6         asking a simple question and she's adding
 7         comments.
 8         Q.    Can your IVR system call at 6 p.m. at
 9    night, yes or no?
10         A.    Yes.
11         Q.    Can your IVR system call at 7 p.m. at
12    night, yes or no?
13         A.    Yes.
14         Q.    Can your IVR system even call after a
15    vender is closed?
16         A.    Yes, it could.
17         Q.    Okay.  Here we go.  Make this real short
18    and sweet.  MART is in the business of
19    transportation, correct?
20         A.    Correct.
21         Q.    How long has MART been in business with
22    transportation approximately?
23         A.    For the service that you're doing?
24         Q.    Montachusetts Regional Transit Authority,
```

**Rebecca Badgley**
**June 22, 2021**

Page 61

1    period, how long have they been in the business of

2    transportation, 10, 20, 30?  It doesn't have to be

3    exact.

4         A.    50 years probably.

5         Q.    Did you say 50, Rebecca?

6         A.    Oh, yeah.

7         Q.    So it's a fact that MART has been in the

8    transportation business for 50 years?

9         A.    Since it's inception, yes.

10        Q.    Okay.  So it's a fact that MART has been

11   in the transportation business for at least 50 years?

12        A.    Yes.

13        Q.    Okay.  So seeing that MART's IVR system

14   calls venders and drivers daily, this is a continuing

15   thing Monday through Friday on a daily basis,

16   correct?

17        A.    Correct.

18        Q.    Okay.  So, basically, every day MART is

19   calling -- strike that.

20             So MART -- strike that.

21             MART has a continuing relationship with

22   the drivers and the vender?

23        A.    I'm not understanding your question.

24        Q.    I'm just saying that, you know, the

**Rebecca Badgley**
**June 22, 2021**

Page 62

1  **question is, MART has relationship on an ongoing**

2  **basis with the vender, meaning that the vender just**

3  **doesn't get in touch with MART and get all this work.**

4  **This is a continuing relationship between MART and**

5  **the venders and the drivers on a daily basis?**

6  　　　　　MS. ECKER:  Objection.

7  　　A.　　It's a relationship with MART and the

8  vender.

9  　　**Q.　　Okay.**

10 　　A.　　On a daily basis.

11 　　**Q.　　Thank you.  How often is the vender paid**

12 **through MART, is it to be paid hourly, weekly,**

13 **monthly, biweekly?**

14 　　A.　　The service that your company provided

15 was for the MassHealth PT One Demand Response, which

16 is a 15-day billing cycle.  The first or the 15th of

17 the month is the first cycle.  The 15th should be end

18 of the month, is the next cycle and then there's

19 payable for the contractual obligation; they're paid

20 within 45 days following an improved invoice.

21 　　**Q.　　So, basically, the work that the vender,**

22 **CCRD, and their employees perform is part of MART's**

23 **everyday business?**

24 　　　　　MS. ECKER:  Objection.

Rebecca Badgley
June 22, 2021

Page 63

```
 1              MR. JONES:  On what grounds?

 2              MS. ECKER:  Form of the question.  But

 3         she can answer.  I didn't instruct her not to

 4         answer.

 5              MR. JONES:  You instructed her not to

 6         answer that?

 7              MS. ECKER:  She can answer the question.

 8         I'm just objecting for the record.

 9         A.    So repeat your question, Paul.

10         Q.    So the work that CCRD and I do is a

11    regular part of MART's business?

12              MS. ECKER:  Objection.

13         A.    Correct.

14         Q.    One second.  I want to ask a question on

15    one more report that is required from MART.  It's an

16    employee report -- driver's report.  Strike that.

17    I'm going to ask a question on a report that is also

18    from the venders to MART that MART requested.  Can

19    you explain the employee report?

20         A.    I am not sure what you're talking about.

21    You'll have to give me an example of what you're

22    referring to.

23         Q.    No problem.  The drivers report, you

24    know, when you send over the drivers hire date, drug
```

Rebecca Badgley
June 22, 2021

Page 64

1    screens that's required?

2         A.    When you're adding a new driver?

3         Q.    Yes.

4         A.    Okay.

5         Q.    Can you explain that report in detail?

6         A.    We don't label it as a report.  There's

7    specific things that are required within the contract

8    prior to you, as a vender, putting the driver in

9    contact with the agency consumers that are under the

10   contract.  So you have to send a updated RMV report,

11   the date that you ran the CORI.  You have to at a

12   minimum have a fingerprint receipt, and the required

13   training and confirmation of the result of the test

14   for the preemployment.

15        Q.    Is that before we can -- the employee,

16   the driver, can actually start driving with MART

17   required to send to you guys?

18        A.    You're supposed to update your vehicle

19   log as you hire so we verify that they have all the

20   requirements.

21        Q.    What type -- what is the name of this

22   document?  You said it's not a report.  What do you

23   name it?

24        A.    It's not a report.  It's contractual

**Rebecca Badgley**
**June 22, 2021**

Page 65

```
 1    requirements.
 2         Q.    Is it an employee log?  What's the name
 3    of it?  I'm going to put a name on it.
 4         A.    It's not a report.  We house the backup
 5    information here in a database, but it's not -- we
 6    don't require that you submit a report.  We require
 7    that you submit particular items that are clearly
 8    defined within your contract.
 9         Q.    Well, is it called an employee log, yes
10    or no?
11         A.    We keep a record here.  We don't call it
12    anything.  It's in your database.
13         Q.    So it's not called an employee log,
14    correct?
15         A.    In the contract it's your employee log
16    that you update.
17         Q.    Okay.  Rebecca, I'm trying to get a name
18    of this.  I have e-mails that says send over employee
19    log, and it says that an employee log is attached to
20    it.  So I'm trying to understand, because you're
21    the --
22         A.    Within the contract, Paul, it's your
23    company's updated employee log that they're
24    referring.
```

Rebecca Badgley
June 22, 2021

Page 66

1      Q.    I don't care -- the question's not whose

2   it is.  The question is the name of it, because I

3   just want to write it down for, you know, exhibit

4   purposes and things like that.

5      A.    In your contract it is referred to as

6   your employee log.

7      Q.    So employee log is the name, correct?

8      A.    Yeah.

9      Q.    Okay.  When is this required to be sent

10  to MART?

11     A.    Your contract clearly defines that you're

12  supposed to submit it when you make changes to it.

13     Q.    So is it a fact that before we hire an

14  employee -- a driver -- I'm sorry, strike that.

15           Is it a fact that before we hire a

16  driver, we have to submit all these documents like an

17  RMV-1 and whatever else is required to MART for

18  approval?

19     A.    You can -- you're required to perform all

20  those items before you put the individual in contact

21  with our consumers.

22     Q.    Okay.  Does MART have to approve it if

23  the driver is approved?

24     A.    When you send us your updates, we look at

**Catuogno Court Reporting - A Service of InfraWare**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

**Rebecca Badgley**
**June 22, 2021**

Page 67

1  all that documentation and say that they meet

2  guidelines; if they don't meet guidelines, then we

3  tell you you have to remove them, that they can't

4  transport MART's members.

5      Q.    **So MART has the authority -- strike that.**

6            **So we have to go to an approval process**

7  **with MART before we hire a driver and let them come**

8  **in contact with MART's employees; is that clear?**

9      A.    You don't have to seek our approval to

10  hire your employees.  You're supposed follow all

11  those things that are identified in the contract

12  prior to putting them in contact with agency

13  consumers.

14      Q.    **Do you have to receive all your**

15  **credentialing before we put them in contact with**

16  **MART's consumers?**

17      A.    Not necessarily.  If you've done what's

18  required of your contract; when you send it, we're

19  going to verify it.

20      Q.    **So is that a yes or no?**

21      A.    We don't have to approve that.  You are

22  the hiring authority.

23      Q.    **Do you -- do MART have to approve --**

24  **strike that?**

Rebecca Badgley
June 22, 2021

Page 68

1          I'm trying to ask you if -- it's just a

2    simple straightforward question.  Do Commonwealth

3    Community Recovery Division have to get approval from

4    MART before we let a driver come in contact with a

5    consumer, yes or no?

6          A.    No.  CCRD has to follow their contract

7    and have all those items in place prior to putting

8    the individual into service.

9          Q.    Okay.  A few more questions here.  Is a

10   GPS system required to transport MART clients?

11         A.    It's in the current contract.

12         Q.    Is it required?

13         A.    I think I answered that earlier saying I

14   don't think it was in there as a requirement.

15         Q.    No, we were -- what we were just talking

16   about earlier with the GPS was regarding

17   cancellations and things like that, if there was a

18   requirement for a cancellation.  Now I'm asking is

19   there a requirement to transport MART's clients?

20         A.    There currently is.

21         Q.    As of?

22         A.    It's in the new contract.

23         Q.    For 2021?

24         A.    2022.

**Rebecca Badgley**
**June 22, 2021**

Page 69

1    Q.    2022?

2    A.    Yeah.

3    Q.    So it's in there.  Okay.

4    A.    Yes.  And I believe in '19 or '20 we were

5    launching our driver app, so you would have to have a

6    GPS-enabled phone.

7    Q.    On your driver's app, was that a

8    requirement that every driver use?

9    A.    We were just launching it so we were

10   putting it in place.

11   Q.    When did it launch?

12   A.    We started launching it last year.

13   Q.    So now is it a requirement for all

14   drivers to have?

15   A.    FY22.

16   Q.    That's great, save venders a lot of

17   money.  I got a few more questions, and we can wrap

18   this thing up.

19        MR. JONES:  So, now, Ellen what we need

20        to do is put up -- I'm going to send you

21        Exhibit 3 and 4; I made a note of that.  And so

22        basically I just want to put up Exhibit 2 --

23        I'm sorry.  Hold on one second.  Exhibit 1, the

24        interrogatories, I have a question on that.

**Rebecca Badgley**
**June 22, 2021**

```
                                                   Page 70
 1          Interrogatories and admissions is on Exhibit 2.

 2          So we can get rid of Exhibit 1, Ellen, and go

 3          to Exhibit 2 so I can ask these final

 4          questions.  Exhibit 2, everyone sees it?

 5                  MS. ECKER:  Yes.

 6          A.    Yes.

 7          Q.    Okay.  This document is, Exhibit 2 it has

     the answers that were sent from the defendant to me,

 9   the interrogatories, admissions and -- this has the

10   interrogatories and admissions.  So I have a few

11   questions.  Have you ever seen this document before,

12   Rebecca?

13          A.    Yes, I have.

14          Q.    Okay.  See my mouse?

15          A.    Yes.

16          Q.    Can you just read what it is, the title

17   of this document?

18          A.    "Defendant ANSWERS to Plaintiff's First

19   Set of Interrogatories."

20          Q.    Okay.  Who answered these?

21          A.    Myself.

22          Q.    Okay.  Can you read Interrogatory No. 2,

23   please.

24          A.    "Please explain why after plaintiff
```

**Catuogno Court Reporting - A Service of InfraWare**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

**Rebecca Badgley**
**June 22, 2021**

Page 71

1    contacted Rebecca Badgley, Michelle Moyo and others,

2    that he was unable to edit the CCRD capacity tabs and

3    was denied access to do so and was told that MART

4    does not give the vender ability to change they

5    capacity, that is something that only MART has access

6    to.  With regards to standing orders, you will need

7    to contact the scheduling department.  Thank you,"

8    which was "cc" to the brokeragecontract@mrta.us, and

9    which was seen by over 15 MART employees."

10            Q.    Okay.  That was the question that I

11   asked.  When did you answer these?  I'm going to go

12   down to the date -- strike that.

13            It said you answered this on April 28,

14   2020 -- no, nope.  I'm sorry.

15            A.    No, it says that I answered it on May

16   25th.

17            Q.    Nope.  May 25th?

18            A.    That's when I physically signed my name.

19            Q.    Yes.  So what was the date you answered

20   these on?

21            A.    May 25th.

22            Q.    Okay.  Now, earlier, I asked you about

23   the capacity tab, and you said, oh, it was changed

24   two years ago where venders or employees of venders

**Rebecca Badgley**
**June 22, 2021**

Page 72

1   couldn't change it, only MART could, right?

2        A.   A year and a half, two years ago, yes.

3        Q.   **Are you sure?**

4        A.   I'm pretty sure, yes.

5        Q.   **Okay.  Are you sure, yes or no?**

6        A.   I don't recall the exact date.  It was

7   approximately two years ago.

8        Q.   **Approximately two years ago?**

9        A.   Yes.

10       Q.   **Are you sure that you electronically**

11  **signed these on May 25, 2021?**

12       A.   Yes.

13       Q.   **And you answered them as well, correct?**

14       A.   Correct.

15       Q.   **Let's go back to No. 2 for the answer.**

16  **Can you read the answer, please, No. 2.**

17       A.   "Defendant objects to the interrogatory

18  to the extent that it does not contain the entire

19  e-mail referenced, which is a document that speaks

20  for itself, and was not attached to the plaintiff

21  first set of interrogatories to the defendant.

22            "Without waiving this or any other

23  objections, the defendant responds to the

24  interrogatory as follows:  MART's venders are able to

**Rebecca Badgley**
**June 22, 2021**

Page 73

```
 1   make changes to their capacity manager to reflect

 2   time and days of the week they are willing to accept

 3   work by visiting the vender portal and editing the

 4   capacity management tab.  The venders are not able to

 5   change the actual capacity figure in the vender

 6   portal software system."

 7          Q.     Okay.  So according to this answer, MART

 8   venders are able to make changes to their capacity

 9   tab?

10          A.     Manage it --

11          Q.     To reflect times and days of the week?

12          A.     Yes.

13          Q.     Correct?

14          A.     Yes.

15          Q.     Didn't earlier you tell me we weren't

16   able to change the capacity tab to reflect --

17          A.     It says you weren't able to change your

18   capacity for the amount of work, that is specific to

19   the dates and times of the week that you're --

20          Q.     Why don't you strike that and I'll do it

21   over  that way -- so it's a fact that MART venders

22   are able to make changes to their capacity manager to

23   reflect the times and dates of the week they are

24   available, correct?
```

**Rebecca Badgley**
**June 22, 2021**

Page 74

1      A.    Correct.

2      Q.    Okay.  So now I want to ask -- we're

3   going to go down to the admissions.  Are you familiar

4   with this document, Rebecca?

5      A.    Yes.

6      Q.    Can you read Request 1, please.  Let me

7   make it a little bit bigger.

8      A.    No, that's fine.  I can see it.  "Admit

9   that MART coordinates the time of pickup and drop-off

10  and return of all their clients that calls MART

11  directly for transportation services through their

12  transportation brokerage program for trips that are

13  assigned to transportation venders."

14     Q.    And the response, please.

15     A.    "Admitted."

16     Q.    Okay.  Request No. 2, can you read it,

17  please?

18     A.    "Admit that that capacity tab controls

19  the time a vender is operating hours displayed to

20  MART in the amount of jobs and money a vender can

21  schedule and earn with MART's transportation

22  program."

23     Q.    Answer?

24     A.    "Denied."

Rebecca Badgley
June 22, 2021

1      Q.     The response, please?

2      A.     It says "denied."

3      Q.     Now, can you please tell me why this was

4  denied?

5      A.     Well, ultimately, you choose.  We offer

6  you work and you choose whether you're going to

7  accept or decline.

8      Q.     I'm referencing a question.  "Admit that

9  the capacity tab controls the time," stop.  Does the

10  capacity tab controls the time?

11          MS. DECKER:  I'm going to object if

12      you're asking her only a portion because

13      you're -- it doesn't have a period after that.

14      You asked her about the entire request for

15      admissions.  If you're asking all of the

16      request, that's fine.

17          MR. JONES:  No problem.

18      Q.     "Admit that the capacity tab controls the

19  time a vender operating hours displays to MART."

20  Rebecca?

21      A.     The capacity tab contains your hours of

22  service.

23      Q.     I'm taking this question all the way up

24  to "and."  So, basically, I'm trying to get an

**Rebecca Badgley**
**June 22, 2021**

Page 76

1   understanding here.  Is this correct or isn't

2   correct?  You denied it so...

3                    MS. ECKER:  She denied the entire

4          paragraph, that was my objection.  If you want

5          to ask her a question that's not specifically

6          this request, you can do that, but she denied

7          the entire request.

8                    MR. JONES:  Okay.

9          Q.    So can you read it one more time, please?

10         A.    "Admit that the capacity tab controls the

11   time a vender operating hours displays to MART and

12   the amount of jobs and money a vender can schedule

13   and earn with MART's transportation program."

14         Q.    And the response was denied --

15         A.    Correct.

16         Q.    -- correct?  In your own words, tell me

17   what the capacity tab controls?

18         A.    So the capacity tab shows the hours that

19   you're operating --

20         Q.    No.  What it controls.  Please --

21                    MS. ECKER:  She just answered your

22          question.  Let her finish.

23                    MR. JONES:  Please, Ms. Ecker, you don't

24          have to be disrespectful.  But can we please be

**Rebecca Badgley**
**June 22, 2021**

Page 77

```
 1        cordial.
 2              MS. ECKER:  I'm just saying you asked a
 3        question.  Please let her finish her answer.
 4              MR. JONES:  But it's the manner in which
 5        you're saying it.  Can we just be cordial here,
 6        please.
 7              MR. ECKER:  We are being cordial.  I'm
 8        not trying to talk over you.  But you asked a
 9        question, please let her answer it.
10              MR. JONES:  Thank you.  That's much
11        better.
12        Q.     So I'm going to ask you the question
13   again.
14        A.     It displays the times that your company
15   operates and what your capacities are; but,
16   ultimately, you, as a vender, control what you accept
17   or decline from what's being offered to you.
18        Q.     Can you repeat that?
19        A.     I said the capacity tab shows what your
20   hours of operation are and what your capacity is, but
21   you, as the transportation provider, control what you
22   accept or decline.
23        Q.     Okay.  You said -- my question was, what
24   does the capacity tab control?  You answered the
```

**Rebecca Badgley**
**June 22, 2021**

Page 78

1    **question that says what the capacity tab shows, shows**

2    **and control are two different things.  I want to know**

3    **what the capacity tab controls not what the capacity**

4    **tab shows.  So, please, the question again is, in**

5    **your own words, what does the capacity tab control?**

6              MS. ECKER:  Objection.  You can answer,

7         if you can.

8         A.    Companies are provided a volume of work

9    based off their capacity; that's the only thing that

10   it controls, is the volume of work that is assigned.

11        **Q.    Okay.**

12        A.    You control what you accept or decline in

13   what you do.

14        **Q.    Okay.  You just said that the capacity**

15   **tab controls the volume of work; is that correct?**

16        A.    Being offered.  If you as a company,

17   Mr. Jones, can only handle a hundred trips per day --

18        **Q.    That's not the question that I asked,**

19   **Rebecca?**

20        A.    You're asking --

21        **Q.    I did not ask that question.**

22             MS. ECKER:  Mr. Jones, let her finish.

23             MR. JONES:  No, it's -- I'm not

24        because --

Rebecca Badgley
June 22, 2021

Page 79

```
 1            MS. ECKER:  Let her finish.  Mr. Jones,
 2         let her finish.
 3            MR. JONES:  I did not ask that question.
 4            MS. ECKER:  Mr. Jones, let her finish.
 5            MR. JONES:  My question is, what does the
 6         capacity tab control, and she said a volume of
 7         work being offered.  And -- is that correct?
 8            MS. ECKER:  And she didn't finish her
 9         answer.  So, for the record, please have her
10         finish her answer to you.  Go ahead, Rebecca.
11         A.   It is not going to offer the vender over
12    what their capacity is for the day.
13         Q.   That's not my question.  Listen, my
14    question is, what does the capacity tab control?
15         A.   The capacity that you, as a company, and
16    your fleet size can handle in the course of a day.
17         Q.   Okay.  Thank you.  Now, what does the
18    capacity tab show?
19            MS. ECKER:  Objection.
20         A.   I already answered that, the hours --
21    operating hours and capacity.
22         Q.   Okay.  Question answered.  All right.
23    Read number 3 for me.
24         A.   "Admit that MART employees sent an e-mail
```

**Rebecca Badgley**
**June 22, 2021**

Page 80

1    in 2017 stating all venders must create and submit a

2    log to MART on a monthly basis at the end of the

3    month, odometer reading, updated vehicle inventory,

4    total vehicle hours and hours that the vehicle is on

5    the road in service to MART for the month.  Example,

6    time driver leaves garage to begin work until break

7    and time back in service until next break.  Vehicle

8    accident miles, the odometer reading of the vehicle

9    at the time of an accident, report dead head miles

10   for wheelchair van, reporting of mileage from start

11   to first pick-up and from last drop-off to garage at

12   the end of the day unless there is a significant

13   break, then would need same after break.

14           Percentage of fully allocated expenses in

15   service to MART broken down by the following

16   categories.  1.  Vehicle operations, driver salary,

17   dispatcher salary, fuel.  2.  Vehicle maintenance,

18   oil changes, tires, mechanic salary.  3.  NonVehicle

19   maintenance, janitor salary, utility bills, cleaning

20   supplies.  4. General administration, office staff

21   salaries, profits, admin overhead, "f," fuel cost,

22   total cost of fuel for the month, "g" gallons of

23   fuel, total number of gallons of fuel purchased, "h,"

24   miles per gallon, average number of miles that a

**Rebecca Badgley**
**June 22, 2021**

Page 81

 1   vehicle travelled on one gallon of fuel for each

 2   vehicle used for brokerage contract."

 3        Q.    And the question was -- what was her

 4   response?

 5        A.    "Admitted that MART request brokers

 6   provide MART the information set forth above.  Denied

 7   that the above is a complete and accurate recitation

 8   of an e-mail sent by a MART employee in 2017, which

 9   e-mail is a document that speaks for itself and was

10   not attached to Plaintiff's Request for Admissions."

11        Q.    Okay.  Would you admit that Request No. 3

12   is in your 2019 amendments not contract?

13        A.    Yes.

14        Q.    So for the record you admit that Question

15   No. 3 is in your 2019 amendments, just to be clear?

16        A.    Yes, it was in the 2019 amendment.

17        Q.    Okay.  Do you admit this is a requirement

18   for MART venders and their drivers in the 2019

19   amendments?

20        A.    Yes, it was in the amendment.  But I

21   believe I indicated earlier that we didn't require

22   it.  We didn't force venders to submit.

23        Q.    Hold on.  So you're saying that the

24   governing document in 2019 had this in it, but it

Rebecca Badgley
June 22, 2021

Page 82

1    **wasn't a requirement?**

2         A.    We did not force the venders to submit

3    it, that is correct.

4         Q.    **The question is, is it a requirement?**

5         A.    It was in the amendment.  I've answered

6    the question.  My response is not going to change.

7    It is in the amendment.

8         Q.    **It is a requirement in the 2019**

9    **amendments, yes or no?**

10        A.    It was in the additional provider

11   performance standard under required reporting.  But

12   we did not request the venders to submit nor force

13   them to.

14        Q.    **Rebecca, this is a very simple question.**

15             MS. ECKER:  And she's answered the

16        question.

17             MR. JONES:  No, she didn't.

18             MS. ECKER:  Mr. Jones, she's going --

19             MR. JONES:  She --

20             MS. ECKER:  Mr. Jones, let me finish for

21        the record so the stenographer doesn't have us

22        talking over one another.  You repeatedly do

23        this.  You ask the question.  She answers the

24        question.  For whatever reason, you don't like

**Rebecca Badgley**
**June 22, 2021**

Page 83

```
 1        the answer; you ask again and we go back and

 2        forth.  I will let you ask it one more time

 3        before I --

 4              MR. JONES:  This is a yes or a no

 5        question.

 6              MS. ECKER:  But it's not.  And I think

 7        that's what you're not understanding.  Just

 8        because you say it is a yes or no question,

 9        doesn't mean the witness has to answer yes or

10        no, so that's your interpretation.  But it's

11        not necessarily a yes or no answer every time

12        you ask a question.  But go ahead, ask again.

13        Q.    Rebecca, is No. 3 that you just read with

14   all these requirements in the 2019 MART amendments?

15        A.    Yes, it is in there but we did not

16   require it to be submitted.

17        Q.    Thank you.  We're going go to No. 5.  Can

18   you read that please, Request No. 5?

19        A.    "Admit that the skills required to

20   participate in MART's transportation program as a

21   transportation provider does not require a degree in

22   a particular skill the constitute a regular and

23   essential part of MART's business operations."

24        Q.    Okay.  Earlier, you said that MART was in
```

Rebecca Badgley
June 22, 2021

Page 84

1    the transportation business, correct?

2         A.    Correct.

3         Q.    For approximately 50 years, correct?

4         A.    MART, a regional transit authority, yes.

5         Q.    MART is -- you said MART has been in the

6    business for approximately 50 years, correct?

7         A.    Correct.

8         Q.    And you also earlier stated that MART

9    didn't require a vender to have a degree, high school

10   diploma or anything like that, correct?

11        A.    Correct.

12        Q.    But, yet, on No. 5 when I asked, "Admit

13   that MART -- that the skills required to participant

14   at MART programs, transportation programs as a

15   transportation venders does not require a degree in a

16   particular skill and constitute a regular and

17   essential part of MART's business operations."  You

18   denied No. 5, right?

19        A.    Correct.

20        Q.    Thank you.  I got a question.  Can you

21   explain what a standing order is?

22        A.    A standing order is a repeating trip

23   schedule.  So an example of that would be an

24   individual going three days a week same days, same

Rebecca Badgley
June 22, 2021

Page 85

```
 1    times, same appointments, such as dialysis or
 2    something of that nature.
 3         Q.    So if I accepted -- if Commonwealth
 4    Community Recovery Division accepted a trip and I was
 5    a driver, say I was the only driver, and I had a
 6    standing order for seven days a week, under your
 7    definition I would have to take that client every day
 8    of that standing order?
 9         A.    Correct.
10         Q.    Okay.  So isn't it a fact MART requires
11    vender portal training at least once when you first
12    start, a vender starts?
13         A.    Yeah.  I answered that earlier.  We have
14    them come in for vender portal training before their
15    work is assigned.
16         Q.    Okay.  Can you read No. 8, please?
17         A.    "Admitted that MART requires it's vendors
18    to abide by safety requirements, to have certain
19    policies of insurance, to meet certain vehicle
20    requirements and offers other vendor portal and
21    orientation training."
22         Q.    You didn't finish it.
23         MS. ECKER:  I think she might have.
24         A.    I think I started with the response.  I'm
```

**Rebecca Badgley**
**June 22, 2021**

Page 86

1    sorry.

2         Q.    **Yeah.  Can you -- Request No. 8.**

3         A.    Request No. 8, "Admit that MART provides

4    Vendor safety requirements, insurance requirements,

5    vehicle  requirements, CCRD INC employee

6    requirements, vendor portal, orientation training,

7    requires a vendor to work every day if they have a

8    standing order for seven day a week, which is

9    mandatory for all venders."

10        Q.    **And the response please for No. 8 can you**

11   **read?**

12        A.    "Admitted that MART requires its vendors

13   to abide by safety requirements, to have certain

14   policies of insurance, to meet certain vehicle

15   requirements and offers vendor portal and orientation

16   training.  The remaining allegations are denied."

17             MR. JONES:  Ellen, did you get the last

18        sentence of that because I didn't hear.

19             THE STENOGRAPHER:  She's reading it from

20        the document, so yeah.

21             MR. JONES:  Can you repeat the last

22        sentence she said, Ellen.

23        Q.    **Can you please read No. 9.  I'm sorry.**

24   **Let me make a note.  No. 9 has Response No. 9 and**

1    Response No. 9.  It's supposed to say Request No. 9.

2    So can you read the top one?

3         A.    "Admit that CCRD or their employees

4    possess no proprietary interest in their respective

5    delivery routes that MART assigns and all customers

6    (clients) belong not to CCRD but to MA."

7         Q.    Okay.  Just to make a clarification, "MA"

8    stands for MART.

9         A.    Okay.

10        Q.    And can you -- did you know that when you

11   answered this?

12        A.    I assumed that you meant that the

13   consumers belonged to the State of Mass. and the

14   agency that they're covered by, so.

15        Q.    Okay.  So I can you read the response,

16   please?

17        A.    "Admitted that CCRD has no proprietary

18   interest in the trips offered by MART and accepted by

19   CCRD.  The remaining allegations are denied."

20        Q.    Also, basically, I misnumbered these and

21   the responses so they were -- okay.  I already --

22   strike that.  Okay.  So that's admitted.  We can wrap

23   it up for the day.

24             MR. JONES:  Ellen, I'm going to send you

Rebecca Badgley
June 22, 2021

Page 88

1          Exhibits 3 and 4.  Thank you very much ladies

2      for your patience with me.

3              THE STENOGRAPHER:  Attorney Ecker, would

4      you want a copy of this?

5              MS. ECKER:  Yes, please.

6              THE STENOGRAPHER:  Exhibits also?

7              MS. ECKER:  Yes, please.

8

9              (Deposition concluded at 1:16 p.m.)

10             (Exhibits 1-4, marked off the record)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**Rebecca Badgley**
**June 22, 2021**

Page 89

1                C E R T I F I C A T E

2

3    COMMONWEALTH OF MASSACHUSETTS

4    PLYMOUTH, SS.

5         I, Ellen M. Muir, a Shorthand Reporter, do

6    hereby certify:

7         REBECCA BADGLEY, the witness whose testimony is

8    hereinbefore set forth, was duly sworn by me,

9    pursuant to Mass. R. Civ. P. 27, 30, 30A, and 31, and

10   that such testimony is a true and accurate record of

11   my stenotype notes taken in the foregoing matter, to

12   the best of my knowledge, skill and ability.

13        I further certify that I am not related to any

14   parties to this action by blood or marriage; and that

15   I am in no way interested in the outcome of this

16   matter.

17        IN WITNESS WHEREOF, I have hereunto set my hand

18   This 5th day of July, 2021.

19

20

21

22

23   Ellen M. Muir              My Commission expires:

24   Notary Public              May 8, 2026