# EXHIBIT 1

PDF processed with CutePDF evaluation edition www.CutePDF.com

NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-13106

KYANA JINKS[1] & others[2] <u>vs</u>.  CREDICO (USA) LLC.

Suffolk.     October 4, 2021. - December 13, 2021.

Present:  Budd, C.J., Gaziano, Lowy, Cypher, Kafker, Wendlandt,
& Georges, JJ.

<u>Independent Contractor Act</u>.  <u>Massachusetts Wage Act</u>.  <u>Labor</u>,
Overtime compensation, Wages.  <u>Statute</u>, Construction.
<u>Collateral Estoppel</u>.  <u>Res Judicata</u>.  <u>Practice, Civil</u>,
Summary judgment, Judgment on the pleadings.

<u>Civil action</u> commenced in the Superior Court Department on
July 25, 2016.

A motion for judgment on the pleadings was considered by
<u>Kenneth W. Salinger</u>, J., and motions for summary judgment were
heard by him.

The Supreme Judicial Court on its own initiative
transferred the case from the Appeals Court.

<u>Harold L. Lichten</u> for the plaintiffs.
<u>Barry J. Miller</u> (<u>Alison H. Silveira</u> also present) for the
defendant.

_____

[1] Individually and on behalf of all others similarly
situated.

[2] Antwione Taylor, Lee Tremblay, and Justin Jackson,
individually and on behalf of all others similarly situated.

Ben Robbins & Martin J. Newhouse, for New England Legal Foundation, amicus curiae, submitted a brief.

Ana Muñoz, Joseph Michalakes, & Audrey Richardson, for Massachusetts Employment Lawyers Association & others, amici curiae, submitted a brief.

WENDLANDT, J.  This case presents the issue whether G. L. c. 149, § 148B (independent contractor statute), which sets forth the standard to classify an individual as an employee or an independent contractor for purposes of the minimum wage and overtime statutes, G. L. c. 151, §§ 1 and 1A (wage laws), also establishes the standard to determine whether an entity is that individual's joint employer for purposes of those laws.  We conclude that it does not.  Instead, we borrow the test applied to determine joint employer status under the Fair Labor Standards Act (FLSA), from which the Massachusetts wage laws derive.  Pursuant to that test, whether an entity is a joint employer of an individual is determined by considering the totality of the circumstances of the relationship between the individual and the entity, guided by a framework of four factors:  whether the entity (1) had the power to hire and fire the individual, (2) supervised and controlled the individual's work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records.

Considering these factors in light of the undisputed material facts in the record before us, we affirm the Superior Court judge's allowance of summary judgment in favor of the defendant, Credico (USA) LLC (Credico).  More specifically, the plaintiffs were salespersons directly retained by DFW Consultants, Inc. (DFW), an entity with which Credico subcontracted to provide regional direct sales services for its national clients.  The record, when considered in view of the aforementioned factors as a whole, does not support the conclusion that the plaintiffs had a reasonable expectation of proving that Credico exercised the type of control over their employment necessary to conclude it was their joint employer. Further determining that the claims of the plaintiff Justin Jackson were barred by the doctrine of claim preclusion, we affirm.[3]

1.  Background.  The undisputed material facts are as follows.  Credico was a client broker for independent direct marketing companies; for years, it contracted with DFW to provide regional door-to-door and other face-to-face sales

_____

[3] We acknowledge the amicus briefs submitted by the New England Legal Foundation and by the Massachusetts Employment Lawyers Association; Lawyers for Civil Rights; the Immigrant Worker Center Collaborative; the Massachusetts Law Reform Institute; the National Employment Law Project; Justice at Work; Fair Employment Project, Inc.; and the Jewish Alliance for Law and Social Action.

services for Credico's nationally based telecommunications and energy clients.  DFW, in turn, retained the services of the plaintiffs -- Kyana Jinks, Antwione Taylor, and Lee Tremblay -- as salespersons to work on various marketing campaigns in Massachusetts for Credico's clients.[4]  Without any apparent input from Credico, DFW classified Jinks and Taylor as independent contractors and Tremblay as an employee.

Two agreements governed DFW's relationship with Credico during the years that the plaintiffs worked for DFW -- a 2013 "Subcontractor Agreement" (2013 agreement) and a 2015 "Services Agreement" (2015 agreement), which apparently superseded the 2013 agreement.  Relevant to the issues on appeal, the 2013 agreement provided that DFW would comply, and have its employees comply, with Credico's "Code of Business Ethics and Conduct"; otherwise, "[DFW] retain[ed] sole and absolute discretion, control, and judgment in the manner and means of carrying out the assignment," including "filing all necessary and required tax filings, reports, payments, and similar obligations," as well as "any workers' compensation, Medicare, Medicaid, or other similar deductions or contributions."  The 2013 agreement also provided that "[i]nvoicing by and payment to [DFW] shall be in accordance with the Subcontractor Commission Schedule."  The

---

[4] DFW was owned and operated by Jason Ward.

schedule governed when Credico would pay DFW, made provisions in case of fraud on the part of DFW, reserved Credico's right to amend the schedule, and provided a table of the rates at which Credico would compensate DFW for particular types of sales.  The plaintiffs cite to no record support for their contention that the schedule additionally governed the commissions DFW paid to them; to the contrary, the records show that Credico had no involvement in DFW's policies regarding the compensation DFW paid to its salespersons.

The 2015 agreement similarly provided that DFW "retain[ed] sole and absolute discretion, control, and judgment in the manner and means of carrying out the Services."  DFW had "exclusive control over its labor and employee relations policies, and its policies relating to wages, hours, or working conditions of its employees," and had "the exclusive right to hire, transfer, suspend, lay off, recall, promote, assign, discipline, adjust grievances and discharge its employees."  Credico required DFW to ensure that its workers complied with certain regulatory requirements, including undergoing background checks and signing nondisclosure agreements.  Credico provided DFW with access to a data portal, ARC, capable of tracking the number of salespersons working on a particular campaign on a particular day; the plaintiffs' additional contentions that the portal provided Credico with salespersons' daily rankings and

pay reports and that Credico used the portal to gather information about DFW's salespersons are unsupported.

Aside from reporting to the DFW office at the beginning and end of a workday, the plaintiffs completed their sales work "in the field" via face-to-face interactions with consumers.[5]  The plaintiffs testified that they had never met, communicated with, or seen anyone employed by Credico, and had never been to a Credico office.

In June 2019, the plaintiffs filed the third amended complaint in this action, individually and on behalf of all others similarly situated,[6] against Credico, DFW, and Jason Ward.[7]  With respect to Credico, the plaintiffs alleged that, as

---

[5] The plaintiffs' contention that their workday schedules, including reporting to the DFW office at the beginning and end of each day, mirrored the schedule followed by Credico subcontractors nationwide, is not supported by the record on summary judgment.

[6] The claims on behalf of those similarly situated were placed on hold pending resolution of the parties' cross motions for summary judgment.  Thus, a class has not been certified.

[7] Kanika Misra and Craig Levine were originally plaintiffs in this action; their claims against Credico were dismissed as barred by claim preclusion.  See Vasto vs. Credico (USA) LLC, U.S. Dist. Ct., No. 15 Civ. 9298 (S.D.N.Y. Oct. 27, 2017), aff'd, 767 Fed. Appx. 54 (2d Cir. 2019).  Following the addition of more plaintiffs in the second amended complaint, claims by the plaintiff Jacqueline Sill against Credico were effectively stayed when the Superior Court judge granted a motion to compel arbitration as to her claims.  Finally, claims asserted by the plaintiff Juan Melo against Credico were dismissed for failure to prosecute.  None of these rulings is the subject of this appeal.

the plaintiffs' joint employer, Credico violated the independent contractor statute, G. L. c. 149, § 148B, by misclassifying Jinks and Taylor as independent contractors rather than employees, and that it violated the wage laws, G. L. c. 151, §§ 1 and 7, and G. L. c. 151, § 1A, by failing to pay each of the plaintiffs minimum wage and overtime for hours worked in excess of forty hours per week.  The claims asserted by Jackson, who was a named plaintiff in the second amended complaint, against Credico, see note 7, supra, were found by the Superior Court judge to be barred by the doctrine of claim splitting based on Jackson's participation in a Federal lawsuit against Credico in which he did not raise his State law claims, see Huffman vs. Credico (USA) LLC, U.S. Dist. Ct., No. 1:17CV04242 (S.D.N.Y.).

After a period of discovery, the parties submitted cross motions for summary judgment in December 2019.  Credico sought summary judgment on all claims raised against it in the third amended complaint.  The plaintiffs sought summary judgment on their claims that Credico violated the wage laws, maintaining that Credico was their joint employer, that they were not exempt under the statutes' "outside sales" exemption, and that Jinks

and Taylor were misclassified by Credico as independent contractors.[8]

The judge granted summary judgment to Credico on all claims on the ground that the undisputed facts established it was not the plaintiffs' joint employer.  The plaintiffs appealed from the allowance of Credico's motion for summary judgment, as well as the allowance of Credico's motion for judgment on the pleadings as to Jackson's claims.  This court transferred the case sua sponte from the Appeals Court.

2.  <u>Discussion</u>.  a.  <u>Summary judgment</u>.  i.  <u>Employer "ordinarily" is entity for whom employee directly performs services</u>.  The appropriate test to determine whether an entity is an individual's employer under the wage laws is a legal

---

[8] The plaintiffs also sought summary judgment against DFW and Ward for violation of the wage laws.  DFW and Ward sought partial summary judgment on the plaintiffs' claim that they violated the overtime statute by failing to pay overtime for hours worked in excess of forty hours per week.  The judge granted summary judgment to the plaintiffs Jinks and Taylor on their claim that DFW misclassified them as independent contractors.  He denied summary judgment as to the plaintiffs' minimum wage claims against DFW and Ward on the ground that there was a genuine dispute of material fact whether the plaintiffs fell within the "outside sales" exemption of the minimum wage statute, as defined in G. L. c. 151, § 2.  He granted summary judgment in favor of DFW and Ward on the plaintiffs' overtime claims, concluding that the plaintiffs fell within the separate outside sales exemption of the overtime statute, G. L. c. 151, § 1A (4).  None of these rulings was appealed; instead, the plaintiffs entered into a settlement agreement with DFW and Ward and dismissed their claims against both parties.

question, which we consider de novo.  Rotondi v. Contributory

Retirement Appeal Bd., 463 Mass. 644, 648 (2012).  Relying on

the independent contractor statute, G. L. c. 149, § 148B, the

plaintiffs urge that an entity is an individual's employer so

long as the individual is "performing any service" from which

the entity derives an economic benefit.[9]

We rejected such an approach in Depianti v. Jan-Pro

Franchising Int'l, Inc., 465 Mass. 607 (2013), determining

instead that the entity for whom the individual directly

performs services is ordinarily the individual's employer

responsible for compliance with the wage laws.  In particular,

we posited a hypothetical situation in which "company A

---

[9] The independent contractor statute provides, in relevant
part:

"For the purpose of [G. L. cc. 149 and 151], an individual
performing any service . . . shall be considered to be an
employee under those chapters unless: --

"(1) the individual is free from control and direction in
connection with the performance of the service, both under
his contract for the performance of service and in fact;
and

"(2) the service is performed outside the usual course of
the business of the employer; and,

"(3) the individual is customarily engaged in an
independently established trade, occupation, profession or
business of the same nature as that involved in the service
performed."

G. L. c. 149, § 148B.

contracts with company B for services, and company B enters into arrangements with third parties to perform the work it undertook under its contract with company A." Id. at 624 n.17.  Even though company A derived an economic benefit from the third-party workers, we concluded that "ordinarily, in such circumstances, company A would not be liable for misclassification of the third-party workers.  This is because ordinarily, in such circumstances, company B would be the agent of any misclassification" as the third parties' direct employer. Id.

     In the present case, DFW, like company B in the hypothetical scenario, was the direct employer of the plaintiffs.  Credico, like company A, did not classify the plaintiffs.  Therefore, Credico was not the direct employer of the plaintiffs and thus "ordinarily" would not be liable for any misclassification under the wage laws.  See id.

     While this is the ordinary outcome, we have recognized at least two exceptions -- first, where the law of corporate disregard is applicable and, second, where an entity has engaged in an "end run" around its wage law obligations.  We describe each in turn.

     ii.  Alter ego employer.  First, company A could be liable for company B's misclassification of the employee if company B is the "alter ego" of company A pursuant to the narrowly

tailored, equitable doctrine of corporate disregard.  See
Attorney Gen. v. M.C.K., Inc., 432 Mass. 546, 555 (2000) ("The
doctrine of corporate disregard is an equitable tool that
authorizes courts, in rare situations, to ignore corporate
formalities, where such disregard is necessary to provide a
meaningful remedy for injuries and to avoid injustice").  To
trigger such veil-piercing liability, a plaintiff must show the
following factors:

> "(1) common ownership; (2) pervasive control; (3) confused
> intermingling of business assets; (4) thin capitalization;
> (5) nonobservance of corporate formalities; (6) absence of
> corporate records; (7) no payment of dividends;
> (8) insolvency at the time of the litigated transaction;
> (9) siphoning away of corporation's funds by dominant
> shareholder; (10) nonfunctioning of officers and directors;
> (11) use of the corporation for transactions of the
> dominant shareholders; and (12) use of the corporation in
> promoting fraud."

Sebago v. Boston Cab Dispatch, Inc., 471 Mass. 321, 328 (2015),
quoting M.C.K., Inc., supra at 555 n.19.  See My Bread Baking
Co. v. Cumberland Farms, Inc., 353 Mass. 614, 618 (1968)
(setting forth principle that "corporations are generally to be
regarded as separate from each other and from their respective
stockholders" absent showing of factors permitting disregard of
corporate form).

    In the present action, the plaintiffs have not alleged or
attempted to show that Credico is the alter ego of DFW, nor

would the facts in the summary judgment record support this conclusion.

iii. <u>End-run employer</u>.  Second, an employment relationship between company A and company B's employees could exist if company A has engaged in a scheme as an "end run" around its wage law obligations such that company A, even though it is not the employee's direct employer and cannot be shown to be the direct employer's "alter ego," nonetheless is the agent of the misclassification.  Such a scenario would occur if company A "designed and implemented the contractual framework under which [company B's employee] was misclassified as an independent contractor," specifically to evade obligations under the wage laws.  <u>Depianti</u>, 465 Mass. at 624 n.17 (noting that where first entity is agent of misclassification it may be directly liable under independent contractor statute).  See <u>id</u>. at 625-626 (Cordy, J., dissenting in part) (recognizing that liability under independent contractor statute may flow where entity is set up specifically for purpose of evading wage law obligations); <u>Cumpata</u> v. <u>Blue Cross Blue Shield of Mass., Inc</u>., 113 F. Supp. 2d 164, 168 (D. Mass. 2000) ("The Wage Act is meant to protect employees from the dictates and whims of shrewd employers").

In the present action, despite their continued allegations that Credico established a "fissured" employment structure with

DFW,[10] the plaintiffs have not adduced facts to show that DFW was set up by Credico for the purposes of evading wage law obligations.

iv.  _Joint employment_.  We turn now to consider a third exception to the rule that, ordinarily, one entity is not the employer of a different entity's employees.  In the parlance of _Depianti_'s hypothetical scenario, we consider whether an employment relationship exists between company A and company B's employees when company A is the employees' joint employer.

A.  _Whether the joint employment concept is included in the wage laws_.  "The basis of the [joint employer] finding is simply that one employer while contracting in good faith with an otherwise independent company, has retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer."  _Swallows_

---

[10] In a "fissured" employment structure, a company funnels work through subcontractors or other intermediaries, which are often judgment-proof.  When workers attempt to sue the company over wage issues, the company avoids liability by pointing to the intermediary as the responsible party.  See Griffith, The Fair Labor Standards Act at 80:  Everything Old Is New Again, 104 Cornell L. Rev. 557, 571-597 (Mar. 2019); Weil, Why the Fissured Workplace Is Bigger than the Contingent Worker Survey Suggests, The American Prospect (May 14, 2019), https://prospect .org/economy/future-real-jobs-prospect-roundtable [https://perma .cc/4BFP-TYKQ].  We agree that "[t]o allow such an 'end run'" around the wage laws would contradict their purpose, which is to provide broad remedial protection to workers.  _Depianti_, 465 Mass. at 624, quoting _DiFiore_ v. _American Airlines, Inc_., 454 Mass. 486, 496 (2009).

v. Barnes & Noble Book Stores, Inc., 128 F.3d 990, 993 n.4 (6th
Cir. 1997), quoting National Labor Relations Bd. v. Browning-
Ferris Indus. of Pa., Inc., 691 F.2d 1117, 1123 (3d Cir. 1982).
See 2 B. Lindemann & P. Grossman, Employment Discrimination Law
1312 (3d ed. 1996).  See also Boire v. Greyhound Corp., 376 U.S.
473, 481 (1964) (describing inquiry whether bus company had
"sufficient control over the work of the employees" of another
company).  In other words, company A, by its good faith
retention of sufficient control over the terms and conditions of
employment of company B's employees, has created a "work
arrangement" between it and company B's employees.  Depianti,
465 Mass. at 625 (Cordy, J., dissenting in part).  We conclude
that the wage laws, which neither define "employer" nor
expressly provide for "joint employers," include this long-
standing concept of joint employment.[11]  Compare G. L. c. 152,
§ 26B (workers' compensation law, expressly providing for joint
and several liability "[w]hen an employee [is] employed in the
concurrent service of two or more insured employers").  See,
e.g., Sebago, 471 Mass. at 329 (implicitly acknowledging that
more than one entity could constitute employee's employer);
Gallagher v. Cerebral Palsy of Mass., Inc., 92 Mass. App. Ct.

---

[11] None of the other provisions in G. L. c. 151 defines
"employer."

207, 214 (2017) (applying joint employment concept in connection with wage laws).

"Where the meaning of a statute is not plain from its language, familiar principles of statutory construction guide our interpretation." Depianti, 465 Mass. at 620, quoting DiFiore v. American Airlines, Inc., 454 Mass. 486, 490 (2009). We interpret the statute "according to the intent of the Legislature ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated." Industrial Fin. Corp. v. State Tax Comm'n, 367 Mass. 360, 364 (1975), quoting Hanlon v. Rollins, 286 Mass. 444, 447 (1934). Because of their remedial nature, employment statutes are generally "entitled to liberal construction," see Batchelder v. Allied Stores Corp., 393 Mass. 819, 822 (1985), "with some imagination of the purposes which lie behind them," Lehigh Valley Coal Co. v. Yensavage, 218 F. 547, 553 (2d Cir. 1914), cert. denied, 235 U.S. 705 (1915). See, e.g., Boston v. Commonwealth Employment Relations Bd., 453 Mass. 389, 391 (2009).

Where, as here, the Legislature has not defined a term in a statute, we presume that its use of the term (in this case, the

term "employer") incorporates the understanding of that term under the common law.  See Koshy v. Sachdev, 477 Mass. 759, 770 (2017), quoting Commonwealth v. Wynton W., 459 Mass. 745, 747 (2011) ("Where the Legislature does not define a term, we presume that its intent is to incorporate the common-law definition of the term, 'unless the intent to alter it is clearly expressed'").  The concept of joint employment finds long-standing support in the common law.  See Whitman's Case, 80 Mass. App. Ct. 348, 355 (2011), quoting Williams v. Westover Finishing Co., 24 Mass. App. Ct. 58, 60 (1987) (noting "[j]oint employment . . . is a well recognized phenomenon"); Commodore v. Genesis Health Ventures, Inc., 63 Mass. App. Ct. 57, 61-62 (2005) (reviewing Federal jurisprudence defining concept of joint employer and applying same in context of Massachusetts employment discrimination claims).  See also Kelley v. Southern Pac. Co., 419 U.S. 318, 324 (1974) (setting forth common-law principles whereby individual "can establish his 'employment' with [one entity] even while he is nominally employed by another"); Browning-Ferris Indus. of Cal., Inc. v. National Labor Relations Bd., 911 F.3d 1195, 1209 (D.C. Cir. 2018) (joint employment "finds extensive support in the common law of agency").[12]

---

[12] See generally 5 L.K. Larson & T.A. Robinson, Larson's Workers' Compensation Law §§ 68.01, 68.02 (2021) ("[T]here is

Thus, in the absence of an expressed indication to the contrary and in view of the broad remedial nature of the wage laws, we presume that the term "employer" includes the concept of joint employment, which itself is deeply rooted in the common law.  See <u>Depianti</u>, 465 Mass. at 621, quoting <u>Psy-Ed Corp</u>. v. <u>Klein</u>, 459 Mass. 697, 708 (2011) ("In light of the [wage laws'] broad remedial purpose, 'it would be an error to imply . . . a limitation where the statutory language does not require it'").[13]

---

nothing unusual about the coinciding of both control by two employers and the advancement of the interests of two employers in a single piece of work"); <u>id</u>. (noting trend of courts "to dispose of close cases, not by insisting on an all-or-nothing choice between two employers both bearing a close relation to the employee, but by finding a joint employment on the theory that the employee is continuously serving both employers under the control of both").

[13] This conclusion is further bolstered by the history of the wage laws, which were modeled after the FLSA.  See <u>Mullally</u> v. <u>Waste Mgt. of Mass., Inc</u>., 452 Mass. 526, 531 (2008), quoting <u>Swift</u> v. <u>AutoZone, Inc</u>., 441 Mass. 443, 447 (2004) (wage laws were "intended to be 'essentially identical'" to FLSA).  Other States also have interpreted their wage statutes to incorporate the concept of joint employment and provide broad protection for workers, relying in part on the FLSA's inclusion of the joint employment concept.  See, e.g., <u>Director of the Bur. of Labor Standards</u> v. <u>Cormier</u>, 527 A.2d 1297, 1299-1300 (Me. 1987) (recognizing that Federal interpretation of FLSA, while not binding, provides guidance, and that remedial nature of State minimum wage and overtime statutes requires liberal construction to further purpose of protecting employees, and finding joint employment available under State statutes); <u>Becerra</u> v. <u>Expert Janitorial, LLC</u>, 181 Wash. 2d 186, 195-198 (2014) (looking to Federal jurisprudence to determine availability of joint employment concept under State statutes based on FLSA).  But see <u>Martinez</u> v. <u>Combs</u>, 49 Cal. 4th 35, 66-68 (2010) (finding that, because State minimum wage act was enacted before FLSA and

B.  <u>Standard for determining joint employment under the wage laws</u>.  Having established that the wage laws include the concept of joint employment, the next issue is the proper factors to consider in determining whether an entity, contracting in good faith with a second entity, has retained for itself sufficient control over the terms and conditions of the second entity's employees to be considered the joint employer of those employees.[14]  See Swallows, 128 F.3d at 993 n.4.

---

amendments were intended to distinguish it from FLSA, it does not incorporate expansive Federal definition of employer).

[14] Credico points to the "paycheck" test as a potentially viable option to determine joint employer status.  Under this test, "[t]he plain and common understanding of 'employer' is the entity with which an employee has an express or implied contract to work for compensation and from which he receives pay." Rogier vs. Chambers, Mass. Super. Ct., Nos. SUCV201502876BLS1 & SUCV201600849BLS1 (Suffolk County Sept. 1, 2016).  This test effectively precludes a finding of joint employer status in circumstances where a worker receives only one paycheck.

Because we conclude that the wage laws include the common-law concept of joint employment, the paycheck test is not the appropriate standard for the joint employer inquiry.  To adopt it would be inconsistent with the remedial purpose of the wage laws and this court's recognition that employment statutes merit a liberal construction.  See Depianti, 465 Mass. at 620. Indeed, we have already implicitly rejected this test in Depianti by finding in the context of the independent contractor statute that "the lack of a contract between the parties does not itself, without more, preclude liability" for the employer. Id. at 619.  See Sebago, 471 Mass. at 329 ("[I]f, for example, the plaintiffs . . . were found to be employees of [company A (the entity with which they contracted)], the lack of a contract between the plaintiffs and [company B] would not shield [company B] from potential misclassification liability").  Accordingly, we reject it.

The plaintiffs urge that the test set forth in the independent contractor statute, G. L. c. 149, § 148B, also known as the "ABC" test, determines joint employment status.  Section 148B "establishes a standard to determine whether an individual performing services for another shall be deemed an employee or an independent contractor for purposes of our wage statutes." Sebago, 471 Mass. at 327, quoting Somers v. Converged Access, Inc., 454 Mass. 582, 589 (2009).  See Taylor v. Eastern Connection Operating, Inc., 465 Mass. 191, 198 (2013) (purpose of independent contractor statute is "to protect workers by classifying them as employees, and thereby grant them the benefits and rights of employment, where the circumstances indicate that they are, in fact, employees").  Section 148B (a) provides that "an individual performing any service . . . shall be considered to be an employee under [G. L. cc. 149 and 151] unless" three factors are established to rebut this presumption of employment:

> "(1) the individual is free from control and direction in connection with the performance of the service, both under his contract for the performance of service and in fact; and (2) the service is performed outside the usual course of the business of the employer; and, (3) the individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed."

G. L. c. 149, § 148B (a).  See Sebago, supra.

The ABC test thus asks a question that differs from the question relevant to determining whether an entity is a joint employer.  The test classifies a worker as either an employee or an independent contractor for purposes of the wage laws based on the answer to the question "who, if anyone, controls the work other than the worker herself." Browning-Ferris Indus. of Cal., Inc., 911 F.3d at 1214.  By contrast, the question of joint employment focuses on whether an individual, whose work is controlled by one entity, is also subject to the control of another entity.  See id.  "In short, using the independent-contractor test exclusively to answer the joint-employer question would be rather like using a hammer to drive in a screw:  it only roughly assists the task because the hammer is designed for a different purpose." Id. at 1215.  See Henderson v. Equilon Enters., LLC, 40 Cal. App. 5th 1111, 1125 (2019) (determining that ABC test "does not fit analytically with and was not intended to apply to claims of joint employer liability").

Instead, we are persuaded that whether an entity is a joint employer under the wage laws, which were modeled after the FLSA, should be determined (as is done under the FLSA) by examining the totality of the circumstances of the parties' working relationship, guided by a useful framework of four factors: "whether the alleged employer (1) had the power to hire and fire

the employees; (2) supervised and controlled employee work
schedules or conditions of employment; (3) determined the rate
and method of payment; and (4) maintained employment records."
Baystate Alternative Staffing, Inc. v. Herman, 163 F.3d 668, 675
(1st Cir. 1998).

Notably, the determination whether an entity is a joint
employer is "not a mechanical determination."  Bonnette v.
California Health & Welfare Agency, 704 F.2d 1465, 1470 (9th
Cir. 1983).  "The four factors . . . provide a useful framework
for analysis . . . , but they are not etched in stone and will
not be blindly applied."  Id.  See Rutherford Food Corp. v.
McComb, 331 U.S. 722, 730 (1947) (considering that meat boners
worked onsite, alongside slaughterhouse employees;
responsibility under contracts passed without material change
from one meat boner to another; lack of business organization
that could or did shift to another slaughterhouse;
slaughterhouse manager kept close eye on operations; and profits
essentially were based on piecework rather than dependent on
"initiative, judgment or foresight" of putative employees).
See, e.g., Goldberg v. Whitaker House Coop., Inc., 366 U.S. 28,
32-33 (1961) (concluding that it is "the 'economic reality'
rather than 'technical concepts' [that] is to be the test of
employment," and considering whether knitters who worked from
home as members of cooperative were employed by cooperative

where they were not otherwise self-employed; members were not independently selling products on market for whatever price they could command; they were regimented under one organization, manufacturing what cooperative desired and receiving compensation as cooperative dictated; management fixed piece rates; and management retained authority to fire members for substandard work or failure to obey regulations [citations omitted]).

Nevertheless, the four aforementioned factors provide a framework that, in many cases, will capture both the nature and structure of the working relationship as well as the putative employer's control over the economic aspects of the working relationship. Baystate Alternative Staffing, Inc., 163 F.3d at 675-676. No one factor is dispositive; instead, it is the totality of the circumstances that will determine whether an entity ought to be considered a joint employer. Id. at 676.[15]

v. Analysis. Having determined that the wage laws incorporate the concept of joint employment and having set forth

---

[15] Massachusetts courts have previously applied the "right to control" test when determining joint employer status, which is similar to the test we adopt today. See Gallagher, 92 Mass. App. Ct. at 214, quoting Commodore, 63 Mass. App. Ct. at 62 (assessing joint employer status under right to control test by examining whether defendant "has retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer"). In fact, the judge here applied the "right to control" test using the four-factor framework we set forth herein.

the framework to be considered when determining whether an entity is a joint employer, we turn to the record on summary judgment to determine whether, viewing the evidence in the light most favorable to the nonmoving or opposing party, "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law."  Conservation Comm'n of Norton v. Pesa, 488 Mass. 325, 330 (2021), citing Mass. R. Civ. P. 56 (c), as amended, 436 Mass. 1404 (2002).

> "[A] party moving for summary judgment in a case in which the opposing party will have the burden of proof at trial is entitled to summary judgment if he demonstrates, by reference to material described in Mass. R. Civ. P. 56 (c), unmet by countervailing materials, that the party opposing the motion has no reasonable expectation of proving an essential element of that party's case.  To be successful, a moving party need not submit affirmative evidence to negate one or more elements of the other party's claim."

Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991).  Once the moving party has met this burden, the opposing party is "required to respond by 'set[ting] forth specific facts showing that there is a genuine issue for trial.'"  Id., quoting Mass. R. Civ. P. 56 (e), 365 Mass. 824 (1974).

In reviewing a grant of summary judgment, "we look to the summary judgment record and review de novo."  Carey v. Commissioner of Correction, 479 Mass. 367, 369 (2018).  Thus, it is important on appeal, just as it was before the Superior Court judge, that the parties provide "'an appropriate and accurate record reference' for each and every fact set forth in the

brief." Lynn v. Thompson, 435 Mass. 54, 56 n.4 (2001), cert. denied, 534 U.S. 1131 (2002), quoting Mass. R. A. P. 16 (e), as amended, 378 Mass. 940 (1979). This requirement "prevents parties from exaggerating or distorting the facts as presented below, or from inserting into the analysis on appeal facts that are simply nonexistent." Lynn, supra.

With these principles in mind, we turn to examine the summary judgment record to determine whether, considering the totality of the circumstances guided by the four-factor framework, the plaintiffs have any reasonable expectation of showing that Credico "(1) had the power to hire and fire the employees; (2) supervised and controlled employee work schedules or conditions of employment; (3) determined the rate and method of payment; and (4) maintained employment records." Baystate Alternative Staffing, Inc., 163 F.3d at 675.

The first two factors "address the extent of a putative employer's control over the nature and structure of the working relationship." Id. The plaintiffs present no evidence that Credico had the power to hire or fire DFW employees. To the contrary, the record shows that only DFW had that power. For example, the 2015 agreement stated that DFW retained "the exclusive right to hire, transfer, suspend, lay off, recall, promote, assign, discipline, adjust grievances and discharge its employees." The plaintiffs contend that, because Credico

retained responsibility under its agreements with clients for ensuring quality control as it pertained to how salespersons conducted themselves in the field, DFW did not retain exclusive control over hours and working conditions.  In support of this claim, the plaintiffs cite to passages from contracts between Credico and its clients stating that Credico is responsible for ensuring that subcontractors and salespersons receive proper training, monitoring against fraudulent activity, and maintaining records of salespersons' background checks and drug tests.[16]  Exercising such quality control measures does not constitute supervising and controlling work conditions.  See, e.g., Zheng v. Liberty Apparel Co., 355 F.3d 61, 75 (2d Cir. 2003) ("[S]upervision with respect to contractual warranties of quality and time of delivery has no bearing on the joint employment inquiry, as such supervision is perfectly consistent with a typical, legitimate subcontracting arrangement"); Godlewska v. HDA, 916 F. Supp. 2d 246, 259 (E.D.N.Y. 2013), aff'd, 561 Fed. Appx. 108 (2d Cir. 2014) ("Exercising quality control by having strict standards and monitoring compliance

---

[16] These agreements between Credico and its clients do show that Credico agreed to assume these responsibilities, but they do not mandate that Credico control specifics of working hours and conditions, nor does the record show that Credico attempted to do so.

with those standards does not constitute supervising and controlling employees' work conditions").

The second two factors of the framework "address the extent of a putative employer's control over the economic aspects of the working relationship." Baystate Alternative Staffing, Inc., 163 F.3d at 676. Nothing in the record supports a reasonable conclusion that Credico determined the rate and method of payments made by DFW to the plaintiffs or maintained employment records.

The plaintiffs contend that pay "flowed from" Credico because the 2013 agreement incorporated a commission schedule for each campaign, stating that "[i]nvoicing by and payment to [DFW] shall be in accordance with the Subcontractor Commission Schedule."[17]  The plaintiffs contend that, although the schedule determined only the payments from Credico to DFW and not the payments received by the plaintiffs, this evidence, when taken in conjunction with Ward's testimony that he did not set the DFW commission schedules, suffices to put the fact of payment determination in dispute.  Ward, however, testified that he did not know whether the schedules were set by Credico, and the

---

[17] The schedule for one campaign states that Credico "will pay to [DFW one hundred percent] of the reported sales that have the Installed status," makes provisions in case of fraud or negligence by DFW, reserves Credico's right to alter or amend the schedule, and provides payment rates to DFW for various sales.

plaintiffs provide no additional support for their assertion that Credico had any role in setting the commission schedules for payments from DFW to the plaintiffs.

The plaintiffs assert that Credico "maintained employment records" for DFW salespersons by receiving information through the ARC portal it required DFW to use -- the portal "track[ed] the sales agents that were working that day," as well as daily rankings of salespersons from DFW and pay reports broken down by salesperson.  The record does not show that Credico received any reports as to the activity or employment of specific salespersons; to the contrary, Ward testified that Credico received reports directly from the clients rather than from DFW.  Considering these factors and the totality of the circumstances, the plaintiffs have no reasonable expectation of proving that Credico was their joint employer, and therefore Credico is entitled to summary judgment.[18]

b.  Motion for judgment on the pleadings.  As set forth supra, the judge granted Credico's motion for judgment on the pleadings as to Jackson's claims, concluding that they were barred by the doctrine of claim splitting in view of Jackson's decision to join a Federal action naming Credico as a defendant

---

[18] Because we find that Credico was not the plaintiffs' joint employer and was thus not subject to the requirements of the wage laws, we need not address whether the plaintiffs fall into the outside sales exemption of G. L. c. 151, § 1A (4).

and asserting claims under the FLSA arising from wage
violations.  Jackson contends on appeal that the dismissal of
his claims was in error.  This court reviews de novo a decision
granting or denying a motion for judgment on the pleadings.
Hovagimian v. Concert Blue Hill, LLC, 488 Mass. 237, 240 (2021).

Briefly, in June 2017, Michaela Huffman commenced a
collective action under the FLSA in the United States District
Court for the Southern District of New York against Credico,[19]
Huffman vs. Credico (USA) LLC, U.S. Dist. Ct., No. 1:17-CV-04242
(S.D.N.Y.), asserting that Credico was her joint employer and
violated the FLSA by failing to pay her minimum wage and
overtime.  Jackson, who subsequently would join the present
action, opted into the Huffman litigation, thereby "consent[ing]
and agree[ing] to pursue [his] claims arising out of [his]
employment at [Credico and DFW] in connection with the [Huffman]
lawsuit."  The opt-in form was silent as to any State law
claims, and Jackson did not raise any Massachusetts law claims
in the Huffman litigation.

In May 2019, the Huffman parties stipulated to the
dismissal of the case on the ground that a decision of the
United States Court of Appeals for the Second Circuit in Vasto
v. Credico (USA) LLC, 767 Fed. Appx. 54, 57 (2d Cir. 2019),

_____

[19] Neither DFW nor Ward was a defendant in the Huffman
action.

another lawsuit alleging claims under the FLSA against Credico,
was dispositive of all claims.  See note 7, supra.

Although Credico's motion for judgment on the pleadings
alleged that Jackson's claim was barred by claim splitting and
the judge granted the motion on that basis, Credico's argument
is more properly treated as asserting claim preclusion.[20]  "When
a State court is faced with the issue of determining the
preclusive effect of a Federal court's judgment, it is the
Federal law of res judicata which must be examined."  Anderson
v. Phoenix Inv. Counsel of Boston, Inc., 387 Mass. 444, 449
(1982).  "The doctrine of res judicata, or claim preclusion,
holds that 'a final judgment on the merits of an action
precludes the parties or their privies from relitigating issues
that were or could have been raised in that action.'"  Monahan

---

[20] Claim splitting and claim preclusion are related but
distinct concepts.  See Katz v. Gerardi, 655 F.3d 1212, 1218
(10th Cir. 2011); Curtis v. Citibank, N.A., 226 F.3d 133, 138
(2d Cir. 2000).  Claim splitting does not generally require a
final judgment as a necessary component, unlike claim
preclusion.  Katz, supra ("[T]he test for claim splitting is not
whether there is finality of judgment, but whether the first
suit, assuming it were final, would preclude the second suit").
Indeed, a dismissal on claim-splitting grounds generally occurs
while "the dismissed party is involved in another pending suit
regarding the same subject matter against the same defendants."
Id. at 1219.  By the time the Superior Court judge ruled on
Jackson's claim, final judgment had already entered in the
Huffman litigation, meaning that Jackson was not, at that time,
"involved in another pending suit regarding the same subject
matter against the same defendants."  Id.  Accordingly, the
dismissal of Jackson's claim is properly analyzed under the
doctrine of claim preclusion.

v. New York City Dep't of Corrections, 214 F.3d 275, 284-285 (2d
Cir.), cert. denied, 531 U.S. 1035 (2000), quoting Allen v.
McCurry, 449 U.S. 90, 94 (1980).  The doctrine bars a subsequent
action when "(1) the previous action involved an adjudication on
the merits; (2) the previous action involved the plaintiffs or
those in privity with them; [and] (3) the claims asserted in the
subsequent action were, or could have been, raised in the prior
action."  Monahan, supra at 285.

The first two factors are readily shown.  The stipulation
of dismissal in Huffman must "be accorded the same effect as a
final judgment" to avoid "parties [being] permitted to change
their minds and relitigate the exact same claims against the
same parties."  Jarosz v. Palmer, 436 Mass. 526, 536 (2002).
Moreover, both Jackson and Credico were parties to Huffman and
the present action.

We thus consider whether Jackson's State law claims could
have been raised in the Federal action.  In general,

> "if a set of facts gives rise to a claim based on both
> State and Federal law, and the plaintiff brings the action
> in a Federal court which had 'pendent' jurisdiction to hear
> the State claim but the plaintiff declines to assert such
> State claim, he may not subsequently assert the State
> ground in a State court action.  The exception to this rule
> is that if the Federal court in the first action would
> clearly not have had jurisdiction to hear the State claim
> or, if having jurisdiction, clearly would have declined to
> exercise it as a matter of discretion, then a second action
> in a State court should not be precluded."  (Citations
> omitted.)

Anderson, 387 Mass. at 450.  Pendent or "[s]upplemental jurisdiction allows federal courts to hear and decide state-law claims along with federal-law claims when they 'are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy.'"  Wisconsin Dep't of Corrections v. Schacht, 524 U.S. 381, 387 (1998), quoting 28 U.S.C. § 1367(a).  "The state and federal claims must derive from a common nucleus of operative fact."  United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 725 (1966).

The court in Huffman had Federal question jurisdiction over the plaintiffs' FLSA claims pursuant to 28 U.S.C. § 1331, including Jackson's.  The claims raised in Huffman and in the present action are essentially identical, other than the theory of liability (State versus Federal law) and arise from the same set of facts (Jackson's alleged employment by Credico).  There is no indication that the Federal court in Huffman would have declined to exercise jurisdiction over Jackson's State law claims; other Federal courts have consented to hear State law claims supplemental to FLSA actions.  See, e.g., Vasto, 767 Fed. Appx. at 57 (deciding claims based on New York and Arizona law alongside FLSA claims).

Finally, there is no indication that Jackson would be prevented from asserting State law claims due to the collective nature of the Huffman action.  Collective actions under the FLSA

are "fundamentally different" from other class actions.  Genesis

Healthcare Corp. v. Symczyk, 569 U.S. 66, 74 (2013).  "Unlike

class actions under Fed. R. Civ. P. 23, collective actions under

the FLSA . . . require would-be members of the collectivity to

opt in to (i.e., voluntarily join) the class."  DeKeyser v.

Thyssenkrupp Waupaca, Inc., 860 F.3d 918, 920 (7th Cir. 2017).

"This difference means that every plaintiff who opts in to a

collective action has party status, whereas unnamed class

members in Rule 23 class actions do not."[21]  Halle v. West Penn

Allegheny Health Sys. Inc., 842 F.3d 215, 225 (3d Cir. 2016),

quoting 7B C.A. Wright & A.R. Miller, Federal Practice and

Procedure § 1807 (3d ed. 2016).  "Consequently, although the

original plaintiffs in a collective action may pursue the suit

on a representative basis, each FLSA claimant has the right to

be present in court to advance his or her own claim."  Wright &

Miller, supra.

> "The difference between the opt-in requirement of the Act
> and the opt-out requirement of Rule 23(b)(3) has raised the
> question whether it is improper to join state-law class-
> action claims in a collective FLSA action because the two
> procedures are fundamentally incompatible.  Joining them in
> one action creates serious management issues and the
> possibility of confusion relating to the notice.  Thus,
> some courts have exercised their discretion not to assume
> jurisdiction over the state-law class-action claims under
> these circumstances.  Other courts, however, have allowed

---

[21] Other than this difference, "case law has largely merged
the standards" for collective actions under the FLSA and class
actions under Fed. R. Civ. P. 23.  Espenscheid v. DirectSat USA,
LLC, 705 F.3d 770, 772 (7th Cir. 2013).

      class and collective-action claims to be litigated
simultaneously."  (Footnotes omitted.)

Id. (collecting cases).

      Huffman was litigated in the Southern District of New York.
Courts in that district "have unflinchingly certified FLSA and
New York Labor Law claims together," even though the State law
claims tend not to predominate the lawsuit.  Iglesias-Mendoza v.
La Belle Farm, Inc., 239 F.R.D. 363, 375 (S.D.N.Y. 2007).  This
practice extends to claims under other States' laws.  Shahriar
v. Smith & Wollensky Restaurant Group, Inc., 659 F.3d 234, 247,
249 (2d Cir. 2011), quoting Ervin v. OS Restaurant Services,
Inc., 632 F.3d 971, 980 (7th Cir. 2011) (finding that "nothing
in the language of the FLSA prevents the exercise of
supplemental jurisdiction over Plaintiffs' state law wage
claims," and that "the 'conflict' between the opt-in procedure
under the FLSA and the opt-out procedure under Rule 23 is not a
proper reason to decline jurisdiction" over claims under New
York law).  Therefore, because Jackson could have brought his
State law claims against Credico in the Huffman action, his
claims are barred by the doctrine of claim preclusion.

                       Judgment affirmed.