UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PAUL JONES,<br>    Plaintiff,<br><br>v.<br><br>MONTACHUSETT REGIONAL TRANSIT<br>AUTHORITY, Et Al.,<br>    Defendants. | CIVIL ACTION<br>NO. 19-11093-TSH |

**MEMORANDUM OF DECISION AND ORDER**
**March 28, 2022**

**HILLMAN, D.J.**

## Background

Paul Jones ("Plaintiff" or "Jones") has brought this action against the Montachusett Regional Transport Authority ("MART") and numerous named and unnamed individuals (together with MART, "Defendants") asserting claims against them for violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §200e, *et seq.* ("Title VII"), *i.e.,* discrimination, retaliation, and hostile work environment, and against all Defendants for violation of the Massachusetts anti-discrimination statute, Mass.Gen.L. ch. 151B §4 ("Chapter 151B").

This Memorandum of Decision and Order addresses Defendants' Motion for Summary Motion for Summary Judgment (Docket No. 118). For the reasons that follow, that motion is *granted*.

## Summary Judgment Standard

Federal Rule of Civil Procedure 56 provides that the court shall grant summary judgment if the moving party shows, based on the materials in the record, "that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual dispute precludes summary judgment if it is both "genuine" and "material." *See Anderson v. Liberty Lobby*, 477 U.S. 242, 247-48, 106 S.Ct. 2505 (1986). An issue is "genuine" when the evidence is such that a reasonable factfinder could resolve the point in favor of the non-moving party. *Morris v. Gov't Dev. Bank*, 27 F.3d 746, 748 (1st Cir. 1994). A fact is "material" when it might affect the outcome of the suit under the applicable law. *Id*.

The moving party is responsible for "identifying those portions [of the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548 (1968). It can meet this burden either by "offering evidence to disprove an element of the plaintiff's case or by demonstrating an 'absence of evidence to support the non-moving party's case.'" *Rakes v. U.S.*, 352 F. Supp. 2d 47, 52 (D. Mass. 2005) (citation to quoted case omitted). Once the moving party shows the absence of any disputed material fact, the burden shifts to the non-moving party to place at least one material fact into dispute. *See Mendes v. Medtronic, Inc.*, 18 F.3d 13, 15 (1st Cir.1994) (discussing *Celotex*, 477 U.S. at 325). When ruling on a motion for summary judgment, "the court must view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Scanlon v. Dep't of Army*, 277 F.3d 598, 600 (1st Cir. 2002). However, the court should not "credit bald assertions, empty conclusions, rank conjecture, or vitriolic invective." *Caban Hernandez v. Philip Morris USA, Inc.*, 486 F.3d 1, 8 (1st Cir. 2007).

**Facts**[1]

Jones is the owner, manager, and a dispatcher for Commonwealth Community Recovery Division, Inc. ("CCRD"). MART is a regional transportation authority established pursuant to Mass.Gen.L. ch. 161B. MART provides public transportation services to twenty-two (22) cities and towns in north central Massachusetts. Through its Dial-A-Mart Service, MART provides transportation that serves the needs of either human services agencies or target populations through eligible agency sponsored trips.

MART also provides transportation through its operating company for the Commonwealth of Massachusetts's Human Services Transportation Division of the Executive Office of Health and Human Services ("EOHHS"). MART provides routes for the Department of Developmental Services as well as individual MassHealth client rides on an as needed basis. The Commonwealth has established a statewide "Human Services Transportation" coordination initiative, which utilizes a broker system of managing transportation services for eligible consumers from various programs and agencies ("HST Brokerage System"). Selected Regional Transit Authorities such as MART acting as "Brokers" arrange transportation by subcontracting

---

[1] Jones has disputed several factual allegations set forth in MART's Statement of Material Facts (Docket No. 120). However, pursuant to this Court's local rules, to dispute a material fact asserted by MART, Jones must cite to evidentiary support in the record, *i.,e.,* provide page references to affidavits, depositions and other documentation that support his version of the facts. *See* LR, D.Mass. 56.1. Where Jones, in his Response to Defendants' Statement of Material Facts (Docket No. 124), has failed to cite to proper record evidence to support his assertion that a fact is disputed, I have accepted MART's asserted facts as true. The Court notes that Jones's own unsworn averments are not sufficient to rebut MART's factual allegations. Additionally, Jones has included several asserted facts which go to whether he is entitled to recover on the merits, that is, whether MART discriminated against him based on his race, retaliated against him, or created a hostile work environment. However, the Court was very clear that the only issue it is addressing at the stage of the proceedings is whether Jones was an "employee" of MART for purposes of Title VII and Chapter 151B. Such factual assertions are not relevant to deciding Defendants' motion and have not been considered. The Court also notes that when disputing many of MART's asserted facts, Jones includes allegations which he contends contradict MART's allegations. However, many of the facts he alleges are in "dispute" were facts asserted by MART in its Statement of Material Facts. Put another way, Jones is disputing facts as to which both parties agree. Finally, the Court has ignored statements asserts in Jones's own Statement of Material Facts (Docket No. 128) which are not relevant to whether MART was his employer, which misstate the evidence (*see* the Court's discussion of the many instances in which Jones has mischaracterized the record evidence, *infra*). and which are not facts, but instead are self-serving legal conclusions that MART was his employer under a direct or joint employment theory.

with qualified "Transportation Providers," which are also referred to as "Vendors." The contractual agreement between the Broker and the Transportation Provider/Vendor is referred to as the "Transportation Provider Subcontract" ("Subcontract").

All Vendors are required to comply with the Transportation Provider Performance Standards ("Performance Standards"). The Performance Standards are incorporated into all Subcontracts that MART has with its over two hundred (200) Vendors. Under the Performance Standards, a Vendor is defined as a "local transportation delivery entity under contract to a Broker for the direct provision of transportation services (vehicles and drivers) for HST Consumers. The Performance Standards further provide that the Vendor is a "subcontractor to the Broker" and is subject to the provisions of the "Commonwealth Terms and Conditions and Standards." Pursuant to Performance Standards, Vendors such as CCRD are required to maintain workers compensation insurance for all employees/agents including owner(s) in the case of a sole proprietorship and to furnish a certificate of insurance to the Broker evidencing compliance prior to transporting any eligible consumers. In addition, the Performance Standards require Vendors to maintain liability insurance on all vehicles used under their contract with the Broker and that Broker be named as an additional insured on the Vendor's insurance policy.

MART uses an online portal system to assign rides to its Vendors. The portal system assigns rides to the lowest cost qualified Vendor. If the lowest cost qualified Vendor does not accept the ride, the online portal system goes down the list to the next lowest cost qualified Vendor.[2] Vendors submit rates to MART for use in the portal system. MART does not set

---

[2] Jones disputes this fact by asserting that while this is the normal routine, MART can override the system by setting a Vendor's capacity tab (as hereafter explained) to "0" at which point the Vendor will not receive any assignments unless MART decides to manually give the Vendor an assignment through the online portal system or manually telephones the Vendor. He contends that in this way, MART can disable trips to the lowest bidder and then just give the Vendor the same assignments over and over that they have previously rejected or don't want. However, Jones's cited evidence in the record does not support his contention. Jones cites to a series of emails between he and representatives of MART. Jones initiated the email string when he wrote to MART concerning

Vendor rates and Vendors are permitted to adjust their rates quarterly. MART does not set the hours that Vendors are available to work— the Vendors set their own hours.[3] The capacity tab in the portal system contains the Vendor's hours of service (as specified by the Vendor) and the Vendor's capacity based on what their fleet size can handle during the day. Based on the size of the Vendor's fleet reflected in the capacity tab, MART controls the amount of work that can be offered to the Vendor, that is, MART controls the amount of work offered to a Vendor based on the number of vehicles the Vendor has and the size of such vehicles. As a courtesy, MART provides training to new Vendors before assigning them work so that they understand how they system works. The training describes how the Vendor will accept offered work, how the billing is done and how to file and respond to complaints.[4]

---

repeated calls CCRD was getting from the online portal system which kept offering him assignments he had previously denied-- he asked MART to adjust the system not to contact CCRD about assignments it had previously rejected. A MART representative responded to Jones that same day and informed him that unfortunately, if no other assignments are available, the system will continue to contact CCRD regarding open assignments, even if it had previously rejected the assignment. Jones was told that the only way to stop the system from contacting him in this circumstance was for CCRD (*not* MART) to mark its capacity as full. She asked him to let her know if the problem persisted. In a follow-up email a couple of days later, the same MART representative told him CCRD could also stop the unwanted contact by marking its status as "full" on the online portal. *See* Docket No. 127-10. Jones also points to deposition testimony of Rebecca. Badgley, who oversaw the HST Brokerage System for MART, in which she states that MART controls the Vendor's online portal capacity tab based the size of the Vendor's fleet and the hours the Vendor had told MART it was available to provide transportation. *See* Badgley Dep. (Docket No. 126-7 ("Badgley Dep."), at pp. 33-35. However, Ms. Badgley's testimony does not contradict the asserted fact that Jones is disputing. Moreover, MART's Statement of Material Facts expressly acknowledges that MART determines the Vendor's capacity based on their fleet size and work hours set by the Vendor. If a Vendor's hours or fleet size changed, they could email MART and MART would reflect the change by adjusting the capacity tab. Accordingly, the Court accepts MART's asserted fact as undisputed.

[3] Jones disputes this fact by asserting that MART, through amendments to the Subcontract it had with its Vendors and emails, demanded that Vendors be available until 9 pm to answer MART calls. He also assets that MART required Vendors to have a dispatcher and communication line available to be contacted 24 hours a day which put undue stress on his family. However, the evidence cited does not support this assertion. On the contrary, the cited evidence shows that MART sent its Vendors an email noting that its Call Center had changed its operating hours to be open from 6 am to 9 pm and therefore, Vendors "may be contacted *if [their] contract indicates [they] are open during these time frame.*" *See* Ex. 4 (Docket No. 127-4) at p. 3 (page 467 Bate Stamp)(emphasis added). Moreover, the evidence establishes that Jones emailed MART as follows: "Hello can you please change CCRD INC. Vendor Capacity to reflect that we are willing to except [sic] trips 7 days a week 24 hours a day. Thank you very much…." *See Id.* at p. 4 (Bate Stamp 468). There is NO evidence cited by Jones which supports his assertion that MART set CCRD's hours and forced it to be open to 9 pm and have a dispatcher or communication line available 24 hours a day.

[4] Jones disputes this fact and asserts that training is mandatory citing provisions contained in amendments to the CCRD/MART Contract (as hereafter defined) which became effective in 2018. These amendments reflect that as of the effective date (some three years after the parties entered the CCRD/MART Contract), all the Vendor's

The online portal system assigns trips to Vendors (beginning with the lowest cost qualified Vendor) three or more days in advance of the scheduled service. For next day or same day requests for transportation, MART assigns the trips to Vendors by telephone. As with the online portal system, MART assigns trips to its Vendors starting with the lowest cost qualified Vendor. MART attempts to contact Vendors three times by telephone to offer the trips before moving on to the next lowest cost qualified Vendor.  While the capacity tab shows what hours the vendor operates and the volume of work being offered, the Vendor controls whether they accept or decline an assignment. Moreover, if a Vendor marks their portal as full for a particular day, the call system is set up to stop offering the Vendor work for that day.

If a consumer calls in advance to change the time of a trip which has been assigned to a Vendor, the portal system will notify the Vendor of such change and the Vendor can, in turn, notify MART whether it is able to accommodate the change. If the customer wants to change the time the same day or day before the scheduled ride, MART will call the Vendor to see if they can accommodate the change. If there is a customer that the Vendor does not wish to transport, the Vendor can notify MART and the Vendor will no longer be asked if they can transport the individual. The Vendor need not get permission from MART to drop a customer, however, when dropping a customer that has a standing order assigned to the Vendor, MART asks that the Vendor continue to transport the customer for three business days before suspending service. If the Vendor wants to drop a customer that has already being scheduled for a trip, the Vendor must

---

drivers and monitors are required be available to attend orientation with MART staff, at Vendor's expense, within two weeks of being hired and annually thereafter. The training which the drivers/monitors are required to undergo involves sensitivity and human rights training, not training related to how to work within the online portal system. Moreover, the deposition testimony cited by Jones is misleading.  He cited cites to page 27 of Ms. Badgley's deposition which is ambiguous regarding whether the online portal system training is mandatory.  However, if you read her full statement which goes over to page 28, Ms. Badgley clearly states that Vendor portal training is *not* mandatory. *See* Badgley Dep., at p. 28. At page 85 in her testimony, which Jones cites in support of his contention that training is mandatory, Ms. Badgley merely affirms what she testified to earlier. Accordingly, Jones has failed to dispute MART's factual allegation.

inform MART they no longer wish to transport that individual so that the individual's trip may be rescheduled.[5]

Vendors do not have to obtain MART's permission to hire employees, however, pursuant to the Subcontract, a Vendor must update its employee log when it adds or subtracts employees. Additionally, to transport MART customers, a Vendor's employees must meet the specifications set forth in the Subcontract. MART does not have the authority to hire or fire any employees of the Vendor, however, it does have the right to deny approval of any driver or monitor to work under the Subcontract, or to require the Vendor replace any driver or monitor for any reason. Thus, the driver or monitor can still work for the Vendor but cannot perform HST services for MART under the Subcontract.

Jones called MART to apply for a driver's position sometime in 2014. Jones was told that MART only contracts with corporations, including limited liability corporations, to provide transportation services. It was then that Jones incorporated CCRD. CCRD entered a Subcontract with MART on October 26, 2015 (the "CCRD/MART Contract"), and CCRD signed the Subcontract on December 12, 2015.[6] CCRD submitted its requested rates to MART and changed them on occasion. To change its rates and fleet size, CCRD had to submit a form to MART and MART would then make the changes on the online portal (Vendors were not permitted to make such changes themselves). The rates submitted by CCRD were higher than those for many other MART Vendors providing services to EOHHS. CCRD also set the hours it was willing to

---

[5] Jones disputes that Vendors are notified of changes and asserts that Vendors are fined $100 for each client rejected because MART has changed the time and the Vendor cannot accommodate the change. As with many of Jones's disputed facts, the evidence he cites to in the record simply does not support his allegation.

[6] Jones disputes this fact stating, "See Contract Signature of Paul Jones," and cites to Exhibit 14 as record support. However, Ex. 14 does not support Jones's factual allegation. It is the parties' obligation to accurately cite to record evidence to support their factual allegations and not the Court's obligation to peruse through the submitted evidence to determine whether the fact is supported somewhere in the record. In any event, the date the contract was signed is not relevant to resolution of Defendants' motion.

work—those hours were reflected in the portal system's capacity tab. CCRD set the hours it was available to provide transportation services pursuant to the CCRD/MART Contract to be from 7:00 a.m. to 3:00 p.m. MART did not set the hours which CCRD was available to provide transportation services. CCRD was placed on a no-work hold in April 2020 due to the expiration of its workers' compensation insurance.

CCRD requested to suspend service to three customers for which it had standing orders because it no longer wanted to provide services outside a given area. CCRD inquired what the fine would be to suspend service immediately rather than provide service for three additional business days. CCRD was informed it would be $100 per customer ($300), but that MART would consider the reasons for immediate suspension of the service and look at CCRD's history regarding such cancellation before deciding whether to administer any fines.

According to Jones, he received so much work for MART that CCRD could not take on any work outside of the MART work. Jones's entire income from March 2016 through November 2019 came from his providing services to MART under the CCRD/MART Contract. While Jones asserts that he was unable to do any work outside of his work for MART, he admits that in the Fall of 2019, he was able to take on work with other companies.

MART informed CCRD that several its employees could not be drivers for its transportation program due to their unsatisfactory Registry of Motor Vehicle ("RMV") records or because CCRD had not provided their RMV records to MART. CCRD was told one employee was to be removed from MART work until that employee passed a drug test, and after an accident (with no specifics provided) another CCRD employee was to be removed from MART work immediately pending an investigation. The relationship between MART and CCRD lasted approximately four years.

**Discussion**

Jones seeks to recover against the Defendants for violation of Title VII of and Chapter 151B for alleged discrimination, retaliation and hostile work environment which he suffered in connection with CCRD contracting with MART to provide transportation services to eligible consumers under the auspices of the Commonwealth of Massachusetts' HST coordination initiative. As a threshold matter, in order to state a claim under either Title VII or Chapter 151B against the Defendants[7], Jones must be an "employee" of Mart:

Under Title VII,

> it shall be an unlawful employment practice for an *employer* ... to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

> One of Congress' objectives in enacting Title VII was to achieve equality of employment opportunities.... Consequently, there must be some connection with an employment relationship for Title VII protections to apply.

*Araujo v. UGL Unicco-Unicco Operations*, 53 F.Supp.3d 371, 381 (D. Mass. 2014)(internal quotation marks, internal citations, citations to quoted cases and brackets omitted)(emphasis in original); *see also Lopez v. Massachusetts.* 588 F.3d 69, 72 (1st Cir.2009) ("The Title VII claim depends on the [defendant] being the 'employer' of the [plaintiff] officers"). Likewise, Chapter under Chapter 151B, requires that the plaintiff have an employment relationship with the defendant. *See Aranjo*, 53 F.Supp 3d at 381-82.

---

[7] For purposes of deciding Defendants' motion, the Court need not consider whether individuals are subject to liability under Title VII. Moreover, the Court is assuming, for purposes of this decision, that Jones, who owns, operates and works for CCRD, the entity that contracted with MART, is the proper party to maintain this action against the Defendants. I want to make clear that Defendants have highlighted the issue and while the Court has entertained Jones's contention that he was an "employee" of MART and the proper party to pursue this action, Defendants have in no way conceded that point.

Because establishing an employment relationship is a prerequisite to Jones's recovering against Defendants under these statutes, the Court ordered the parties to undertake discovery limited to the issue of whether Jones was an "employee" of MART. That discovery having been completed, the Defendants have moved for summary judgment asserting that based on the undisputed facts, Jones was not an employee of MART and therefore, he cannot establish an essential element of his claims. For the reasons set forth below, I agree.

To determine an individual's employment status for purposes of Title VII and Chapter 151B, " 'the terms 'employer' and 'employee' … are to be defined with reference to [ ] common law agency principles[,] ' and 'the common-law element of control [by the putative employer over the putative employee] is the principal guidepost that should be followed.... ' " *DeLia v. Verizon Commc'ns Inc.*, 656 F.3d 1, 4 (1st Cir. 2011)(internal citations and citations to quoted cases omitted)(stating law with respect to Title VII, but noting that Massachusetts courts apply a similar test under Chapter 151B); *see also* Lopez v. Massachusetts, 588 F.3d 69, 83 (1st Cir. 2009)( A series of Supreme Court decisions have established that when a statute contains the term "employee" but does not define it, a court must presume that Congress has incorporated traditional agency law principles for identifying employment relationship; it is clear that the terms "employer" and "employee" under Title VII are to be defined with reference to these common law agency principles).

The First Circuit has held that for purposes of determining who is an "employee" and "employer" for purposes of Tittle VII, U.S. Supreme Court precedent suggests that the court look to the following non-exhaustive factors set forth in the Equal Employment Opportunities Compliance Manual:

> the employer has the right to control when, where, and how the worker performs the job; the work does not require a high level of skill or expertise; the work is performed on the employer's premises; there is a continuing relationship between

> the worker and the employer; the employer has the right to assign additional projects to the worker; the employer sets the hours of work and the duration of the job; the worker is paid by the hour, week, or month rather than the agreed cost of performing a particular job; the worker does not hire and pay assistants; the work performed by the worker is part of the regular business of the employer; the employer is in business; the worker is not engaged in his/her own distinct occupation or business; the employer provides the worker with benefits such as insurance, leave, or workers' compensation; the worker is considered an employee of the employer for tax purposes; the employer can discharge the worker; and the worker and the employer believe that they are creating an employer-employee relationship. The guidelines emphasize that these criteria should be viewed in light of the totality of the circumstances based on the parties' relationship.

*Lopez*, 588 F.3d at 84-85 (internal quotation marks and brackets omitted)(citing 2 Equal Employment Opportunity Comm'n, *EEOC Compliance Manual,* § 2–III, at 5716–17 (2008)). The Court will now apply these factors to the instant case bearing in mind that Jones bears the burden of establishing that he was an employee of MART. *See generally DeLia*, 656 F.3d at 4-5 (plaintiff failure to demonstrate that defendant was her "employer" was fatal to her Title VII, Chapter 151B and Age Discrimination Act claims).

While MART determined Jones's (CCRD's) assignments, that is when and where he would be required to transport customers, how many customers he could accommodate and the amount he would be reimbursed for services, it did so based on information provided by Jones. More specifically, Jones informed MART of his rates, the size of his fleet and the hours he was willing to work and based on that information, MART provided him assignments. Moreover, Jones was not required to accept assignments, and could refuse to transport any given customer (there were limitations placed on Jones's ability to cancel assignments once accepted, but such limitations were to prevent customers from being stranded without a ride.)  While under the CCRD/MART Contract MART had the right to approve a driver before such individual could be hired by CCRD to transport MART customers and could  demand that CCRD terminate an employee's right to work under the contract, MART could not force CCRD to fire its employees

11

outright or prevent CCRD from hiring an employee to perform work outside of the contract. Thus, the principal factor (control) cuts against Jones. Looking at other relevant factors, other than his initial training and the training his drivers and monitors were required to undergo, Jones was able to perform all services offsite (away from MART's premises), including logging on to the online portal system. MART did not pay drivers and monitors employed by CCRD. The only work/projects which Jones and MART engaged in related to transportation services under the CCRD/MART Contract.

Jones asserts that he did not do any work outside providing transportation services for MARTS, however, this appears to be a consequence of the amount of work he received from MART and not because MART prohibited from taking on other work. Indeed, he admits that when he started receiving less work in 2019, he was able to do work for other companies. From the record evidence it is clear that MART did not provide Jones with workers compensation insurance— CCRD was obligated to do so.  CCRD was also obligated to obtain liability insurance for vehicles it used to transport MART customers and was required to name MART an additional insured. Moreover, Jones who has the burden of proof, has not provided any evidence that MART provide him any employment benefits or treated him as an employee for tax purposes. These factors are either neutral (because there is no evidence on the record regarding such factors) or favor MART. As to the parties' expectations, give that when Jones contacted MART about getting hired as a driver, he was told that MART only contracted with corporations that provided transportation, the Court is skeptical that at the time CCRD contracted with MART Jones believed he was being employed by MART. However, even assuming he did, it is clear that MART did not believe that it was entering an employer/employee relationship with Jones.

The only factors which arguably favor Jones are that the services he provided did not require a high level of skill or expertise, and the work he performed was for the most part within

the regular business conducted by MART, *i.e.*, transportation services. However, when balanced against the far weightier factors which favor a finding that he was not an employee of MART, they are insufficient as a matter of law to establish otherwise.

On this record, I find that there are no genuine issues of material fact and that as a matter of law, Jones was not an employee of MART for purposes of Title VII and Chapter 151B. Accordingly, Defendants' motion for summary judgment is granted.

## Conclusion

For the reasons set forth above:

Defendants' Motion for Summary Judgment (Docket No. 118) is ***granted***. Judgement shall enter for Defendants on all claims.

SO ORDERED.

/s/ *Timothy S. Hillman*
**TIMOTHY S. HILLMAN**
**UNITED STATES DISTRICT JUDGE**