UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DOCKET No. 4:19-cv-11093-MRG

| | |
|---|---|
| PAUL JONES<br><br>    Plaintiff<br><br>v.<br><br>MONTACHUSETT REGIONAL TRANSIT AUTHORITY,<br><br>    Defendant | DEFENDANTS' LOCAL RULE 56.1 <u>STATEMENT OF FACTS</u> |

Pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1, Defendants, Montachusett Regional Transit Authority and Crystal Geisert, Bonnie Mahoney, Jessica Torres, Karen Cordio, Michelle Moyo, Donna Landry, Joanne Norris, Robert Monk, Amanda Kukta, Ivan Roman, Tamara Schumovskaya, Rebecca Badgley, and Stephanie Richards (collectively, "MART" or "Defendants"), hereby set forth the following statement of undisputed material facts in support of their Motion for Summary Judgment:

## **<u>GENERAL FACTS</u>**

1.  The Plaintiff, Paul Jones ("Plaintiff"), is the Manager/Dispatcher and a driver for Commonwealth Community Recovery Division, Inc. ("CCRD"). Second Verified Amended Complaint, ¶ 42 [Dkt. 55].

2.  MART is a regional transportation authority established pursuant to G.L. c. 161B. **Exhibit A, Affidavit of Rebecca Badley, ¶ 2; G.L. c. 161B.**

3.  MART provides public transportation services to twenty-two (22) cities and towns in north central Massachusetts by brokering with subcontracted vendors. **Exhibit A, ¶ 3.**

4. Specifically, the Commonwealth has established a statewide Human Services Transportation coordination initiative, which utilizes a broker system of managing transportation services for eligible consumers from various programs and agencies. Selected Regional Transit Authorities such as MART act as Brokers and arrange transportation by subcontracting with qualified transportation providers. **Exhibit A, ¶ 6**.

5. MART has subcontracts with over two hundred (200) vendors or transportation providers. **Exhibit A, ¶ 8**.

6. CCRD was one such vendor or "Transportation Provider." **Exhibit A, ¶ 9**.

7. To assign rides among its various Transportation Providers, such as CCRD among others, MART uses an online portal system. **Exhibit A, ¶ 14.**

8. The portal system utilizes a bid process to assign rides that are going out three (3) days or more in advance to the lowest-cost qualified Transportation Provider based off vendor rates and availability, as trips are received. **Exhibit A, ¶ 17**.

9. If the lowest-cost qualified Transportation Provider does not accept the ride, the online portal system goes down the list to the next lowest-cost, qualified Transportation Provider. **Exhibit A, ¶ 14**.

10. The lowest-cost qualified Transportation Providers is determined based on the rates that are submitted to MART for use in the vendor portal system by the vendors. Vendors are allowed to adjust their rates quarterly. **Exhibit A, ¶¶ 14-17**.

**TCPA CLAIM**

11. For next-day or same-day requests for transportations services, MART assigns the trips by telephoning vendors using its interactive voice response ("IVR") system at a number that the vendor provided to MART. **Exhibit A, ¶ 18.**

12. This system is primarily utilized to efficiently manage high volumes of calls for trip dispatch operations, which involves both the acceptance and rejection of trips by MART's vendors. **Exhibit B – Affidavit of Stephen Oldfield, ¶2.**

13. The IVR System does not have the capacity to use a random or sequential number generator to dial the numbers provided by vendors. Rather, as with MART's online vendor portal system, the calls using the telephone IVR system are made to Vendors by starting with the lowest-cost qualified vendors. **Exhibit B, ¶ 3**.

14. Specifically, the backend operations of the IVR system are engineered to optimize the assignment of trips to the low-cost Vendors in MART's portal of subcontractors. The process begins by identifying unassigned trips and pinpointing the lowest-cost qualified Transportation Provider in the system. Once a trip is accepted by a vendor, it is officially assigned to that vendor. If the trip is rejected, the IVR system moves on to the next lowest-cost qualified vendor. Additionally, if a vendor marks the vendor's portal as full for a particular day or marks that they are on "holiday," the call-out system will not have the capacity to offer the Vendor work for those particular days by telephone. If a Vendor does not respond after several attempts, the vendor is marked as having "declined" the trip. **Exhibit B, ¶ 4**.

15. The IVR system does not use or have the capacity to generate random ten-digit phone numbers, but rather, uses specific phone numbers that are provided to MART by its Vendors. The IVR system then telephones the Vendor based on its low-cost qualified transportation provider algorithm. **Exhibit B, ¶ 5**.

16. The IVR system does not have the capability to make large blocks of identical and simultaneous calls to random numbers, as that would be contrary to its targeted system of first allowing the lowest-cost vendor to either accept or reject the trip before the call-out system moves

onto asking the next lowest-cost qualified transportation provider to offer it the trip. The call to the Vendor commences with an announcement of available trips, by stating: "I found six trips in this request," for example. Vendors are then reminded of their obligation to be authorized to accept new work from MART, and the IVR system will present options to the Vendors to either: (1) accept the trip; (2) request a call back; (3) decline the trip; or (4) hear the options again. If the Vendor opts to review the proposed trip by pressing "5," the Vendor is provided with options to either accept or decline individual trips, or to have the details repeated. **Exhibit B, ¶ 6; Exhibit C – Directions for How to Accept Trips via Different Programs.**

17. MART has verified that the telephone number provided by Mr. Jones as CCRD's caller id as 617-939-5417. Vendor's such as CCRD have the autonomy to update their telephone numbers through the portal. From May 5, 2019 to March 27, 2020, within the Vendor Portal, Mr. Jones on behalf of CCRD, intermittently updated CCRD's status to "full-capacity," indicating that CCRD was at capacity and could not accept additional work. As a result, these status updates were intended to prevent the assignment of new trips to CCRD via the IVR system. CCRD would not have been offered trips during these periods when the updates were active in the Vendor Portal. **Exhibit B, ¶ 7.**

18. On June 17 and 20, 2019, MART received an email from Mr. Jones indicating that he wanted MART's IVR system to use two CCRD office numbers only to contact him. Prior to this date, MART was not in receipt of any request from Mr. Jones not to use his cell phone for purposes of assigning new trips to CCRD via the IVR system, nor had Mr. Jones revised his telephone number in the online portal system. **Exhibit B, ¶ 8.**

19. MART's records indicate that the last trip accepted via the IVR system using the telephone number provided for CCRD was on Jun 20, 2019. This suggests that the cell phone

number provided by Mr. Jones on behalf of CCRD for use by the IVR system was deactivated in the IVR system prior to June 24, 2019 and no further trips were accepted by CCRD after that date through the IVR system. **Exhibit B, ¶ 8; Exhibit D – Emails dated June 17 - June 20, 2019.**

20. Shortly thereafter, Mr. Jones did not receive any telephone calls arranging trips by MART's IVR System to his cell phone. **Exhibit B, ¶ 8.**

21. The telephone number associated with MART's IVR system that appears on a vendor's caller id and/or cell phone bill, is 978-252-0019. MART's primary trunk line which appears on caller id for outgoing calls from MART employees is 978-424-9002. The trunk line number is not connected or affiliated with the IVR system. MART would have contacted Plaintiff by use of its trunk line – 978-424-9002 after June 20, 2019, to offer Plaintiff as dispatcher for CCRD trips or for other purposes. **Exhibit B, ¶ 9**.

### G.L. c. 151B and G.L. c. 258

22. CCRD submitted an application to become a transportation provider to MART on October 26, 2015. CCRD executed the Transportation Provider Sub-Contract with CCRD on December 12, 2015. Because there was documentation that was missing, MART did not execute the Transportation Provider Sub-Contract with CCRD until February 3, 2016. **Exhibit A, ¶ 19**

23. CCRD submitted its requested rates to MART. The rates submitted by CCRD were higher than many of the other MART vendors providing services to EOHHS. **Exhibit A, ¶ 21**.

24. CCRD also set the hours it was willing to provide transportation services, which were between the hours of 7:00 a.m. to 3:00 p.m. MART did not set the hours during which CCRD could provide transportation services. **Exhibit A, ¶ 22**.

25. Because of the limits on the hours CCRD was willing to work, CCRD automatically missed opportunities to be assigned rides that were not during CCRD work hours.

MART receives many requests from clients for rides before 7:00 a.m. to transport riders to Methadone clinics or to dialysis. **Exhibit A, ¶ 23**.

26. Daily and Standing Order (weekly) rides are based on assignment from the low-cost auto-assign program (no human intervention) which is based upon vendor rates and capacity tables. **Exhibit A, ¶ 24**.

27. On March 22, 2016, Mr. Jones received Vendor Portal Training at MART's offices. **Exhibit A, ¶ 26.**

28. Following the Vendor Portal Training, Mr. Jones almost immediately began to complain that his company, CCRD was not being assigned a sufficient number of trips. By email dated April 16, 2016, Ms. Badgley advised Mr. Jones that trips are assigned by the vendor portal using a low-cost vendor automated program. **Exhibit A, ¶ 27.**

29. On August 24, 2016, Mr. Jones sent an email to Rebecca Badgley who at the time was the Director of Brokerage for MART, in which he complained of racial discrimination since the beginning of CCRD's contract with MART. Ms. Badgley looked into the issues raised by Mr. Jones in his email. After doing so, she responded to Mr. Jones, and advised him that after looking into his concerns she found that there was one area of the vendor portal that had been blocked, which was an oversight. She advised Mr. Jones to log into the vendor portal and make sure that he was able to adjust his capacities and see daily work as well as standing orders. **Exhibit A, ¶ 28, Exhibit 3 attached thereto.**

30. On March 5, 2017, Ms. Badgley met with Mr. Jones in person to discuss issues he was having. **Exhibit A, ¶ 29**.

31. On March 10, 2017, Mr. Jones sent a letter to Everett Jones, Regional Director to Senator Elizabeth Warren alleging that MART was violating his civil rights in violation of Title

VI, and complained of retaliation, hostile work environment and unfair and deceptive acts. Mr. Jones attached email exchanges he had with MART employees about his not being assigned rides as early as March 29, 2016. **Exhibit E – Letter dated March 10, 2016**.

32. On March 24, 2017, Mr. Jones sent a letter of complaint addressed to MART's Title VI Civil Rights Officer. **Exhibit F – Letter.**

33. MART responded to the letter on April 28, 2017, responding to each of the concerns raised by Mr. Jones in his letter. **Exhibit A, ¶ 28, Exhibit 4 attached thereto.**

34. In an email dated October 2, 2017, Mr. Jones informed Ms. Badgley that "things have changed for the worst since we had a meeting in March . . . to iron out the portal differences." In that email, Mr. Jones complained that CCRD was having problems with "non cost-effective trips miles." He complained that CCRD was being fined and that CCRD trips were still "90% given to [CCRD] by the Automatic Dialing System which causes [CCRD] not to be able to compete with any other vendors" complaining that "[CCRD] calls are hand-picked and sent through the Automatic Dialing System and are not cost effective." **Exhibit A, ¶ 31, Exhibit 5 attached thereto.**

35. Ms. Badgley responded to Mr. Jones by email dated October 3, 2017. She told him that she was sorry to hear that things were not going well. She reiterated her previous suggestion to him that he branch out to other venues in addition to contracting with MART. She advised him that as they had previously discussed and confirmed with him, his company has complete access to the vendor portal. She reminded him that transportation that is scheduled 3 days or more in advance is going out through the vendor portal auto assign system based on vendor bid prices for the trips. She told him that She had taken a look at CCRD's rates and that they continued to be on the high side, which is why CCRD was seeing little to no trips in

advance through the vendor portal. Further, Ms. Badgley told Mr. Jones that CCRD was getting the bulk of its calls from the vendor call out and scheduling members due to the fact that there is same day and next day work and the other vendors are at capacity and MART has reached CCRD's trip rate for coverage. **Exhibit A, ¶ 32, Exhibit 5 attached thereto.**

36. Mr. Jones sent Ms. Badgley an email on January 8, 2018, in which he complained that CCRD had dropped its rates but was still not receiving offers through the vendor portal. **Exhibit A, ¶ 33, Exhibit 6 attached thereto.**

37. Ms. Badgley looked into Mr. Jones' concerns. She subsequently advised Mr. Jones that she had followed up on her end and that the assign program was functioning properly and rides in the area were being picked up by vendor with lower rates prior to getting to CCRD's rate structure during the running of the assign program. This was why CCRD was getting offered trips via the call out system or from staff. Ms. Badgley advised Mr. Jones that she had looked at CCRD's rates in comparison to other vendors in the area and that CCRD's rates were still on the high side in comparison. She advised him that he was welcome to request the most updated rates. **Exhibit A, ¶ 34, Exhibit 6 attached thereto**.

38. Because some of the issues raised by Mr. Jones appeared to Ms. Badgley to be due to his not understanding fully how to use the Vendor Portal system, she thought it would benefit him to receive one-on-one training on the system. Ms. Badgley arranged for Mr. Jones to receive one-on-one training with Robert Monk in May 2018. **Exhibit A, ¶ 35, Exhibit 7 attached thereto.**

39. Prior to the training Ms. Badgley and other MART employees continued to work with Mr. Jones to assist him in the use of the vendor portal. **Exhibit A, ¶ 36; Exhibit 8 attached thereto.**

40. By email dated May 9, 2018, MART sent Mr. Jones a memo that had been sent to all vendors regarding billing and the schedule of fines for late invoices and fraudulent billing. **Exhibit A, ¶ 37, Exhibit 9 attached thereto.**

41. On February 11, 2019, Mr. Jones filed a charge of discrimination with the Equal Employment Opportunity Commission and dually filed the complaint with the Massachusetts Commission Against Discrimination. In his MCAD complaint, Plaintiff alleged that the Respondent was discrimination against him in violation of Title VII of the Civil Rights Act of1964, as amended and the applicable laws of the Commonwealth of Massachusetts. Plaintiff alleged that he was a MART employee. He did not bring a claim under G.L. c. 151B, §§ 4(4) and 4(4A) and only named MART – not any individuals as Respondents. **Exhibit G – EEOC Complaint; Exhibit H – MCAD Complaint**.

42. The EEOC dismissed Mr. Jones' complaint on February 19, 2019, for "Lack of Jurisdiction: No Employee/Employer Relationship." **Exhibit I – EEOC Dismissal**.

43. On December 4, 2020, the MCAD issued a Notice of Substantial Weight Determination stating that after review of the EEOC's Final Determination dated February 19, 2019, that the MCAD was in agreement with the EEOC and has granted substantial weight to the EEOC's determination. The MCAD determined that the "charge reveals no distinct jurisdiction under the discrimination laws separately enforced by the MCAD." **Exhibit J - MCAD Dismissal.**

44. By email dated June 24, 2019, Mr. Jones asked Ms. Badgley to explain the shared ride policy because he believed that he was not properly getting credit for some shared ride members when they did not show up. Ms. Badgley emailed Mr. Jones and explained the standing order to him. **Exhibit A, ¶ 38, Exhibit 10 attached thereto.**

45. By email dated June 27, 2019, Mr. Jones complained that CCRD's vendor portal reflected offers of trips that CCRD never accepted and complained that MART's system had a "glitch." Ms. Badgley again looked into the concerns raised by Mr. Jones in his email. Ms. Badgley responded to him and informed him that she had looked into the information he provided to her and told him that MART has no way of controlling what times or how frequently members book appointments and reiterated to him that everything booked is assigned via a low cost qualified bid process based off vendor rates as trips are received. In addition, Ms. Badgley advised him again that MART does not have the ability to build CCRD's schedule for him or provide trips in a specific geographical area as the trips are all medical appointments that can change in volume and location on a daily basis. **Exhibit A, ¶ 39, Exhibits 11 and 12 attached thereto.**

46. In another email dated July 1, 2019, Ms. Badgley responded to another issue raised by Mr. Jones about vendor assignments, advising him that all of the calls that he had accepted via IVR vendor call-out, transferred through to his portal and were scheduled with his company. **Exhibit A, ¶ 40, Exhibits 11 and 12 attached thereto.**

47. Assignments made by MART to its over two hundred Vendors are based on a low cost qualified bid process based off vendor rates and availability as trips are received. As Ms. Badgley repeatedly told Mr. Jones, CCRD's rates were simply higher than those of other eligible Vendors in the area, which is why CCRD was not being assigned as many trips as Mr. Jones would have liked. MART does not have information on the demographics of the Transportation Providers it contracts with but is aware that seventeen of those Transportation Providers have registered their businesses with the Supplier Diversity Office (SDO) of the Operational Services

Division of the Commonwealth of Massachusetts. CCRD does not appear on the list as having been certified as a diverse business by the SDO. **Exhibit A, ¶41; Exhibit 13 attached thereto.**

|  |  |
|---|---|
| | DEFENDANT, |
| | MONTACHUSETT REGIONAL TRANSIT AUTHORITY, <br> By its attorneys, |
| | */s/ Deborah I. Ecker* <br> Mark R. Reich (BBO# 553212) <br> Deborah I. Ecker (BBO# 554623) <br> KP Law, P.C. <br> 101 Arch Street, 12th Floor <br> Boston, MA 02110-1109 <br> (617) 556-0007 <br> mreich@k-plaw.com |
| Dated: April 2, 2025 | decker@k-plaw.com |

956138v2/37800/0006

CERTIFICATE OF SERVICE

I, Deborah I. Ecker, certify that the above document will be served by first-class mail upon any party or counsel of record who is not a registered participant of the Court's ECF system, upon notification by the Court of those individuals who will not be served electronically.

Date: April 2, 2025                    */s/ Deborah I. Ecker*

11