# EXIHBIT 2

## MAY 25, 2025

# COURT TRANSCRIPTS

# MOTION FOR SUMMARY

# JUDGMENT HEARING

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


Paul Jones, Pro se                )
                Plaintiff,        )
                                  )
                                  )
vs.                               )        Case No. 19-cv-11093-MRG
                                  )
                                  )
Montachusett Regional Transit)
Authority, et al.,                )
                Defendants.       )


BEFORE:   The Honorable Margaret R. Guzman


Motion Hearing



United States District Court
Courtroom No. 2
595 Main Street
Worcester, Massachusetts
May 15, 2025


Marianne Kusa-Ryll, RDR, CRR
Official Court Reporter
United States District Court
595 Main Street, Room 514A
Worcester, MA 01608-2093
508-929-3399 justicehill@aol.com
Mechanical Steno - Transcript by Computer

2

APPEARANCES:

Paul Jones, Pro se
79 Thompson Street
Springfield, Massachusetts 01109
Pro se

KP Law, P.C.
Deborah I. Ecker, Esquire
101 Arch Street
Boston, Massachusetts 02110
on behalf of the Defendants

3

P R O C E E D I N G S

(The following proceedings were held in open court before the Honorable Margaret R. Guzman, United States District Judge, United States District Court, District of Massachusetts, at the Donohue Federal Building & United States Courthouse, 595 Main Street, Worcester, Massachusetts, on May 15, 2025.)

THE CLERK:  All rise.  Good morning.

Please be seated.

Civil Action No. 19-11093, Jones versus Montachusett Regional Transit Authority.

Counsel and parties, please note -- note your appearance for the record.

THE PLAINTIFF:  Paul Jones for the plaintiff.

THE COURT:  Good morning.

MS. ECKER:  Good morning, your Honor.  Deborah Ecker for the defendant; and with me is my associate, Jackson Dowd. He has not yet been sworn into the federal bar.  He's scheduled to do that next Tuesday.

THE COURT:  All right.  Excellent.  Congratulations. And thank you and welcome to everyone.

All right.  You can have a seat.

All right.  I have reviewed all of the filings.  I have some questions.

And so, Mr. Jones, let -- there's -- these are questions that I have the -- I have the First Circuit Court of

4

Appeals' ruling, and I've reviewed most of the filings.  We have seen each other here in court, but this is -- we're just now really coming up to speed on the questions that are remaining.

Let me ask you about the -- the issue related to the calling list.  You have cited repeatedly that you -- even though you had initially provided authorization to call that number, you revoked it at some point.

You revoked your permission for them to call you on that number?

THE PLAINTIFF:  Yes, verbally and in writing.

THE COURT:  Okay.  When was it that you did that?

THE PLAINTIFF:  Um --

THE COURT:  So not the verbal one, but the written one.

THE PLAINTIFF:  Okay.

THE COURT:  When is the first time you -- would it -- how -- how far back?

THE PLAINTIFF:  As soon as the calls started, I tried to stop it immediately.  And the first letter that I sent.  I just sent a letter.  It wasn't certified.  It wasn't return receipt, and I got no -- no feedback.  So I said let me send a letter certified, and I sent that in around November 2016.  The calls kept coming in.

THE COURT:  Okay.

5

THE PLAINTIFF:  I spoke to --

THE COURT:  Did you retain a copy of that?

THE PLAINTIFF:  Yes.  They're on the --

THE COURT:  Okay.  Just asking.

THE PLAINTIFF:  Yes.

THE COURT:  Okay.  And did you have -- did you -- did you give them a substitute number to call you?

THE PLAINTIFF:  I gave them two substitute numbers, yes.

THE COURT:  All right.  And -- and did you receive calls on the substitute numbers?

THE PLAINTIFF:  Never, your Honor, until June 20th, after that.

THE COURT:  Okay.

THE PLAINTIFF:  They never would call me.

THE COURT:  You have to use years, sir.  You're talking about something that's -- you know, we're looking at about a ten-year process here, so --

THE PLAINTIFF:  Okay.  Sorry.

THE COURT:  So you -- when did you first sign up with them and provide them information about phone numbers, the very first?  Was that in 2015?

THE PLAINTIFF:  2015, I gave them the office number, the 888 toll-free number, and I also had put my personal number on the contract.

6

THE COURT:  Okay.  And then in 2016, you said you rescinded -- November of 2016, you sent a certified letter rescinding that number, that number, the cell phone?

THE PLAINTIFF:  Yes.

THE COURT:  Did you receive -- and you say you continued to receive calls on that number.

Did you also receive calls on the other numbers?

THE PLAINTIFF:  Not at all.

THE COURT:  You never received any calls?

THE PLAINTIFF:  Not until 2020.

THE COURT:  All right.  So did you answer the phone ever?

THE PLAINTIFF:  Yes, I answered it, and I -- but when I answered it, it wasn't a person there, so I would send letters, uncertified also, and called them and say, Please stop calling my phone.

THE COURT:  Did you have any jobs from them?  Did you get any -- did your business relationship with them ever -- was it ever consummated?

THE PLAINTIFF:  Ah, I signed the -- I signed the contract in 2015-2016.  For the first six months, your Honor, I received no work, and that's when all the problems started because I called and I said, Look, I'm traveling from Boston -- Stoughton to Springfield six months, and I'm not receiving no work.  And, you know, I'm paying for insurance.

7

I'm paying for this.  My workers are sitting around.  They're all quitting.  And that's when all the problems started.  And all I wanted was an honest day's work with an honest day's pay.

THE COURT:  No, okay.  Mr. Jones, please.  It's -- I have really specific reasons for asking these questions.

THE PLAINTIFF:  Yes.

THE COURT:  So you only received -- when you started -- when you sent the certified letter saying don't call me on this number any more --

THE PLAINTIFF:  Yes, ma'am.

THE COURT:  -- did you only receive calls from the MART on that number, not on any other number?

THE PLAINTIFF:  Oh, I'm sorry.  They did call me a few times on the 888 number.

THE COURT:  Uh-huh.

THE PLAINTIFF:  They were calling both.

THE COURT:  Okay.  At the same -- like, you were getting on that one, and then you were also getting on the 888 number.

And was that for work?

THE PLAINTIFF:  Yes.

THE COURT:  Okay.

THE PLAINTIFF:  The 888 number was in the office where the dispatcher was.  I was driving.  So the dispatcher was getting a few calls.  And then once I complained about not

8

getting no work, they put my phone number on the ATDS and it just...

THE COURT:  You complained about not getting work?

THE PLAINTIFF:  Through the portal.  Everybody else was getting -- you can login, and you can pick your schedule through a portal, everyone, because we all talked.  We are all vendors.  Everyone.  Once I complained, look, I'm not getting any work, they said, We'll give you work when we're ready.  As a matter of fact, we will call you.  And I said, But I really can't make a schedule if you call me.  So that's when they stopped -- they stopped calling the dispatcher at the office, and they put my personal cell phone number on their -- on their, ah, automated -- their -- their -- their phone system. And the first five months I didn't get any work.  And then November, it -- my phone went from 6:00 in the morning -- we wasn't open -- they would start calling, you know, and --

THE COURT:  Did you not take the work?

THE PLAINTIFF:  Excuse me?

THE COURT:  Did you refuse to take the work?  Did you not do any work as a result of those calls to that phone number?

THE PLAINTIFF:  Well, the base -- the problem is --

THE COURT:  No, just a yes or no, sir.

THE PLAINTIFF:  Well, it's -- it's really -- if I got 50 calls, it would be for one job, the same job over and over

9

again.

THE COURT:  Okay.  So they were related to work?

THE PLAINTIFF:  They were related to work, yes.

THE COURT:  Okay.  And then after you sent the certified letter telling them not to call you on that number, are you saying you did not ever get another call on the business number in the dispatcher's office or something?

THE PLAINTIFF:  A couple of times they called.

THE COURT:  Okay.  So you'd have calls on both. They'd call the dispatcher, and they'd call your cell phone number?

THE PLAINTIFF:  A couple of times they called the dispatcher, but 90 percent of it was on my cell phone.

THE COURT:  Okay.  All right.  Let me see what else I wanted to inquire of you.

So what is it that you -- did you -- did you use that cell phone for something other than --

THE PLAINTIFF:  My cell phone was for my personal life.

THE COURT:  All right.

THE PLAINTIFF:  I've had that number over a decade, and it was for family, kids, and things like that.

THE COURT:  You did give it to them though, right?  I mean, you initially gave them that number?

THE PLAINTIFF:  Not to call me on it.  I put it -- I

10

put on the application, the contract, you'll see, it says the office number 888. And then as an officer -- I mean a manager, I put my cell phone there.

THE COURT: Okay. So -- but, I mean, they didn't find that number somewhere else. They -- you provided that number to them?

THE PLAINTIFF: Well, they wasn't calling it until I started calling them on my -- I called them once from the office, and then I called them on my cell phone and said, Please don't call this number. Call me on the cell -- on the office number and -- because I'm driving and it's -- I can't answer and drive.

THE COURT: Okay. All right. Thank you.

I'm going to hear from -- I'm going to hear from counsel on this issue.

MS. ECKER: Okay. So --

THE COURT: This is specifically related to what is the relationship, how did it start, and does it fall within the parameters of the objectionable behavior that the statute is intended to prevent?

MS. ECKER: Okay. And you're focused on whether it was revoked --

THE COURT: Yes.

MS. ECKER: -- or not?

Okay. So he provided the cell phone number.

11

Mr. Jones was the dispatcher, manager, one-man shop.  He then in response to a summary judgment, he sent certified mails, my understanding is 2007 -- two in 2017, one in 2018.

In response to the summary judgment, he has now sent us the signed certified receipts.  The individuals who accepted them were accounts receivable.  No one that he deal -- he had been dealing with all along.  So he had constant relationship with Rebecca Badgley, who was the director of brokerage services, a Mr. Monk and several other individuals.  And he never once said to them in the back and forth on the emails, Do not call my cell phone.

Instead his complaint was I'm only getting work from the IVR service.  So there are two types of services.  One is through the portal, and that is where for both of the services the vendors put in their information, your phone number that is one of them that you want MART to contact you on.  So if you don't want MART contacting you on your cell phone, then you go in and you pull it off.  You put in an office phone number because again this is an automatic system.  It's not like someone's calling up, and an office or a satellite.  It's whatever's in the software.  So that's number one.

And then his complaint was I'm only getting on the IVR system 90 percent of the time, not on the vendor portal.  The vendor portal is scheduled out further in advance.  And because of his rates, and Rebecca Badgley, most often her, would

12

explain to him because your rates are too high you're not getting reached.  And that's why then you're still available when you get the same or next-day services.

So he had plenty of opportunity to say to Rebecca or others, don't call my cell phone, even if he didn't know how to go into the portal and change it himself, because when he did send the email to the appropriate person in 2020, they removed it, and the only -- he has produced his cell phone bills, and so you'll see in 2020 -- June -- June 2020, it's removed.  So the only calls you'll see are then through there -- there's another trunk line that MART has versus the IVR system.

THE COURT:  All right.  So Mr. Jones --

THE PLAINTIFF:  Yes.

THE COURT:  So do you -- do you agree that that is the case that you -- that you -- so the -- the -- I didn't realize the dispatcher and the portal are two different things, right?

THE PLAINTIFF:  Yeah, I don't agree with any of that.

First of all, she said that I was a one-man shop. When I first started, we had six employees.  I was a driver, and in my contract you'll see everyone's position.

THE COURT:  The question was whether or not you provided the telephone number and it was on the port- -- that was the portal.  That was -- and that you were required to self-remove the -- the telephone number.

Do you disagree with that?

13

THE PLAINTIFF:  I totally disagree.  I -- in my complaint, you'll see that I was never ever able to change anything in the portal, and they -- at one time they --

THE COURT:  Did you attempt to do it?

THE PLAINTIFF:  Excuse me.

THE COURT:  Did you attempt to do it and you --

THE PLAINTIFF:  I attempted to do it plenty of times, and they told me after two years of telling me you can change it, you can change it, then they finally said, Oh, you can't change it.  You tell us, and we'll change it.  And I said that you've been telling me this for three years.

THE COURT:  And so then when you told them did they change it?

THE PLAINTIFF:  No.  No.  And I had every -- I even had three -- two face-to-face meetings regarding please stop calling my cell phone.  Two face-to-face meetings with Rebecca, Monk.  That's why there are so many defendants.  All of these defendants I verbally told them and even on the green cards, I sent it to Crystal Geisert, who was my contract manager, care of Crystal Geisert.  Here's the letters, please stop calling my cell phone.

And the reason they were calling my cell phone was to punish me so I couldn't do like all the other vendors do, log into the portal, pick my trips for my -- for my -- my coworkers like all the other vendors.

14

THE COURT:  Well, that's not what -- this claim isn't about that, sir.  This claim is about whether or not there was a violation of a statute --

THE PLAINTIFF:  Of the telephone --

THE COURT:  Yes.

THE PLAINTIFF:  -- communication practices act.

THE COURT:  Yes, yeah, that's all this is about.  It doesn't say anything -- that doesn't have anything to do with -- in fact, the fact that it's a competitive business, it takes away from -- well, it could literally take away from use of the TCPA, because that's really intended for people's private numbers, so.

THE PLAINTIFF:  Not really.  The TCPA doesn't --

THE COURT:  No, sir, I -- I -- I think I can tell you that the TCPA --

THE PLAINTIFF:  Yeah.

THE COURT:  -- in this case could include you, but it generally is intended to prevent people who -- whose phones are repeatedly called for reasons by robocallers and -- and -- ad advertisers and things that they don't -- or even collection agencies.

THE PLAINTIFF:  Add business to business, it doesn't discriminate.  The TCPA is for business to business and consumers.

THE COURT:  I understand, sir.  Mr. Jones.

15

THE PLAINTIFF:  Yes.

THE COURT:  Please just listen to my questions and answer them.  All right?

THE PLAINTIFF:  Okay.

THE COURT:  I'm not arguing with you, sir.

THE PLAINTIFF:  I'm not arguing.

THE COURT:  I'm asking you because your allegations --

THE PLAINTIFF:  Uh-huh.

THE COURT:  -- which are being assessed -- this isn't the trial.  We're trying to see after this -- the First Circuit reviewed this, these were questions they raised.  You know, it may be that you have a valid claim.

THE PLAINTIFF:  Uh-huh.

THE COURT:  But if you don't have a valid claim, then the MART is entitled to summary judgment.  That's what the issue is.

THE PLAINTIFF:  I agree with you.

THE COURT:  Okay.  So --

THE PLAINTIFF:  I agree.

THE COURT:  All right.  So that's why I'm asking you the questions because the way the allegations have read that it is -- you -- you have indicated that you had no way of stopping these calls.  You attempted repeatedly to stop these calls, and what's being indicated now, at least by the opponent, is that you always had the opportunity to -- that you initiated the

16

relationship with them with this number and that you always -- you always had the opportunity to either ask somebody to remove it or to remove it yourself. That's what their allegation is in response to yours, so.

THE PLAINTIFF: Okay. Mine is totally different.

THE COURT: Yeah, I -- I recognize that.

THE PLAINTIFF: Okay.

THE COURT: I recognize that. And so those are just the questions that I have regarding that issue.

THE PLAINTIFF: Uh-huh.

THE COURT: Okay. All right. Is there anything further on that issue?

MS. ECKER: The only thing I would refer your Honor to is some of the exhibits that are attached to the summary judgment, the access to the portal. Specifically, those that are attached to Exhibit A, which is Ms. Badgley's affidavit.

If you -- if you look at Exhibit 5 and 6, and those are just a few, it talks about her -- there's an email exchange about accessing the portal, having access to the portal, et cetera.

THE COURT: Okay. All right. I -- we intend to rule on this specific issue very soon within the next couple of weeks.

THE PLAINTIFF: Uh-huh.

THE COURT: There are issues that we're not -- I'm not

17

really sure where we are on them.

You have asked, Mr. Jones, for additional time to conduct discovery for some purpose?

THE PLAINTIFF:  Ah, yes, the purpose is I've never had -- I had 56 days of discovery, it was based on Title VII, limited to if I was an employee or not.  And you can even look at our summary judgment when she filed it, she said this is for limited discovery, which was 56 days, ten production of documents, ten interrogatories, ten admissions, and one deposition.  I filed all of them with their -- with them, and on -- on my production of documents, they only answered two.  The other eight answers were object.  It's outside of the order from the court where it's based on if you are an employee or not.  The same thing with the interrogatories.  The same thing with the answers.

THE COURT:  So you had a business relationship with them, right?

THE PLAINTIFF:  Excuse me?

THE COURT:  You had a business relationship with them? A business relationship?  They weren't your friends.

THE PLAINTIFF:  No, they wasn't.

THE COURT:  You were trying to get business from them, correct?

THE PLAINTIFF:  Yes.

THE COURT:  All right.  And the -- the business was

18

that you, amongst others, might receive sort of a -- limited contracts. Some person needs a ride, you provide the services for that?

THE PLAINTIFF: It wasn't with -- it -- I'm sorry. It wasn't with me. It was with Commonwealth Community Recovery Division, which is not my company. It's a nonprofit agency that I was the manager, driver, and dispatcher. There were several man- -- several dispatchers. They had a relationship with them. And if you look at my exhibits --

THE COURT: So you did work only under the Commonwealth -- under the CCR?

THE PLAINTIFF: CCR, Commonwealth Community Recovery Division, which I said CCR did.

THE COURT: You did only work for them. So you didn't -- you weren't the Paul Jones --

THE PLAINTIFF: The owner.

THE COURT: -- LLC?

THE PLAINTIFF: No.

THE COURT: Okay. So if this was under the CCRI, and when you provided them your telephone numbers, were those numbers -- who pays for that phone? Does the CCRA?

THE PLAINTIFF: The CCRD pays for the phone.

THE COURT: Okay. So it's not your personal phone?

THE PLAINTIFF: No, there's two phones -- three phones really. We had two office numbers --

19

THE COURT:  Uh-huh.

THE PLAINTIFF:  -- and my personal cell phone number.

THE COURT:  Yeah, but you gave them your personal cell -- they wasn't the CCRA number, was it?

THE PLAINTIFF:  CCRD.

THE COURT:  RD, I'm sorry.

That wasn't their personal -- that wasn't their phone number.

THE COURT:  That was your number?

THE PLAINTIFF:  Yes, we had two phone numbers for them.

THE COURT:  And did you include that number when you initiated the work with -- so how was it that you had a relationship with them?  Under -- was it a contract to CCRA or D?

THE PLAINTIFF:  It was a contract with CCRD and them and MART.  They had a contractor, and I'm employee of CCRD.  I don't own it.  It's a nonprofit agency.  Can't no one own the nonprofit.  I was just an employee of it.

THE COURT:  So but you were not an employee of the MART?

THE PLAINTIFF:  No.

THE COURT:  All right.

THE PLAINTIFF:  And that was found --

THE COURT:  Right.

20

THE PLAINTIFF:  -- that I'm not an employee of MART.

THE COURT:  And so you allege that they excluded or you -- you believed that they exercised some discriminatory intent to prevent you from having work?

THE PLAINTIFF:  Yes, they did.

THE COURT:  So wouldn't it be the CCRD that they prevented from having work?

THE PLAINTIFF:  If they prevent --

THE COURT:  No, that's -- that's who they were contracting with, right?

THE PLAINTIFF:  Yes, they're contracting with CCRD.

THE COURT:  Okay.  And so --

THE PLAINTIFF:  And if they discriminate against CCRD, they discriminated against me because I can't get a check from CCRD.

THE COURT:  All right.  Okay.  So under the Title VII claim --

THE PLAINTIFF:  That's dismissed.

THE COURT:  I understand.  I understand.  But in the discussion --

THE PLAINTIFF:  Yes, ma'am.

THE COURT:  -- of that there was a significant discussion not just in that, but in the entire thing about you having a direct relationship to the MART, and you don't. You -- you are an employee of someone who has a direct

21

relationship or is it -- is that the case, that the CCR -- do you have a contract in which it's between Paul Jones --

THE PLAINTIFF:  No.

THE COURT:   -- and the --

THE PLAINTIFF:  No, not at all.  And she even -- even said it.  If you look at my exhibits, her answers were, Mr. Jones, we do not have even a contact with him.  He's not our employee.  He has nothing to do with them.  He's employee by CCRD.

THE COURT:  And you -- you acknowledge that?

THE PLAINTIFF:  Excuse me?

THE COURT:  You acknowledge that?

THE PLAINTIFF:  I'm not in -- I'm not here to acknowledge or not acknowledge at this point of time.

THE COURT:  All right.  Thank you.  I just want to hear from counsel for the MART.

MS. ECKER:  So the contract is CCRD with MART.  An individual can't contract with MART for this type of service.  I have CCRD as being -- there's one that's an LLC and one that's a nonprofit.  The names are all -- on all of them are Mr. Jones, and Mr. Jones as the manager, dispatcher, president of CCRD.

THE COURT:  So always on behalf of CCRD?

MS. ECKER:  I'm sorry.

THE COURT:  On behalf of CCRD?

22

MS. ECKER: Correct. Correct. And that's how -- MART would not have had the phone number otherwise. It's a business relationship. They're -- we're not just calling people randomly to offer trips.

THE PLAINTIFF: If I may, your Honor.

THE COURT: You -- you should because this is --

THE PLAINTIFF: Can I --

THE COURT: -- a very significant -- the -- the -- this -- you -- you -- in order to raise claims, you have to have -- there has to be a legal relationship in which the person could be liable for -- for violating your rights.

THE PLAINTIFF: Okay. Which claim?

THE COURT: So there has to be a -- hmm?

THE PLAINTIFF: Which claim are we talking about?

THE COURT: Yeah, any claim. Any claim.

THE PLAINTIFF: The TCPA?

THE COURT: Yeah or -- or the -- or discrimination claims. I mean there has to be -- there has to be a legal relation. You don't have to be their employee, but if you -- if they contracted with you, Paul Jones --

THE PLAINTIFF: Uh-huh.

THE COURT: -- and the MART, if that was the contract, then that's how I read your allegations --

THE PLAINTIFF: Uh-huh.

THE COURT: -- in that they specifically prevented you

23

from realizing the -- the worth of your work through discriminatory intent.  They said that guy, no way, and they -- and for whatever reason, but you feel that it was discriminatory, and that discrimination is recognized in the law.

THE PLAINTIFF:  Okay.

THE COURT:  The problem is that they didn't have a contract with Paul Jones.

THE PLAINTIFF:  Uh-huh.

THE COURT:  You were working on behalf of an entity --

THE PLAINTIFF:  Uh-huh.

THE COURT:  -- that they had a contract with.

So how can a claim lie -- can it -- can it be available to you if they didn't have a legal relationship with you?

THE PLAINTIFF:  Can I answer?

THE COURT:  Yes.

THE PLAINTIFF:  Okay.  Under Chapter 151B, Section 4 4., it says you don't have to have a relationship with them.  It can be against anyone.  It doesn't have to -- I can go in a store, and if one of their -- if I'm retaliated against or discriminated against --

THE COURT:  If you went on a bus, if you went on one of the MART vehicles, you, you walked on the MART vehicle, and they said, we're not letting you ride.  We're not going to let

24

you ride.  You could sue the -- the bejesus out of them as -- yes, you can.

THE PLAINTIFF:  Yes.

THE COURT:  That's a -- that is your personal relationship.  You contracted for a ride, and they didn't give it to you for reasons that you believe were discriminatory.  But that is different than saying, I am a representative for a company and that company did not get work for discriminatory intent.

THE PLAINTIFF:  I never -- I never -- okay.  First of all, the First Circuit court recognized in their order that I don't have to be an employee.  I don't have to have a business relationship under Chapter 151B, subsection 4 4.  It's -- I don't have to be that.  That's why they only threw out Title VII, because I have to have a relationship like you're saying, a contract with them under Paul Jones, but chapter -- that's why I sued under Chapter 151B, subsection, because the subsection states, clearly states that you don't have to have a relationship with them or their employees and anybody could be charged, so.

THE COURT:  Yes, maybe, but we're here as to whether or not there's the sufficiency of this -- just the allegations as they are and what evidence has already been supplied to allow this matter to go forward.

THE PLAINTIFF:  So this is a motion to dismiss?

25

THE COURT:  This is a summary judgment.

THE PLAINTIFF:  Summary --

THE COURT:  This is a motion for summary judgment.  A motion to dismiss --

THE PLAINTIFF:  I understand what it is.

THE COURT:  -- has already passed.

THE PLAINTIFF:  Uh-huh.

THE COURT:  That -- the Court ruled on that.

THE PLAINTIFF:  Okay.

THE COURT:  And the standard for that is -- is really, really high.

THE PLAINTIFF:  Uh-huh.

THE COURT:  They don't want people to lose the opportunity to challenge lawsuits based -- you know, when you haven't had full discovery.

THE PLAINTIFF:  Uh-huh.

THE COURT:  Summary judgment is something different.

THE PLAINTIFF:  I understand.

THE COURT:  Okay.  And it's a --

THE PLAINTIFF:  I'm a paralegal, your Honor, and I've been a -- I've been -- for over a decade I've been a student of the National Consumer Law Center --

THE COURT:  And I appreciate that.

THE PLAINTIFF:  -- to let you know.

THE COURT:  So that you -- so I don't have to explain

26

about the summary judgment --

THE PLAINTIFF:  Right.

THE COURT:  -- but we are here because that now we, the federal courts, are very concerned that at -- with -- with the stage of this case right now, and it's pretty old right now --

THE PLAINTIFF:  It is old.

THE COURT:  -- that if there is taking into account the appropriate burdens, if there is not a viable claim, you don't send it to a jury just to see how it works.

THE PLAINTIFF:  Understood.

THE COURT:  Just to -- just to throw it at them.

THE PLAINTIFF:  I agree.

THE COURT:  So that's the burden that -- that's -- that's -- I'm being forced to look at.  This, in my mind, is a significant issue related to the title 151, okay.  I'm telling you, it is.

You are alleging that they personally -- that they personally against you committed acts of discrimination.

THE PLAINTIFF:  And retaliation, yes.

THE COURT:  And retaliation.  And those have to be judged based on the facts that we have them.  And the fact that we have them are that the legal relationship and the involvement that you had with them was as a representative of another organization.

27

THE PLAINTIFF:  So let me make this clear.  Just to be clear, you are going forward -- you're not going to give me a chance --

THE COURT:  Wait a minute.  Mr. -- Mr. Jones --

THE PLAINTIFF:  I have a question, that's all.

THE COURT:  No, that isn't a question.  You're making a statement.  I'm telling you what --

THE PLAINTIFF:  I'm sorry.

THE COURT:  -- the state of the law is, and I'm telling you what I have just learned and how that may impact my ruling, but I have not made a determination --

THE PLAINTIFF:  Okay.

THE COURT:  -- about anything.

THE PLAINTIFF:  So let me re- -- let me re- -- I just want to be clear.  Let me restate that.  So right now we're arguing summary judgment.  I just have a question.  Is my Rule 56B -- D -- that's -- you're going to rule on that, too, right, if I'm going to get a chance to get discovery, right?

THE COURT:  I am going -- yes.

THE PLAINTIFF:  Okay.  Question answered.

THE COURT:  Do you have something else you'd like to say?

THE PLAINTIFF:  Ah, yes.  And as far as she said that I was a one-man shop, I was never a one-man shop.  And CCRD, Inc., has a contract, not an LLC.  It's just CCRD, Inc.  She

28

has admitted it, and that's a fact between both parties agree that Paul Jones did not have a contract with them.  Whether it helps me or it doesn't help me, it's a fact.

THE COURT:  Okay.  All right.  Thank you very much.  Anything, counsel?

MS. ECKER:  On?  In general or?

THE COURT:  In general.

MS. ECKER:  In general, I mean, no, the -- as you said, the contract's with CCRD.  I don't know if you wanted me to go through the discovery or -- issue or --

THE COURT:  Yes, let me hear from you regarding that.

MS. ECKER:  Okay.  So in both is 56D and in the response to the statement of facts, Mr. Jones seems to believe that he's entitled to discovery, but he has the information.  There's four categories.  He either has the information needed to respond specifically in the summary judgment to the fact that's stated; two, we've told him the information doesn't exist; and, three, the information that he's seeking isn't relevant to be able to oppose the summary judgment motion.  And I can just give you some examples, although I could go through.

This depo- -- this issue with the deposition. Mr. Jones did take the deposition of Rebecca Badgley.  I did not attach it.  It's on the docket there, however, at -- and I just lost where it was at.  I can tell you in a minute.  120-3 is where it is on the docket.  It's attached as Exhibit 3 to a

29

statement of fact of a prior summary judgment motion.  In there even though the judge had limited what the -- what the discovery was on, he does ask questions to Ms. Badgley, and she again explains the use of the portal, the rates, everything that he's objecting to in the summary judgment.  So he has that.

In regards to the guides for the telecommunication act claim, he says that he was only provided a 2021 manual, but we have produced a 2008, 2002, 2009, 2011, and a 2018 as well as overviews as how the system works.  MART does not have any other manuals to produce.  We have made that clear.

Similarly, he has asked for information on other vendors, the demographics, how he treats some differently from others.  Ms. Badgley in her affidavit has said that MART does not keep the demographics of its vendors.  It only has a list -- and I'm forgetting the number off the top of my head, your Honor, of those vendors who are registered.  It's a different term than minority vendors, but a similar type program with the state.  CCRD is not one of those vendors.

The rates themselves are public.  So at the time he was complaining, he could have either seen the rates on the portals of all other vendors or they keep them on the public website.  So it's not a mystery as to whose rates are what and where you fall.  In fact, there's some emails that are attached that refer him to the rates, and Ms. Badgley has looked into

30

the rates for him.  So that information he has.  He has his cell phone.  He has his emails, even though we have produced them, he has the emails or should.

He has asked for information about telemarketing.  It's not a telemarketer.  We only contact those who we have a business relationship with in order to offer trips.

I think those are the general -- unless you would like me to go through some of the others.  Some of the others are the response to facts.  For example, when we said you didn't file a complaint of discrimination based on the sections of the statute with the MCAD, his response was, Plaintiff lacks sufficient discovery to admit or deny.  Well, that's something he would have.  We wouldn't have that to produce.  You know, that's something that would be in his knowledge.  So unless you want me to go through each that is --

THE COURT:  No, that's --

MS. ECKER:  -- a general argument.

THE COURT:  All right.  Thank you.

Mr. Jones, what specifically were you thinking is available that you haven't received yet?

THE PLAINTIFF:  What I haven't received is in -- okay.  I just want to -- let me answer your question.  What's not available that I received.  I am claiming that I was treated differently with my rates.  The rates are not -- the -- the rates.  I'm saying I was treated differently than any other

31

vendor. Basically, it's in their possession of the vendors' rates. If they're saying -- it's one thing to say your rates are too high. Okay. My rates are too high. Let's see the other vendors' rates. They can tell me whatever they want, but us vendors speak together. What's your rate, John? It's $20. Okay. Well, I'm going to go ten. My rates are lower. They have the rates.

THE COURT: So you have the capacity to depose or get information and affidavits from other individuals about what rates they were paid.

THE PLAINTIFF: I didn't know that. I didn't -- under the Federal Rules of Civil Procedure, if discovery is never open, I can't go there.

THE COURT: Well, you certainly -- well, you tell me that you have these relationships with people who you are asking these questions of.

THE PLAINTIFF: Yeah. Yeah.

THE COURT: So but -- so your response to what was indicated is that they were public rates, that they were listed. You're -- you deny that?

THE PLAINTIFF: False. Your Honor, the only rates that are listed are old rates. The old rates. Three to six months old. If that was the case, what is the bidding system going to be? We're going to post all the bids? It's a secret, your Honor.

32

THE COURT:  Okay.  I'm trying to get a sense of what it is you think is out there.  So you dispute --

THE PLAINTIFF:  What do I need for discovery?

THE COURT:  No, you're saying -- the questions you asked about having additional discovery --

THE PLAINTIFF:  Uh-huh.

THE COURT:  -- the response by the attorney for MART was that that information you're looking for is either within your own control or was already publicly out there.  You have indicated --

THE PLAINTIFF:  False.

THE COURT:  -- that the -- your support for your belief that you were paid differently is conversations you had with individuals.  So you have an opport- -- you know who those people are.  You're telling me you've had conversations with them, Joe or whatever you said it was.

THE PLAINTIFF:  A couple of them, but -- but they have -- they have the rates.  They can press one button and give me the rates for everybody in the last three years.  Or when I tried to go to the third party that also had the rates, they objected, and the judge told me do not contact any third parties.  That's what I was told.  I didn't know I can get affidavits.  He told -- Judge Hillman told me do not contact anyone -- third parties regarding any rates, anything other than you were a -- an employee.

33

THE COURT:  Was that before you went to the Court of Appeals?

THE PLAINTIFF:  Yes.  That was --

THE COURT:  Did you -- did you --

THE PLAINTIFF:  That was before I went to the Court of Appeals.

THE COURT:  Did you raise that issue with the Court of Appeals?

THE PLAINTIFF:  Ah, I'm not sure, your Honor.  I'm not sure.

THE COURT:  But you -- okay.

THE PLAINTIFF:  And another issue that I wanted -- she said that the rates are public.  That's false.  I never said -- I never said that -- they have the records, your Honor, and, you know, it's just like any -- any other case, it comes, they file a motion to dismiss.  I defeated the motion to dismiss.  Once I defeated the 12(b)(6) motion to dismiss, they filed three more -- three total then and this is the third summary judgment.  All I want to do is do what everybody else do, file their case.  If a motion to dismiss is filed, if I defeat it, we can have a scheduling order, we can go to discovery and get it over.  That was never done in -- in this case.  And I've never seen a case like this where I can't get a scheduling order.  I can't -- you know, the scheduling order that I got -- but anyway, I wanted to make that, and, your

34

Honor, one more important thing is on the telephone communication practices act, the telephone communications practices act doesn't care if it's business to business or consumer to business.  If I stop means stop.  The statute means what it says and says what it means.  And there's three elements that I have to prove.

One, they called my cell phone.  It's not -- it's a fact.  They admitted it, all through the record that they called the cell phones.

Two, the prerecorded messages that they left that I only -- it's way more, but that's what I have on my cell phone. They admitted, yes, those are us.  Those are our prerecorded messages that we left.

Three, the only -- that's the last and final element that I have to meet as what -- did I revoke revocation of consent.  And yes, I did.  There's -- verbally, I said it in my verified complaint, which must be true to as an affidavit.  And I have three certified return receipt letters on the docket that states it went there to MART.  MART -- the TCPA case law says that MART can't tell me how to revoke consent.  The TCPA says any way, even if I tell them stop calling me, they have to adhere.  They can't tell me where to send a letter, this and that, as long as it goes to their office, which a hundred Main Street, Fitchburg, Mass., that's where I sent it.

Your Honor, those are the three elements that I have

35

to prove that they called the cell phone.  The prerecorded messages are there.  Those first two they admitted that they're there.  There's no question.  They admitted it.

Third, revocation.  I revoked consent over 40 times verbally --

THE COURT:  All right.  Mr. Jones --

THE PLAINTIFF:  Yes.

THE COURT:  -- I've been patient.  You've told me the same thing six times.

THE PLAINTIFF:  Yeah, I was just going to wrap that up.

THE COURT:  No, you wrapped up.  You've wrapped up.

THE PLAINTIFF:  I'm finished?

THE COURT:  Unless there's something you have not talked about that you wish to talk to me about.

THE PLAINTIFF:  Okay.  Well, I was just telling you the three elements.  So that's wrapped up.  I just wanted to get it on the record.  I'm sorry if I over went.  I just wanted to get it on the record, and I disagree with everything that she says that the rates are public.

There's no rates that are public, only old rates.  And I did tell everyone, all the defendants, Rebecca, everyone in there to stop calling my cell phone.  And I have the right.  This is my cell phone.  You cannot call it and abuse me like that.  So that's abuse.  So I said what I have to say, your

36

Honor.

THE COURT:  All right.  Thank you --

THE PLAINTIFF:  Thank you.

THE COURT:  -- very much.  Without any further adieu, I'm going to say I'm going to do what I have to do.

THE PLAINTIFF:  Thank you.

THE COURT:  -- and thank you both, both parties, and we'll get a ruling out as soon as we can.

MS. ECKER:  Thank you, your Honor.

THE PLAINTIFF:  Okey-dokey.

THE CLERK:  All rise.

Court is now in recess.

(At 11:42 a.m., court was adjourned.)

37

C E R T I F I C A T E


I, Marianne Kusa-Ryll, RDR, CRR, do hereby certify that the foregoing transcript is a true and accurate transcription of my stenographic notes before the Honorable Margaret R. Guzman, to the best of my skill, knowledge, and ability.



/s/ Marianne Kusa-Ryll            5/17/2025

Marianne Kusa-Ryll, RDR, CRR            Date

Official Court Reporter