# Exhibit A

**VERIFICATION AND CERTIFICATION OF AFFIDAVIT (DECLARATION PURSUANT TO 28 U.S.C. § 1746)**

**STATE OF MASSACHUSETTS**

I, Ivan Roman, being duly sworn, depose and state under the pains and penalties of perjury & based on Firsthand Knowledge:

**BACKGROUND AND EMPLOYMENT**

I, Ivan Roman, do hereby declare under penalty of perjury, pursuant to 28 U.S.C. § 1746 and the laws of the Commonwealth of Massachusetts, that the following is true and correct:

1. I am over eighteen years of age, competent to testify in a court of law, and make this statement based upon my first hand personal knowledge of the facts set forth herein.
2. I am a former employee of the Montachusett Regional Transit Authority ("MART"), located at 100 Main Street, Fitchburg, MA 01420, where I worked for eight (8) years, including within the Brokerage Department.
3. I resigned from MART in May of 2018. I filed several complaints with Human Resources at MART and even the Massachusetts Attorney General's Office to report illegal acts I was subject to, seen and heard from MART employees including Rebecca Badgley, Cheryl Montouri, Karen Cordio, Crystal Geisert, Stephanie Richards, Robert Monk, Fatima Rivera, Matt Diaz and more governed by a racial undertone.

4. I have not retained, authorized, consulted with, or been represented by any attorney in any state or federal court proceeding relating to Paul Jones v. Montachusett Regional Transit Authority (MART).
5. I further declare that after I resigned from MART, an attorney representing the Authority contacted and threatened me, expressly instructing me that I must not communicate with any of MART's subcontractors or I would face a lawsuit. At no time did I authorize that attorney, or any attorney, to represent me, act on my behalf, or enter an appearance for me in any matter.

**KNOWLEDGE OF DISCRIMINATORY TREATMENT**

6. I personally heard MART employees Rebecca Badgley and Karen Cordio make discriminatory comments regarding Paul Jones and other minority vendors. Specifically, I heard Cordio state, "HIS BLACK ASS THINKS HE'S SPECIAL," in a mocking manner, followed by laughter shared with Badgley and Crystal Geisert. Geisert then stated, "plan of attack."
7. Cordio further stated she would instruct inspector Matt Diaz to harass Mr. Jones at drop off locations and conduct targeted research into Mr. Jones and his company to find any pretext to issue fines or terminate his contract, or have Matt Diaz staff to do it if he was not assigned to the area where Paul Jones was driving at.
8. I witnessed MART management Rebecca and Karen compare Paul Jones and other vendors of color unfavorably to white vendors.
9. These comparisons were racial in nature and intended to justify unequal treatment.

10. I heard Karen comment that Paul Jones "is such a crybaby," Followed by Rebecca stating, "like all of them," as they look at each other in a you know what I'm talking about manner as If I were ignorant to the fact they are referring to race.

11. Rebecca also didn't seem to care when I raised concerns that Karen and Crystal were not evaluating vendor applications with the same merits for white raced vendors versus black raced vendors as black raced vendors were rejected and similarly experienced white vendors were allowed on. When initially asked about it Karen blatantly stated, "they are not our preferred vendors."

12. I witnessed MART management Karen and Rebecca negotiate and approve more favorable rates to white vendors and even opting to assign certain work themselves which was abnormal with socalled special rates. Rebecca and Karen constantly made changes to the way negotiated rates a practice as far as I'm aware MART still uses but no longer allows for the company I currently work for who also happens to have a black owner.

13. Rebecca allowed Karen to set the culture and mindset of MART Management. She was ultimately demoted which should tell a story within itself.

14. I do believe Paul Jones was targeted because he is Black, verbally complained, filed written complaints, and knew that he was treated differently than other vendors with the same size fleet of vehicles his company had.

15. This directive to bypass standard operational procedures and isolate Mr. Jones served to interfere with his business operations and facilitate the retaliatory "plan of attack" previously discussed by management.

16. On or about March 15, 2016, I was instructed by Karen Cordio to email Paul Jones and reschedule his Vendor Portal training at 100 Main Street, Fitchburg, Massachusetts to on

or about March 22, 2016, I did so. The stated purpose was to move Mr. Jones out of the group training so that Ms. Cordio could isolate him. Based on my observations and involvement, this was done to prevent Mr. Jones from receiving proper training on how the Vendor Portal operated, including how to accept trips and how the system functioned in practice this is documented.

17. On or about March 22, 2016, Crystal Geisert informed me that Paul Jones came in for training and we had him come into Karen Cordio's office where we only used Karen's Laptop not the vendor portal to so call train Paul Jones on This Vendor Portal Training was done with Karen Cordio's personal laptop computer on her desk no vendor portal this is documented.

18. In reality, this instruction was a tactical maneuver by Cordio to isolate Mr. Jones and prevent him from receiving proper training on the Vendor Portal, specifically regarding the technical processes for accepting trips and understanding how the system functioned.

19. By intentionally depriving Mr. Jones of this critical operational knowledge, MART management ensured he would be unable to compete on equal footing with white vendors who were granted full access and training.

20. Karen Cordio used an excuse that the vendor portal room was under construction when Paul Jones came in for training this is documented as well.

21. Soon after Paul Jones so called Vendor Portal training with Karen Cordio and Crystal Geisert I was instructed to call Paul Jones because he was emailing the Brokerage department saying he could not access the vendor portal that displayed the daily and weekly jobs I was told to inform him by Karen Cordio that "some vendors just never gain

access" to those specific portal features and that, moving forward, he was to wait for the Scheduling Department to call him if any work became available.

22. This was a deliberate effort to bypass the automated portal system, effectively "blacklisting" Mr. Jones by removing his ability to see available jobs and placing his revenue entirely at the discretion of MART staff who had already expressed racial animus toward him.

23. Soon after Paul Jones began to email MART's Brokerage Department again stating that when he tried to log into MART's vendor Portal to adjust his capacity to receive trips it stated your portal is locked by MART.

24. Soon after I was instructed to tell Paul Jones he could log in and change his capacity tab for trips to accept every hour I was instructed to tell Paul Jones this as I knew MART locked his portal as I could see the back end, this was to blacklist Mr. Jones by removing his ability to change his capacity to accept a certain amount of trips each hour like the other similarly situated other vendors.

25. Around 2017 I remember Paul Jones emailed the Brokerage department and stated that due to no work he had to lay off several drivers he had.

26. Paul Jones also said that he had to lay off the workers after he paid money to get their credentials to drive.

27. I heard MART manager Karen and Crystal make fun of Paul Jones's financial hardship caused by their actions.

28. Karen, Rebecca and Crystal took this as Paul Jones being a pain because he would not just accept their story and excuses why he could not see any trips that were available why his portal stated it was locked by MART.

29. Karen, Rebecca and Crystal took Paul Jones emails for help as he was complaining.
30. Paul Jones's inability to see jobs was not due to lack of training—it was because MART employees intentionally disabled his portal.
31. MART's director Rebecca Badgley and program managers Karen Cordio and Fatima Rivera held all control over the Vendor Portal and Rebecca was complicit in Karen's actions.
32. Around 2017 Paul Jones filed several written complaints against Rebecca, Karen and other staff with MART Brokerage and the HST department that oversees MART's Brokerage Department.
33. Soon after it was known that Paul Jones was filing complaints verbally and written because of the no help he was receiving from MART's managers and supervisors which caused him to be economically harmed.
34. On or about June 2017 I recall an instance where Rebecca Badgley called me into a meeting with Paul Jones, Sharna Smalls, and Sandy Mulcahy of the Executive Office of Health and Human Services (EOHHS) Transportation (HST) Department the state entity that oversees MART's operations at 100 Main Street at the Brokerage Department.
35. Prior to entering the meeting, Badgley explicitly instructed me to provide a false narrative: I was to state that I had been attempting to assist Mr. Jones but that he suffered from an "understanding problem," and to affirmatively deny that MART or its employees were engaging in discrimination or retaliation.
36. I followed Badgley's instructions during the meeting in the presence of Mr. Jones, Ms. Smalls, and Ms. Mulcahy; at that time, I lacked the full context of management's internal "plan of attack," and as a subordinate, I feared the professional consequences of opposing

Case 4:19-cv-11093-MRG Document 184-1 Filed 01/07/26 Page 8 of 15

Badgley, who exercised unchecked authority over the Brokerage Department for over 30 years.

37. While some of the things Mr. Jones brought up in the meeting didn't make sense at the time I noticed later that someone had indeed been manipulating his portal and IVR standing not only making his points during the meeting valid but credible.

38. I recall at the meeting Paul Jones complained that he was treated differently than other white vendors that had the same size fleet he had.

39. I recall Paul Jones complained at the meeting that he was blocked from changing his capacity Tab in the Vendor Portal, Paul Jones showed pictures from his cell phone and laptop he had at the meeting.

40. As I recall the Photo of the capacity tab Paul Jones showed Rebecca, Sharna Smalls, and Sandy Mulcahy he stated that "see the picture says that I am Blocked by MART".

41. Paul Jones also stated that he had not been able to make a schedule from the vendor portal for at least 3 months and this caused him to have to lay off all his drivers for no work.

42. Mr. Jones complained that he would only receive calls from the automated call out system and the only reason I can think of was because the scheduling department must have been instructed to bypass his company. If the automated call out was reaching his rates, it is only logical the schedulers would also reach his rate if they weren't bypassing him so if they weren't calling that could be the only reason.

43. It was only later, after discovering the full scope of the internal efforts to undermine Mr. Jones, that I realized my statements in that meeting—made at the direction of

management were used to cover up MART's discriminatory practices and mislead state overseers.

44. A few days later Rebecca called me in her office at the Brokerage department and Karen and Crystal were in there.

45. This was a meeting in Rebecca's office at 100 Main street the Brokerage department to figure out what to do about Paul Jones filing verbal and written complaints on Rebecca, Karen, Crystal and other staff at MART that was not assisting him to receive work like the other similarly situated vendor with the same size fleet he had.

46. During this meeting, Rebecca Badgley spoke disparagingly of Paul Jones and explicitly instructed us to ignore his communications and forward any emails from him directly "up the chain of command."

47. These comments were frequent and said openly by Rebecca, Karen, and Crystal and carried over once Karen and Crystal were demoted with Fatima, Stephanie, Robert, and Michelle.

48. They reflected the culture and mindset of MART Management.

49. I believe Paul Jones was targeted by MART management because of his race and in retaliation for his verbal and written complaints regarding the discriminatory environment.

50. It was evident that Mr. Jones was subjected to disparate treatment when compared to white vendors who operated fleets of a similar size, as those vendors were not subjected to the same level of scrutiny, fines, or operational interference.

51. This targeting constituted a calculated effort to punish Mr. Jones for exercising his protected right to oppose discriminatory practices this is documented.

52. I personally overheard MART employees Karen and Crystal planning to change Paul Jones's vendor portal settings to 0 (Zero) after I had been tasked to ensure his portal was good to go in the meeting mentioned in #17 as I was called in to assess Crystal's work who was Mr. Jones's direct vendor supervisor on the vendor portal being I was her superior. I personally checked that CCRD was active.

53. I also reviewed Mr. Jones' portal from a-z ensuring he should be offered work and had it confirmed by my superiors Karen and Rebecca. Two weeks later he was back at zero and I was filing a complaint on Crystal and Karen with human resources as they stole my passwords from my desk drawer while I was at lunch. I believe Karen's plan was to have Crystal further alter information on the vendor portal under my account, but I caught them.

54. Rebecca was informed that it did appear that someone was seemingly manipulating his portal behind me and I believed that Karen and Crystal were looking to set me up as I did discover what I thought were mistakes made by Crystal during my review which apparently turned out to be intentional.

55. This was a tactic Karen created to give vendors a hard time as they are also supposed to be able to make changes to the number of trips they would like to be able to accept for a per hour time frame. If you are set to 0 (Zero) you will get 0 (Zero) offers for trips that fall in that hour's slot.

56. I reported my findings to Rebecca and human resources. Rebecca was the director, headperson in charge of the MART call center. I know Rebecca was privy to all Karen and Crystal were doing beforehand but had no proof of this and while she tried to brush it off HR stepped in. They eventually demoted Karen and Crystal.

57. From my understanding of the Vendor Portal no Vendor can maintain drivers if their vendor portal is set to 0 (Zero) as they would not be able to set up a schedule for the future and would have to depend on next day calls from the IVR system.

58. I believe Karen Cordia and Crystal Geisert planned to manipulate Paul and who knows how many other vendors portal under my own account when they had stolen my password and training notebooks.

59. going. A matter I had to take up with HR prior to both of those colleagues' departures from MART.

60. This was done specifically to prevent him from receiving jobs.

61. Karen and Crystal had authority to remove Mr. Jones from IVR (call out system) and could make him only receive "next day automatic prerecorded calls".

62. Karen did this after being instructed to make sure his portal is active in a meeting.

63. I saw proof that MART manager Karen Cordio removed trips that were originally assigned to black vendors that were high paying in nature and reassigned them to white vendors she was friendly with. Other times they were assigned to their own MART vehicles (Dial-A-Mart Services, Inc.) at rates that bypassed the low cost bidding system.

64. I saw many of those trips reassigned to white vendors favored by certain MART staff such as Rebecca, Karen, and Gayle Wislocki.

65. I saw many incidents of this portal manipulation and am familiar with the tactics used.

66. Paul Jones's inability to see jobs was not due to lack of training—it was because MART employees Karen and Crystal intentionally disabled his portal.

67. Other vendors were given 2–6 trips per hour; Paul Jones was set at 0 (Zero) time and time again as if Rebecca and Karen were playing a game.

Case 4:19-cv-11093-MRG Document 184-1 Filed 01/07/26 Page 12 of 15

68. This would also have prevented him from choosing jobs like other vendors could.

69. When Paul emailed asking why he had no visibility, staff knowingly ignored his correspondence per Rebecca's orders. This was an intentional practice carried out by MART's top management for two main reasons but it's a discretional thing. I have seen this tactic used when Karen and Rebecca and later Rebecca and Fatima felt the vendors' rates were too high and when they wanted to hurt a company. Both ways hurt companies because they won't tell you that they will not call you or that they are restricting you because of your rates being high. They just tell you your rates are too high, and the trips never make it to you. All lies.

70. Whenever any Supervisor or Manager told a vendor the reason you are not getting any trips was that your rates are too high that is an automatic killer of a vendor receiving trips from the portal and a way to control the vendor economically.

71. Paul Jones submitted valid complaints that were intentionally ignored.

72. I heard Rebecca, Karen, Crystal, Robert say they couldn't wait to see Mr. Jones fail as a vendor.

73. MART management instructed by Rebecca Badgley such as Donna Landry, Fatima Rivera, Karen Cordio, Crystal Geisert, Joanne Norris, Stephanie Richards, Tamara Shumovskaya, Jessica Torres, Amanda Kukta, Robert Monk, and more myself included executed these actions.

74. Rebecca Badgley, Fatima Rivera, Donna Landry, Bonnie Mahoney, Karen Cordio, Joanne Norris, Stephanie Richards, Tamara Shumovskaya, Jessica Torres, Amanda Kukta, Robert Monk, Michelle, Matt Diaz, and Crystal Geisert were all my co employees at MART.

Case 4:19-cv-11093-MRG Document 184-1 Filed 01/07/26 Page 13 of 15

75. My duties included interacting daily with MART supervisors, dispatchers, vendor owners and managers, administrative employees, being a contract manager, vendor supervisor in charge of approving or denying applications from vendors, vendor training, and contract compliance supervisor. I did my job well and was promoted at least four times, earning employee of the month honors multiple times prior to joining management.

76. I personally also witnessed time and time again Robert Monk use racial innuendoes and consistently look to punish black vendors with higher fines at a higher frequency while making exceptions and excuses for white vendors.

77. I regularly accessed MART's internal systems, including the Vendor Portal and back end trip assignment system as part of my job and I have firsthand knowledge of the Vendor Portal ins and outs.

78. I personally interacted with the following MART employees: Rebecca Badgley, Donna Landry, Bonnie Mahoney, Karen Cordio, Joanne Norris, Stephanie Richards, Tamara Shumovskaya, Jessica Torres, Amanda Kukta, Robert Monk, Michelle Moyo, Crystal Geisert, and others.

79. I honestly still feel that if I were to have continued to work under Rebecca Badgley I could have been set up for a fate worse than being terminated, such as criminal allegations. Reason being that I also witnessed what I believe to have been illegal interactions between Cheryl and Karen with vendors under Rebecca's watch. In the form of vendors personally hand delivering envelopes that were delivered behind closed doors.

80. I make this affidavit voluntarily to disclose what I personally witnessed regarding the discriminatory and retaliatory treatment of Paul Jones, his company, Commonwealth Community Recovery Division, Inc. ("CCRD"), and other minority companies by MART

staff at the direction from MART's director Rebecca Badgley. Rebecca is no longer employed there but this type of behavior seems to still exist.

81. I contacted Paul Jones voluntarily after leaving MART because I felt compelled to reveal the truth about the treatment he and his company CCRD INC. received as I initially thought he was the problem but incidents regarding his case revealed an underlying bigger issue that was brewing at MART and which eventually led to my voluntary resignation from one of the most sought after positions within their company. I resigned after the HR manager acknowledged that she could see the corruption I had brought to her attention was dismissed for reasons I was not privy to. They also had to let Matt Diaz go around the same time after I discovered fraudulent documents he had submitted as proof of work he never completed.

82. An employee that worked at MART's HR Department was also retaliated against for taking complaints of some of this behavior from MART employees that may have led to Karen Cordio and Crystal Geisert's resignation from MART I believe her name is Kathleen Brown.

83. Everything in this affidavit is truthful and based solely on first hand observations.

84. I make this declaration based on my personal knowledge of the facts stated herein and my observations during my tenure at MART.

85. I am prepared to testify to these facts if called upon in a court of law or administrative proceeding.

**DECLARATION UNDER PENALTY OF PERJURY**

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Case 4:19-cv-11093-MRG Document 184-1 Filed 01/07/26 Page 15 of 15

**Executed on:** January 6, 2026.

**Signature:** ______________________ **Ivan Roman**

**DECLARATION UNDER PENALTY OF PERJURY**

Pursuant to **28 U.S.C. § 1746,** I declare under penalty of perjury under the laws of the United States of America and the Commonwealth of Massachusetts that the foregoing is true and correct.

**Executed on:** January 6, 2026.

**Signature:** ______________________

**Ivan Roman**