UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DOCKET No. 4:19-cv-11093-MRG
(combined with Case No. 1:20-cv-12076)

PAUL JONES

Plaintiff

v.

MONTACHUSETT REGIONAL TRANSIT AUTHORITY,

Defendant

DEFENDANTS' LOCAL RULE 56.1 STATEMENT OF FACTS

Pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1, Defendants, Montachusett Regional Transit Authority and Crystal Geisert, Bonnie Mahoney, Jessica Torres, Karen Cordio, Donna Landry, Joanne Norris, Robert Monk, Amanda Kukta, Tamara Schumovskaya, Rebecca Badgley, and Stephanie Richards (collectively, "MART" or "Defendants"), hereby set forth the following statement of undisputed material facts in support of their Renewed Motion for Summary Judgment:

## GENERAL FACTS

1. The Plaintiff, Paul Jones ("Plaintiff" or "Mr. Jones"), is the Manager/Dispatcher and a driver for Commonwealth Community Recovery Division, Inc. ("CCRD"). Second Verified Amended Complaint, ¶ 42 [Dkt. 55].

2. MART is a regional transportation authority established pursuant to G.L. c. 161B. **Exhibit 1, Affidavit of Rebecca Badgley, ¶ 2; G.L. c. 161B.**

3. The Commonwealth of Massachusetts Executive Office of Health and Human Services ("EOHHS"), through its Human Services Transportation ("HST") established a statewide Human Services Transportation coordination initiative, which utilizes a broker system of

managing transportation services for eligible EOHHS consumers from various programs and agencies. Select Regional Transit Authorities such as MART act as Brokers and arrange transportation by subcontracting with qualified transportation providers ("Vendors"). **Exhibit 1, ¶ 6**,

4. MART entered into Agreements with EOHHS through its HST Office and integrated Care Options Providers: Fallon Total Care, Commonwealth Care Alliance and Network Health to manager certain transportation for various agency eligible consumers. **Exhibit 1, ¶ 9**.

5. MART has agreements with over two hundred (200) Vendors to provide transportation services pursuant to MART's Agreement with EOHHS to manage certain transportation for the various agency eligible consumers ("Vendor Agreement"). **Exhibit 1, ¶ 8**.

6. MART entered into a Vendor Agreement with CCRD, Inc. for a period of July 1, 2015 to June 30, 2020, on February 2, 2016 that Plaintiff executed on December 12, 2015. **Exhibit 1, ¶ 9; Exhibit 2 – Agreement Between MART and CCRD**.

7. As part of the application process and Vendor Agreement, Plaintiff provided MART with his cellphone number as the CEO and Director of CCRD, Inc. **Exhibit 2, p. 3 of 83**.

8. MART amends the Vendor Agreements annually. Plaintiff as President/Manager of CCRD, Inc. executed the Contract Amendments annually up and until the Contract Amendment for FY 2021. **Exhibit 3 – Amendments to Vendor Agreement for FY 2017-FY 2021**.

9. CCRD, Inc.'s Agreement with MART was placed on hold because MART was notified on April 22, 2020 that CCRD, Inc.'s workers compensation insurance was cancelled on April 15, 2020. Plaintiff did not provide MART with documentation that CCRD, Inc. had a workers compensation insurance policy after April 15, 2020. **Exhibit 4 – Email Exchange Dated**

**May 8, 2020-May 20, 2020 and September 9, 2020; Exhibit 5 – Plaintiff's Deposition Transcript, pp. 12-15**.

10. To assign rides among its various Vendors such as CCRD among others, MART uses primarily an online portal system. **Exhibit 1, ¶ 14**.

11. The portal system utilizes a bid process to assign rides that are going out three (3) days or more in advance to the lowest-cost qualified Vendor based off vendor rates and availability, as trips are received. **Exhibit 1, ¶ 17**.

12. If the lowest-cost qualified Vendor does not accept the ride, the online portal system goes down the list to the next lowest-cost, qualified Vendor. **Exhibit 1, ¶ 14**.

13. The lowest-cost qualified Vendor is determined based on the rates that are submitted to MART for use in the vendor portal system by the vendors. Vendors are allowed to adjust their rates quarterly. **Exhibit 1, ¶¶ 14-17**.

14. For next-day or same-day requests for transportations services, MART assigns the trips by telephoning vendors using its interactive voice response ("IVR") system at a number that the vendor provided to MART. **Exhibit 1, ¶ 18.**

15. This system is primarily utilized to efficiently manage high volumes of calls for trip dispatch operations, which involves both the acceptance and rejection of trips by MART's vendors. **Exhibit 6 – Affidavit of Stephen Oldfield, ¶2.**

16. The IVR System does not have the capacity to use a random or sequential number generator to dial the numbers provided by vendors. Rather, as with MART's online vendor portal system, the calls using the telephone IVR system are made to Vendors by starting with the lowest-cost qualified vendors. **Exhibit 6, ¶ 3**.

17. Specifically, the backend operations of the IVR system are engineered to optimize the assignment of trips to the low-cost Vendors in MART's portal of subcontractors. The process begins by identifying unassigned trips and pinpointing the lowest-cost qualified Transportation Provider in the system. Once a trip is accepted by a vendor, it is officially assigned to that vendor. If the trip is rejected, the IVR system moves on to the next lowest-cost qualified vendor. Additionally, if a vendor marks the vendor's portal as full for a particular day or marks that they are on "holiday," the call-out system will not have the capacity to offer the Vendor work for those particular days by telephone. If a Vendor does not respond after several attempts, the vendor is marked as having "declined" the trip. **Exhibit 6, ¶ 4**.

18. The IVR system does not use or have the capacity to generate random ten-digit phone numbers, but rather, uses specific phone numbers that are provided to MART by its Vendors. The IVR system then telephones the Vendor based on its low-cost qualified transportation provider algorithm. **Exhibit 6, ¶ 5**.

19. The IVR system does not have the capability to make large blocks of identical and simultaneous calls to random numbers, as that would be contrary to its targeted system of first allowing the lowest-cost vendor to either accept or reject the trip before the call-out system moves onto asking the next lowest-cost qualified transportation provider to offer it the trip. The call to the Vendor commences with an announcement of available trips, by stating: "I found six trips in this request," for example. Vendors are then reminded of their obligation to be authorized to accept new work from MART, and the IVR system will present options to the Vendors to either: (1) accept the trip; (2) request a call back; (3) decline the trip; or (4) hear the options again. If the Vendor opts to review the proposed trip by pressing "5," the Vendor is provided with options to

either accept or decline individual trips, or to have the details repeated. **Exhibit 6, ¶ 6; Exhibit 7 – Overview and Directions for How to Accept Trips via Different Programs.**

20. Vendors have autonomy to update their telephone numbers. They can directly contact MART via phone or email to request such updates which MART can promptly implement. **Exhibit 7; Exhibit 8 – Ivan Roman Deposition Transcript, p. 48**.[1]

21. In 2016, Vendors such as Plaintiff, could also communicate with the Division of Medical Assistance through an email address/email box set-up by MART to relay a phone number change. **Exhibit 9 – Defendant's Response to Plaintiff's Third Set of Interrogatories**.

22. MART has verified that the telephone number provided by Mr. Jones as CCRD's caller id was 617-939-5417 – the telephone number associated with Plaintiff's account with Sprint. MART's records indicate that the last trip accepted by CCRD, Inc. via the IVR system using that telephone number was on June 20, 2019. This suggests that the 617-939-5417 telephone number provided by Plaintiff was deactivated in the IVR system prior to June 24, 2019. **Exhibit 6, ¶¶ 7-8**.

23. If Vendors did not want the IVR system to contact them for a given period of time, the Vendor could mark their status in the Vendor Portal to "full-capacity." **Exhibit 5, pp. 150-151; Exhibit 10 – Email dated September 4, 2018**.

24. From May 5, 2019 to March 27, 2020, within the Vendor Portal, Mr. Jones on behalf of CCRD, intermittently updated CCRD's status to "full-capacity," indicating that CCRD was at capacity and could not accept additional work. As a result, these status updates were

[1] By referencing Mr. Roman's deposition testimony and attaching the deposition transcript hereto, Defendants do not waive their right to move to strike Mr. Roman's deposition testimony and Affidavits on the grounds that Mr. Jones refused to allow Defense Counsel to cross examine Mr. Roman at Mr. Roman's deposition. The reference to Mr. Roman's deposition here is illustrative and simply bolsters the undisputed material fact, that Vendors could change their contact telephone numbers at any time.

intended to prevent the assignment of new trips to CCRD via the IVR system. CCRD would not have been offered trips during these periods when the updates were active in the Vendor Portal. **Exhibit 5, pp. 150-151; Exhibit 6, ¶¶ 7, 8**.

25. On June 20, 2019, MART received an email from Mr. Jones indicating that he wanted MART's IVR system to use two CCRD office numbers only to contact him. Prior to that date, despite sending numerous emails to Rebecca Badgley, Karen Cordio, Ivan Roman, Crystal Geisert, Robert Monk, Tamara Shumovskaya, Amanda Kukta, Jessica Torres as well as exchanging emails with employees of HST and EOHHS from 2016 to June 19, 2020, some about MART's IVR system, Plaintiff had never emailed them requesting that MART change the telephone number he provided for use by the IVR system from his cellphone number to CCRD's office number only. **Exhibit 11 – Email dated June 20, 2019; Exhibit 5, pp. 35, 143-148, 159-161.**

26. Prior to June 20, 2019, Mr. Jones had not submitted a form Vendors are provided to update information, including their contact telephone numbers to MART. **Exhibit 5, p. 35; Exhibit 31 – MART Change Form**.

27. Plaintiff repeatedly accepted trips from MART's IVR System made to his cellphone from 2016 up and until June 20, 2019. **Exhibit 5, pp. 35-36, 127-128, 150-151**; **Exhibit 6, ¶ 22; Exhibit 12 – Emails.**

28. MART's records indicate that the last trip accepted via the IVR system using the telephone number provided for CCRD was on Jun 20, 2019. This suggests that the cell phone number provided by Mr. Jones on behalf of CCRD for use by the IVR system was deactivated in the IVR system prior to June 24, 2019 and no further trips were accepted by CCRD after that date through the IVR system. **Exhibit 6, ¶ 8; Exhibit 10.**

29. Shortly thereafter, Mr. Jones did not receive any telephone calls arranging trips by MART's IVR System to his cell phone. **Exhibit 6, ¶ 8; Exhibit 14 – Plaintiff's Cellphone Bills.**

30. The telephone number associated with MART's IVR system that appears on a vendor's caller id and/or cell phone bill, is 978-252-0019. MART's primary trunk line which appears on caller id for outgoing calls from MART employees is 978-424-9002. The trunk line number is not connected or affiliated with the IVR system. MART would have contacted Plaintiff by use of its trunk line – 978-424-9002 after June 20, 2019, to offer Plaintiff as dispatcher for CCRD trips or for other purposes. **Exhibit 6, ¶ 9**.

31. Plaintiff alleges he sent letters by certified mail in November 2016, February 2017 and in March 2018 asking MART to remove his cellphone from the Automatic Telephone Dialing System. The first letter appears to be addressed to MART, and the February 2017 letter is addressed to Crystal Geisert. Defendant is not in possession of any of the three letters and Plaintiff has only produced one of the letters. Plaintiff has produced two so-called "green cards" indicating MART's receipt of two of the letters. Both the February 2017 and March 2018 green cards produced were signed by administrative staff working in MART's Accounts Receivable. The cards were signed by Aliceson Hill and Katherine Marean. MART has no record of receiving the letters, is not aware that the letters were ever opened and the individuals who signed for the letters are administrative staff who would not have been responsible for and had no authority to remove a Vendors phone number from the IVR system. After sending the letters, Plaintiff communicated regularly with individuals who were able to facilitate the change in phone numbers. **Exhibit 13 - Affidavit Bruno Fisher**.

**G.L. c. 151B and G.L. c. 258**

32. CCRD submitted an application to become a transportation provider to MART on October 26, 2015. CCRD executed the Transportation Provider Sub-Contract with CCRD on December 12, 2015. Because there was documentation that was missing, MART did not execute the Transportation Provider Sub-Contract with CCRD until February 3, 2016. **Exhibit 1, ¶ 19**

33. CCRD submitted its requested rates to MART. The rates submitted by CCRD were higher than many of the other MART vendors providing services to EOHHS. **Exhibit 1, ¶ 21**.

34. CCRD also set the hours it was willing to provide transportation services, which were between the hours of 7:00 a.m. to 3:00 p.m. MART did not set the hours during which CCRD could provide transportation services. **Exhibit 1, ¶ 22.**

35. Because of the limits on the hours CCRD was willing to work, CCRD automatically missed opportunities to be assigned rides that were not during CCRD work hours. MART receives many requests from clients for rides before 7:00 a.m. to transport riders to Methadone clinics or to dialysis. **Exhibit 1, ¶ 23**.

36. Daily and Standing Order (weekly) rides are based on assignment from the low-cost auto-assign program (no human intervention) which is based upon vendor rates and capacity tables. **Exhibit 1, ¶ 24**.

37. On March 22, 2016, Mr. Jones received Vendor Portal Training at MART's offices. **Exhibit 1, ¶ 26.**

38. Following the Vendor Portal Training, Mr. Jones almost immediately began to complain that his company, CCRD was not being assigned a sufficient number of trips. By email dated April 16, 2016, Ms. Badgley advised Mr. Jones that trips are assigned by the vendor portal using a low-cost vendor automated program. **Exhibit 1 ¶ 27;**

39. On August 4, 2016, Mr. Jones sent an email to Karen Cordio, complaining that CCRD, Inc. had not received jobs. **Exhibit 15 - Email dated August 4, 2016.**

40. On August 24, 2016, Mr. Jones sent an email to Rebecca Badgley who at the time was the Director of Brokerage for MART, in which he complained of racial discrimination since the beginning of CCRD's contract with MART. Ms. Badgley looked into the issues raised by Mr. Jones in his email. After doing so, she responded to Mr. Jones, and advised him that after looking into his concerns she found that there was one area of the vendor portal that had been blocked, which was an oversight. She advised Mr. Jones to log into the vendor portal and make sure that he was able to adjust his capacities and see daily work as well as standing orders. **Exhibit 1, ¶ 28; Exhibit 16 – Emails Dated August 24- 25, 2016**.

41. On March 5, 2017, Ms. Badgley met with Mr. Jones in person to discuss issues he was having. **Exhibit 1, ¶ 29**.

42. On March 22, 2017, Plaintiff submitted a Title VI Complaint to MART's Title VI Civil Rights Officer which was received on March 24, 2017. **Exhibit 17– Letter dated March 22, 2017**.

43. On April 5, 2017, Plaintiff met with Ms. Badgley, and the Director of HST Sharna Small-Borsellino to discuss his complaint. **Exhibit 5, p, 92; Exhibit 18 – Letter dated May 5, 2017 to Plaintiff**.

44. MART responded to Plaintiff's complaint in writing on May 5, 2017, responding to each of the concerns raised by Mr. Jones in his letter. **Exhibit 1, ¶ 28; Exhibit 18**.

45. On July 14, 2017, Plaintiff emailed Tamara Shumovskaya, the Scheduling Department Manager informing her that he had "received over 140 Automatic Dialing system calls in the last 10 days: thanking her for the offer of work but stating that the "automatic dialing

system is very very dangerous" when he is driving. In his email, Plaintiff did not request that MART not use his cellphone number. Ms. Shumovskaya forwarded Plaintiff's email to Mr. Roman who advised Plaintiff that he was able to mark himself full at any time via the capacity button located in the portal and doing so would cease the calls. **Exhibit 19 – Emails dated July 14, 2017.**

46. In an email dated October 2, 2017, Mr. Jones informed Ms. Badgley that "things have changed for the worst since we had a meeting in March . . . to iron out the portal differences." In that email, Mr. Jones complained that CCRD was having problems with "non-cost-effective trips miles." He complained that CCRD was being fined and that CCRD trips were still "90% given to [CCRD] by the Automatic Dialing System (IVR system) which causes [CCRD] not to be able to compete with any other vendors" complaining that "[CCRD] calls are hand-picked and sent through the Automatic Dialing System and are not cost effective." Mr. Jones did not request that MART not use his cellphone number. **Exhibit 1, ¶ 31; Exhibit 20 – Emails dated October 2 and 3, 2017.**

47. Ms. Badgley responded to Mr. Jones by email dated October 3, 2017. She told him that she was sorry to hear that things were not going well. She reiterated her previous suggestion to him that he branch out to other venues in addition to contracting with MART. She advised him that as they had previously discussed and confirmed with him, his company has complete access to the vendor portal. She reminded him that transportation that is scheduled 3 days or more in advance is going out through the vendor portal auto assign system based on vendor bid prices for the trips. She told him that She had taken a look at CCRD's rates and that they continued to be on the high side, which is why CCRD was seeing little to no trips in advance through the vendor portal. Further, Ms. Badgley told Mr. Jones that CCRD was getting

the bulk of its calls from the vendor call out and scheduling members due to the fact that there is same day and next day work and the other vendors are at capacity and MART has reached CCRD's trip rate for coverage. **Exhibit 1, ¶ 32; Exhibit 20**.

48. Mr. Jones sent Ms. Badgley an email on January 8, 2018, in which he complained that CCRD had dropped its rates but was still not receiving offers through the vendor portal. Mr. **Exhibit 1, ¶ 33, Exhibit 21 – Emails dated January 8, 19, 2018**. Mr. Jones did not ask Ms. Badgley to remove his cellphone from MART's IVR system.

49. Ms. Badgley looked into Mr. Jones' concerns. She subsequently advised Mr. Jones that she had followed up on her end and that the assign program was functioning properly and rides in the area were being picked up by vendors with lower rates prior to getting to CCRD's rate structure during the running of the assign program. This was why CCRD was getting offered trips via the call out system or from staff. Ms. Badgley advised Mr. Jones that she had looked at CCRD's rates in comparison to other vendors in the area and that CCRD's rates were still on the high side in comparison. She advised him that he was welcome to request the most updated rates. **Exhibit 1, ¶ 34, Exhibit 21**.

50. Because some of the issues raised by Mr. Jones appeared to Ms. Badgley to be due to his not understanding fully how to use the Vendor Portal system, she thought it would benefit him to receive one-on-one training on the system. Ms. Badgley arranged for Mr. Jones to receive one-on-one training with Robert Monk in May 2018. The Vendor Portal Training occurred on May 16, 2018. **Exhibit 1, ¶ 35, Exhibit 22 – Emails dated May 10, 2018**.

51. Prior to the training Ms. Badgley and other MART employees continued to work with Mr. Jones to assist him in the use of the vendor portal. **Exhibit 1, ¶ 36.**

52. Mr. Monk followed up with Plaintiff after the training, thanking him for taking the time to come in for a Vendor Portal refresher. In his email to Plaintiff on May 17, 2018, Mr. Jones wrote that during the training they determined that the appearance of Plaintiff's daily work on the portal was normal, and that the primary problem as they had discussed appeared to be how he submitted his rates due to apparent miscommunication or misunderstanding. **Exhibit 23 – Email dated May 17, 2018**.

53. Mr. Jones emailed Mr. Monk on May 18, 2018, complaining that due to lack of work two of his employees quit. He complained that he had work offered, but that they were non cost effective trips. Mr. Monk responded to Mr. Jones that as they had discussed, the primary issue with his trip offers were his rates. He advised Mr. Jones that he increased his capacity to accept more trips, though he understood that the offers may not be cost effective. **Exhibit 24 – Emails dated May 21, 2018**.

54. On June 1, 2018, Mr. Jones emailed Mr. Monk asking if he could come back to MART to look at the Portal Demo. Mr. Monk emailed Plaintiff back on June 7, 2018, advising that during their one-on-one they reviewed several technical issues and determined what areas to focus on to enhance his trip offers (rates). While he did not believe the problems Plaintiff was having would be addressed in a Vendor Portal training, he told Plaintiff that if he – Plaintiff, believed that he needed to attend a third Vendor Portal training, they would include him in the training on July 1, 2018. In the same email chain, Mr. Monk told Plaintiff that his capacity management was irrelevant to any problems or issues he was having. Mr. Monk wrote that Mr. Jones' capacities had been increased several times, however that doesn't guarantee Mr. Jones will be offered or receive work. **Exhibit 25 – Emails dated June 7, 2018**

55. On October 12, 2018, in response to an email from Plaintiff, Mr. Monk advised Plaintiff that they would be holding another Vendor Portal Training on October 19, 2018, but in the email exchanged advised Plaintiff that there is no intense portal training reviewing each and every aspect of the portal. **Exhibit 26 – Emails dated October 12, 2018**.

56. On February 11, 2019, Mr. Jones filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) and dually filed the complaint with the Massachusetts Commission Against Discrimination (MCAD). In his MCAD complaint, Plaintiff alleged that the Respondent MART was discriminating against him in violation of Title VII of the Civil Rights Act of 1964, as amended and the applicable laws of the Commonwealth of Massachusetts. Plaintiff alleged that he was a MART employee. He did not bring a claim under G.L. c. 151B, §§ 4(4) and 4(4A). MART was notified of the Charge of Discrimination by the EEOC on February 12, 2019. **Exhibit 27 - 2019 – EEOC/MCAD Complaint**.

57. Plaintiff did not name any of the individual defendants or any individuals as a Respondent in his EEOC or MCAD complaint. **Exhibit 27**.

58. The EEOC dismissed Mr. Jones' complaint on February 19, 2019, for "Lack of Jurisdiction: No Employee/Employer Relationship." On December 4, 2020, the MCAD issued a Notice of Substantial Weight Determination stating that after review of the EEOC's Final Determination dated February 19, 2019, that the MCAD was in agreement with the EEOC and has granted substantial weight to the EEOC's determination." The MCAD determined that the "charge reveals no distinct jurisdiction under the discrimination laws separately enforced by the MCAD." **Exhibit 28 – EEOC Dismissal and Notice of Rights. And MCAD Notice of Substantial Weight Determination.**

59. By email dated June 24, 2019, Mr. Jones asked Ms. Badgley to explain the shared ride policy because he believed that he was not properly getting credit for some shared ride members when they did not show up. Ms. Badgley emailed Mr. Jones and explained the standing order to him. **Exhibit 1, ¶ 38, Exhibit 10 attached thereto.**

60. By email dated June 27, 2019, Mr. Jones complained that CCRD's vendor portal reflected offers of trips that CCRD never accepted and complained that MART's system had a "glitch." Ms. Badgley again looked into the concerns raised by Mr. Jones in his email. Ms. Badgley responded to him and informed him that she had looked into the information he provided to her and told him that MART has no way of controlling what times or how frequently members book appointments and reiterated to him that everything booked is assigned via a low cost qualified bid process based off vendor rates as trips are received. In addition, Ms. Badgley advised him again that MART does not have the ability to build CCRD's schedule for him or provide trips in a specific geographical area as the trips are all medical appointments that can change in volume and location on a daily basis. **Exhibit 1, ¶ 39, Exhibits 11 and 12 attached thereto.**

61. In another email dated July 1, 2019, Ms. Badgley responded to another issue raised by Mr. Jones about vendor assignments, advising him that all of the calls that he had accepted via IVR vendor call-out, transferred through to his portal and were scheduled with his company. **Exhibit 1, ¶ 40, Exhibits 11 and 12 attached thereto.**

62. Assignments made by MART to its over two hundred Vendors are based on a low cost qualified bid process based off vendor rates and availability as trips are received. As Ms. Badgley repeatedly told Mr. Jones, CCRD's rates were simply higher than those of other eligible Vendors in the area, which is why CCRD was not being assigned as many trips as Mr. Jones

would have liked. MART does not have information on the demographics of the Transportation Providers it contracts with but is aware that seventeen of those Transportation Providers have registered their businesses with the Supplier Diversity Office (SDO) of the Operational Services Division of the Commonwealth of Massachusetts. CCRD does not appear on the list as having been certified as a diverse business by the SDO. **Exhibit 1, ¶41.**

63. CCRD, Inc.'s Agreement with MART was placed on hold because MART was notified on April 22, 2020 that CCRD, Inc.'s workers compensation insurance was cancelled on April 15, 2020. Plaintiff did not provide MART with documentation that CCRD, Inc. had a workers compensation insurance policy after April 15, 2020. **Exhibit 4; Exhibit 5, pp. 12-15**.

64. Mr. Jones did not send a presentment letter to MART pursuant to G.L. c. 258, § 4 at any time. **Exhibit 13.**

65. MART paid CCRD, Inc. approximately the following amounts:

| | |
|---|---|
| April 7, 2016-December 29, 2016 | $30,125.00 |
| January 9, 2017-August 17, 2017 | $128,321.75 |
| August 3, 2017 0 September 21, 2018 | $29,895.75 |
| September 21, 2018-December 3, 2018 | $45,933.75 |
| January 13,2019 – June 21, 2019 | $123,049.00 |
| July 3, 2019 – December 20, 2019 | $91,000.00 |
| January 2, 2020 – June 18, 2020 | $35,728.00 |

**Exhibit 29 – Transaction Report for CCRD, Inc.**

66. According to Plaintiff, he "provided his personal services to MART's clients for approximately three to four years, working Forty to Sixty hours per week 365 days a year."

**Exhibit 30 - Plaintiff's Verified Complaint, Paul Jones v. Montachusetts Regional Transit Authority et al., Suffolk Superior Court C.A. No. 2184CV01662, ¶ 34**.

Respectfully submitted,

DEFENDANTS,
MONTACHUSETT REGIONAL TRANSIT AUTHORITY et al,

By their attorneys,

Mark R. Reich (BBO# 553212)
Deborah I. Ecker (BBO# 554623)
KP Law, P.C.
101 Arch Street, 12th Floor
Boston, MA 02110-1109
(617) 556-0007
mreich@k-plaw.com
decker@k-plaw.com

Dated: September 28, 2026

4929-3600-7886/37800/0006

CERTIFICATE OF SERVICE

I certify that the above document will be served upon any other party or counsel of record who is not being served by the Court's ECF system, upon notification by the Court's ECF system of same.

Mr. Paul Jones
pj22765@gmail.com

*/s/ Deborah I. Ecker*