UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PAUL JONES,<br><br>Plaintiff<br><br>v.<br><br>MONTACHUSETT REGIONAL TRANSIT AUTHORITY, et al.,<br><br>Defendants | Civil Action: 4:19-cv-11093 MRG<br>Combined with case No. 1:20-cv-12076 |

**PLAINTIFF'S LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF RENEWED MOTION FOR SUMMARY JUDGMENT (CORRECTED VERSION)**

Pursuant to Local Rule 56.1, I submit this statement of material facts of record as to which there is no genuine issue to be tried, in support of my Renewed Motion for Summary Judgment on the TCPA claim, 47 U.S.C. § 227(b)(1)(A)(iii) (Count I). The retaliation claims, G.L. c. 151B §§ 4(4)/4(4A) (Count V), are deferred pending completion of discovery. Each paragraph states one fact followed by its record citation.

## PART I: TCPA CLAIM (Count I, 47 U.S.C. § 227(b)(1)(A)(iii))

### A. Calls to my wireless number (617-939-5417)

1. In its Answer to the First Amended Verified Complaint, MART "admitted that Defendant placed calls to Plaintiff's cellphone number because he was the Dispatcher/Director of CCRD, Inc. until June 2019 using an Interactive Voice Response system ('IVR')." (Doc 247, attached Answer ¶5 (filed 2026-09-15).) In its Answer to the First Amended Verified Complaint, MART "admitted that Defendant placed calls to Plaintiff's cellphone number because he was the Dispatcher/Director of CCRD, Inc. until June 2019 using an Interactive Voice Response system ('IVR')." (Docket 247, attached Answer ¶5 (filed 2026-09-15).)"

2. Defendants admit that "MART called Plaintiff numerous times to offer Plaintiff trips as CCRD's dispatcher/director since November 2016 using the telephone number Plaintiff provided." (Doc 173, Def. Resp. 12 and Resp. 19 (filed 2026-04-28).)

3. Defendants admit that "[t]he telephone number that is associated with MART's IVR system that appears on a vendor's caller id and/or cell phone bill is 978-252-0019." (Doc 173, Def. Resp. 4 (filed 2026-04-28).)

4. In discovery, Badgley identified 617-939-5417 as "Plaintiff cell phone," and my 2016-11-12 letter describes 617-939-5417 as "my cellular telephone." (Badgley RFA/RFP Responses (served 2026-08-10; signed under penalties of perjury 2026-08-07), RFP Resp. 2; Doc 176-1 (filed 2025-04-30), p. 2.)

5. Defendants state that "Plaintiff provided his cellphone number to MART for MART to contact him through the IVR system (automated calls) and regular calls as the Director/Dispatcher of CCRD, Inc." (Shumovskaya Interrogatory Responses (2026-08-07; signed under penalties of perjury), Int. 19.)

6. The verified complaint alleges that Defendants called me "from 978-XXX-0019 & 978-XXX-9002 with an ATDS and or predictive dialer and left artificial computerized voice messages since

on or about May, 2016 … until June 13, 2019." (Doc 55 ¶146 (filed 2020-03-27; §1746 verification signed 2020-03-25).)

7. Defendants characterize my cellphone-bill exhibit as showing that "the last date that MART's IVR system called Plaintiff's cell phone number was on June 20, 2019." (Doc 173, Def. Resp. 4 (filed 2026-04-28).) That characterization understates the record: the bills show seven prerecorded IVR calls from 978-252-0019 on June 20, 2019, all after the June 17 email and six after the June 20 email sent at 6:50 a.m., using the same prerecorded/artificial computerized voice I had been hearing since 2016 (Jones Aff. ¶45), plus eleven additional incoming calls from MART's operators from 978-424-9002 between June 20 and July 12, 2019 (id. ¶18).

8. In its Answer, MART denies that it placed IVR calls to my cellphone after June 19, 2019. (Doc 247, attached Answer ¶8.)

9. In its Third Set of interrogatory answers, MART states that its IVR system "called Plaintiff's cellphone up and until June 20, 2019 to offer Plaintiff as dispatcher of CCRD, Inc. trips." (MART 3rd Interrogatory Answers (2026-08-05; signed under penalties of perjury), Int. 1.)

**B. Artificial or prerecorded voice**

10. Defendants admit that Exhibit 3 contains messages left on my voicemail using an artificial voice. (Doc 173, Def. Resp. 18 (filed 2026-04-28).)

11. In sworn interrogatory answers, Shumovskaya describes the IVR calls sent to vendors as using "an artificial voice." (Shumovskaya Interrogatory Responses (2026-08-07), Int. 13.)

12. The Court's summary-judgment order recites Defendants' factual submission that "[t]he system calls vendors without human intervention and communicates ride assignments with pre-recorded messages." (Doc 193, p. 5 (filed 2026-03-18) (citing DSOF ¶¶13, 15–16).)

13. In her sworn 2020 affidavit, Badgley states that "[d]aily and Standing Order (weekly) rides are based on assignment from the low-cost auto-assign program (no human intervention)" and that "all of the calls that he had accepted via IVR vendor call-out, transferred through to his portal and were scheduled with his company." (Badgley Affidavit (signed 2020-04-09), ¶¶24, 40.)

14. Roman testified that HBSS introduced and operated the IVR system and that MART staff did not place the calls themselves: "we didn't use it to make the calls. HBSS did it." (Aug. 26, 2026 Roman Deposition Transcript, p. 46:8-9.)

15. In response to RFA 11, Shumovskaya denied that she could have stopped prerecorded calls by programming the IVR, adding: "MART never sent Plaintiff 'prerecorded calls' to his cell phone number." (Shumovskaya RFA Responses (2026-08-07), RFA 11.) That statement conflicts with her own sworn interrogatory description of IVR calls "using an artificial voice" (¶10) and with Defendants' admission that Exhibit 3 contains artificial-voice messages left on my voicemail (¶9).

16. MART admitted that its IVR system placed calls "to plaintiff's cell phone as dispatcher for MART's Vendor, CCRD, Inc. between February 17, 2017 and March 15, 2018 using an artificial voice to offer CCRD, Inc. trips." (MART RFA Responses (2026-07-16; signed under penalties of perjury), RFA 7: "Admitted.")

17. MART admitted that its IVR system called my cellphone to offer CCRD trips, while denying that all communications were automated and denying prerecorded messages. (MART 3rd RFA Responses (2026-08-05), RFA 4.)

18. MART "admit[ted] that when Plaintiff was called by the IVR system an artificial voice would state that the call was from MART." (MART 3rd RFA Responses (2026-08-05), RFA 5: "Admitted.")

19. MART admitted that its IVR system used an artificial voice to call my cellphone through June 20, 2019. (MART 3rd Interrogatory Answers (2026-08-05), Int. 2.)

20. MART states that the IVR messages "were not 'prerecorded scripts.' Instead, an artificial voice created by the software program would contact Plaintiff to offer CCRD, Inc. trips and each call was specific to the trip being offered." (MART Interrogatory Answers (2026-07-16), Int. 20.)

21. Shumovskaya states that the Scheduling Department does not create the calls, that the IVR uses an artificial voice, and that she does not know how the software works. (Shumovskaya Interrogatory Answers (2026-08-07), Int. 13.)

**C. Lack of prior express consent**

22. Badgley admitted the following: "Admit that MART has no such thing as a Consent form for individuals to sign giving MART CONSENT to call their cell phone between 2016 and June 25, 2019." (Badgley RFA Responses (served 2026-08-10), RFA Resp. 11: "Admitted.")

23. In response to the request to produce the consent form used "to call Plaintiff cell phone 617-939-5417," Badgley answered: "Defendant has no responsive documents." (Badgley RFP Responses (served 2026-08-10), RFP Resp. 2.)

24. In its Third Set of RFP responses, MART cited only the MART–CCRD, Inc. vendor agreement, "in which Plaintiff Mr. Jones provides his cellphone number," as its consent documentation, stating there are "no additional responsive documents." (MART's Third Responses to Requests for Production (2026-08-05), Request 2, Ex. 18.)

25. Defendants state their consent position as follows: "Plaintiff as Director/Dispatcher of CCRD, Inc. entered into a Vendor Agreement with MART… It is Plaintiff who provided MART with his cellphone number… Plaintiff could have changed CCRD Inc.'s contact telephone numbers at any time." (Shumovskaya Interrogatory Responses (2026-08-07), Int. 22.)

26. Defendants' Corrected Answer to the Second Verified Complaint contains no occurrence of the words "consent" or "revok." and pleads no consent- or revocation-related affirmative defense. (Doc 243 (filed 2026-09-01).)

27. MART admitted that it "did not specifically ask Plaintiff in words for consent" to call my cellphone, claiming instead that I supplied the number. (MART 3rd RFA Responses (2026-08-05), RFA 10.)

28. MART admitted that it had no consent form that vendors signed to authorize calls to cellphones. (MART 3rd RFA Responses (2026-08-05), RFAs 11-12: "Admitted.")

29. MART states its consent theory as follows: "Plaintiff provided MART with his cellphone number for use when he executed the Vendor Agreement between MART and CCRD, Inc. and included his cellphone number for use to contact him as Dispatcher for CCRD, Inc. in the Vendor Portal." (MART Interrogatory Answers (2026-07-16), Int. 13.)

30. In its July 16 RFA responses, MART denied RFAs 14-16 and 20 concerning consent documentation. Those denials are not affirmative admissions and are not characterized as such herein.

## D. Revocation

31. A letter dated 2016-11-12, filed as Doc 176-1, states: "I am revoking all ATDS calls to my cellular telephone (617-939-5417)… please remove my 617-939-5417 number as soon as

possible… please call CCRD INC only on 888-680-4667." (Doc 176-1 (filed 2025-04-30), pp. 2–3; also filed as Doc 7-1 (2019-06-14).)

32. USPS tracking records for article 7016 2710 0001 0777 5997 show "Delivered, Left with Individual," on 11/21/2016 at 12:03 p.m. in FITCHBURG, MA 01420; the certified-mail receipt is postmarked 11/17/2016 and addressed to MART, 100 Main St, Fitchburg, MA 01420. (Doc 176-1, p. 3.)

33. A letter dated 2017-02-11 addressed to Crystal Geisert states: "I am writing again to request that all calls to my cellular telephone be removed from MARTS Automatic Telephone Dialing System… 30 – 40 calls a day from MART on my cellular telephone… with an computerized voice… The 617-939-5417 number is my personal cell phone please remove my cell number from you call list asap." (Doc 176-1, p. 4.)

34. The certified-mail green card for the 2017 mailing, addressed to MART c/o Crystal Geisert, 100 Main St, Fitchburg, MA 01420, bears the signature "Alice m Hill," dated 2/17/17, with the "Agent" box checked (tracking 7015 0640 0001 5570 5341); the certified-mail receipt is postmarked 02/15/2017. (Doc 176-1, pp. 5–8.)

35. A green card for a 2018 certified mailing to MART, 100 Main St, Fitchburg, MA 01420, bears the signature "K Marean" with the "Agent" box checked (tracking 7015 1520 0000 1814 3550); the card bears no delivery date. (Doc 176-1, pp. 5, 8.) The original text of my 2018 letter has not been located, but my supplemental affidavit states its contents from my personal knowledge: the letter asked MART to remove my personal cellular number, 617-939-5417, from its IVR System, revoked all consent to calls on that number, and directed MART to call CCRD Inc. only at 413-315-4500 and 888-680-4667. (Supp. Jones Aff. ¶¶ 4-7.)

36. The verified complaint alleges that "plaintiff revoked consent several time by certified mail and verbally" (¶38), that "Plaintiff sent 5 letters to defendants to revoke consent to calling plaintiffs personal cellular telephone" (¶82), and that revocation occurred "several time verbally and in writing" (¶146) and "early and often" (¶165). (Doc 55 (filed 2020-03-27).)

37. Defendants assert as an affirmative defense that "Plaintiff did not revoke his consent for MART to call his cellphone number until June 2019." (Doc 247, attached Answer, Defenses ¶2 (filed 2026-09-15).)

38. On 6/17/2019 and again on 6/20/2019, I emailed Badgley, Shumovskaya, Torres, and Kukta requesting that MART contact CCRD, Inc. through its office numbers only (the 6/17 email mistyped the office number as 4130315-4500; the 6/20 email gave the correct number, 413-315-4500); Shumovskaya forwarded the 6/20 request to MART staff the same morning. (Shumovskaya Interrogatory Responses (2026-08-07), Int. 9; Shumovskaya RFA Responses (2026-08-07), RFA 28.)

39. Shumovskaya admits that after my 6/20/2019 email, "the IVR system did not contact Plaintiff on his cell phone." (Shumovskaya RFA Responses (2026-08-07), RFA 28.) Defendants state the number was removed from the IVR on 6/24/2019. (Doc 193, p. 5 (citing DSOF ¶¶18, 21).) my Sprint bill for 6/17–7/16/2019 contradicts the RFA: it shows 7 incoming calls from 978-252-0019 (the IVR number) on 6/20/2019, all after the 6/17 email and six after the 6/20 email, using the same prerecorded/artificial computerized voice I had been hearing since 2016. (Sprint bill, 6/17–7/16/2019; Jones Aff. ¶45.) The bills show eleven further incoming calls from MART's operators from 978-424-9002 between June 20 and July 12, 2019. (Jones Aff. ¶45.)

40. Roman testified that changing a vendor's telephone numbers in the system was simple: "You should be able to call in and change your numbers anytime… it should be as simple as that." (Aug. 26, 2026 Roman Deposition Transcript, p. 48:1-8.)

41. MART admitted that the February 17, 2017 green card reflects receipt by an Accounts Receivable employee, while disputing that it constituted revocation. (MART RFA Responses (2026-07-16), RFA 8.)

42. MART admitted that the signatures appearing on the Hill and Marean green cards are authentic, subject to its claimed lack of knowledge regarding the contents of the envelopes. (MART RFA Responses (2026-07-16), RFAs 26-29.)

43. MART states that two Accounts Receivable employees signed the February 17, 2017 and March 15, 2018 certified-mail green cards. (MART Interrogatory Answers (2026-07-16), Int. 18.)

44. At the May 15, 2025 hearing, defense counsel Ecker stated: "In response to the summary judgment, he has now sent us the signed certified receipts," and "The individuals who accepted them were accounts receivable." (May 15, 2025 Hearing Transcript Ex. 14, p. 11, ¶¶ 1-6.) MART admitted that the quoted language accurately reflects what is contained in the hearing transcript. (MART RFA Responses (2026-07-16), RFA 13: "Admitted.") Ecker did not identify Hill or Marean by name; their names appear on the green cards and in MART's discovery responses.

45. MART states that it "did not receive notice that Plaintiff wanted CCRD removed as a vendor." (MART Interrogatory Answers (2026-07-16), Int. 17.) I clarify that I never asked to end the vendor relationship; I asked MART to stop calling my personal cellphone. (Jones Affidavit (DRAFT 2026-09-26) ¶32.)

**E. Timing and volume**

46. The verified complaint alleges artificial/prerecorded calls "since on or about May, 2016... until June 13, 2019" (¶146) and "61 calls with an ATDS and or Predictive Dialer (Artificial message) from 6:10 am until 7:18 pm" on "June 5, 2019" (¶147). (Doc 55 (filed 2020-03-27).)

47. My Sprint bill for the period 11/17/2016–12/16/2016 lists 356 incoming calls from (978) 252-0019, the number Defendants admit is associated with MART's IVR system (see ¶3), and 143 incoming calls from (978) 424-9002. Of the IVR-number calls, 311 are dated on or after 11/21/2016 (the delivery date of the first certified revocation letter, see ¶21) and 45 are dated 11/17–11/20/2016. (Sprint bill, 2016-11-17 to 2016-12-16.)

48. MART Administrator Stephen Oldfield swore that "MART does not create call logs of calls to and from MART Vendors... MART has no such call logs to produce" and that "MART has never created or kept recordings of calls made to Vendors through the IVR system... no such recordings to produce." (Oldfield Affidavit (signed 2026-08-05), ¶¶4–5.)

49. Shumovskaya admitted that MART had no written "do not call" policy from January 1, 2016 through June 30, 2020. (Shumovskaya RFA Responses (2026-08-07), RFA 27: "Admitted.")

50. Roman testified that I received no training on consent to call a vendor's number, no TCPA training, and no do-not-call-registry training. (Roman Deposition (2026-08-26), Tr. pp. 48:11-20, 49:1-10.)

51. MART admitted that the IVR calls concerned nonemergency transportation for MassHealth clients. (MART RFA Responses (2026-07-16), RFA 11: "Admitted.")

52. MART admitted that the artificial-voice calls to my cellphone were not made for an emergency purpose. (MART RFA Responses (2026-07-16), RFA 18: "Admitted.")

53. MART states that it does not know how many IVR calls were placed to my cellphone and has no documents reflecting the call count. (MART 3rd Interrogatory Answers (2026-08-05), Int. 2.)

54. MART states: "MART does not have any polices regarding the Telephone Consumer Protection Act." (MART 3rd Interrogatory Answers (2026-08-05), Int. 3 (sic).)

**F. The second action and the July 2019 tail**

55. In the consolidated second action, No. 1:20-cv-12076 (Doc. 6, Compl. filed 12/21/20), I allege that Defendants placed ATDS and/or artificial/prerecorded-voice calls to 617-939-5417 "from on or about June 17, 2019 until on or about July 10, 2019" (¶ 8), "[d]espite Plaintiff['s] repeated and unequivocal instructions" to cease all calls to my personal cellphone (¶¶10–11); that Defendants lacked my express written consent (¶15); and that the prerecorded messages offered trip assignments ("found (a number of) trip in this request ... press five to hear the trips now ...") (¶16). My sworn affidavit establishes seven prerecorded IVR calls from 978-252-0019 on June 20, 2019, all after the June 17 email and six after the June 20 email, using the same prerecorded/artificial computerized voice I had been hearing since 2016, plus eleven incoming live-operator calls from MART's operators from 978-424-9002 between June 20 and July 12, 2019. (Jones Aff. ¶45.) Defendants admit the IVR calls to my cellphone through June 2019 (Doc 247, Answer ¶5) but deny IVR calls after June 19, 2019 (Doc 247, Answer ¶8), a denial contradicted by my Sprint bills showing seven calls from the IVR number, 978-252-0019, on June 20, 2019. (Sprint bill, 6/17–7/16/2019; see also Jones Aff. ¶45.)

**PART II: RETALIATION CLAIMS (Count V, G.L. c. 151B §§ 4(4)/4(4A))**

**A. Protected activity**

56. Badgley admitted that "Plaintiff filed at least 2 complaints against MART and some of its employees and [Badgley] knew about it." (Badgley RFA Responses (served 2026-08-10), RFA Resp. 10: "Admitted.")

57. Badgley admitted receiving my email stating I "was being discriminated against as a minority vendor" and admitted replying the next day that "there was no discrimination." (Badgley RFA Responses (served 2026-08-10), RFA Resp. 8 (admitted receipt of email; denied remainder), RFA Resp. 9 (admitted reply).)

58. My Title VI complaint letter is dated 3/22/2017; MART's 5/5/2017 response acknowledges receipt of the letter on 3/24/2017 and an in-person meeting on 4/5/2017 attended by me, Badgley, Sharna Small-Borsellino, and Sandy Mulcahy. (Doc 7-2 (filed 2019-06-14); MART Title VI Response Packet (2017-05-05), pp. 1–2.)

59. I submit verified complaints to the EEOC dated 1/13/2019 and 2/11/2019, pleading discrimination, hostile work environment, and retaliation. (EEOC Complaint (mailed 2019-01-13; §1746 verification signed /s/ Paul Jones); EEOC Complaint (2019-02-11; §1746 verification signed /s/ Paul Jones).)

**B. Employer knowledge**

60. Badgley admitted that she knew me "filed at least 2 complaints against MART and some of its employees." (Badgley RFA Responses (served 2026-08-10), RFA Resp. 10: "Admitted.")

61. MART's 5/5/2017 Title VI response was copied to Administrator Mohammed Khan, Deputy Administrator Bruno Fisher, Badgley, Small-Borsellino, and MassDOT Chief Diversity & Civil Rights Officer Julian Tynes, and was signed by Title VI Civil Rights Officer Bonnie J. Mahoney. (MART Title VI Response Packet (2017-05-05), cover page.)

62. Badgley admitted that she "had at least one meeting with Karen Cordio, Ivan Roman and Crystal Geisert about Paul Jones Title VI Complaint" (RFA 19: "Admitted"); she denied that there was a "plan of action" to deal with me for filing complaints at that meeting (RFA 20: "Denied"). (Badgley RFA Responses (served 2026-08-10).)

63. Roman testified that by January 1, 2018, "several employees knew" that I had complained to MART by email and in written complaints. (Aug. 26, 2026 Roman Deposition Transcript, p. 49:11-24.)

64. Roman testified that after my investigation, staff "were told not to answer any of [Plaintiff's] e-mails" and that "[a]nything that you wrote to us would get kicked up to upper management, which would be Karen and Rebecca Badgley." (Aug. 26, 2026 Roman Deposition Transcript, p. 26:18-25, 27:1-11.)

**C. Adverse action**

65. Badgley admitted that "Crystal Geisert mistakenly … made an error when setting CCRD Inc.'s agreed upon capacity which should have been reflected as 10 … but was entered as 0 on May 2, 2016" and that "[t]his was adjusted and corrected on August 25, 2016." (Badgley RFA Responses (served 2026-08-10), RFA Resp. 1: "Admitted.")

66. MART's 5/5/2017 response states that because "CCRD's max capacity was set to 0 mistakenly on 5/2/16," "the low-cost auto assign program skipped over CCRD's rates from the period of May 2 to August 25th when it was corrected." (MART Title VI Response Packet (2017-05-05), pp. 1–15.)

67. In my sworn declaration, Roman states that I first observed CCRD's vendor portal set to "0 (Zero)" in Fall 2016, rechecked it at least every 30 days until my 2018 resignation, observed it reset to zero repeatedly, and that a zero setting meant zero trip offers; at my deposition I

confirmed that after my investigation the portal was set "back to either zero" and that I "wasn't getting no trips." (Doc 184-2 (executed 2026-01-06; filed 2026-01-07), ¶¶9, 13; Roman Deposition (2026-08-26), Tr. pp. 25, 31.)

68. Badgley admitted that vendors "cannot change their vendor capacities or vendor capacity distributions in the Vendor Portal." (Badgley RFA Responses (served 2026-08-10), RFA Resp. 2: "Admitted.")

69. MART's 5/5/2017 response acknowledges that "certain staff members were negligent in their diligence to respond to your correspondence," that an 8/4/2016 email from me "went unanswered," and that "an email trail to CCRD from Karen Cordio cannot be found." (MART Title VI Response Packet (2017-05-05).)

70. The verified complaint alleges that Defendants' "refusing to remove plaintiffs personal cellular telephone from their ATDS and or predictive dialer, constitutes adverse employment action" (Doc 55 ¶227 (filed 2020-03-27)). Despite three certified revocation mailings (¶¶20–24) and the 6/17 and 6/20/2019 office-number-only emails (¶27), the calls continued: 7 prerecorded IVR calls from the IVR number on June 20, 2019, all seven after the 6/17 email and six after the 6/20 email (¶28; Jones Aff. ¶45), and eleven incoming live-operator calls from 978-424-9002 between June 20 and July 12, 2019 (id.). The consolidated complaint alleges the calls continued until on or about July 20, 2019 (¶63).

71. In my sworn declaration, Roman states that "Badgley, Cordio, and Geisert had authority to remove [Plaintiff] from the IVR/call out system"; at my deposition I confirmed that Cordio and Geisert had authority to remove a vendor from the IVR. (Doc 184-2 ¶13; Aug. 26, 2026 Roman Deposition Transcript, p. 52:11-14.)

72. My verified EEOC complaint states that on 4/1/2017 MART's scheduling department cut CCRD's workload by 40% "after complaint filed"; that on 6/1/2017 Cordio changed the bid-change window from 30 to 90 days; that on 7/1/2017 the complaint-notification button was removed for CCRD; that on 6/14/2017 a client was reassigned after my racial-slurs complaint; and that on 6/20/2017 I was subjected to a duplicative audit. (EEOC Complaint (2019-02-11; verified §1746).)

73. My verified EEOC complaint states that on 1/13/2019, the same day the verified EEOC complaint was mailed, MART allowed another vendor to pick up a client booked with CCRD and removed the trip (Trip I.D. T8291956). (EEOC Complaint (mailed 2019-01-13; verified §1746), ¶29.)

74. My verified EEOC complaint states that on 3/12/2018 MART sent a memo that its automatic calling system would begin calling at 6:00 a.m. though CCRD opens at 7:00 a.m.; that around 1/10/2019 portal complaints I had filed were removed; and that MART removed the vendor-portal access tab after I use portal reports as evidence. (EEOC Complaint (2019-02-11; verified §1746), ¶¶12, 33 and Adverse Actions block.)

75. The verified complaint alleges that Defendants subjected me to "multiple back to back audits," "fining plaintiff excessively," "disabling multiple sections of the plaintiffs vendor portal," and "adding non-cost effective trips to his schedule." (Doc 55 ¶180 (filed 2020-03-27).)

**D. Causation / retaliatory intent**

76. In my sworn declaration, Roman states that in Spring 2017, at MART's Brokerage Department, I personally heard Karen Cordio say of me, "HIS BLACK ASS THINKS HE'S SPECIAL," with Badgley and Geisert present and laughing; at my deposition I confirmed the

statement and that MART management "looked at [Plaintiff] as an enemy at that point." (Doc 184-2 ¶3; Roman Deposition (2026-08-26), Tr. pp. 39–41.)

77. In my sworn declaration, Roman states that in Spring 2017 I personally heard Crystal Geisert say "plan of attack" regarding me, with Cordio, Badgley, and Roman present, and that Cordio arranged for inspector Matt Diaz "to harass [Plaintiff] at drop-offs whenever possible"; at my deposition I confirmed the "plan of attack" discussion ("How are we going to harass him") and that Cordio "instructed [Diaz] to pretty much harass you." (Doc 184-2 ¶6; Roman Deposition (2026-08-26), Tr. pp. 10, 18.)

78. In my sworn declaration, Roman states that Cordio and Badgley called me "such a crybaby" and "like all of them" in Spring 2017, and that Cordio said in November 2016 that CCRD were "not our preferred vendors"; at my deposition I confirmed these statements. (Doc 184-2 ¶¶4–5; Roman Deposition (2026-08-26), Tr. pp. 10–13.)

79. Roman testified that "directives came from Rebecca Badgley" and that "Karen was more like the attack dog"; that the motive was "[i]f they were insulted by the line of questions you would ask or your race or all of the above"; and that "[v]endors that were vocal, like yourself, they would find ways to harass and try to find ways to hurt your company." (Roman Deposition (2026-08-26), Tr. pp. 16–19.)

80. When asked whether MART management "kind of retaliated against Paul Jones," Roman answered "Yes. Absolutely."; when asked whether I believed "Karen Cordio made it a point to retaliate against Paul Jones or CCRD, Inc.," I answered "Yes, I do." (Roman Deposition (2026-08-26), Tr. pp. 19–20, 50–51.)

81. In my sworn declaration, Roman states that before a June 2017 meeting with me, Smalls, and Mulcahy, Badgley "explicitly instructed him to 'basically lie,'" to say I had been trying to help me and that MART was not discriminating or retaliating. (Doc 184-2 ¶7.)

82. Badgley denied that my Title VI complaints "played any role" in any discipline of Cordio, Geisert, or Roman. (Badgley RFA Responses (served 2026-08-10), RFA Resp. 28–30: "Denied.")

83. In its 3/18/2026 summary-judgment order, the Court denied summary judgment on the §§ 4(4)/4(4A) retaliation claim, finding that "material factual issues remain to be determined" on retaliatory intent and noting that discovery to that point "ha[d] been generally limited to the question of Mr. Jones's employment status, and not the merits of the underlying retaliation claim." (Doc 193, pp. 13–14.)

84. On 6/2/2016, Roman emailed me, copying Cordio, Geisert, and Shumovskaya, stating that I was "able to make changes to your capacity manager" through the vendor portal; that same evening I emailed Roman reporting that the capacity tab stated in red bold letters, "You cannot change capacities as it has been locked by MART." (Emails, 2016-06-02; Jones Affidavit (DRAFT 2026-09-25) ¶25.)

85. MART states that in 2016, vendors could relay telephone-number changes through MART's DMA email box, and that a vendor portal later became available for such changes. (MART 3rd Interrogatory Answers (2026-08-05), Int. 6.)

86. MART states that it is unaware of any other vendor receiving the multiple or individualized portal training that was provided to me. (MART Interrogatory Answers (2026-07-16), Int. 9.)

87. MART states that Badgley reviewed Vendor Portal information when responding to my complaint. (MART Interrogatory Answers (2026-07-16), Int. 2.)

88. In my sworn affidavit, Roman states that on or about March 15, 2016, Cordio instructed me to pull me out of group vendor-portal training into a one-on-one session on or about March 22, 2016, so Cordio could isolate me; that the "training" was conducted on Cordio's personal laptop rather than in the vendor portal; and that this was done to prevent me from learning how to accept trips and how the system functioned, which "served to interfere with his business operations and facilitate the retaliatory 'plan of attack.'" (Doc 184-1 (executed 2026-01-06; filed 2026-01-07), ¶¶15–20.)

89. Roman states that soon after, when I emailed that I could not access the portal features displaying daily and weekly jobs, Cordio instructed Roman to tell me that "some vendors just never gain access" to those features and that I should wait for the Scheduling Department to call if work became available; and that my inability to see jobs was not due to lack of training but because MART employees intentionally disabled my portal. (Doc 184-1, ¶¶21–22, 30, 66.)

90. Roman states that when I emailed that my portal stated it was "locked by MART" when I tried to adjust capacity, Roman was instructed to tell me I could log in and change my capacity tab every hour, which Roman knew was false because I could see on the back end that MART had locked the portal, to blacklist me by removing my ability to change my capacity to accept trips like other vendors. (Doc 184-1, ¶¶23–24.)

91. Roman states that I personally overheard Cordio and Geisert planning to change my vendor-portal settings to 0 after Roman had been tasked with ensuring the portal was working; that I personally verified CCRD was active and had it confirmed by my superiors Cordio and Badgley; and that two weeks later the portal was back at zero. (Doc 184-1, ¶¶52–53.)

92. Roman states that Cordio and Geisert stole my passwords from my desk drawer while I was at lunch, which I believed was so they could alter vendor-portal information under my account;

that I caught them; and that I reported my findings to Badgley and to human resources. (Doc 184-1, ¶¶53–54, 56.)

93. Roman states that a zero capacity setting means zero trip offers for trips falling in that hour's slot; that other vendors were given 2–6 trips per hour while I was set at 0 "time and time again as if Rebecca and Karen were playing a game"; and that with a zero setting a vendor cannot maintain drivers or set up a future schedule and must depend on next-day IVR calls. (Doc 184-1, ¶¶55, 57, 67.)

94. Roman states that Cordio and Geisert had authority to remove me from the IVR call-out system and could make me receive only "next day automatic prerecorded calls." (Doc 184-1, ¶61.)

95. Roman states that after my complaints became known, Badgley instructed staff in a meeting to ignore my communications and forward any emails from me directly "up the chain of command"; and that when I emailed asking why I had no visibility into available trips, staff knowingly ignored my correspondence per Badgley's orders. (Doc 184-1, ¶¶46, 69.)

96. Roman states that I saw proof that Cordio removed high-paying trips originally assigned to Black vendors and reassigned them to white vendors she favored; that I saw many such trips reassigned to white vendors favored by Badgley, Cordio, and Gayle Wislocki; and that management negotiated more favorable rates for white vendors while repeatedly changing my negotiated rates. (Doc 184-1, ¶¶12, 63–64.)

97. Roman states that I repeatedly witnessed Robert Monk use racial innuendoes and punish Black vendors with higher fines at higher frequency while making exceptions and excuses for white vendors. (Doc 184-1, ¶76.)

98. Roman states that Cordio said she would instruct inspector Matt Diaz to harass me at drop-off locations and conduct targeted research to find a pretext to fine me or terminate my contract (Doc 184-1, ¶7); that Cordio and Geisert made fun of my financial hardship after I told them I had to lay off drivers for lack of work (Doc 184-1, ¶¶25–27); and that I heard Badgley, Cordio, Geisert, and Monk say they "couldn't wait to see Mr. Jones fail as a vendor" (Doc 184-1, ¶72).

99. Roman states my belief that I was targeted because I is Black, because I verbally complained and filed written complaints, and because I knew I was treated differently than other vendors with the same size fleet; and that the targeting was "a calculated effort to punish Mr. Jones for exercising his protected right to oppose discriminatory practices." (Doc 184-1, ¶¶14, 49, 51.)

100. Roman states that at the June 2017 meeting with EOHHS/HST officials, I show cell-phone and laptop photos of my capacity tab stating I was "Blocked by MART"; that I said I had been unable to make a schedule from the vendor portal for at least three months and had to lay off all my drivers; and that Roman later realized the portal and IVR manipulation made my complaints "valid" and "credible." (Doc 184-1, ¶¶37, 39–41, 43.)

101. Roman states that Badgley, Cordio, and Fatima Rivera "held all control over the Vendor Portal" and that Badgley was complicit in Cordio's actions. (Doc 184-1, ¶31.)

102. Roman states that my duties included contract manager, vendor supervisor in charge of approving or denying vendor applications, vendor training, and contract compliance; that I regularly accessed the Vendor Portal and back-end trip-assignment system as part of my job; and that I has firsthand knowledge of the portal's operation. (Doc 184-1, ¶¶75, 77.)

103. MART's FY2022 HST brokerage vendor spreadsheet contains 396 vendor rows with columns for broker, transportation provider, contact, ICORI account name, telephone, fax, address, city, and ZIP. (FY2022 HST Brokerage Transportation Vendors spreadsheet, "FY22

Active Vendors" sheet; copy sent to me by the Executive Office of Health and Human Services; Jones Affidavit (DRAFT 2026-09-25) ¶31, Ex. D.)

104. Matching the spreadsheet's rows by shared contact person, telephone number, or street address identifies sixteen companies that appear as two to four separately named vendor entities each, including: "Atlantic Trans. Inc," "Fleet, Inc.," and "Luxus, Inc." (four rows, all at 95 Washington St, Suite 474, Canton, contact Sandzhar Yusupov); "Mobile Transportation Etc., LLC," "SMART Transportation, Inc.," and "WOW Transportation, Inc." (four rows, all at 156 Quincy Shore Drive #71, Quincy, contact Mikhail Bezvitny); "Alexander Antonian D/b/a Best Transportation" and "Alexander Antonian D/b/a Five Stars Transportation" (same person, telephone, and Natick address); and "Brewster Ambulance Service Inc." and "Eascare, LLC" (same contact Mark Brewster, address, and telephone in Weymouth). (Jones Affidavit (DRAFT 2026-09-25) ¶31, Ex. D.)

105. The pattern persists across MART's later lists: thirteen of the sixteen multi-registration groups appear in MART's 2022-2023 vendor list, and nearly all persist in MART's FY2025 vendor list. CCRD Inc. appears on neither the 2022-2023 list nor the FY2025 list. (MART 2022-2023 vendor list; MART FY2025 vendor list; Jones Affidavit (DRAFT 2026-09-25) ¶31, Exs. E-F.)

106. In addition to my written revocations, I verbally instruct MART's managers, dispatchers, and other employees to stop calling my personal cellular telephone and to contact CCRD, Inc. only through its office numbers, in person and by telephone. The calls to my personal cellular telephone continued anyway. (Jones Affidavit (DRAFT 2026-09-25) ¶32.) The verified complaint likewise alleges that I revoked consent "several time by certified mail and verbally." (See ¶36 (Doc 55 ¶¶38, 82, 146, 165 (filed 2020-03-27)).)

107. Defendants admit that I received calls notifying me of potential trips. (Doc 54 ¶83 (Defendants' Answer to Verified Amended Complaint, filed 2020-03-20).)

108. Defendants admit that I contacted Defendants about receiving calls. (Doc 54 ¶84 (filed 2020-03-20).) The Verified Amended Complaint alleges that I "immediately called Defendants Ivan his contract manager and Crystal and informed them to please only call plaintiff on his office number 888-680-4667 (Revoked Consent)," and that Ivan and Crystal assured me no calls would come to my personal cellular telephone anymore. (Doc 7 ¶84 (filed 2019-06-14).)

109. Defendants admit that MART informed all vendors that the vendors needed to have non-toll-free numbers in order to receive calls from the IVR system. (Doc 54 ¶85 (filed 2020-03-20).)

110. Defendants admit that on or about May 2017, Ms. Cordio resigned from her employment with MART. (Doc 54 ¶100 (filed 2020-03-20).)

111. Defendants admit that MART has levied fines against CCRD. (Doc 54 ¶141 (filed 2020-03-20); Jones Affidavit (DRAFT 2026-09-25) ¶22.)

112. Defendants admit that on or about May 15, 2018, Mr. Roman resigned from my employment with MART and emailed several MART vendors, including CCRD. (Doc 54 ¶142 (filed 2020-03-20).)

113. Asked in discovery to "[s]tate the process of an individual giving MART Consent to call his personal cell phone," Badgley described only that "[e]ach Vendor provides MART with their telephone numbers for MART to contact them to assign trips," and that vendors could relay a phone-number change through a MART email address. She described no process for obtaining consent to place artificial or prerecorded calls to a personal cellular telephone. (Badgley Interrogatory Responses (served 2026-08-10), Int. 2.)

114. Badgley admitted that "most of the time, but not all of the time CCRD, Inc. abided by the Vendor Contract." (Badgley RFA Responses (served 2026-08-10), RFA Resp. 12: "Admitted ... [denied] the remaining allegations.")

115. Cordio admitted that she "generally had a role in managing the vendor portal, that included capacity tabs, trips and training with oversight from her manager." (Cordio RFA Responses (served 2026-07-16; signed under penalties of perjury), RFA Resp. 8.)

116. Cordio denied that CCRD Inc.'s vendor-portal access "was locked, restricted, or completely inaccessible" between July 1, 2015 and December 31, 2018 (Cordio RFA Resp. 6: "Denied"), while Badgley admitted that Geisert "made an error when setting CCRD Inc.'s agreed upon capacity which should have been reflected as 10 ... but was entered as 0 on May 2, 2016" and that it was not corrected until August 25, 2016 (Badgley RFA Resp. 1: "Admitted").

117. My verified administrative complaint dated February 11, 2019, signed /s/ Paul Jones, named the individual defendants who participated in the alleged retaliation: Supervisors Rebecca Badgley, Joanne Norris, and Tamara Shumovskaya; former employees Karen Cordio and Ivan Roman; and lower employees Jessica Torres, Amanda Kukta, Michelle Moyo, and Robert Monk. (EEOC Verified Complaint (2019-02-11; verified §1746), "Supervisors & Lower Employees that participated in the above allegations" block.)

118. In my First Combined Discovery (served 2026-06-21), I served Request for Production No. 14 seeking "a complete copy of all interactive voice response (IVR) system user manuals for 2015 through 2020, technical installation guides, software operational specs, and system administration manuals for the automated outbound calling equipment utilized by Defendant MART or hosted by HB Software Solutions, Inc. to place calls to the Subject Telephone Number between November 1, 2016, and July 31, 2020." In its supplemental responses (served 2026-08-

25), MART objected that the request "assumes a fact that Defendant denies, namely that the calls are 'automated' and that the calls are 'hosted' by HB Software Solutions, Inc.," and, without waiving objection, "refers Plaintiff to documents produced on March 6, 2025," listing nine documents (including Mitel 3300 guides and the "ST Outbound Campaign IVR Version 4 User Guide") and stating "[t]he documents will not be reproduced here." (MART Supp. RFP Responses (2026-08-25), Resp. 14.)

119. On September 25, 2026, EOHHS produced 42 pages of documents, Bates-stamped EHS2P000001 through EHS2P000042, in response to my subpoena dated July 11, 2026. (Cover letter from T. Hoitink (2026-09-25); EHS2P000001-42.) Earlier that day, EOHHS Assistant General Counsel Timothy S. Hoitink had advised me by email that EOHHS was "checking with the team on the next and final production," that "[w]e are in the process of submitting the IT ticket, but it sometimes takes several business days for the documents to be pulled," and that production "may be middle of next week," after the September 28, 2026 filing deadline. (Email from T. Hoitink (2026-09-25 10:13 AM).) I had confirmed receipt of the 118-record interim production (Bates EHSPJ000203-879) that morning. (Email from P. Jones (2026-09-25 9:48 AM).) Mr. Hoitink separately advised that a further production through EOHHS's Everlaw system is expected during the week after September 28, 2026.

120. On October 2, 2017, I emailed Badgley disputing the $400 "returned work" fines: "They are called returned when we never accepted the calls (See $400 Fine attached)." He added, "I informed Ivan Roman in August when these issues came up that we did not accept these trips as we did not have the capacity to take on trips outside of the area where we were working that day." (EHSPJ000529.) On October 3, 2017, Badgley responded that she had "looked into the fines" and that "regarding the returned work... they are valid in nature," while in the same email

admitting the SNS-IVR defect: "due to the phone prompts being the same number to listen to the job and then to accept the job and through testing it was determined that some smartphones and devices were sensitive and would take the 1 twice placing the first trip as accepted even if the vendor did not hear or mean to accept the job." (EHSPJ000528.) Her only answer to the defect was her own assertion that a fix had taken effect in July. In the same email Badgley reversed the camera fine ("that staff should not have fined you for that") but left the $400 fines standing. (EHSPJ000528; see EHSPJ000529 (the $100 dash-cam fine).) She also stated, "You are getting the bulk of your calls from the vendor call out," claimed "your company has complete access to the vendor portal," and told me, "I would suggest that maybe you branch out to other venues in addition to contracting with MART." (Id.)

121. A MART fine notification report dated September 29, 2017 states: "The following fines will be applied and deducted from a future invoice. Continued contract violations/fines may result in additional fines, suspension and/or termination of your contract with MART." It lists "Complaints... 96.00" and "Returned Work... TRIPS ACCEPTED VIA VP, AND IVR... 400.00," for a total of $496.00. (EHSPJ000517.)

122. On May 29, 2018, EOHHS's Anthony Ta emailed EHS colleague Sharna Small-Borsellino relaying what "Becky" (Badgley) told me that morning: "Becky states his bid is still not competitive enough to assign him work." Ta added, "I've asked Becky to provide me with bid data when Mr. Jones first initially escalated this, his current bid rate, and current low-bids/competitive bids for their regions to compare & contrast in the event anyone has any questions." (EHSPJ000572.) No such bid-data comparison appears in the EOHHS production.

123. On August 24, 2016, I emailed MART Director Rebecca Badgley complaining of racial discrimination. On August 25, 2016, at 11:57 a.m., Badgley replied that she had "done an

investigation" and found "no racial discrimination, retaliation or Hostile work place going on." (Paul Jones contemporaneous notes, email dated 2016-09-23 (preserved at files/evidence/Paul-Jones-retaliation-notes-email-2016-09-23.md); Jones Aff. ¶36.)

124. On August 25, 2016, the day after my discrimination complaint, Ivan Roman called me and said I had "inadvertently blocked" me from the Capacity Management tab, even though I had protested the block by email several times; Roman failed to unblock me. The same day, MART removed my Vendor Activity tab from the Vendor Portal, "making it impossible to track my Vendor activity." (Id.)

125. My contemporaneous notes document the following September 2016 adverse actions: on September 23, 2016, MART Scheduling placed a trip marked "ONLY FEMALE driver" in my portal after I had informed MART three times that CCRD had no female drivers; on September 23, 2016, a standing order (client name redacted, Chicopee to Holyoke) I had accepted was removed from the Vendor Portal along with a one-way trip accepted September 20, 2016; on August 26, 2016, at approximately 7:30 p.m., CCRD was assigned an overlapping standing order; as of September 23, 2016, CCRD had been offered approximately 20 trips through the assigned program versus approximately 2,500 submitted through the assigned program for nonminority vendors; and a promised $70.50 payment for the August 30, 2016 Hadley-to-Palmer trip went unpaid despite my follow-up emails on September 1, 6, 12, and 16, 2016. (Id.; see also Paul Jones contemporaneous notes, email dated 2016-09-27 (same subject).)

126. On July 1, 2019, Badgley emailed me and others, including defendants Shumovskaya, Kukta, Torres, Monk, Moyo, and Norris, reporting her research that on June 28, 2019, CCRD was offered 169 trips and accepted 60. (EHSPJ000808.) MART's own records thus confirm the

IVR system was still calling my number in late June 2019, after all three revocation mailings (¶¶31-35) and the June 17 and June 20, 2019 office-number-only emails (¶38).

127. On April 25, 2017, Badgley sent emails to EOHHS Director Sharna Small-Borsellino captioned "Paul Jones update" and "RE: Paul Jones update," transmitting an attachment titled MART_FINDINGS_REGARDING_CCRD.docx and a spreadsheet of vendor rates, and noting that she had "researched" the contract dates. (EHS2P000011 through EHS2P000013.) The attachment MART_FINDINGS_REGARDING_CCRD.docx was not included in either EOHHS production; the rate spreadsheet appears in the earlier EOHHS production as EHSPJ000391.

128. On January 9, 2019, at 9:49 a.m., Badgley wrote to Sandy Mulcahy of EOHHS regarding my December 27, 2018 complaint about standing orders placed in CCRD's vendor portal without its consent, in reply to EOHHS's direct inquiry "Any update on this": "Yes, I spoke with him directly his issues are the same he wants more work but he really only wants to stay within certain areas and does not have a large fleet. He recently reduced his rates and is not seeing as much work as he thought he would. He only has 3 cars one of which he informed me he is pulling off the road. I told him if he has any issues to let me know." (EHS2P000004.) The email does not address the complaint's substance.

129. On March 28, 2017, Badgley emailed Small-Borsellino and Mulcahy of EOHHS regarding "CCRD," stating she was pulling audit information and "I have to follow up with Karen." (EHSPJ000300.)

130. On May 5, 2017, Badgley told Small-Borsellino of EOHHS that MART's response to me would go out that day and that Bonnie Mahoney would send it (EHSPJ000394); Mahoney transmitted MART's formal response to my March 22, 2017 Title VI complaint letter the same

day, with a follow-up summary describing the April 5, 2017 meeting attendees as me, Badgley, and Small-Borsellino. (EHSPJ000395.)

131. In his signed affidavit, Roman states that on or about June 2017, Badgley called him into a meeting with Sharna Smalls and Sandy Mulcahy of EOHHS/HST at MART's Brokerage Department, 100 Main Street; that before entering the meeting Badgley "explicitly instructed [him] to provide a false narrative": to state that he had been attempting to assist me but that I suffered from an "understanding problem," and to "affirmatively deny that MART or its employees were engaging in discrimination or retaliation"; and that he followed Badgley's instructions during the meeting in their presence. (Doc 184-1 (executed 2026-01-06; filed 2026-01-07), ¶¶34–36.)

132. MART's vendor change form states: "This form must be utilized for any changes of address, business or mailing and is required to be signed by the Contractor. This change form will serve as an amendment to your current contract with the Montachusett Regional Transit Authority." The form contains fields for "Phone Number" and "IVR Number." (MART Change Form.) On December 26, 2018, Moyo wrote to me: "Vendors are not authorized to make changes to the Vendor Capacity or the Vendor Capacity Distribution. That is only for MART staff... No vendor has access to adjust their capacity." (Supp. R.A. 00515.) The same day, Moyo wrote that hours-of-operation changes required me to "fill out the attached form and submit it back to MART." (Supp. R.A. 00516.) On May 21, 2018, Monk wrote to me: "I did increase your capacity to accept more trips." (Monk email, 2018-05-21.)

133. The FY20 MART contract amendment (effective July 1, 2019), in my handwritten disclosures, lists the contact telephone number as 413-315-4500 and the address as 79 Thompson St., Springfield, MA 01109. (Supp. R.A. 00329.)

**E. July 2017 written objection to the autodialer calls (supports Part I.D)**

134. On July 14, 2017, I emailed Shumovskaya, Badgley, Kukta, Cordio, and Torres stating that I had "received over 140 Automatic Dialing system calls in the last 10 days" and that "the automatic dialing system is very very dangerous as I am driving when these calls come through most of the time," and asking MART to place trips in CCRD's vendor portal instead. That same day Shumovskaya forwarded the email within MART, and Roman replied that I could mark myself "full" in the portal to stop the calls and that my "MART contract mandates that should [he] need to answer a call while driving [he is] required to pull over." The calls continued. (MART000336-338; Affidavit of Paul Jones ¶38; Ex. 8.)

**F. Pleading coverage, preservation demand, and incomplete discovery (supports deferral of Count V)**

135. The TCPA claim in Case No. 4:19-cv-11093-MRG is pleaded as Count I of the Verified Amended Complaint (Doc. 7, filed June 14, 2019). The TCPA claims in Case No. 1:20-cv-12076 are pleaded as Counts 1-2 of the First Amended Verified Complaint. This renewed motion for summary judgment covers the TCPA counts in both docket numbers.

136. On March 15, 2021, I served a formal Notice to Preserve Electronic Evidence on Defendants' counsel, Deborah I. Ecker, Esq., KP Law, P.C., via Certified Mail No. 7019 1120 0000 0061 1739, demanding preservation of all electronically stored information from July 5, 2015 through March 15, 2021, including call records, IVR dialer data, internal emails, dispatch records, and HR investigation files. (Doc. 240-2.) Counsel acknowledged receipt on March 15, 2021.

137. In their July 16, 2026 First RFP responses, Defendants stated: "Defendant only retains personnel files for employees for seven (7) years after they have left their employment with MART." (MART First RFP Resp. 12.) Defendants have responded "no responsive documents" to requests for HR investigation files and personnel records for Karen Cordio, Michelle Moyo, and Crystal Geisert.

138. On August 28, 2026, I filed a Motion for Sanctions for Spoliation of Evidence pursuant to Fed. R. Civ. P. 37(e) and 37(b) (Doc. 240). Defendants opposed (Doc. 241), and I replied (Doc. 246, filed September 8, 2026). The motion remains pending and has not been ruled on.

139. Michelle Moyo's deposition has been noticed but has not been taken.

140. The Court ordered Defendants to produce the manual for the IVR system that placed calls to me from 2016 through July 20, 2019, Defendants' telephone records, and voice messages. Defendants have not produced these documents. Defendants substituted a 2021 IVR user manual for the operative 2016-2020 manuals that governed the dialing equipment during the actionable period.

141. The CCRD-MART Brokerage Transportation Provider Contract (July 1, 2015 through June 30, 2020) is between the Montachusett Regional Transit Authority and Commonwealth Community Recovery Division Inc. I signed the contract solely as CCRD Inc.'s authorized representative; I am not a party to the contract in my individual capacity. The contract contains no provision in which I consent, in my individual capacity, to prerecorded or artificial-voice calls to my personal cellular telephone number, 617-939-5417. (CCRD-MART Brokerage Transportation Provider Contract (2015-2020); Jones Aff. ¶46.)

Respectfully submitted, Date: September 29, 2026

Paul Jones, Pro Se Plaintiff

79 Thompson Street

Springfield, Ma 01109

Tel: 617-939-5417

Pj22765@gmail.com

## CERTIFICATE OF SERVICE

I, Paul Jones, hereby certify that on September 29, 2026, I served the foregoing Plaintiff's Renewed Motion for Summary Judgment (Corrected Version), Memorandum in Support (Corrected Version), Statement of Undisputed Facts Pursuant to Local Rule 56.1 (Corrected Version), Affidavit of Paul Jones with Exhibits (Corrected Version),and the Supplemental Affidavit Corrected Version on the following counsel of record via the Court's CM/ECF system:

Date: September 29, 2026

Deborah I. Ecker, Esq.
KP Law, P.C.
101 Arch Street, 12th Floor
Boston, MA 02110
DEcker@k-plaw.com

Tel: 617-654-1714
Mark R. Reich, Esq.
KP Law, P.C.
101 Arch Street, 12th Floor
Boston, MA 02110
mreich@k-plaw.com
Tel: 617-654-1714

Respectfully submitted,

Paul Jones, Pro Se Plaintiff

79 Thompson Street

Springfield, MA 01109

Tel: 617-939-5417

Pj22765@gmail.com