UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DOCKET No. 4:19-cv-11093-MRG
(combined with Case No. 1:20-cv-12076)

| | |
|---|---|
| PAUL JONES,<br><br>Plaintiff<br><br>v.<br><br>MONTACHUSETT REGIONAL TRANSIT AUTHORITY, et al.,<br><br>Defendants | MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT<br>**(Leave to File Granted on November 3, 2026)** |

## I. INTRODUCTION

Defendants, Montachusett Regional Transit Authority("MART") and Crystal Geisert, Bonnie Mahoney, Jessica Torres, Karen Cordio, Donna Landry, Joanne Norris, Robert Monk, Amanda Kukta, Tamara Schumovskaya, Rebecca Badgley, and Stephanie Richards (collectively, "Defendants"), hereby renew their motion for summary judgment in the above-captioned matter on Count I of Plaintiff Paul Jones' ("Plaintiff" or "Jones") First Amended Complaint [Dkt No.7],[1] and on Counts V and VI of Plaintiff's Second Verified Amended Complaint [Dkt No. 55], following a remand to this Court by the First Circuit Court of Appeals in Case No. 22-1234.[2]

[1] After the TCPA claims were dismissed by this Court, the Plaintiff did not renew them in his Second Verified Amended Complaint. Following the Court of Appeals' remand to this Court, however, the TCPA claim in Count I brought pursuant to 47 U.S.C. § 227(b)(1)(A)(iii) has been revived, and the Defendants move for summary judgment on that count. In contrast, the First Circuit concluded that the Plaintiff had not plausibly alleged any other claims pursuant to other sections of the TCPA. Therefore, Count II of the First Amended Verified Complaint [Dkt No.7] has not been similarly revived.

[2] The related TCPA claim issues were discussed by the First Circuit Court of Appeals in Appeal Case No. 22-1569, and that decision ordered remand to the Court in Jones's other case, No. 1:20-cv-12076-TSH (Appeal No. 22-1569). At the Status Conference held on February 27, 2025, this case was consolidated and the complaint combined with Case 4:19-11093.

Following the remand, both Plaintiff and Defendants filed motions for summary judgment. In opposing Defendants' motion for summary judgment, Plaintiff filed a motion pursuant to Rule 56(d) of the Federal Rules of Civil Procedure, claiming that summary judgment was premature due to limited discovery. By decision dated March 18, 2026, the Court agreed in part and denied the parties cross-motions for summary judgment allowing discovery to proceed.

Discovery has been conducted and the discovery period has now closed. Discovery has only served to bolster Defendants' summary judgment motion. Accordingly, Defendants renew their summary judgment motion. First, Defendants are entitled to summary judgment on Plaintiff's claim for the Negligent Infliction of Emotional Distress contained in Count VI of the Second Verified Amended Complaint, because Plaintiff did not present his claim in writing to the executive officer of MART a prerequisite to filing a negligence claim under the Massachusetts Tort Claims Act ("MTCA"). G.L. c. 258, § 4. Second, the individual Defendants are entitled to summary judgment on Plaintiff's claim for the Negligent Infliction of Emotion Distress because a public employee is not liable for negligent or wrongful acts pursuant to the MTCA. G.L. c. 258, § 2.

Third, Plaintiff's claim against the individual Defendants brought pursuant to G.L. c. 151B, contained in Count V of the Second Verified Amended Complaint, must be dismissed, because Plaintiff failed to name the individuals as Respondents in any complaint filed with the Massachusetts Commission Against the Discrimination ("MCAD") or with the Equal Employment Opportunity Commission ("EEOC") for that matter, a prerequisite for filing a claim in court.

Fourth, in Count V of his Complaint, Plaintiff alleges that he was retaliated against for "requesting an accommodation" (Second Verified Complaint, ¶ 225), but there is no evidence that Plaintiff can put forth that he ever asked for an accommodation based on a disability. Even if

Plaintiff meant to bring a claim for retaliation based on his filing of an internal complaint of retaliation, Plaintiff's retaliation claim, he now purports to bring pursuant to G.L. c. 151B, §§ 4(4) and 4(4A), must be dismissed because Plaintiff cannot establish that he was treated differently by Defendants after he complained of discrimination. Instead, Plaintiff's complaints before he complained of discrimination, that his company Commonwealth Community Recovery Division, Inc. ("CCRD") was not assigned enough work, were the same as his complaints after he complained. The undisputed facts supported by admissible evidence show that Plaintiff's company was not assigned as much work as Plaintiff would have liked because CCRD was not the lowest cost qualified Vendor. In addition, not only were Plaintiff's complaints the same, but the undisputed facts show that rather than retaliate against him after he complained, MART sought to assist Plaintiff in better understanding the vendor portal. In fact, based on the transaction history, CCRD earned more after Plaintiff complained than before and that is even though Plaintiff rejected a significant number of trips offered.

Finally, Plaintiff's claim brought pursuant to the Telephone Consumer Protection Act ("TCPA") contained in Count I of the Plaintiff's Verified Amended Complaint must be dismissed, because discovery has made clear that Plaintiff consented to the use of his cell phone number when he provided it to MART for use to contact him as the Manager/Dispatcher[3] for CCRD and because Plaintiff did not clearly revoke his consent until June 20, 2019, when he sent an email to the MART employees he had been regularly communicating with in the Brokerage Division requesting that MART's interactive voice response system ("IVR") contact CCRD's office number only. Certainly, the admissible evidence makes clear that MART did not have reason to know that

[3] Plaintiff has used various titles in documents to clarify his position with CCRD, Inc.

Plaintiff had revoked his consent because Plaintiff continued to accept trips on behalf of CCRD through MART's IVR System using his cellphone up and until June 20, 2019.

As set forth above and in more detail below, summary judgment should enter in favor of Defendants on Plaintiff's remaining claims.

## II. ARGUMENT

### A. Legal Standard.

The purpose of summary judgment is "to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." Tobin v. Federal Express Corp., 775 F.3d 448, 450 (1st Cir. 2014) (internal citation and quotations marks omitted). "[A] court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is inappropriate "if the record is sufficiently open-ended to permit a rational fact finder to resolve a material factual dispute in favor of either side." Pierce v. Cotuit Fire Dist., 741 F.3d 295, 301 (1st Cir. 2014).

In determining whether summary judgment is proper, the Court must view the record in the light most favorable to the non-moving party and must draw all reasonable inferences in the non-movant's favor. Ahmed v. Johnson, 752 F.3d 490, 495 (1st Cir. 2014). The moving party bears the initial burden of asserting the absence of a genuine issue of material fact and "support[ing] that assertion by affidavits, admissions, or other materials of evidentiary quality." Mulvihill v. Top-Flite Golf Co., 335 F.3d 15, 19 (1st Cir. 2003) (citation omitted). A genuine issue of fact exists where a fact finder could find in favor of the non-moving party, "while material facts are those whose existence or nonexistence has the potential to change the outcome of the suit." Green Mountain Realty Corp. v. Leonard, 750 F.3d 30, 38 (1st Cir. 2014) (internal citation

and quotations marks omitted). "Once the moving party avers the absence of genuine issues of material fact, the nonmovant must show that a factual dispute does exist, but summary judgment cannot be defeated by relying on improbable inferences, conclusory allegations, or rank speculation." Fontanez-Nuñez v. Janssen Ortho LLC, 447 F.3d 50, 54-55 (1st Cir. 2006) (internal citation and quotation marks omitted).

Here, even when drawing all reasonable inferences in favor of Plaintiff, there remain no genuine issues of material fact as to Plaintiff's claims brought pursuant to the TCPA, § 227(b)(1)(A)(iii); Chapter 151B, §§ 4(4) and/or 4(4A); and his claim for the negligent infliction of emotional distress. As such, judgment must enter in favor of Defendants on all remaining claims before this Court.

**B. Negligent Infliction of Emotional Distress – Plaintiff's Claim Is Barred, as a Matter of Law, by the Massachusetts Tort Claims Act.**

In Count VI of Plaintiff's Second Verified Amended Complaint, Plaintiff brings a claim for the negligent infliction of emotional distress, alleging that "Defendants knew or should have known, that failure to combat the Intentional Discrimination, Retaliation and the Hostile Work Environment and to investigate plaintiffs' allegations in a timely orderly fashion and to exercise due care would cause plaintiff severe emotional distress and physical symptoms." [Dkt 55, at ¶ 236.] Plaintiff's negligent infliction of emotional distress claim must be dismissed because Plaintiff did not present his claim as required under the MTCA, a prerequisite to being able to file a negligence claim against MART in court. See G.L. c. 258, § 4. Specifically, under the MTCA a claim for negligence, a tort claim, may not be brought against a public employer unless the plaintiff "first presented his claim in writing to the executive officer of such public employer within two years after the date upon which the cause of action arose, and such claim shall have been finally denied by such executive officer in writing." G.L. c. 258, § 4. Presentment is a condition precedent

to Plaintiffs' negligence claim and must "be made 'in strict compliance with the statute.'" Gilmore v. Commonwealth, 417 Mass. 718, 721 (1994), quoting Weaver v. Commonwealth, 387 Mass. 43, 47 (1982); see, e.g., Spring v. Geriatric Auth. of Holyoke, 394 Mass. 274 (1985) ("If proper presentment is not made within the time allotted, the plaintiff's complaint is subject to dismissal"); Hankey v. Town of Concord-Carlisle, 136 F. Supp. 3d 52, 75 (D. Mass. 2015) (where "Plaintiff has not provided evidence that she made proper presentment before filing suit … [the claim] is subject to dismissal"). Plaintiff has not produced evidence that he sent a presentment letter to MART in response to Defendants' discovery requests and MART has no record of ever receiving a presentment letter. **SOF, ¶ 64**. Because Plaintiff did not make proper presentment of his negligence claim, his claim for the negligent infliction of emotional distress must be dismissed and judgment entered in favor of Defendants.

To the extent that the individual Defendants remain in this case, which they do not, the claim of negligent infliction of emotional distress must too be dismissed against them regardless of whether proper presentment was made by Plaintiff, because under the MTCA, public employees are not liable for negligent acts. G.L. c. 258, § 2.

In addition, assuming *arguendo* that Plaintiff's claim is not barred by the MTCA for his failure to make proper presentment, his claim for the negligent infliction of emotional distress must still be dismissed and judgment entered for MART because the provisions of the MTCA do not apply to discretionary functions, such as those that form the basis of Plaintiff's negligence claim. Put another way, MART is immune from claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty . . . whether or not the discretion involved is abused." G.L. c. 258, § 10 (b). Indeed, Plaintiff's claim that MART negligently inflicted emotional distress on him is barred by G.L. c. 258, § 10(b) because, whether and how to

respond to all of Plaintiff's complaints and whether and how to investigate the issues he raised in said complaints, none of which had anything whatsoever to do with Plaintiff's race or sex, are discretionary functions of a public employee. Harrington v. City of Attleboro, 172 F. Supp. 3d 337, 347 (D. Mass. 2016) (school's decisions on whether and how to investigate complaints of harassment and to discipline are discretionary functions). In fact, MART's decisions in these regards were not limited by any statute or regulation and thus involves policy-making and planning for which § 10(b) was designed to immunize. Harry Stoller & Co. v. City of Lowell, 412 Mass. 139, 141 (1992).

Finally, even if Plaintiff's claim was not barred by discretionary function exception to the MTCA, Plaintiff's claim for the negligent infliction of emotional distress must still be dismissed because, based on the undisputed material facts, Plaintiff cannot prove the elements of his claim. To recover for the negligent infliction of emotional distress, Plaintiff must prove, 1) negligence; 2) emotional distress; 3) causation; 4) physical harm manifested by objective symptomatology; and 5) that a reasonable person would have suffered emotional distress under the circumstances. Lanier v. President and Fellows of Harvard College, 490 Mass. 37 (2022). Here, Plaintiff cannot establish any of the required elements. Plaintiff's claim presupposes that he will prevail on his discrimination, harassment and retaliation claims. However, Plaintiff's only remaining claim in this regard is for retaliation brought pursuant to G.L. c. 151B, §§ 4(4) and 4(4A) which claim as set forth below cannot survive summary judgment. In addition, Plaintiff will not be able to prove the elements of his negligence claim because based on the overwhelming undisputed material facts, MART did not breach any duty owed to Plaintiff. In fact, MART was not negligent, but instead, spent an inordinate amount of time trying to assist Plaintiff in better understanding the manner in which trips are assigned, in the use of the vendor portal and in responding to Plaintiff's

numerous emails seeking information. **SOF, ¶¶ 37, 40, 41, 43, 44, 45, 47, 49, 50-55, 59-61**. While Plaintiff clearly did not like the reasons provided for why CCRD was not being assigned more rides, the fact that he would have liked a different outcome is not evidence of negligence. Plaintiff has not and cannot produce evidence to show that any of MART's actions caused him to suffer from emotional distress, any evidence of physical harm manifested by objective symptomology or evidence that a reasonable person under the circumstances of this case would have suffered from emotional distress.[4] Accordingly, even if Plaintiff's claim for the negligent infliction of emotional distress was not barred for the reasons set forth above, summary judgment must still enter in favor of Defendants on Count VI of Plaintiff's Second Amended Complaint because Plaintiff cannot prove the essential elements of his claim.

**C. Chapter 151B – Plaintiff has Failed to Make out a Case for Retaliation or Interference with Protected Rights.**

In Count V of Plaintiff's Second Verified Amended Complaint [Dkt. 55], Plaintiff brings a claim for "Violations of M.G.L. c. 151B, § et seq – Interference with Protected Rights and Retaliation for Requesting Reasonable Accommodation" which he now alleges was brought pursuant to G.L. c. 151B, §§ 4(4) or 4(4A). [Dkt. 55 at 38-39.] First, Plaintiff's claim brought pursuant to G.L. c. 151B, §§ 4(4) or 4(4A) must be dismissed because Plaintiff failed to file a charge of retaliation or interference pursuant sections 4(4) and 4(4A) with the MCAD as required prior to bringing his claim in court. *See* G.L. c. 151B, § 4. While Plaintiff filed a complaint of discrimination and retaliation with the EEOC and dually filed it with the MCAD, that complaint was not filed under Sections 4(4) or 4(4A). **SOF, ¶ 56**. The EEOC dismissed Plaintiff's complaint for lack of jurisdiction because there was no employee/employer relationship. **SOF, ¶ 58**. The

[4] During the July 24, 2026 hearing, Plaintiff stated that he was not seeking damages for any medical treatment he alleges he received arising from the allegations contained in his Complaints.

MCAD followed the EEOC's determination and issued a substantial weight determination dismissing Plaintiff's complaint on the same grounds as the EEOC, presumably understanding that Plaintiff had only filed his charge of discrimination and retaliation as an employee of MART. Plaintiff did not file a separate complaint of retaliation with the MCAD pursuant to sections 4(4) and 4(4A) of Chapter 151B and in fact, did not initially claim here that his retaliation claim was based on anything other than his status as an employee of MART. Because Plaintiff did not file a charge of retaliation with the MCAD under the sections of the statute he now seeks to pursue, Plaintiff's claim brought pursuant to G.L. c. 151B, §§ 4(4) and 4(4A) must be dismissed. **SOF, ¶ 56**.

To the extent that the individually named Defendants are still parties to this matter, any claim against them pursuant to G.L. c. 151B, 4(4) and 4(4A) must be dismissed because Plaintiff never named them as respondents either in his charge filed with the EEOC or his Charge of Discrimination filed with the MCAD as required. **SOF, ¶¶ 56, 57**; See, G. L. c. 151B, § 9. Certainly, the MCAD and EEOC did not believe that Plaintiff had filed a claim against the individual Defendants first because there is no individual liability under Title VII of the Civil Rights Act of 1964, the statute the EEOC is charged with enforcing, but also because in its Notice of Charge of Discrimination to MART on February 12, 2019, the EEOC only has MART as a Respondent. While there can be individual liability under G.L. c. 151B, in his Charge of Discrimination Plaintiff only named MART as a Respondent and the MCAD's Notice of Substantial Weight Determination dated December 4, 2020, only names MART as a Respondent finding that, "the charge reveals no distinct, independent jurisdiction under the discrimination laws separately enforced by the MCAD." **SOF,** ¶ 58.

Finally, even if Plaintiff's claims brought pursuant to G.L. c. 151B, §§ 4(4) and 4(4A) are not dismissed for his failure to file a separate charge of retaliation under those sections of the statute, Plaintiff's claims must still be dismissed because, based on the undisputed material facts, Plaintiff cannot establish the essential element of his claims. "Chapter 151B, [ ] does not actually use the word 'retaliation.' Rather, § 4(4) makes it unlawful for 'any person . . . to discharge, expel or otherwise discriminate against any person because he has … filed a complaint, testified or assisted in any proceeding under [G.L. c. 151B, § 5],' while § 4(4A) makes it unlawful for 'any person to coerce, intimidate, threaten, or interfere with such other person for having aided or encouraged any other person in the exercise or enjoyment of any such right granted or protected by this chapter.'" Psy-Ed Corp. v. Klein, 459 Mass. 697, 706 (2011) quoting, G.L. c. 151B, §§ 4(4) and 4(4A). In a retaliation case under G.L. c. 151B, the court utilizes the burden shifting standard adopted by the Supreme Judicial Court in Mole v. University of Mass., 442 Mass. 582, 591-592 (2004). "In the absence of direct evidence of retaliatory motive, to make out a prima facie case of retaliation, the plaintiff must show that 'he engaged in protected conduct, that he suffered some adverse action, and that a 'causal connection existed between the protected conduct and the adverse action.'" Id., quoting, Mole v. University of Mass., 442 Mass. 582, 591-592 (2004) (*internal citations omitted)*. The desire to retaliate, however, must be shown to be a determinative factor in its decision to take adverse action. Id. citing, Abramian v. President & Fellows of Harvard College, 432 Mass. 107 (2000). As an initial matter, as set forth above, it is undisputed that Plaintiff never made a request for accommodation as that is defined under G.L. c. 151B, § 4 and the factual allegations contained in the Second Verified Amended Complaint do not reference any such request. To the extent that Plaintiff alleges that Defendants retaliated against him because he complained of discrimination, Plaintiff's retaliation claim against MART – or even the individual

Defendants for that matter must be dismissed because Plaintiff cannot establish his *prima facie* case of retaliation under either section of the statute.

1. Retaliation Claim Under § 4(4).

Plaintiff's retaliation claim under section 4(4) of Chapter 151B begins and ends with Plaintiff's failure to establish the elements of his *prima facie* case of retaliation. The basis for Plaintiff's claim of retaliation, as set forth above, is that MART retaliated against Plaintiff because he complained of discrimination on March 24, 2017, or by email dated August 24, 2016, or both by limiting his ability to work through the online portal system, and by not offering CCRD sufficient trips either through MART's online vendor portal or the IVR system, the same actions Plaintiff complained of from almost the outset of CCRD's contract with MART. **SOF, ¶¶ 38-40, 46, 47-49, 53, 60**.

For purposes of this Motion, MART does not dispute that Plaintiff engaged in protected conduct by submitting his March 24, 2017, letter to MART's Title VI Civil Rights Officer or for that matter when he alleged he was being discriminated against in his August 24, 2016 email to Ms. Badgley, and therefore can establish the first element of his *prima facie* case of retaliation. However, Plaintiff will not be able to prove the second essential element of his *prima facie* case because, based on the undisputed facts, Plaintiff did not suffer from an adverse action following Plaintiff's complaints. In fact, after Plaintiff sent his email to Ms. Badgley on August 24, 2016, Plaintiff's transaction history shows, that Plaintiff's company CCRD, earned more money for work performed pursuant to the Vendor Agreement than before he complained **SOF, ¶ 65**. In his lawsuit filed in Suffolk Superior Court Paul Jones v. Montachusett Regional Transit Authority, Suffolk Superior Court CA No. 2184CV01662, Plaintiff alleges that he worked forty to sixty hours for MART 365 days a year, certainly more than he worked prior to August 24, 2016. **SOF ¶ 66**. While

Plaintiff would have preferred to receive more offers of trips, the evidence shows that Plaintiff turned down trips offered to CCRD, Inc. If he had accepted some of those offered trips, CCRD would have earned even more for work performed pursuant to the Vendor Agreement after he complained of discrimination. **SOF, ¶ 45, 46, 60**,

In addition, Ms. Badgley reviewed the concerns raised by Plaintiff in his August 24, 2016, email and in response to his Title VI Complaint sent to MART's Title VI Civil Rights Officer on March 24, 2017. **SOF, ¶¶ 43-44**. Ms. Badgley did find that on May 2, 2016, CCRD's max capacity was set to 0 mistakenly which was the cause of the message "you cannot change capacities as it has been locked by MART", but Ms. Badgley remedied that on August 25, 2016 and the issue was resolved. **SOF, ¶ 44, Exhibit 18, p. 2**. Because "CCRD's capacity was accidentally set to 0, the low-cost auto assign program skipped over CCRD's rates from the period of May 2 to August 25th when it was corrected. However, scheduler call-outs for same-day, next-day trips would have still occurred even with 0 capacity as the vendors' rate for a trip will still be seen in the calculated rate drop-down list for schedulers to see and call the vendors in order from lowest." **Id.** Ms. Badgley reviewed Plaintiff's concerns raised both before and after he complained of discrimination, and other than the setting of capacities to 0 between June 2, 2016 to August 24, 2016, found that CCRD was being assigned fewer trips than he would have liked because his rates were simply too high and/or he misunderstand how the portal system operated and how trips were assigned to MART vendors. **SOF, ¶¶ 44, 47, 49, and 60**.

Based on the evidence, not mere allegations, Plaintiff cannot rebut that the reason CCRD did not receive as many requests for rides through the vendor portal or the IVR system or both before and after Plaintiff complained of discrimination was predominantly because CCRD had higher vendor rates than other transportation providers and because of his capacities, including but

not limited to CCRD's work hours set by Plaintiff, the number of vehicles and the areas in which Plaintiff was willing to work. **SOF, ¶¶ 44, 47, 49, 52, 53, 60, and 62**. Rather than retaliate because the Plaintiff alleged discrimination, Ms. Badgley analyzed the online portal system, noticed that the rates submitted by Plaintiff on behalf of CCRD were higher than several other vendors, and explained to Mr. Jones that this was why he was not being offered rides ahead of time, except for the same-day or next-day rides that other, lower-cost vendors were unavailable for. Ms. Badgely and others repeatedly told Plaintiff that MART did not have the ability to build CCRD's schedule for him or provide trips in a specific geographical area as the trips were all medical appointments that could change in volume and location on a daily basis. **SOF, ¶¶ 44, 47, 52, 53, 60, and 62**. Ms. Badgley, recognizing that some of the issues raised by Plaintiff appeared to be due to his not fully understanding how to use the vendor portal system, arranged for Plaintiff to receive one-on-one training with Robert Monk in May 2018 and authorized a third training in July 2018. **SOF, ¶¶ 37, 50, 52, 54, and 55**. This was after Plaintiff complained of discrimination. In fact, after Plaintiff complained of discrimination, Ms. Badgley and others continued to work with Plaintiff, explaining to him reasons why CCRD was not being offered more rides and explaining various MART policies; for example, its policy of issuing fines to vendors or for shared rides. Plaintiff received additional Vendor Portal training and Ms. Badgley and other MART employees continued to emphasize to Plaintiff that everything is assigned via low-cost qualified bid process based off of vendor rates as trips are received. **SOF, ¶¶ 44, 47, 49, 50, 52, 53, 60, and 62**.

Finally, to the extent that Plaintiff alleges that CCRD was put on hold (according to Plaintiff he was terminated by MART) after he complained of discrimination, the undisputed evidence is that CCRD was put on hold because MART was notified on April 22, 2020, that CCRD, Inc.'s workers compensation insurance was cancelled on April 15, 2020. Plaintiff did not

provide MART with documentation that CCRD, Inc had obtained workers compensation insurance after April 15, 2020. **SOF, ¶ 9**.

There is simply no evidence by which Plaintiff can show that he suffered an adverse action after he complained of discrimination or that any such adverse action was causally related to his discrimination complaint. Because Plaintiff cannot establish the elements of his *prima facie* case of retaliation, judgment should enter in favor of MART on Plaintiff's claim brought pursuant to G.L. c. 151B, § 4(4).

Assuming arguendo that Plaintiff succeeds in establishing his *prima facie* case of retaliation, the burden shifts to the defendant to present evidence of a legitimate, non-discriminatory reason for the action. Audette v. Town of Plymouth, 858 F. 3d 13, 23 (2017). If the defendant provides such a reason, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the defendant's purported reason was merely pretextual. *Id.* Here, MART has presented clear evidence of a legitimate, non-retaliatory reason for CCRD not being offered more rides than Plaintiff desired – CCRD's higher rates, as well as CCRD's limited capacities. Because rides are offered based on a "low-cost" system, the online portal was not assigning CCRD rides, not due to any retaliatory motive on MART's part but, due to CCRD's rates, due in part to CCRDs hours of operations, and due in part to a vendors' capacity tables. As MART employees repeatedly advised Plaintiff, MART could not create Plaintiff's schedule or ensure that the trips offered were cost effective. **SOF, ¶¶ 33-36, 47, 49, 52, 53, 54, 60, and 62**. As such, there was plainly a plausible, legitimate, and nonretaliatory justification for Plaintiff not being offered more trips than he would have liked even given the increase in the amount MART paid CCRD pursuant to the Vendor Agreement after Plaintiff complained. **SOF, ¶ 65**.

Because MART has presented evidence based on the undisputed material facts of a legitimate, non-retaliatory reason for CCRD not being assigned more trips, the burden shifts back to Plaintiff to prove by a preponderance of the evidence that MART's purported reason was merely pretextual, that MART's purported retaliatory motive was a determinative factor in CCRD not being assigned more trips. Plaintiff cannot meet this burden, because Plaintiff has not and cannot proffer admissible evidence to show that MART's reasons were pretextual and that CCRDs failure to be assigned more trips was due to a retaliatory motive as opposed to Plaintiff's rates and capacities as set forth above. Plaintiff's conclusory allegations, at most, amount to no more than subjective feelings of disillusionment with MART and his hopes that CCRD would have been offered more trips and offered trips that he believed to be cost effective.

Because Plaintiff cannot make out a *prima facie* case of retaliation and, even if he could, cannot show by a preponderance of the evidence that MART's legitimate non-retaliatory reason was pretextual, judgement must enter in favor of MART on Plaintiff's claim pursuant to section 4(4) of Chapter 151.

2. Interference Claim Under § 4(4A).

Plaintiff also purports to have brought a claim under § 4(4A) of Chapter 151B which makes it unlawful for "any person to coerce, intimidate, threaten, or interfere with another person in the exercise or enjoyment of any right granted or protected by [G.L. c. 151B], or to coerce, intimidate, threaten or interfere with such other person for having aided or encouraged any other person in the exercise or enjoyment of any such right granted or protected by [G.L. c. 151B]." G.L. c. 151B, § 4(4A). In this regard, Plaintiff's interference claim appears premised on the allegation of a hostile work environment based on MART's "refusing to train plaintiff properly, refusing to allow plaintiff to participate in Federal Funded Programs, refusing [to] communication with plaintiff,"

while at the same time, telephoning Plaintiff to offer next-day and same-day rights too frequently. [Dkt No. 55, at ¶ 227.] As the term is used in G.L. c. 151B, § 4(4A), "interfere" "is appropriately considered with, and interpreted in light of, the words 'coerce,' 'intimidate' and 'threaten' that precede it and that each implies some form of intentional conduct." Lopez v. Commonwealth, 463 Mass. 696, 708 (2012). Claims based on a violation of G.L. c. 151B, § 4(4) and 4(4A) are commonly called retaliation claims even though the statute does not use those terms. As with section 4(4), section 4(4A) essentially proscribes retaliation against those who exercise their rights under G.L. c. 151B. For the reasons set forth above discussing why judgement should enter in favor of MART on Plaintiff's claim brought pursuant to section 4(4), so too MART is entitled to summary judgment on Plaintiff's retaliation claim under section 4(4A) of Chapter 151B. Plaintiff has not and will not be able to produce admissible evidence to establish his *prima facie* case of retaliation because even if he did suffer an adverse action, which he did not, he will not be able to prove that any such adverse action was causally connected to his complaints of discrimination. Plaintiff, as set forth above, similarly will not be able to present evidence to show that MART's legitimate non-retaliatory reason for CCRD not being assigned more trips was a pretext. Further, under section 4(4A), Plaintiff cannot offer any admissible evidence that MART and its employees engaged in intentional conduct to retaliate against Plaintiff and to prevent CCRD from being assigned more trips. Instead, as repeatedly explained to Plaintiff, the online portal system as well as the IVR system utilize a bid process to assign rides based on the lowest cost qualified transportation provided dependent upon vendor rates and availability. CCRD's rates were simply too high. **SOF, ¶¶ 33-38, 47, 49, 52, 53, 54, 60, and 62.**[5] It is undisputed that Plaintiff was

[5] During his deposition Plaintiff testified when asked whether it was his testimony that those individuals for any specific job had rates that were higher than [his] responded, " not for any specific job". It is the specific job however that matters, because if another Vendor has a lower rate than CCRD for a specific job and has capacity, that Vendor will be offered the trip over CCRD. **SOF, Exhibit 5, p. 71**.

unhappy with the level of ride offers CCRD was getting (despite declining some offers and offers of standing orders) because CCRD's vendor rates were too high from the outset of the contract between MART and CCRD, Inc. Plaintiff's subjective complaints not only do not suffice to support a claim of retaliation or interference with protected rights, but Plaintiff also has not shown a causal connection between his complaining of discrimination and the complained of action or that the actions were taken to interfere with Plaintiff's rights under G.L. c. 151B. See Bain v. City of Springfield, 424 Mass. at 766 ("subjective or intangible impressions must not be considered in making out a case under the statute").

Accordingly, summary judgment on this claim, too, must enter for Defendants and Count V of Plaintiff's Verified Amended Complaint must be dismissed.

**D. Plaintiff's TCPA Claim Must Be Dismissed Because Plaintiff Consented to MART's Use of His Cellphone Number and Did Not Unambiguously Revoke His Consent Prior to June 19, 2020.**

Finally, Plaintiff's claims for the violation of the TCPA must be dismissed not only for all the reasons set forth in Defendants' prior Motion for Summary Judgment (Dkt. No. 166), but also because discovery has made clear that Plaintiff consented to MART using his cellphone number to offer Plaintiff trips as the Manager/Dispatcher of CCRD when he provided MART with the cellphone number and that Plaintiff did not unambiguously revoke consent for use of his cellphone number for that purpose until June 19, 2020, when he emailed Ms. Badgley, Ms. Shumovskaya, Ms. Torres, and Ms. Kukta -MART employees who he had been communicating with since 2016, requesting that they call CCRD's office number only. **SOF, ¶¶ 6, 7**. Certainly, discovery has made crystal clear that MART did not know or have reason to know that Plaintiff no longer wanted MART's IVR system to contact his cellphone number until Plaintiff sent an email on June 20, 2019, to the MART employees that he had been communicating with since 2016, Ms. Badgley,

Ms. Shumovskaya, Ms. Torres, and Ms. Kukta requesting that they call the office number only **SOF, ¶¶ 20, 28**. Prior to that, Plaintiff had never emailed them requesting that they not use his cellphone number, had never emailed the Division of Medical Assistance ("DMA") through the email address set up by MART for Vendors to communicate with DMA, had never sent a form provided by MART to all Vendors changing his telephone numbers and had continued to accept trips offered through the IVR system using his cell phone number. **SOF, ¶¶ 14, 20, 26, and 28**. If Plaintiff did not want MART's IVR system to call his cellphone prior to June 20, 2019, he could have easily used one of the above methods to unambiguously revoke his consent. The fact that Plaintiff purportedly sent certified letters to others was not adequate notification. This is particularly so, given Plaintiff's constant written communication with the above-referenced employees throughout the years, and given that immediately upon receiving Plaintiff's email requesting that MART use CCRD's office numbers only, MART took steps to remove Plaintiff's cellphone number from the IVR system. **SOF, ¶¶ 23-31**.

The First Circuit has stated that it "understand[s] consent to be an affirmative defense, which the caller has the burden to prove; lack of consent is not an element of the called party's claim." Breda v. Cellco P'ship, 934 F.3d 1, 5 n.4 (1st Cir. 2019). "The TCPA does not define prior express consent." Moskowitz v. Am. Sav. Bank, F.S.B., 37 F.4th 538, 541 (9th Cir. 2022). Some courts, then, have adopted the FCC's interpretation the text: "that a person who knowingly releases his number consents to be called at that number, and that consent is 'effective' where the responsive messages relate to the same subject or type of transaction as the messages that led to the response." Moskowitz, 37 F.4th at 542, quoting Van Patten v. Vertical Fitness Grp., *LLC*, 847 F.3d 1037, 1044-1045 (9th Cir. 2017) and *In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 7 F.C.C. Rcd. 8752, 8769 (Oct. 16, 1992).

Here, there is no dispute that Plaintiff knowingly provided MART with his cellphone number, therefore consenting to MART's calling him on his cellphone for purposes set forth in the Vendor Agreement, for ascertaining and accepting opportunities for rides to provide transportation services pursuant to the Vendor Agreement. **SOF, ¶6**. Specifically, the evidence is undisputed that the Plaintiff initiated contact with MART by providing his cell phone number to MART to obtain same-day or next-day rides under the terms of the Vendor Agreement between MART and CCRD, **SOF, ¶¶ 6, 27, 28, and 32**; Van Patten, 847 F.3d at 1046 (holding, as matter of law, that plaintiff "gave prior express consent" when he "gave his cellular telephone number for the purpose of a … contract with … defendant," reasoning that "transactional context matters in determining the scope of a consumer's consent to contact"); Moskowitz, 37 F. 4th at 542 (affirming grant of summary judgment for defendant where plaintiff "initiated contact with [defendant]" and "expressly consented" to receiving certain messages from defendant). See also, Lawrence v. Bayview Loan Servicing, LLC, 666 Fed.Appx. 875, 880 (11th Cir. 2016) ("[T]he provision of a mobile phone number, without limiting instructions suffices to establish the consumer's general consent to be called under the TCPA."); Miller v. Ginny's Inc., 287 F. Supp. 3d 1324, 1328 (M.D. Fla. 2017) (plaintiff provided defendant "with consent to call her using an ATDS by agreeing to the Credit Terms and providing [defendant] with her cell phone number in connection with the credit transaction").

The transactional nature of the parties' relationship here, and the explicit contract that CCRD, Inc. had with MART to provide transportation services, directly bears on the issue of consent and the nature of the calls that were sent to the Plaintiff's cell phone as CCRD, Inc.'s Manager/Dispatcher. Indeed, as the First Circuit noted in its decision to remand this case, the prior business relationship between the two parties is "relevant to the question whether Jones gave prior

express consent to receive the calls." Jones v. MART, Case No. 1234, at 6 (1st Cir. 2023). See also, Van Patten, 847 F.3d at 1046 ("a transactional context matters in determining the scope of a consumer's consent to contact"). The phone calls and voice messages sent to Plaintiff's cell phone thus were directly related to the terms of the Vendor Agreement, and MART's offers and Plaintiff's acceptance of rides for Plaintiff's business, CCRD, demonstrate that he had expressly consented to receive such calls from May of 2016 through June 20, 2019, in connection with the business relationship between MART and CCRD. **SOF, ¶¶ 6, 7**. No reasonable view of the evidence can suggest that express consent was not provided by the Plaintiff in connection with the work set forth in the Vendor Agreement between MART and CCRD.

While a "consumer" who has provided express consent to receive autodialed or prerecorded/artificial voice calls may revoke consent, Plaintiff did not use a reasonable method to revoke his consent, particularly given the business context here, and Plaintiff's numerous emails with MART employees over the years from 2016 to June 20, 2019 in which he never requested that they not contact him using his cellphone until June 19, 2020, and his continued acceptance of trips offered by MART's IVR system using his cellphone. **SOF, ¶¶ 22, 25,-27, 38-40, 45, 46, 48, 52-55**. Because Plaintiff did not let those with whom he was in regular email communication with know he was revoking his consent for their use of his cellphone number until June 20. 2019, because he never submitted a change form, changing his telephone numbers, and because he continued to accept numerous rides using his cellphone numbers, Defendants did not know or have reason to know that Plaintiff no longer wanted the IVR system to contact his cellphone telephone number. **SOF, ¶¶ 20-28, 45, 46, 48**. MART provided Vendors with multiple mechanisms to change their telephone numbers, such as emailing DMA through the email address set up for MART Vendors, **SOF, ¶ 31** or submitting a form to MART which Vendors submitted when

changing their rates or hours of operation **SOF, ¶ 26** or even emailing those with whom they were in continual contact with as Plaintiff did on June 19, 2020. **SOF, ¶ 20** Plaintiff did not avail himself of any of these options to change CCRD's telephone numbers until June 20, 2019. **SOF, 24-26**.

While Plaintiff has produced two green cards signed by MART's administrative staff in Accounts Receivable, the letters were not addressed to the appropriate persons – the MART employees Plaintiff had been communicating with, and there is no evidence that the letters were actually opened or were directed to the appropriate individuals.[6] More important, Plaintiff knowing that MART's IVR system continued to call his cellphone, did not send an email to the individuals he regularly communicated with to ask that his cellphone not be called until June 20, 2019, Plaintiff continued to accept trips when the IVR system called his cellphone, and did not email DMA or submit a form to MART seeking to have his cellphone number changed as he did to change CCRD's work hours and rates prior to sending the email on June 20, 2019. **SOF, ¶¶ 25-28.** It is telling that when that email was received, MART removed Plaintiff's cellphone from the IVR system. Had Plaintiff emailed DMA, Ms. Badgley, Mr. Monk, Ms. Shumovskaya or the others he regularly communicated with prior to June 20, 2019, that he did not want MART's IVR system to contact his cellphone, MART would have removed it from the IVR system. **SOF, ¶¶ 28-30**.

MART has established that Plaintiff had several reasonable, easy and accessible methods to let MART know to remove his cellphone number from the IVR system. Plaintiff did not avail himself of any of those reasonable methods prior to June 20, 2019, despite his email communications with various MART employees. Plaintiff did mark his capacities as full as

---

[6] One of the Green Cards produced that was accepted by Aliceson Hill on February 17, 2017, was addressed to Crystal Geisert who Plaintiff did communicate with on occasion. However, Ms. Geisert left her employment with MART shortly after February 17, 2017. Regardless, there is no evidence that the certified letter was forwarded to her.

advised by Ms. Shumovskaya among others so that MART's IVR system would not call his cellphone, but Plaintiff removed that marking, and by doing so agreed to again receive calls from the IVR system on his cellphone. **SOF, ¶¶ 23, 24**. Even Mr. Roman testified at his deposition that Vendors had autonomy to change their telephone numbers at any time. **SOF, ¶ 20**. Until June 19, 2020, Plaintiff did not autonomously change his telephone number. Despite communicating with the proper employees for two or more years after he sent the certified letters, he did not advise them in his numerous email communications that he was revoking his consent for MART's IVR system to call his telephone number. Even when he complained to Ms. Shumovskaya in an email dated July 14, 2017, about the number of calls he was receiving from the Automatic Dialing system while driving, he did not ask her to remove his cellphone from the IVR system. **SOF, ¶ 45**. Similarly, in an email to Ms. Badgley on October 2, 2017, Plaintiff informed her that 90% of trips given to CCRD were by the Automatic Dialing system, but did not tell her to remove his cellphone number from the IVR system or that he did not want MART to contact his cellphone. **SOF, ¶ 46**. When Plaintiff submitted a form requesting to change CCRD's hours of operate and rates, Plaintiff did not request that MART change CCRD's telephone numbers and not call his cellphone. **SOF, ¶ 28**.

"Revocation of consent must be clearly made and express a desire not to be called or texted." See Id. at 1048; see also, Martinez v. TD Bank USA, N.A., 2017 WL 2829601 at *5-*6 (D., N.J. June 30, 2017) (Whether fax number in question was a reasonable method of informing Defendants that Plaintiff was revoking her consent. (United States District Court, D. New Jersey, 2017). As set forth above, Plaintiff could have made clear in a number of ways that he did not want MART to have its IVR system contact him on his cell phone. He availed himself of none of them, continuing to communicate regularly with Ms. Badgley, Mr. Monk, Ms. Shumovskaya and others

without informing them not to use his cellphone number until June 20, 2019. They had no reason to know that Plaintiff had revoked his consent for MART's IVR system to contact him using his cellphone number particularly because Plaintiff continued to accept offers of rides through the IVR system using his cellphone number up and until June 19, 2020. **SOF, ¶¶ 27, 29**.

MART has fulfilled its burden of showing that it did not know and had no reason to know that Plaintiff revoked his consent. First the two employees who signed for the certified letters were administrative staff in Accounts Receivable, not the Brokerage Division. **SOF, ¶ 33**. Second, Plaintiff despite his numerous email communications with MART employees and for that matter with HST, never requested in writing in any of his emails that MART not use his cellphone number. This is true even when Plaintiff complained that MART's IVR system was calling him when he was driving. **SOF, ¶¶ 45, 46**. Third, Plaintiff was instructed that the IVR system would not call his cellphone if he marked his capacity as full and Plaintiff availed himself of that option on occasion, again never emailing the MART employee who advised him of that option that he did not want MART to call his cellphone. **SOF, ¶¶ 23, 24.** Fourth, Plaintiff did not communicate with DMA that he wanted his telephone number changed and his cell phone number removed in the email box set up for Vendors to communicate such requests. **SOF, ¶ 21**. Fifth, and perhaps most important, from 2016 until June 20, 2019, Plaintiff continued to accept trips offered to CCRD through MART's IVR system using his cellphone, at times complaining that 90% of the trips offered to CCRD were though the IVR system. **SOF, ¶¶ 45, 46**. Sixth, Plaintiff knew how to contact MART to change CCRD's rates, hours of operations and drivers, and did not use those methods to inform the Department of Medical Assistance or MART of a change phone number. **SOF, ¶¶ 20, 21, 23**. Finally, when Plaintiff emailed the MART employees that he emailed regularly, that he wanted MART to call CCRD's office number only, MART immediately removed

Plaintiff's cellphone number from MART's IVR system which did not contact Plaintiff on his cellphone again. **SOF, ¶¶ 25, 29.**

Clearly, MART has met its burden of showing through admissible evidence that the Defendants did not know and did not have reason to know that Plaintiff no longer wanted MART's IVR system to contact him using his cellphone number to offer CCRD trips pursuant to the Vendor Agreement up and until Plaintiff sent his June 20, 2019, email, at which time MART removed Plaintiff's cellphone number from its IVR system. **SOF, ¶¶ 29, 30.**

Accordingly, because the admissible evidence shows that Plaintiff consented to MART's use of his cellphone number for purposes of the Vendor Contract and because it shows that Defendants did not know and did not have reason to know that Plaintiff was revoking that consent until his June 29, 2020 email at which time MART removed Plaintiff's cellphone number from the IVR system, Defendants' renewed summary judgment on Plaintiff's claim brought pursuant to the TCPA contained in Count I of his First Amended Complaint should be granted and judgement entered in Defendants favor.

## III. CONCLUSION

For the above reasons, MART respectfully requests that this honorable Court grant Defendants' Renewed Motion for Summary Judgment and enter judgement in favor of the Defendants on Count I of the Plaintiff's First Amended Complaint [Dkt No.7], and on Counts V and VI of Plaintiff's Second Verified Amended Complaint [Dkt No. 55].

Respectfully submitted,

DEFENDANTS,
MONTACHUSETT REGIONAL TRANSIT AUTHORITY et al,

By their attorneys,

Mark R. Reich (BBO# 553212)
Deborah I. Ecker (BBO# 554623)
KP Law, P.C.
101 Arch Street, 12th Floor
Boston, MA 02110-1109
(617) 556-0007
mreich@k-plaw.com
decker@k-plaw.com

Dated: September 28, 2026

493204574-356/37800/0006

CERTIFICATE OF SERVICE

I certify that the above document will be served upon any other party or counsel of record who is not being served by the Court's ECF system, upon notification by the Court's ECF system of same.

Mr. Paul Jones
pj22765@gmail.com

*/s/ Deborah I. Ecker*